**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**WINSTON-SALEM DIVISION**

| IN RE:<br><br>**Renegade Holdings, Inc., et al**<br><br>Debtors | **Case No. 09-50140**<br>**Consolidated for Administration**<br>**Chapter 11** |
|---|---|
| **AMENDED DISCLOSURE STATEMENT FOR DEBTORS'**<br>**AMENDED JOINT PLAN OF REORGANIZATION DATED OCTOBER 1, 2009** ||

Now come Renegade Holdings, Inc. ("RHI"), Alternative Brands, Inc. ("ABI") and Renegade Tobacco Co. ("RTC" and collectively, the "Debtors"), pursuant to 11 U.S.C. Section 1125 and Rule 3016 of the Federal Rules of Bankruptcy Procedure, and respectfully provide the following Disclosure Statement regarding the Debtors' Amended Joint Plan of Reorganization dated October 1, 2009 (the "Plan"). **A copy of the Plan is attached hereto as Exhibit 1 and incorporated by reference.** Capitalized terms are defined in the Plan and shall have the meanings set forth therein.

<u>INTRODUCTION</u>

On January 28, 2009, the Debtors filed voluntary petitions seeking relief under Chapter 11 of the Bankruptcy Code and an Order for relief was entered in each proceeding. The cases were consolidated for purposes of administration, and the Debtors continued in possession of their assets and operate their business as debtors-in-possession. Pursuant to various orders entered by the Court in response to the Debtors' motions and after notice and hearing, the Debtors obtained authority for use of cash collateral, assumed or rejected certain executory contracts and leases, and otherwise complied with all requirements for operation and filing of necessary reports with the Court as mandated by the Bankruptcy Code, the Bankruptcy Rules, and Local Rules of the Court.

The Debtors have filed the Plan as a plan of reorganization, pursuant to which the Debtors will restructure and pay secured and unsecured creditors as set forth in the Plan and summarized below. All creditors and other parties in interest are encouraged to read the Plan carefully and thoroughly, and to review the Plan with their attorneys or other advisors to

ascertain its terms, provisions, and conditions and the effect of the Plan on any Claims or Equity Interests which such persons may possess.

Pursuant to the Bankruptcy Code, this Disclosure Statement has been presented to and approved by the Court. Such approval is required by statute and does not constitute a determination by the Court as to the desirability of, or the value, adequacy, or suitability of any consideration offered under the Plan, but does indicate that the Court has determined that the Disclosure Statement contains adequate information to permit those claimants and other parties in interest whose acceptance of the Plan is solicited pursuant to this Disclosure Statement to make an informed judgment about the Plan.

The Debtors prepared this Disclosure Statement to disclose that information available which, in the Debtors' opinion, is material, important and necessary to an evaluation of the Plan, and the material herein contained is intended solely for this purpose and the use of known creditors and equity interest holders of the Debtors. This Disclosure Statement may not be relied upon for any purpose other than a determination of how to vote on the Plan. Furthermore, the matters addressed and the discussions contained in this Disclosure Statement are not necessarily sufficient for the formulation of a judgment by any creditor or equity interest holder of whether the Plan is preferable to any alternative thereto. However, the Debtors as the proponent of the Plan support the Plan for the reasons explained herein and encourage each creditor, equity interest holder, or other party in interest to accept the Plan by timely returning a ballot in favor of the Plan.

The Disclosure Statement is submitted in accordance with § 1125 for the purpose of soliciting acceptance of the Plan from holders of certain classes of claims and equity interests. The persons whose acceptance is sought are those whose claims or interests are "impaired" by the Plan; *i.e.*--those whose claims or equity interests are altered by the Plan or who will not receive under the Plan the allowed amounts of their respective claims or equity interests in cash. Holders of those claims and interests which are not "impaired" are automatically deemed to have accepted the Plan.

If the Plan is rejected by one or more impaired classes of claims or equity interests, the Plan or a modification thereof may still be confirmed by the Court if the Court determines, among other things, that the Plan does not discriminate unfairly and is fair and equitable with respect to the rejecting class or classes of claims or interests impaired by the Plan. The Debtors

will request such a determination (commonly referred to as a "cram down") if the Plan or modification thereof is not accepted by one or more of the impaired classes of claims or interests.

If the Plan or any modification thereof is not accepted by one or more of the impaired classes of claims or interests and is not confirmed by the Court pursuant to the cram down provisions of the Bankruptcy Code, the Debtors may seek to modify the Plan or may convert this case to a proceeding under Chapter 7, in which event the Chapter 7 trustee would wind down operations, liquidate all assets and pursue all necessary litigation.

By separate Order served on all parties in interest, the Court set a hearing to consider confirmation of the Plan. A creditor or equity interest holder, in order to vote, must file a Proof of Claim or Interest on or before the date set as the "bar date" for filing all claims. The bar date for filing claims against the Debtors (other than claims asserted by governmental units) has been set by the Court as May 25, 2009. No bar date was initially set by the Court as to governmental units. Rule 3002(c) provides that a proof of claim filed by a governmental unit is timely filed if it is filed not later than 180 days after the order for relief (i.e., July 27, 2009). However, the Plan proposes a "Claims Bar Date" which shall be, as applicable, (i) with respect to all creditors except a governmental unit, May 25, 2009, (ii) with respect to a governmental unit, November 1, 2009, or such other date as may be set by the Court, and (iii) with respect to claims arising from the rejection of any lease or executory contract, sixty (60) days from the Confirmation Date, or such other (whether earlier or later) deadline as may be set by the Court generally or with respect to any lease or contract rejected

Any creditor or equity interest holder whose claim or interest is listed in the schedules filed by the Debtors and <u>not</u> identified as disputed, unliquidated or contingent is <u>deemed</u> (to the extent so scheduled) to have filed a claim, and absent objection such claim is deemed allowed and entitled to vote.

A creditor or equity interest holder may vote to accept or reject the Plan by filling out and mailing (as instructed thereon) the ballot which has been provided with this Disclosure Statement. The Court has set the time by which ballots must actually be filed; and, any ballots received after such time may not be counted. Regardless of whether a creditor or interest holder votes against the Plan, or whether the creditor or interest holder votes at all, such persons will be bound by the terms and treatment set forth in the Plan if the Plan is confirmed by the Court.

Allowance of a claim or interest for voting purposes does not necessarily mean that all or a portion of the claim will be allowed or disallowed for distribution purposes. The Debtors or any party in interest may file an objection to a claim, which will then be allowed or disallowed by the Court after notice and an opportunity for hearing. Tax consequences of any of the transactions proposed by the Plan will depend upon the individual circumstances applicable to each creditor, equity interest holder, or other party in interest, and must of necessity include factors beyond the Debtors' knowledge. A general discussion of potential tax consequences is contained in the Disclosure Statement.

The various claims of creditors and interests of equity interest holders are all treated under the proposed Plan. There are additional significant provisions contained throughout the Plan that impact the treatment of creditors and equity interest holders--please read the Plan carefully to fully understand its terms. The Plan proposes segregation of the creditors into separate classes, with an additional class comprising the equity interests.

The Debtors or others may solicit your vote for or against the Plan. The cost of any solicitation by the Debtors will be borne by the Estate. No other additional compensation shall be received by any party for any solicitation other than as disclosed to the Court.

**Consummation Of The Plan Is Subject To Numerous Conditions And Variables, And There Can Be No Assurance That The Plan, As Contemplated, Will Be Effectuated. No Representations Or Assurances Concerning The Plan Are Authorized By The Debtors Other Than As Set Forth In This Disclosure Statement. Any Representations Or Inducements Made By Any Person To Secure Your Vote Which Are Other Than Herein Contained Should Not Be Relied Upon By You In Arriving At Your Decision, And Such Additional Representations Or Inducements Should Be Reported To Counsel For The Debtors, Who In Turn Shall Convey Such Information To The Court For Such Action As May Be Deemed Appropriate.**

Certain materials contained in this Disclosure Statement may have been taken directly from other, readily accessible instruments or digests of other instruments. In addition, other information may be made available, upon reasonable written request, to creditors or other parties in interest having standing to request such information. While the Debtors made every effort to retain the meaning of any such instruments or documents or the portions thereof reiterated herein, you are advised that any reliance on the contents of such other instruments or documents should be predicated on a thorough review of the instruments or documents themselves, including the Plan.

Case 09-50140    Doc 366    Filed 10/12/09    Page 4 of 30

## VOTING

If you are in one of the classes of creditors or other parties in interest whose interests are affected by the Plan, it is important that you vote. To vote to accept or reject the Plan, creditors and other persons or entities having claims against the Debtors falling within any of the impaired classes should indicate their acceptance or rejection on the appropriate ballot. Any persons holding claims in more than one impaired class must file one ballot for each such class. Additional ballots may be obtained by proper written request to John A. Northen, Northen Blue, L.L.P., Post Office Box 2208, Chapel Hill, North Carolina 27515-2208.

A class of claims will have accepted the Plan if it is accepted by class members holding at least two-thirds (2/3) in amount and more than one-half (½) in number of the allowed claims of such class voting on the Plan. A class of equity interests will have accepted the Plan if it is accepted by class members holding at least two-thirds (2/3) in amount of the allowed interests in such class voting on the Plan. You are, therefore, urged to fill in, date, sign, and promptly mail the enclosed ballot furnished to you.

**Please Be Sure To Properly Complete The Form And Legibly Identify The Name Of The Claimant Or Equity Interest Holder. Executed Ballots Must Be Received On Or Before The Return Date Set Forth In The Ballot. Completed Ballots Should Be Returned To The Address Specified On The Ballot. Since Mail Delays May Occur, It Is Important That The Ballot Or Ballots Be Mailed Or Delivered Well In Advance Of The Date Specified. Any Acceptances Or Rejections Of The Plan Received After The Date May Not Be Included In Any Calculation To Determine Whether The Creditors And Equity Interest Holders Have Voted To Accept Or Reject The Plan.**

**This Is A Solicitation By The Debtors Only And Is Not A Solicitation By The Attorneys, Accountants, Or Other Professionals Who May Be Employed By The Debtors, And The Representations Made Herein Are Solely And Exclusively Those Of The Debtors And Not Of Such Attorneys, Accountants, Or Other Professionals.**

## BACKGROUND AND HISTORY OF THE DEBTOR

Renegade Holdings, Inc. and its subsidiaries, Alternative Brands, Inc. and Renegade Tobacco Company, Inc., are leading fabricators and distributors of premium tobacco products. The company markets its cigarette and cigar brands through wholesalers and retailers in 19 states and for export. Alternative Brands, Inc. is also a high-quality state-of-the-art contract fabricator for private label brands of cigarettes and cigars.

For the last two years, Renegade Holdings, Inc. and affiliated companies have been involved in numerous litigation proceedings with various states over interpretation of various

provisions of the Master Settlement Agreement statutes. As a result, one of the affiliated entities filed for bankruptcy protection and was subsequently liquidated as a part of a negotiated settlement with the National Association of Attorney Generals. The Debtors' remaining listed brands were delisted in multiple states, which resulted in these brands being held out of the market for several months in 2007. The states required penalties of over $539,000 to be paid in order to relist the remaining brands. During this process the Debtors incurred over $2.3 million in legal fees.

Under the regulatory scheme implemented by the participating states in conjunction with the Master Settlement Agreement (the "MSA"), each of the MSA States requires that a Non-Participating Manufacturer (a "NPM") deposit into a segregated escrow account amounts which are equivalent to the payments which an Original Participating Manufacturer ("OPM") or a Subsequent Participating Manufacturer ("SPM") would have to pay to the MSA States under the MSA.[1]

The escrow deposits by the NPM are in effect held in a forced savings account, with interest available monthly to the NPM for its general business needs; and, the principal deposits made each year are held as a potential source of payment if and when the States assert a claim similar to those which could have been asserted against the OPM's or SPM's as described in the MSA. To the best of the Debtors' knowledge, no such claim has ever been asserted by a State against an NPM escrow account. After twenty-five (25) years, the principal amount for each year's deposit will be released to the NPM.

In order to determine the amount which an NPM should deposit in its escrow account under the applicable state statutes, the following sequence of events takes place:

1. An NPM applies to the Alcohol and Tobacco Trade Bureau (the "TTB"), the government agency charged with regulating the tobacco industry, for a Tobacco Processing License Number ("TP Number") which may be printed on the package for the registered brand.

2. An NPM submits to each state an application/annual certification, setting forth the brands which the NPM manufactures and intends to market for sale within the state. Each MSA State publishes and maintains a list of all brands permitted to be sold in the particular state, and the party that holds each such brand.

---

[1] Florida, Minnesota, Mississippi and Texas did not participate in the MSA, and consequently did not pass enabling legislation to impose escrow deposit obligations on Non-Participating Manufacturers with respect to such sales.

3.  The NPM sells cigarettes or roll-your-own ("RYO") under the NPM's brand to a distributor. The Debtors believe, although some MSA States contend otherwise, that at this stage no deposit is due under the State Escrows, and in fact there will not be any obligation to make a deposit unless and until the NPM's branded product is sold in an MSA State.

4.  The distributor sells the NPM's branded cigarettes or RYO to the public, by delivery to a retailer. At the end of the month in which the distributor's sale takes place, the distributor is required to file a report with the MSA State in which the sale took place. The distributor's report sets forth, by brand, the quantity sold in the particular state for the specific period covered by the report.

5.  The MSA State receives such reports from all the distributors making sales in that state, assembles and sorts the data by brand, and then on a quarterly or annual basis expects the NPM to make a corresponding deposit into the Escrow Fund.

Prior to this point, the NPM cannot be sure as to whether the brand will actually be sold in an MSA State or elsewhere.

The Debtors also ship contract manufactured products in bond to other licensed tobacco manufacturers, where (i) the Debtors are not identified as the manufacturer on the package, as the contract customer is the entity that controls or owns the manufacturing process with respect to that customer's brand, (ii) the contract customer's TP Number is printed on the package, (iii) the contract customer is the party required to apply and be responsible for the Brand(s) approved for sale and for the escrow payments, (iv) the distributor reports the eventual resale to the MSA States under the contract customer's brand name and TP Number, and (v) the MSA States expect the contract customer to make the applicable State Escrow deposit.

Thus, (i) the Debtors can project but cannot determine with certainty what amount of State Escrow deposits may be due from the Debtors or when they will be due, until such time as the distributor sells the Debtors' branded product in an MSA State and submits the appropriate report, and (ii) the Debtors believe, although some MSA States contend otherwise, that no State Escrow Deposits are due at all or at any time on sales of products manufactured under contract for a third party, shipped in bond, and distributed and sold under that third party's brand and TP Number.

During 2008, the Debtors were required to deposit nearly $5.7 million into the MSA escrow funds accounts, which now total $30 million. As of the commencement of these cases, the Debtors were also scheduled to make nearly $6.8 million of additional MSA escrow deposits for sales made during the calendar years of 2007 and 2008. In spite of these challenges, the Debtors concluded 2008 with improving volumes and operational cash flow, and overall prospects for recovery remain strong.

## SUMMARY OF THE PLAN

**The Following Is A Brief Summary Of Certain Provisions Of The Plan And Should Not Be Relied On For Voting Purposes In Lieu Of A Thorough And Comprehensive Review Of The Actual Plan Itself. The Summary Does Not Purport To Be Complete. Creditors And Equity Interest Holders Are Urged To Read The Plan To Ascertain The Effect Of The Plan On Their Claims And Interests And The Other Provisions Of The Plan. Creditors And Equity Interest Holders Are Further Urged To Consult With Their Attorneys, Tax Advisors, Financial Consultants, Or Other Professionals In Order To Understand More Fully The Plan Or The Effect Of The Plan As To Their Particular Situation.**

The Plan contemplates that the best opportunity for creditors lies in (i) continued operation of the business, (ii) modification and restructuring of the existing secured debt held by the primary lender, (iii) continued payment of existing loans secured by vehicles or equipment in accordance with the contract terms, (iv) satisfaction of Convenience Claims (less than $1,000 in amount) by a single cash payment, in full and with interest from the Petition Date, and (iv) satisfaction of Unsecured Claims, State Escrow Claims, State Penalty Claims and Guaranty Claims by payment, in full and with interest from the Petition Date, in minimum specified installments over various periods of time and additional payments as available from Excess Cash Flow (50% of surplus cash from future operations and 100% of any net recoveries on causes of action pursued by an Examiner).

If the Plan is confirmed, a claims review process regarding Allowed Claims is anticipated to take at least 120 days after the Confirmation Date, and the determination of Guaranty Claims may require an initial estimation and subsequent revision if warranted. Additional provisions of the Plan deal with Executory Contracts, Objections to Claims, Funding of the Plan, and Releases and Discharges. Pursuant to §1145(a), no specimen subscription agreement, offering memorandum or circular, or prospectus has been prepared because no outside third party has been solicited for purposes of contributing capital to fund the restructuring of the Debtors. The

Case 09-50140    Doc 366    Filed 10/12/09    Page 8 of 30

existing holders of Equity Interests will simply retain their interests, although the Equity Interests are pledged and any distributions to shareholders will be restricted.

The Debtors desire that this Plan be a consensual plan, with all classes of creditors voting to accept the Plan by the requisite majorities required under §1126. In the event any class does not accept the Plan, however, the Debtors intend to request that the Plan be confirmed by the cram down provisions of §1129(b) with respect to such dissenting class or classes. The Debtor reserves the right to modify the Plan pursuant to §1127, consistent with the requirement that the Plan, as modified, meets the requirements of §1122 and §1123.

**Classification and Treatment of Claims and Interests.**

For purposes of the Plan, Claims and Equity Interests are divided into the following Classes and will receive the following treatment. **A schedule of estimated claims is attached hereto as Exhibit 2.** The Reorganized Debtors may prepay any Allowed Claim, in part or in full, at any time and without penalty:

*__Unclassified Claims__*: Costs of administration and priority tax claims are not placed into classes for purposes of voting on the Plan, as the treatment of each is governed by specific provisions of the Bankruptcy Code.

Costs of administration as permitted under § 503 of the Bankruptcy Code consist primarily of (i) the fees and expenses of the attorneys, accountants and experts employed, which are determined by time expended and charged at their respective hourly rates, plus certain out of pocket costs, not to exceed reasonable compensation as determined by the Court after notice and hearing on a periodic basis, (ii) quarterly fees payable to the Clerk, filing fees for adversary proceedings, and other court costs, (iii) claims of vendors for goods supplied to the Debtors and received within 20 days prior to the Petition Date, (iv) costs of operating the business in the ordinary course, such as rent, storage, wages, utilities, supplies, etc., and (v) amounts due for Federal Excise Taxes, State Escrow Taxes, Tobacco Buy Out assessments, and State Escrows on post-petition sales, all as required by the applicable statutes.

Allowed Administrative Claims shall be paid in cash and in full, on the Effective Date or as soon thereafter as the same can be determined and allowed by the Court. The aggregate amount of Allowed Administrative Claims is difficult to predict, as the professionals' fees will be directly related to the time and effort necessary to pursue any needed litigation and reconciliation of claims, which in turn will be related to the defenses raised by the parties

Case 09-50140   Doc 366   Filed 10/12/09   Page 9 of 30

involved. In general, the Debtors estimate that accrued and unpaid professional fees as of the Effective Date will not exceed $125,000. State Escrows attributable to post-petition sales are to be deposited in an interim escrow account in accordance with the State Escrow Order and paid as and when due by transfer to the Debtors' existing escrow account maintained for that purpose.

Priority tax claims are those claims entitled to priority as set forth in § 507(a)(8) of the Bankruptcy Code. While there may be some priority tax claims allowed in this case, RHI (and as the parent of its wholly owned subsidiaries, ABI and RTC) is a Subchapter-S corporation and does not have any income tax obligations as the income (or loss) passes through to its shareholders in the same manner as a partnership. Any Allowed Priority Tax Claims shall be paid (i) in cash, (ii) with interest at the applicable statutory rate, and (iii) in quarterly or more frequent installments over a period not exceeding five (5) years from and after the Petition Date. The Debtors project that payments on Priority Tax Claims will total approximately $1,030,561.

***Classified Claims***: All remaining claims are separated into the following classes and treated as set forth below:

**Class 1** consists of the Secured Claims of Bank of the Carolinas ("BofC") with respect to (i) a Term Loan in the original principal amount of $3,675,000 (the "Term Loan") and outstanding balance as of the Petition Date of approximately $3,235,237, and (ii) a Revolving Line of Credit in the maximum amount and outstanding balance as of the Petition Date of approximately $3,000,000 (the "Revolving Line" and together with the Term Loan the "BofC Indebtedness"). At the Effective Date, BofC will apply all funds held in restricted accounts (approximately $1,804,000) to reduce the outstanding indebtedness, all outstanding principal on the Term Loan and the Revolving Line shall be combined as one New Term Loan in the amount of approximately $4,121,280, and the combined indebtedness will thereafter bear interest at an annual rate of 6.25%.

On the first day of the month following the Effective Date, the Debtors are to commence monthly payments of principal and interest sufficient to fully amortize the New Term Loan over a period of 60 months. The Debtors project that such payments on the BofC Indebtedness over the term of repayment will total approximately $5,101,162. Reasonable attorneys' fees and costs (estimated by the Debtors at approximately $15,000) will also be paid in full within 30 days after the Effective Date in an amount agreed to by the parties, subject to approval by the Court pursuant to Section 506. The attached projections reflect such anticipated payments.

BofC shall retain its liens on its existing collateral, including but not limited to the Debtors' accounts receivable, inventory, FF&E, general intangibles, and 51% of the Equity Interests. BofC shall also retain its lien upon interest income payable to the Debtors from the State Escrow accounts; provided however, absent default under the New Term Loan the interest on the State Escrow accounts will be payable to the Debtors.

**Class 2** consists of employee wage and benefit claims. As the Debtors intend to continue operations, these claims are and will continue to be paid in full and in the ordinary course and do not separately appear in the attached projections.

**Classes 3, 4, 5, 6 and 7** consist of claims based upon loans or similar credit arrangements secured by vehicles, a tractor/forklift, computer equipment, and a stamping machine. The Debtors presently intend to retain all the collateral securing these claims, and to pay the claims in accordance with the contract terms and in the ordinary course. The outstanding amount owed to the creditors in these classes as of the Petition Date was approximately $247,163. The Debtors project that aggregate payments on these claims will total approximately $244,203 over a period of approximately four years.

**Classes 8 and 9** consist of the Allowed Unsecured Claims. Those creditors holding claims less than $1,000 (Class 8, approximately $21,350 in the aggregate) will be paid in full, with interest from the Petition Date at 4.25%, within 30 days after the Effective Date. Creditors holding claims in larger amounts (Class 9, approximately $3,046,815 in the aggregate) will be paid in cash, in full, with interest from the Petition Date at 4.25%, in quarterly or more frequent installments of principal and interest sufficient to fully amortize the outstanding indebtedness over a period of sixty (60) months commencing twelve months after the Effective Date. In addition, the Debtors shall disburse to the holders of Allowed Unsecured Claims, State Escrow Claims, and Guaranty Claims, pro rata, Excess Cash Flow within six (6) months after the end of each calendar year after the Effective Date.

**Class 10** consists of the State Escrow Claims accrued and outstanding as of the Petition Date (approximately $7,692,039 in the aggregate), which amount shall be deposited in the State Escrow account in full, with interest from the Petition Date at the rate of 4.25% per annum, in quarterly or more frequent installments of principal and interest sufficient to fully satisfy such deposit obligations over a period of forty-eight (48) months on an seven year amortization schedule commencing thirty-six (36) months after the Effective Date and with payments

accelerated in 2016 to pay the balance in full. In addition, the Debtors shall disburse to the holders of Allowed Unsecured Claims, State Escrow Claims, and Guaranty Claims, pro rata, Excess Cash Flow within six (6) months after the end of each calendar year after the Effective Date.

The MSA States contend that the State Escrow Claims are not "claims" subject to restructuring under the Bankruptcy Code, but are instead regulatory obligations which may not be modified by the Court. If the MSA States were to prevail on this legal position, the Debtors would be unable to continue operations absent the consensual restructuring of such obligations and would be forced to cease operations and liquidate. The MSA States also may assert additional State Escrow Claims (and accompanying State Penalty Claims) based on contract manufactured sales, and based on sales data provided by the Debtors counsel for the MSA States have estimated that such additional State Escrow Claims may total as much as $4.97 million for prepetition sales and $2.62 million for post-petition sales, plus penalties. If such claims were asserted and allowed, the additional debt burden could force the liquidation of the Debtors in Chapter 7.

**Class 11** consists of the State Penalty Claims. As of the Petition Date there was one proceeding regarding State Escrows and associated interest and penalties pending in Missouri, which has not yet been resolved. No penalties have been assessed with respect to the State Escrow Claims which were not past-due as of the Petition Date, and the Debtors contend that no penalties can be asserted or imposed with respect to such prepetition State Escrow Claims if the Plan is confirmed and the Debtors make the payments required with respect to such State Escrow Claims.

In the event there are any allowed State Penalty Claims, such amounts will be paid to the holders of such claims, in full, with interest at the rate of 4.25% per annum, in quarterly or more frequent installments of principal and interest sufficient to fully satisfy such deposit obligations over a period of forty-eight (48) months commencing thirty-six (36) months after the Effective Date. Consistent with the subordinated position of penalty claims generally as provided in Section 726 of the Bankruptcy Code, the State Penalty Claims do not participate in any distribution of Excess Cash Flow until payment in full of Allowed Unsecured Claims, State Escrow Claims, and Guaranty Claims. As noted above, the potential for allowance of State Penalty Claims in a large amount could force the liquidation of the Debtors in Chapter 7.

**Class 12** consists of the holders of Guaranty Claims, those parties holding claims against the Debtors based on a guaranty of payment of obligations of any person or entity other than the Debtors. The Debtors obligations on the Guaranty Claims shall be deemed a guaranty of collection, rather than a guaranty of payment. The Court shall estimate, after notice and one or more hearings, each Guaranty Claim for purposes of voting, confirmation and distributions, pursuant to § 502(c) of the Bankruptcy Code, after taking into account all relevant factors, such as:

1. Whether the primary obligor is current or in default on the payment obligations guaranteed by the Debtors, and the prospect for future payment on the obligations by the primary obligor.

2. The value and expected disposition of the collateral, if any, securing the Guaranty Claim, if the obligation is in default.

3. The ability or expectation that the primary obligor and/or the collateral will satisfy the Guaranty Claim, in part or in full, and the expected deficiency.

Any other matters relevant to the estimation of any potential deficiency which the holder of the Guaranty Claim may suffer and be entitled to receive payment from the Debtors in satisfaction thereof.

The Debtors anticipate that the Guaranty Claims can be reconciled by agreement or by estimation within six months after the Effective Date; however, the Court shall retain jurisdiction to revise the estimation of any Guaranty Claim until such time as the Court enters a Final Decree.

Holders of Allowed Guaranty Claims will be paid in cash, in full, with interest from the Petition Date at 4.25%, in quarterly or more frequent installments of principal and interest sufficient to fully amortize the outstanding indebtedness over a period of sixty (60) months commencing twelve (12) months after the Effective Date. In addition, the Debtors shall disburse to the holders of Allowed Unsecured Claims, State Escrow Claims, and Guaranty Claims, pro rata, Excess Cash Flow within six (6) months after the end of each calendar year after the Effective Date.

Due to the potential payment of such claims by the primary obligors and/or collateral securing such claims, the Debtors estimate that approximately $2,897,213 will be paid to holders of Guaranty Claims over a period of five years. However, there is a wide range of potential exposure to such Guaranty Claims and in the event the aggregate amount of such claims exceeds

the initially estimated amount, the Debtors may have to modify the Plan to provide for a longer period of repayment for Guaranty Claims and allowance of such claims in a large amount could force the liquidation of the Debtors in Chapter 7.

The Debtors believe that a lengthy analysis of each potential Guaranty Claim would not materially assist creditors in voting on the proposed Plan, but for informational purposes the following summary is provided:

1. American Western. This claim was filed in the amount of $1,505,000, and has been estimated by the Debtors at the full amount of the scheduled claim. The claim arises from two promissory notes in favor of American Western and executed by House of Windsor, LLC and Calvin Phelps in connection with an asset purchase in May 2008, and is secured by the assets purchased by House of Windsor, LLC. The Debtors do not expect that House of Windsor, LLC and/or Calvin Phelps will be able to satisfy this obligation in accordance with the terms thereof.

2. Bank of Granite. This claim was filed in the amount of $353,569, and has been estimated by the Debtors at $200,000. The claim arises from a loan made to North West Holdings, LLC, secured by an airplane (Mitsubishi MU2) now located at the Mitsubishi Service Center in Tennessee for service and repairs. The estimated claim is the projected deficiency after the collateral is liquidated.

3. Carolina Bank. This claim was filed in the amount of $1,874,909, and has been estimated by the Debtors at $673,767. The claim arises from a loan made to Blue Ridge Airlines, LLC, secured by an airplane (2008 Eclipse 500LX) now in the possession of the secured creditors. The estimated claim is the projected deficiency after the collateral is liquidated, taking into consideration potential recoveries by this creditor from other obligors.

4. Hauni Richmond. This claim was filed in the amount of $484,985, and has been estimated by the Debtors at $-0-. The claim arises from a sale of equipment by this creditor to PTM Technologies, Inc., and a promissory note executed by PTM as part of the purchase price. The Debtors expect PTM to pay such claim under such terms as may be negotiated between the parties; however, based upon the materials filed with the proof of claim, it appears that the Debtors did not execute any guarantee of the indebtedness.

5. Huntington Bank. This claim was filed in the amount of $514,206, and has been estimated by the Debtors at $-0-. This claim arises from financing arranged for PTM

Technologies, Inc. by Maxxus Capital Group, LLC for a group of lenders which includes this creditor, among others. The existing financing is being serviced by PTM and is not in payment default. The indebtedness is secured by equipment which is leased by PTM to the Debtors, and the lease payments are sufficient to cover the debt service.

6. Maserati Financial Services. This claim was filed in the amount of $129,620, and has been estimated by the Debtors at $25,000. The vehicle was abandoned by the Debtors and returned to the creditor for liquidation, and the Debtors have estimated a potential deficiency claim but no proof of claim has been filed by this creditor.

7. Southeast Toyota. This claim was filed in the amount of $19,515, and has been estimated by the Debtors at $5,000. The vehicle was abandoned by the Debtors and returned to the creditor for liquidation, and the Debtors have estimated a potential deficiency claim but no proof of claim has been filed by this creditor.

8. SunTrust Bank. This claim was filed in the amount of $4,167,380, and has been estimated by the Debtors at $-0-. This claim arises from four (4) loans made to Calvin Phelps and secured by various parcels of real property, including the property known as Chinqua-Penn Plantation ($2.0 million), 321 Farmington Rd. ($1.847 million), 41 Court Square ($138,000) and residential property in Wilmington ($186,000). The Debtors believe that the collateral securing the indebtedness is more than adequate to satisfy the indebtedness in the event of a payment default.

**Class 13** shall consist of Equity Interests in the Debtors. Holders of Equity Interests shall retain their interests subject to the following restrictions: (i) no dividend or other distribution (except for distributions in an amount necessary, if any, to defray any income tax obligations imposed on such Holders by reason of the Reorganized Debtors' net taxable income or such other taxable income that passes through to the holders of Equity Interests, including but not limited to earned interest on investments) unless and until all Allowed Claims have been paid or satisfied in accordance with the terms of the Plan; (ii) subject to the pledge or security interest in favor of BofC.

## MEANS FOR EXECUTION OF THE PLAN

All tangible and intangible assets of the Debtors shall vest in the Reorganized Debtors as of the Effective Date, except that certain assets and the right to pursue certain Bankruptcy Causes of Action will vest in the Examiner. The Reorganized Debtors shall continue the business

operations, which shall be the primary source of funds to consummate the Plan and provide payment to the holders of Allowed Claims as provided in the Plan.

*Regulatory Compliance.*

As noted above, the Debtors' obligations to timely deposit State Escrows have been a major issue over the years and have made a substantial impact on the Debtors' continued operations. Failure to comply with the State Escrow requirements can result in the Debtors' brands being delisted in the applicable state, which has the effect of immediately blocking any sales of such brands unless and until the problem is resolved. Thus, the success of the Plan is dependent upon continued compliance with applicable laws and regulations, and for that reason the Plan provides the following additional safeguards:

1. All post-petition, pre-confirmation obligations of the Debtors with respect to FET, SET, TBO or State Escrows must be paid as and when due.

2. Until such time as all State Escrow Claims have been satisfied as provided in the Plan, the Debtors must comply with the deposit and reporting requirements set forth in the Court's Order Regarding Post-petition Tax and Escrow Reserves entered March 31, 2009 (the "State Escrow Order").

3. Until such time as a Final Decree is entered in these cases, the Court shall have exclusive jurisdiction to resolve any dispute over prepetition or post-petition State Escrows which accrued prior to the Effective Date.

4. So long as the Debtors are in compliance with the Plan treatment of the State Escrow Claims and the State Penalty Claims, if any, the States as the holders of such claims shall not on the basis of the outstanding State Escrow Claims or State Penalty Claims (i) Delist the Debtors' brands, (ii) seize the Debtors' products, (iii) assess any additional penalty or interest other than as provided in the Plan, or (iv) bring any other regulatory enforcement action/remedy against the Debtors.

*Examiner:*

The Debtors are presently owed approximately $8.15 million from Calvin Phelps or entities owned or controlled by Mr. Phelps, and thus insiders or affiliates of the Debtors as those terms are defined in the Bankruptcy Code. Many if not most of these obligations represent funds which were invested in other ventures which have had limited success, and as the investments were made the Debtors booked the obligations and after year-end memorialized the obligations

Case 09-50140    Doc 366    Filed 10/12/09    Page 16 of 30

in the form of promissory notes. **A schedule of such notes receivable as of April 16, 2009 is attached hereto as Exhibit 3**.

The Plan provides for the appointment of a permanent Examiner, initially to be Gene B. Tarr, an experienced bankruptcy practitioner in Winston-Salem, NC, or such other individual as may be appointed by the Court after notice and hearing. In order to facilitate the reorganization process, the Debtors filed a motion seeking the appointment of Mr. Tarr as an Examiner in advance of the confirmation hearing with the following special powers:

1.  The power to investigate any transfers made or obligations incurred to or for the benefit of any Affiliate or Insider, including the right in connection with such investigation to subpoena documents and witnesses and examine parties pursuant to Rule 2004.

2.  The right to bring such actions, in his sole discretion, as may be necessary or appropriate to enforce and collect payments due to the Debtors pursuant to any outstanding promissory note, loan, or other obligation from any Affiliate or Insider.

3.  The power to pursue any claims or causes of action, in his sole discretion, which may be asserted on behalf of the Debtors and the Debtors' estates with respect to any transfers made to or for the benefit of any Affiliate or Insider, including but not limited to any claim or cause of action which may be asserted by a trustee or a debtor-in-possession under Sections 541, 542, 543, 544, 546, 547, 548, 549, 550, or 553 of the Bankruptcy Code.

4.  The power to compromise and settle any of the foregoing on behalf of the Debtors, subject to notice, hearing and approval by the Court pursuant to Rule 9019.

On the Effective Date, the loans and notes receivable from Affiliates and Insiders will be assigned to the Examiner and held for the benefit of creditors. The Examiner may enforce and bring such actions as may be necessary or appropriate to enforce and collect such obligations in accordance with the terms thereof. The Examiner shall also be vested with the power to pursue any causes of action, including Bankruptcy Causes of Action, on behalf of the Debtors and the Debtors' estates with respect to any Affiliate or Insider.

The Debtors believe that the notes receivable referenced above reflect all the transfers to Affiliates or Insiders which would potentially be recoverable either by the terms thereof or pursuant to Bankruptcy Causes of Action. In any event, the Debtors' projections as to cash revenues necessary to maintain operations and fund the Plan distributions to creditors are not dependent upon the collection of any amounts from Affiliates or Insiders, and any such revenues,

if realized, would provide additional cash to fund cost of operations and earlier payment of allowed claims.

At the same time, the Debtors have <u>not</u> provided for classification or payment of amounts due to Affiliates or Insiders, effectively subordinating such claims to the payment of Allowed Unsecured, State Escrow, State Penalty and Guaranty Claims. According to the consolidated financial statements, there are intercompany payables owed by the Debtors (i) to PTM Technologies, Inc. as of May 24, 2009 of $4,939,661 and (ii) to Dogwood Winery and Vineyards, Inc. as of such date of $71,037.

Until such time as there is a default by the Debtors with respect to payments due creditors under the Plan (a "Plan Default"), any payments received by the Examiner would be paid over to the Debtors for distribution pursuant to the Plan. However, upon receiving notice of a Plan Default from the Debtors or any other party in interest, the Examiner shall demand cure of such Plan Default within thirty (30) days, in the absence of which the Examiner may proceed with such actions, in his sole discretion, as may be necessary or appropriate to enforce the Plan, including but not limited to (i) collection of any amounts due to the Debtors, (ii) distributions to creditors in accordance with the Plan, (iii) seeking the conversion of the Bankruptcy Case to Chapter 7, and (iv) such other legal or equitable remedies as may be necessary or appropriate.

The fees of the Examiner shall be determined on an hourly basis at the customary rate charged at the time by the Examiner, and the Debtors shall pay such fees and reimburse the Examiner for actual and necessary expenses on a monthly basis without the necessity of any formal application to or approval by the Court; provided however, that any dispute as to such fees may be heard and determined by the Court upon request of any party in interest until such time as the Court has entered a Final Decree.

<u>*Funding on and after the Effective Date*</u>:

The Debtors believe that net revenues from ongoing business operations will generate sufficient funds to fund the payment obligations under the Plan, as shown in the attached projections discussed below. The Debtors have instituted a number of corrective measures so as to improve profitability and reduce or eliminate, to the greatest extent possible, any recurrence of the State Escrow shortfall going forward. The Debtors believe that the restructured operations will enable the Reorganized Debtors to meet the financial obligations under the Plan.

*Post-Confirmation, Pending or Threatened Litigation:*

The Debtors, and to the extent set forth above the Examiner, may continue, institute, or abandon such legal actions as the Debtors or the Examiner, as applicable, deem necessary unless expressly waived. All Bankruptcy Causes of Action shall be brought in the Court and shall be governed by Bankruptcy Rules 7001 et seq. Any compromise or other settlement of a controversy by the Debtors or the Examiner shall be approved in accordance with the Bankruptcy Rules.

At present, the Debtors do not anticipate any material recoveries or additional claims from pending or threatened litigation, nor does the Plan or the accompanying projections depend upon such recoveries, for a number of reasons:

1. No material transfers were made to non-insider creditors which would be deemed "preferential" within the meaning of Section 547 of the Bankruptcy Code.

2. Transfers made to or for the benefit of Insiders or Affiliates are reflected in the notes or accounts receivable which will be assigned to the Examiner, and no other causes of action (including Bankruptcy Causes of Action) against Insiders or Affiliates are known to the Debtors.

3. The Debtors believe that the Insiders and Affiliates who have obligations to the Debtors will not be able to satisfy their obligations at any earlier date than as set forth in the Related Party Notes, if at all.

*Executory Contracts and Leases:*

The Debtors have previously filed motions to assume or reject certain executory contracts and leases. The Plan provides that all executory contracts or leases which are (i) existing on the Effective Date, (ii) entered into in the ordinary course of business, (iii) are between one or more of the Debtors and one or more third parties, other than an Insider or Affiliate, and (iv) which have not been rejected or which are subject to a pending motion to reject as of the Confirmation Date, are and shall be deemed assumed by the Reorganized Debtors as of the Effective Date and any defaults shall be promptly cured as and to the extent required by Section 365 of the Bankruptcy Code. In the event there is any dispute regarding the cure amounts due on any lease or contract to be assumed, such dispute will be brought before the Court for a prompt determination.

The Plan provides that all executory contracts or leases between one or more of the Debtors and an Insider or Affiliate which are existing on the Effective Date shall be deemed rejected as of the Effective Date; provided however, the following executory contracts and leases with an Insider or Affiliate shall be deemed assumed by the Reorganized Debtor as of the Effective Date and any defaults shall be promptly cured as and to the extent required by Section 365 of the Bankruptcy Code:

Leases with Insiders or Affiliates: The leases of real property with Insiders or Affiliates which will be assumed by the Debtors, all of which are used for the Debtors for manufacturing, warehousing or office purposes, are shown below. Each of the leases with Mr. Phelps or with CLC Properties, Inc. (also an affiliate) requires the tenant to pay rent based on the amount of the debt service associated with the particular property, plus taxes, insurance and maintenance. The Debtors believe the rents are at or about market value, and no excess burden is placed upon the Debtors or provided to the related-party lessors as a result of the lease terms.

|   | Property Description | Lessor | Lessee |
|---|---|---|---|
| 1 | 195 Ken Dwiggins Drive, Mocksville, NC | Calvin A. Phelps | ABI |
| 2 | 163 Industrial Blvd, Mocksville, NC | Calvin A. Phelps | ABI |
| 3 | 325 Farmington Rd, Mocksville, NC | CLC Properties, Inc. | ABI |
| 4 | 321 & 323 Farmington Rd, Mocksville, NC | Calvin A. Phelps | ABI |
| 5 | 2605 US Hwy 601, Mocksville, NC | Calvin A. Phelps | RTC |
| 6 | 305 Farmington Road, Mocksville, NC | Quality Oil Co, LLC | RTC |

1. Bonded facility for tobacco operations and storage.
2. Storage.
3. Leaf tobacco operations.
4. Main corporate offices, factory and warehouse.
5. Retail and tax-paid product storage.
6. Convenience store.

Contracts with Insiders or Affiliates: The executory contracts or equipment leases with Insiders or Affiliates which will be assumed by the Debtors, all of which are necessary and important to the Debtors' business operations, consist of the equipment lease with PTM Technologies, Inc. This lease is on a month to month basis and requires a lease payment of $195,000 per month. The Debtors believe the lease payment is at or about market value, and no excess burden is placed upon the Debtors or provided to the related-party lessor as a result of the lease terms.

There are also some vehicle or equipment leases with third parties, none of whom are Insiders or Affiliates, which the Debtors have classified as secured claims and treated in Classes 3-7. The Debtors are dependent upon the leases and contracts identified above to maintain the business operations. It is quite possible that one or more of the Lessors may themselves experience financial difficulties and may be forced to file for protection under the Bankruptcy Code and may lose ownership or control of the leased assets to their respective secured creditors. The Debtors do not anticipate these events occurring, and even if such events occurred the Debtors expect that the secured creditors of such lessors would seek to preserve such leases in order to realize the economic value of the leases for the purpose of satisfying the debt obligations secured by the leased property or equipment. However, if the leased property or equipment were liquidated under such circumstances, the Debtors may not be then able to find adequate replacements and the business operations would be significantly impaired and may fail.

*Corporate Governance and Bylaws*

The Reorganized Debtors shall amend their respective Articles of Incorporation so as to contain a provision prohibiting the issuance of non-voting equity securities by the Reorganized Debtors for a period of one (1) year following the Effective Date. Calvin Phelps shall continue in office as the sole Director for each of the Reorganized Debtors. The present officers of the Debtors shall also continue as officers of the Reorganized Debtors, consisting of Calvin Phelps, CEO; W. Michael Mebane, President; Lisa Yamaoka, Secretary-Treasurer, at their existing levels of post-petition compensation as set forth in **Exhibit 4** subject to reasonable and necessary adjustments and bonuses from time to time in the Debtors' reasonable business judgment.

**FINANCIAL INFORMATION** The following information is available to creditors, equity interest holders, and other parties in interest:

*Monthly Reports.*

A monthly report has been and shall continue to be filed with the Court until the Confirmation Date. A quarterly consummation status report shall be filed on behalf of the Debtors until the filing of the Final Report, and thereafter shall be served upon the Examiner until such time as the Plan has been fully consummated.  The Debtors shall file such reports by the end of the month next following the report period, and at the same time shall serve a copy thereon upon the Bankruptcy Administrator and any other party in interest making a written request.

*Financial Information on Record.*

At or shortly after the Petition Date, the Debtors filed Schedules of Assets and Liabilities and Statements of Financial Affairs. The monthly reports, the Schedules of Assets and Liabilities, and the Statements of Financial Affairs may be inspected by interested parties in order to obtain a broader financial picture of the Debtors and the Debtors' estates. These may be examined on-line through PACER or in the office of the Clerk of Court. **The Debtors' audited financial statements for the year ended December 31, 2008 are attached as Exhibit 5, and the unaudited year to date balance sheets and income statements as of August 23, 2009, are attached as Exhibit 6.**

*Plan Projections and Liquidation Analysis.*

**Attached to the Disclosure Statement are projections prepared by the Debtors which are intended to illustrate the expected revenues and expenses (Exhibit 7) and debt service payments (Exhibit 8) required of the Reorganized Debtors to meet the financial obligations under the Plan.** Please note that the projections were necessarily prepared prior to completion of the claims deadline and claims reconciliation process, and thus are subject to fluctuations depending on the final amount of the allowed claims and the varying treatment offered under the Plan. The proposed Claims Bar Date for certain claims has not yet expired, and the aggregate amount of allowed claims cannot yet be finally determined.

In the event these cases were converted to Chapter 7, the Court would appoint a Chapter 7 trustee, who would cease all operations and then proceed to liquidate all property of the estate. The Chapter 7 trustee would also retain professionals to represent the trustee, such as attorneys and accountants, and the fees and expenses of the Chapter 7 trustee and the trustee's professionals would be Administrative Expense Claims having priority over any outstanding claims (except secured claims) or other administrative expenses incurred prior to the date of conversion to Chapter 7. **A Liquidation Analysis is attached as Exhibit 9.**

The Debtors believe that any such liquidation would bring little if any net proceeds into the estate. In particular, any party desiring to purchase the business operations as a going concern would likely be required to satisfy the secured claims of BofC and cure any shortfall in the State Escrows. Consequently, it is the Debtors' opinion that the best interests of all creditors, and especially the interests of creditors holding Unsecured Claims, are served through implementation and effectuation of the Plan.

Case 09-50140    Doc 366    Filed 10/12/09    Page 22 of 30

**Tax Consequences of the Plan**

The federal income tax consequences of the Plan are complex and subject to significant uncertainties. The Debtors have not requested a ruling from the Internal Revenue Service ("IRS") or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to any interpretation that the IRS may adopt. In addition, this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers. Furthermore, this discussion assumes that holders of Allowed Claims hold only Claims in a single Class. Holders of Allowed Claims in multiple Classes should consult their own tax advisors as to the effect such ownership may have on the federal income tax consequences described below.

There are certain anticipated U.S. federal income tax consequences of the transactions proposed by the Plan to the Debtors and holders of Allowed Claims and Equity Interest that are impaired under the Plan. This summary is provided for informational purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations promulgated thereunder, judicial authorities and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change or differing interpretations, possibly with retroactive effect. It does not address all aspects of federal income taxation that may be relevant to the Debtors or to a particular holder of a Claim or Equity Interest in light of its particular facts and circumstances or to certain types of holders of Claims subject to special treatment under the Tax Code.

Creditors holding Allowed Claims (whether Priority, Secured or Unsecured) will receive cash payments as provided in the Plan, and in some instances over a period of time with interest, which interest would be separately reportable as income to such creditors. The timing for recognition of revenues, gains or losses for income tax purposes is dependent upon the particular creditor involved and cannot be addressed by the Debtors due to the multiplicity of factors which may be involved. The amount of the income or gain, and its character as ordinary income or capital gain or loss, as the case may be, will depend upon the nature of the claim of each particular Creditor.

The method of accounting utilized by a Creditor for federal income tax purposes may also affect the tax consequences of a distribution. In general, the amount of gain (or loss)

Case 09-50140    Doc 366    Filed 10/12/09    Page 23 of 30

recognized by any such Creditor will be the difference between (i) the Creditor's basis for federal income tax purposes, if any, in the Claim; and (ii) the amount of the distribution received. Whether the distribution will generate ordinary income or capital gain will depend upon whether the distribution is in payment of a Claim or an item which would otherwise generate ordinary income on the one hand or in payment of a Claim which would constitute a return of capital.

The parent entity (RHI) is a Subchapter-S corporation which reports its taxable income or loss to its shareholders for inclusion in their respective individual income tax returns, and consequently the Debtors are not responsible for any income tax which may become due nor may the Debtors realize any tax benefits from any loss reportable for income tax purposes whether for prior, current or prospective periods.

**PROVISIONS FOR IMPAIRED CREDITORS NOT ACCEPTING PLAN**

With respect to any Class of creditors impaired by and not accepting this Plan by the requisite majority in number and two-thirds (2/3) in dollar amount of those casting ballots, adequate protection for the realization by them of the value of their claim shall be provided in the Order confirming the Plan by such method as will, in the opinion of the Bankruptcy Judge and consistent with the circumstances of the case, fairly and equitably provide such protection in accordance with the applicable provisions of the Bankruptcy Code.

With respect to the holders of equity interests of the Debtors, the existing equity interests shall be preserved under the Plan, but any right to receive distributions by reason of the equity ownership (except for distributions in an amount calculated to defray any income tax obligations imposed on such Holders as set forth above) is restricted until all Class 8, 9 and 10 Claims have been paid or satisfied in accordance with the terms of the Plan.

The Bankruptcy Code provides that the Plan may be confirmed even if it is not accepted by all impaired Classes. In order to be confirmed without the requisite number of acceptances of each impaired Class, the Bankruptcy Court must find that at least one impaired Class has accepted the Plan without regard to the acceptance of insiders, and the Plan does not discriminate unfairly against, and is otherwise fair and equitable to, such impaired Class. To the extent confirmation by "cramdown" is necessary or required, the Debtors by the filing of the Plan request confirmation thereof pursuant to Section 1129(b) without further motion or notice, which request shall be considered (if necessary) at the conclusion of the Confirmation Hearing.

## DISCHARGE AND RELEASE.

Except for the obligations imposed by this Plan, the distributions and rights that are provided in the Plan shall be in complete satisfaction, discharge and release of all (i) Claims against, liabilities of, liens on, and obligations of the Debtors, or the assets and properties of the Debtors and the Reorganized Debtors, whether known or unknown, and (ii) causes of action, directly or derivatively through the Debtors, based on the same subject matter as any Claim.

All proceedings and court actions seeking to establish or enforce pre-petition liabilities and claims of any nature against property of the estate or priorities received or retained by any creditor with respect to debts and obligations of the Debtors shall be permanently stayed and treated as specifically provided for in this Plan.

So long as the Debtors are in compliance with the Plan treatment of the State Escrow Claims and the State Penalty Claims, if any, the States as the holders of such claims shall not on the basis of the outstanding State Escrow Claims or State Penalty Claims (i) delist the Debtors' brands, (ii) assess any additional penalty or interest other than as provided in the Plan, or (iii) bring any other regulatory enforcement action/remedy against the Debtors.

## DISPUTED CLAIMS AND OBJECTIONS TO CLAIMS

*Claims*:

The Debtors or any party in interest may file an objection to any claim within ninety (90) days after entry of the Order confirming the Plan. Objections not filed within such time shall be deemed waived unless the period within which to file objections to claims is extended by Order of this Court as provided in the Plan.

The absence of an objection prior to the Confirmation Date, whether as to a scheduled or filed claim, shall not be deemed an acceptance of any Claim nor a waiver of the right to object to any Claim, and the holder of any such Claim shall not be entitled to assert reliance upon any implied acceptance of such Claim when voting to accept or reject the Plan.

*Reserves*:

Any claim, or portion thereof, which is to be paid in cash under the Plan and which is challenged, shall be protected by requiring the Reorganized Debtors to segregate and set aside in an escrow account a reserve based on the Court's estimate of such claim and sufficient to treat said claim in the same fashion as though the objection were denied. The reserve so segregated shall be distributed in accordance with the Plan in the event the objection is overruled or a

Case 09-50140    Doc 366    Filed 10/12/09    Page 25 of 30

dispute is resolved in favor of the party asserting the claim.  In the event the disputed claim is disallowed, the retained cash so segregated shall be retained by the Reorganized Debtors and available for distribution in accordance with the provisions of this Plan, with the disallowed claimant being excluded from the appropriate Class.

## MATTERS TO CONSIDER BEFORE VOTING ON THE CHAPTER 11 PLAN

*Who May File a Plan.*

The confirmation of the Plan of Reorganization is the ultimate goal of the Chapter 11 proceeding. Consequently, your decision whether to accept or reject the Plan must be made in the context established by the Bankruptcy Code.  In a Chapter 11 case, only the Debtors may file a plan of reorganization within the exclusivity period provided by §1121(b).

*Conditions Precedent to Confirmation.*

There are no conditions precedent to confirmation of Plan, except to the extent the Effective Date is defined in such a way as to be conditional upon the entry of a final order confirming the Plan.

*What is Necessary for Court Approval of a Plan.*

Chapter 11 permits the adjustment of secured debt, unsecured debt and equity interests. A Chapter 11 Plan may provide for less than full satisfaction of senior indebtedness and payment of junior indebtedness, and may even provide some return to equity owners absent full satisfaction of indebtedness, so long as no impaired class votes against the Plan (except as provided below).

Even if an impaired class votes against the Plan, implementation of the Plan is still possible so long as (i) the Plan is fair and equitable and (ii) that class is afforded certain treatment defined by the Code, broadly defined as giving a claimant the full value of his claim or interest.  Such value is determined by the Court and balanced against the treatment afforded the dissenting class of creditors.

In particular, senior claims must be satisfied in full prior to payment of junior claims or interests, unless the holders of senior claims agree to different treatment.  This principle (commonly known as the "absolute priority rule") applies only in cases when a class of unsecured claims or equity interests is impaired and does not accept the proposed Plan.  In that event, the absolute priority rule does not apply to all classes of unsecured claims and equity interests, but only to the dissenting class and classes junior to the dissenting class.

Case 09-50140    Doc 366    Filed 10/12/09    Page 26 of 30

In the event a class is unimpaired, it is automatically deemed to have accepted the Plan. If there is no dissenting class, the test for confirmation (*i.e.*, approval) by the Court of a Chapter 11 Plan is whether the Plan is feasible and in the best interests of the creditors and equity interest holders. In simple terms, this test requires that creditors and equity interest holders receive more under the Plan than they would obtain if the Debtors were liquidated and the proceeds distributed in accordance with bankruptcy liquidation priorities. The Court, in considering this factor, need not consider any other alternatives to the Plan but liquidation.

The Debtors submit that, in considering "feasibility" the Court is only required to determine whether the Plan can be accomplished. It is the Debtors' opinion that this entails determining the projected availability of cash for payments required to be made at and after the Effective Date, and any other factor which might make it impossible for the Reorganized Debtors to accomplish that which is proposed in the Plan. In addition, in order to confirm a Plan the Court must find that such Plan was proposed in good faith and that the Plan and the Debtors are in compliance with the applicable provisions of Chapter 11. Finally, similar to the requirement that the Court find the Plan to be feasible, the Court must find that liquidation or further reorganization is not likely to occur after implementation of the Plan, except to the extent the Plan provides for such liquidation.

The determination by the Court that the Plan is fair, equitable and feasible occurs at the confirmation hearing. The Court's adjudication of these matters does not constitute an expression of the Court's opinion as to whether the Plan is a good one nor does it constitute an opinion by the Court regarding any debt or equity interest or securities issued to creditors under the Plan.

*Alternatives to the Plan*.

Although this Disclosure Statement is intended to provide information to assist in the formation of a judgment as to whether to vote for or against the Plan, and although creditors are not being offered, through that vote, an opportunity to express an opinion concerning alternatives to the Plan, the Debtors believe that the only likely alternative to the Plan is the liquidation of the Debtors through conversion of the case to one under Chapter 7. Any such outcome would result in diminished revenues, additional administrative costs, and reduced payments to unsecured creditors.

**The Debtors Have Attempted to Set Forth The Likely Alternatives to The Proposed Plan. The Debtors Must Caution Creditors and Other Parties in Interest That a Vote Must Be For or Against The Plan. The Vote on The Plan Does Not Include a Vote on The Likely Alternatives to The Plan. If You Believe The Alternatives Are Preferable to The Plan And You Wish to Urge Them Upon The Court, You Should Consult Counsel As To The Appropriate Response.**

*Specific Considerations in Voting.*

While the Plan provides for certain payments to creditors, such payments will only be made to the holders of Allowed Claims. Under the Bankruptcy Code, a claim may not be paid until it is "allowed" pursuant to § 502. A filed or scheduled claim will be allowed in the absence of an objection. A claim to which an objection has been filed will be heard by the Court at a regular evidentiary hearing and will be allowed in full or in part or disallowed. While the Debtors will bear the principal responsibility for claim objections, any interested party may file claim objections. Accordingly, payment on all claims may be delayed until all pending objections to such claims are ultimately adjudicated or settled.

For Classes of Claims which do not receive payment in full on the Effective Date, there are certain risks inherent in accepting the Plan, including the absence of absolute certainty of ultimate payment, especially with respect to Claims which are to be paid from future revenues.

The Code also requires disclosure that (i) there are no payments or promises made of the kind specified in Section 1129(a)(4) of the Code which have not previously been disclosed to the Court. Specifically, there are no payments to be made or promised to management or any insiders, except for the compensation payable to current employees.

The materials provided in this Disclosure Statement are intended to assist you in voting on the Plan in an informed fashion. If the Plan is confirmed, you will be bound by its terms; therefore, you are urged to review this material and to make such further inquiries as you may deem appropriate, then cast an informed vote on the Plan. The Debtors solicit your acceptance of the Plan as being in the best interests of creditors in this case.

Case 09-50140    Doc 366    Filed 10/12/09    Page 28 of 30

RESPECTFULLY submitted on behalf of the Debtors, this the 1st day of October, 2009.

/s/ John A. Northen

**Counsel for the Debtors:**
John A. Northen, NCSB #6789
jan@nbfirm.com
Vicki L. Parrott, NCSB #25762
vlp@nbfirm.com
Stephanie Osborne-Rodgers, NCSB #29374
sor@nbfirm.com
Northen Blue, LLP
Post Office Box 2208
Chapel Hill, NC 27515-2208
Telephone:  919-968-4441

**Exhibits to Disclosure Statement:**

1. Amended Joint Plan Of Reorganization Dated October 1, 2009.

2. Schedule Of Scheduled, Filed, And Estimated Allowed Claims, By Class.

3. Schedule Of Related Party Notes.

4. Disclosure of Compensation of Officers.

5. Audited Financial Statements for 2008 (Debtors and consolidated).

6. Unaudited Year to Date (8/23/09) Balance Sheet and Income Statement (Debtors and consolidated).

7. Projections As To Operations

8. Projections As to Plan Payments.

9. Liquidation Analysis.