**UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**WINSTON-SALEM DIVISION**

| | |
|---|---|
| In Re: | ) |
| | ) |
| RENEGADE HOLDINGS, INC., et al. | ) Case Number 09-50140 |
| | ) Chapter 11 |
| Debtors. | ) Administratively Consolidated |
| _____ | ) |

### States' Objection to Confirmation of the Debtors' Joint Plan of Reorganization Dated October 10, 2009

The States object to confirmation of Debtors' *Amended Joint Plan of Reorganization Dated October 1, 2009* ("Plan"). In support of their objections,[1] the States explain as follows:

As a Tobacco Product Manufacturer, the Debtors operate in a highly regulated industry and sell products subject to taxes and other government obligations at a rate far beyond the cost incurred by the Debtors to make them. While the bankruptcy code provides the Debtors with considerable flexibility to restructure their pre-petition debts, they must nevertheless propose a plan that complies with the State and federal regulatory laws that govern their industry. 11 U.S.C. §1129(a)(3). The Debtors' Plan, however, is premised on continuing operations in violation of such regulatory laws, specifically the State escrow deposit statutes ("Escrow Statutes"), for the next seven years. Plan, ¶5.10. Such a provision is "forbidden by law" and renders the plan not confirmable. 11 U.S.C. §1129(a)(3). Similarly, the Plan incorrectly presumes that the Debtors' escrow obligations are bankruptcy "claims" and thereby eligible to be paid over time. They are not claims and must be satisfied in full as a pre-condition for the Debtors to continue to sell cigarettes in the affected MSA States.

---

[1] At the States' request, Debtors' counsel agreed to extend the Plan objection deadline for the States from February 19, 2010, to February 22, 2010.

Because the regulatory framework in which the Debtors must operate is critical to determining the confirmability of the Debtors' Plan, an explanation of its scope and structure is provided below. There is no dispute over the existence and fundamental requirements of these laws. In fact, in the Debtors' related bankruptcy case, *In re Cutting Edge Enters., Inc.*, 372 B.R. 255, 258-59 (Bankr. M.D.N.C. 2007), this Court made extensive findings about how and why this regulatory regime operates.

In addition, a brief overview of the structure of the Plan is also provided below. With this essential background in place, the States assert that the Debtors' cannot confirm their Plan because it is forbidden by law, unfairly discriminates against the State classes, is unfair and inequitable, not proposed in good faith and not feasible.

## I.    Background

### A.    State Regulatory Regime

In November 1998, the Settling States entered into the Master Settlement Agreement ("MSA")[2] with the four largest tobacco manufacturers, which placed strict regulations on the sale and marketing of cigarette products and provided for settlement payments in perpetuity. *In re Cutting Edge Enters., Inc.*, 372 B.R. at 258. After executing the MSA, each of the Settling States enacted Escrow Statutes[3] requiring a Tobacco Product Manufacturer ("TPM") that sought to sell its tobacco products within those States to operate under one of two statutory regimes— either become a Participating Manufacturer ("PM") under the MSA and be covered by the benefits and obligations of the MSA, or become a Non-Participating Manufacturer ("NPM") and

---

[2]    There are four states (Florida, Minnesota, Mississippi, and Texas) that are not signatories to the MSA and the regulatory scheme described herein does not apply in those states. All other states and the District of Columbia are parties to the MSA and operate under the legal regimen described herein and are referred to herein as "MSA States."

[3]    Escrow Statutes are also referred to as Qualifying Statutes. All MSA States enacted nearly identical Escrow Statutes because the MSA itself included a Model Escrow Statute found at Exhibit T to the MSA. North Carolina, the state where the Debtors sell the majority of their tobacco products, has codified its Escrow Statutes at N.C. Gen. Stat. §§66-290 through 291.

2

be exempted from both the MSA's obligations and its releases. *Id.* The Escrow Statutes required all NPMs to make escrow deposits for each cigarette sold in the Settling States that roughly approximate (but do not exceed) the amount a PM would pay per cigarette under the MSA. *Id.* at 258-59.

As this Court found in the *Cutting Edge* case, the escrow accounts serve several important regulatory purposes. First, they ensure that NPMs price their cigarettes at a level sufficiently high to allow them to internalize the health care costs that their products created, by providing a fund from which an MSA State could seek to recover the economic burdens arising from those cigarettes sales. *Id.* at 264. Absent those forced savings requirements, an NPM could use its pricing advantage and freedom from marketing restrictions to generate large short term profits for its owners with no obligation on the owners to retain adequate funds to compensate for the damages caused by their products in the long term. *Id.* Second, by requiring *all* NPMs to internalize those costs, the escrow requirement tends to level the playing field among all the manufacturers and helps ensure that low-priced NPM cigarettes do not encourage increased consumption. *Id.*

Moreover, by requiring NPMs to set money aside, but leaving the possibility that the funds could revert to them if no "Released Claims" (discussed below) were successfully asserted, the Escrow Statutes deter NPMs from engaging in the fraudulent, deceptive, and unfair conduct that precipitated the lawsuits that led to the MSA. *Id.* While such conduct may not be *required* to prove liability, an NPM that engages in such conduct would certainly be more likely to be sued successfully. Conversely, NPMs that avoid such conduct increase their likelihood of regaining the escrow deposits. Thus, Escrow Statutes, by their very nature, inherently create incentives for "good behavior."

3

The escrow account is held solely in the NPM's name, and the NPM is entitled to all of the earnings from the account. N.C. GEN. STAT. §66-291(b). Currently, the Debtors earn about $3,000 per month from their State Escrow account and have pledged these earnings as collateral to the Bank of the Carolinas. The Debtors also list their State Escrow account as a "restricted" asset on their balance sheet. (Exhibit 6 to the Amended Disclosure Statement for the Amended Joint Plan of Reorganization Dated October 1, 2009).

In addition, funds must be left in the account until either: (a) twenty-five years have passed since the deposit was made for a particular year's sales, (b) a judgment or settlement has been entered on "Released Claims" asserted by a Settling State, or (c) it is determined to have deposited excess amounts.[4] N.C. GEN. STAT. §66-291(b). "Released Claims" are defined in paragraph II(nn) of the MSA and encompass a very broad class of claims. Essentially, they include any claim "directly or indirectly based on, arising out of or in any way related, in whole or in part, to (A) the sale, use, distribution, manufacture, development, advertising, marketing or health effects of (B) the exposure to, or (C) research, statements, or warnings regarding, Tobacco Products," except for existing licensing fees and taxes.

Typically, the type of "Released Claim" suits brought by the States that gave rise to the MSA included claims under their consumer protection laws (marketing cigarettes to minors and misleading consumers about the dangerous health effects of smoking) and claims under state common law such as public nuisance and unjust enrichment (seeking reimbursement for the health care costs incurred by the States to pay for treatment of smoking-related illnesses).

---

[4] Depending on the circumstances, such funds may be either refunded or credited against future liabilities. The differences are not relevant for this purpose. Also, in one MSA State, Missouri, there is a fourth condition, called the Allocable Share Release ("ASR"), under which State Escrow funds may be released to the NPM. MO. REV. STAT. § 196.1003(b)(2)(B) (2009). ASR occurs when the NPM's required escrow deposit for Missouri in a given year exceeds the amount that Missouri would have received if the NPM had been a signatory to the MSA. *Id.* Again, this difference is not relevant to the above analysis.

4

If an MSA State files such a suit against an NPM and obtains a favorable judgment or settlement, then it may seek payment from the NPM's State Escrow account. The account may or may not have sufficient funds to pay the "Released Claims" judgment or settlement. Any funds remaining in the account twenty-five years after they were first deposited can be permanently withdrawn by the NPM.

The Settling States have no ownership interest in the escrow account, and the NPM's compliance or noncompliance with the Escrow Statutes does not give rise to a Released Claim. Equally important, when an NPM fails to make an escrow deposit, the Escrow Statutes empower the Attorney General of the affected MSA State to enforce the escrow obligation with only the following remedies: (i) a court order compelling the NPM to make the required deposit within 15 days, (ii) civil penalties up to 100% of the unpaid deposit for improperly withheld funds, (iii) civil penalties up to 300% of the unpaid deposit for a knowing violation, and (iv) as much as a two-year prohibition on sales in the affected MSA state for two knowing violations. N.C. GEN. STAT. § 66-291(c). The Escrow Statutes do *not* authorize the States to obtain a money judgment for the unpaid escrow itself. Finally, although the MSA prescribes the nature of the claims that may be Released Claims, other state laws and common law define whether any such claims exist and the elements thereof. Such elements may vary from state to state and within a state over time without regard to the wording of the Escrow Statutes.

Initially, the Escrow Statutes were enforced only through penalties and civil injunctions; later, most Settling States enacted Complementary Legislation[5] creating a directory that lists NPMs that have complied with the Escrow Statutes. *In re Cutting Edge Enters.*, 372 B.R. at 259. Unless listed in those directories, NPMs may not sell their cigarettes within the Settling States.

---

[5]     North Carolina's complementary legislation is codified at N.C. GEN. STAT. §§ 66-292 through 294.1.

*Id.* NPMs that fail to make their escrow deposits are removed from these directories. *Id.* This process is known as "delisting." *Id.*

### B. The Structure of the Debtors' Plan dated October 1, 2009

Shown in the below chart are the class and payment structure of the Debtors' Plan. In a nutshell, the Plan proposes to pay all creditors in full and for the equity holders to retain their interests in the company without contributing any new value. The largest creditors are the Bank of Carolinas (Class 1) owed $4,136,279 and the States (Class 10 – Escrow, $13,366,379) and (Class 11- Penalties, $15,868,000). The "Amount" column of the chart, there are two amounts listed for the State Escrow and the State Penalty classes. The first amount, $7,692,039, is what the Debtors' estimated it owned to the States for past due State Escrow; however, the amount listed in parentheses, $13,366,379, is what the States have determined is owed in past-due State Escrow. The same applies for State Penalty claims. The Debtors' estimated $0, and the States have determined $15,868,000.

| Class | Status | Name | Amount | | Type of Payment | Int Rate |
|---|---|---|---|---|---|---|
| 1 | Secured | Bank of Carolinas | $4,136,279 | | paid monthly over 5 yrs, beg. 1 mo after ED | 6.25% |
| 2 | Priority non-tax | | | | | |
| | 2-A | wages | ? | | paid wi/60 days after ED | |
| | 2-B | contrb ee plan | ? | | ordinary course | |
| 3 | Secured | Business Vehicle Fin. | $57,658 | | assume loan, cure default wi/30 days after ED | |
| 4 | Secured | Delange Landan | $26,734 | | assume loan, cure default wi/30 days after ED | |
| 5 | Secured | Case Credit Corp. | $14,100 | | assume loan, cure default wi/30 days after ED | |
| 6 | Secured | CIT Technology | $66,151 | | assume loan, cure default wi/30 days after ED | |
| 7 | Secured | United Silicone | $82,517 | | assume loan, cure default wi/30 days after ED | |
| 8 | Unsecured | Convenience Class | $21,350 | | paid wi/90 days after ED | 4.25% |
| 9 | Unsecured | Unsecured Trade | $3,046,815 | | paid quarterly over 5 yrs, beg. 1 yr after ED* | 4.25% |
| 10 | Unsecured | State Escrow | $7,692,039 ($13,366,379) | | paid quarterly over 4 yrs (7 yr amort), beg. 3 yrs after ED* | 4.25% |
| 11 | Unsecured | State Penalty | $0 ($15,868,000) | | paid quarterly over 4 yrs, beg. 3 yrs after ED | 4.25% |
| 12 | Unsecured | Guaranty Claims | $2,408,767 | | paid quarterly 5 yrs, beg. 1 yr after ED* | 4.25% |
| 13 | Equity | Phelps | | | retain ownership | |
| | Administrative | | $125,000 | | paid on ED | |
| | Priority Tax | | $1,030,561 | | paid quarterly over 5 yrs at statutory rate | ? |

6

| | | | | | * = prorata 100% of Excess Cash Flow wi/6 mo after the end of each calendar year during the repayment period for such claim |
|---|---|---|---|---|---|

Both State classes voted to reject the Plan, thereby requiring the Debtors the confirmation requirements found in both §1129(a) and §1129(b).

## II.  Argument

### A.  Escrow Obligations Are Not Claims

As discussed above, the Debtors' Plan proposes to pay the defaulted State Escrow starting three years after the Effective Date and completing payment over the next four years, by 2017.  However, first the Debtors must establish that the past-due State Escrow deposits are, in fact, "claims" within the meaning of the Code.  Unless these statutory obligations are claims, the Debtors cannot classify them, cannot pay them over time, and cannot operate without first paying them in full.  In short, unless they are claims, the Debtors cannot confirm their Plan.

The States respectfully, but strongly, assert that the escrow deposits are not claims but, instead, are a financial obligation, like a performance bond, that the Debtors must satisfy to operate lawfully in an MSA State.  The Code defines "claim" as a "right to payment" by the underlying claimant.  11 U.S.C. §101(5).  The Debtors' obligation—and conversely its failure—to deposit funds into the State Escrow account does not give the enforcing MSA State a right to receive payment for the missing escrow deposit.  If, for example, an NPM fails to deposit $7 million in the State Escrow account, the enforcing MSA State cannot get a judgment against the NPM for $7 million.  Instead, the Escrow Statutes permit the affected MSA State to obtain an affirmative injunction ordering the offending NPM to make the required deposit, and the complementary legislation permits the MSA State to remove the NPM from its approved tobacco manufacturer directory.  Presumably, a money judgment for unpaid escrow is not a prescribed

7

remedy because it would simply not make sense. There would be no reason to authorize an MSA State to obtain such a money judgment (as opposed to injunctive relief) for the past-due escrow because collecting on such a judgment would pay this amount to the State, not to the NPM's escrow account, contrary to the purpose of the Escrow Statutes. The Escrow Statutes also give the MSA States the right to seek civil penalties, but the States agree that any such penalty amounts are, in fact, claims.

The Escrow Statutes require the Debtors to establish a forced savings account that the States may proceed against to satisfy a Released Claim judgment or settlement—when such a judgment is obtained—but the requirement to deposit the funds in the first instance does not give the States a "claim" to such funds. Requiring the deposit does not give the States a "right to a payment"; it only requires that funds be maintained as a potential source of recovery should the States obtain a judgment based on completely different laws. As such, the deposit obligations required by the Escrow Statutes merely create a form of financial assurance, like a bond or a net worth requirement.

In addition, the States do not contest that their right to sue an NPM for Released Claims is a bankruptcy "claim," at least to the extent that such a right currently exists.[6] However, the States' potential right to be paid for its Released Claims is analytically separate from the Debtor's obligation to obey the Escrow Statutes. The Escrow Statutes create a fund from which

---

[6] There are questions as to whether bankruptcy claims for "Released Claims" currently exist. The answer, to some extent, depends on the nature and basis for any potential liabilities. For instance, if a suit seeks compensation for health care costs caused by cigarettes made by a particular NPM, the analysis would start by looking at the NPM's conduct to date to see if this might make it potentially liable, but it would also have to look at whether such activities have yet resulted in manifested illnesses and consequent financial burdens imposed on the States. The long latency periods for cancer, emphysema, and other diseases caused by smoking complicate the issue of when claims "arise" in ways that have been explored at length in the tort context. *See, e.g., Epstein v. Official Comm. of Unsecured Creditors of Estate of Piper Aircraft Corp.*, 58 F.3d 1573 (11th Cir. 1995). Moreover, the fact that it would be the State, not the persons who have become ill, that would be suing would further complicate the timing analysis. There is no need to resolve such issues with respect to this Objection, since the States agree that any suits for Released Claims, to the extent that they have currently arisen, are bankruptcy claims and are subject to a discharge in the Debtor's case. Those claims are, however, distinguishable from the escrow deposit obligations, which are not dischargeable.

the "right to payment" for Released Claims may be satisfied, but they do not themselves create

any such right.  To assert Released Claims against NPMs, the States may look to the same body

of law on which they made claims against the Original Participating Manufacturers such as

public nuisance, unjust enrichment, or consumer protection.

This distinction between (1) the obligation to set aside funds to pay potential claims (not

a claim) versus (2) the right to receive payment from such funds (a claim) is readily apparent in

other regulated fields where operators are required to provide security to ensure payment for

certain liabilities potentially arising from their business operations.  When faced with debtors

regulated for these reasons, the bankruptcy courts cited below have found that enforcement

action by the government requiring the debtor to comply with these financial obligations was

excepted from the stay under §362(b)(4) when the purpose for the underlying law was to protect

the health, safety and welfare of the public.  Although these cases do not directly consider

whether the debtor's failure to post security creates a "claim" when the government seeks to

enforce it, they imply that conclusion. The police and regulatory exception to the stay only

permits the government to enforce a judgment that is **not** a "money judgment."   If the

government's order compelling the Debtor to post security were the equivalent of a "claim" for

the value of the missing security, then its continued enforcement actions against the debtor

would be akin to a collecting on a money judgment, which is not excepted from the stay even if

done pursuant to police and regulatory powers.

The Fourth Circuit provides a clear of example of this in the environmental context in

*Safety-Kleen v. Wyche*, 274 F.3d 846 (4th Cir. 2001).  In that case, Safety-Kleen operated a

commercial hazardous waste landfill in South Carolina.  State law required Safety-Kleen to post

surety bonds to secure its payment of the costs associated with the closure and post-closure

maintenance of its landfill. When the company was unable to obtain these bonds, the South Carolina Department of Health and Environmental Control ("DHEC") ordered it to obtain the bonds within 18 days or cease accepting waste ("bond order"). *Id.* at 856-57. The company did not have the financial ability to obtain the needed bonds and filed for Chapter 11 bankruptcy protection on the same day that DHEC had issued its bond order. *Id.* at 857. A few days later, DHEC ordered the debtor to cease accepting waste at its facility because it had exhausted all of its permitted space ("closure order"). *Id.* Ultimately, the debtor filed an adversary proceeding against the DHEC seeking to enjoin it from enforcing its orders on a number of legal grounds including that it was as barred by the automatic stay. *Id.* On this issue, the Fourth Circuit held that the DHEC's enforcement of its bond order was excepted from the automatic stay under §362(b)(4) as a police and regulatory action. *Id.* at 866. The court looked at the purpose behind the financial assurance requirements and found that even though one purpose included protecting the State's pecuniary interest, their primary purpose was to deter environmental misconduct and to encourage the safe design and operation of hazardous waste facilities. *Id.* Therefore, the DHEC was permitted to enforce its bond order either compelling the debtor to post a bond or to cease accepting waste. Had the court interpreted the States' injunctive order as creating a "claim" for the amount of the missing bond, then surely the State's continued enforcement actions would have been akin to collecting on a money judgment (particularly if the debtor posted the bond)—an action prohibited even under the police and regulatory exception to the stay.

Additional cases that examine this issue in other regulated industries include *Bickford v. Lodestar Energy, Inc.*, 310 B.R. 70, 78-79 (E.D. Ky. 2004) (permitting Kentucky, under §362(b)(4), to enforce its state law requirement against the Chapter 11 debtor, a surface mining

permit holder, to post reclamation bonds); *In re Edwards Mobile Home Sales, Inc.*, 119 B.R. 857, 860 (Bankr. M.D. Fla. 1990) (permitting Florida, under §362(b)(4), to revoke the Chapter 11 debtor's license to sell mobile homes because it failed to post the required surety bond); and *In re Synergy Dev. Corp.*, 140 B.R. 958, 961 (Bankr. S.D.N.Y. 1992) (permitting New York, under §362(b)(4), to require the Chapter 11 health club debtor to post a $50,000 bond as a condition to selling or renewing further memberships). In all of these cases, the Debtors operated under a legal obligation that required them to post security, but their failure to comply did not create a "claim" for the enforcing state agency.

Claims, to be sure, need not involve a present right to payment, and may include those where a contingency must still occur before the right is exercised. But, here, the "contingency" that must be satisfied to establish a right to payment under the escrow deposit statutes is that there must be a right to payment created by some completely *different* statute or common law. In other words, any rights to payment that the States hold against the Debtors exist completely independent of the escrow statutes and are not created or enhanced by those statutes. While the escrow requirement makes it more likely that a judgment for Released Claims could be paid, that does not itself make the escrow requirement a claim, any more than a requirement that a company must obtain workers compensation insurance to cover its employees means that those employees have a "claim" against the employer for its failure to obtain it. While the employees might be paid from the insurance if they are injured, they do not have a "right to payment" with respect to the obligation to obtain that insurance in the first instance.

This same logic applies to surface mining companies, mobile home brokers, or health clubs that fail to post their required bonds. When these companies fail post this security, the parties intended to be protected by that security do not then have a claim against the offending

company for its failure to the post the required bonds. Their right to be paid from these companies only arises when and if they are injured in a way that causes the kind of damage for which the bonds were intended to pay. If the surface mining company doesn't have enough money to properly close its landfill, then the State has a claim against it for such costs, which may be paid from the bond. If the mobile home dealer sells a mobile home under false pretenses or the health club sells a membership under false pretenses, then these purchasers have a claim against these companies that may be paid from their bonds. The Escrow Statutes function the same way, the NPM's failure to save the escrow money does give an MSA State a right to be paid from the escrow account, rather the MSA State must prevail on a Released Claim suit to have a right to a payment from the escrow account. In short, the escrow obligations do not create rights to payment in the MSA States and, therefore, are not claims within the meaning of Section 101(5).

### 1. The *Carolina Tobacco* Cases

The States note that in *In re Carolina Tobacco Co.*, 360 B.R. 702, 709 (D. Or. 2007), the Oregon District Court, affirming the bankruptcy court's decision, ruled that Carolina Tobacco's unpaid NPM escrow obligations were claims. This decision is not binding on this Court, and the States respectfully disagree with the district court's analysis and ask this Court not to follow it. In reaching its decision, the district court affirmed the lower court's analysis that *any* "enforceable obligation" is a right to a payment, and because the States are entitled to enforce the escrow obligations, they are claims of the States. In reaching this conclusion, neither court addressed the fact that the States may not enforce this obligation by obtaining a money judgment for the undeposited escrow. Moreover, just because the escrow deposit obligations are "enforceable," this fact alone does not turn a duty to save into a duty to pay. The notion that *any*

Case 09-50140    Doc 429    Filed 02/22/10    Page 12 of 26

"enforceable obligation" is, *ipso facto,* a claim, is rebutted by existing case law. In *In re Chateaugay Corp.*, 944 F.2d 997, 1008 (2nd Cir. 1991), the Second Circuit contrasted obligations as to which the creditor could demand specific performance (which were not claims) with those where the debtor could force the creditor to accept monetary damages in lieu of performance (which were claims). In addition, even if "specific performance" requires a debtor to spend its funds, *Chateaugay* and many others cases hold that those enforceable obligations are still not claims, even though an obligation to pay money to the State when it does the clean-up itself, would be a claim. *See, e.g., Penn Terra Ltd. v. Dep't of Envtl. Res.*, 733 F.2d 267, 278 (3rd Cir. 1984); *In re CMC Heartland Partners,* 966 F.2d 1143, 1146 (7th Cir. 1992).

The Oregon District Court also approved the lower court's determination that viewing the "statutory scheme as a whole" rendered the unpaid escrow a claim. *In re Carolina Tobacco Co.*, 360 B.R. at 711. The lower court had reasoned that the Settling States "split what is essentially a claim into two parts for NPMs"—one being the right to sue for damages and the other the duty to set aside funds to pay for such damages. *In re Carolina Tobacco Co.*, No. 05-34156, 2006 Bankr. LEXIS 335, at * 11 (Bankr. D. Or. 2006), *aff'd* 360 B.R. 702 (D. Or. 2007). Although there are two separate obligations, created by two separate laws, the court errs when it simply conflates them so as to turn a non-claim into a claim. The right to sue for "Released Claims" *is* a right to payment, and needs no aid from the Escrow Statutes to be treated as such. Conversely, the Escrow Statutes never require payments be made to the Settling States and add nothing to the "claim" status of the "Released Claims."

The Escrow Statutes *do,* of course, make it more likely that payments may be received for Released Claims when they are asserted, but so too do the other financial assurance statutes discussed above. They are enacted precisely because there is a perceived need to make sure that

potential claims that arise under other statutes *will* be paid. If that were enough to make financial assurance obligations "claims," then they would arguably *all* be claims, and none could be enforced during a bankruptcy. Yet, as shown above, the courts have not hesitated to enforce them and the same should be true with respect to the escrow deposit obligations.

In short, the Escrow Statutes and Released Claim provisions are no more the division of a single claim than are environmental statutes that require bonds to be posted to protect the states' right to assert their claims under other provisions for clean-up or reclamation costs. It is at least as likely that states may collect on the bonds for reclamation costs that were at issue in *Safety-Kleen* and *Bickford* as that they will sue NPMs for Released Claims and obtain payments from the escrow accounts. Moreover, the amounts a company must pay to obtain such bonds are irrevocably expended, but some or all of the escrow deposits may in the end, ultimately return to the NPM. Thus, if these environmental bond and remediation statutes do not result in a single integrated "claim," no more so do the Escrow Statutes and Released Claim provisions.

**B.      The Plan violates §1129(a)(3) Because It is Proposed by a "Means Forbidden by Law"**

If this Court rules that the unpaid escrow is not a claim, then the Plan cannot be confirmed because it fails to meet the requirements in §1129(a)(3) that a plan must be proposed in good faith and "not by any means forbidden by law." As discussed above, the Plan does not pay its pre-petition escrow deposits until 2017, allowing it to operate in violation of state law for seven years. (Plan, ¶5.10). Such a result is clearly a means forbidden by law. Under state law, the Debtor must pay the escrow deposits in full or be delisted in affected MSA States. The Plan incorrectly assumes that the escrow obligations are claims. However, the significance of the escrow deposits not being claims is that they cannot be classified, cannot be paid over time, cannot be discharged and cannot be enjoined from enforcement on a going-forward basis.

Case 09-50140     Doc 429     Filed 02/22/10     Page 14 of 26

Without these options, they remain obligations that the Debtors must satisfy if they are to continue to operate lawfully post-petition. As the Ninth Circuit recognized in *In re Baker & Drake, Inc.*, 35 F.3d 1348 (9th Cir. 1994),

> Congress's purpose in enacting the Bankruptcy Act was not to mandate that *every company* be reorganized *at all* costs, but rather to establish a preference for reorganizations, where they are legally feasible and economically practical. Thus, if compliance with [state law] were to render Baker financially unable to reorganize, neither Baker nor Nevada would thereby be violating any provision of the Bankruptcy Act.

*Id.* at 1354. In addition, "§ 1123(a) does not preempt otherwise applicable nonbankruptcy laws that are concerned with protecting public health, safety, and welfare." Montgomery County v. Barwood, Inc., No. PJM 09-567, 2009 U.S. Dist. LEXIS 119127, at *17 (D. Md. 2009).

Significantly, this Court has already held that the Escrow Statutes are part of a larger tobacco regulatory regime enforced by the States under their police and regulatory powers and designed to effectuate a public policy to reduce smoking. *In re Cutting Edge,* 372 B.R. at 264. As such, the Escrow Statutes are not preempted by the Code, and the Debtors must be able to comply with them to confirm their Plan.

**C.    The Plan Unfairly Discriminates Against the States' Escrow Obligations (if they are found to be claims) and Its Penalty Claims (Class 10 and Class 11) and Is not Proposed in Good Faith.**

While that States strongly believe that their escrow obligations are not claims, if this Court holds otherwise, neither they nor the States' Penalty Claims can be separately classified and paid on terms less favorable than other general unsecured claims. Currently, the Plan places unsecured *trade* debt in Class 9 and Guaranty Claims in Class 12 and pays these classes in full,

15

in quarterly installments amortized over five years at 4.25% interest, starting one year after the Effective Date. (Plan, ¶¶ 5.9 & 5.12). By contrast, the MSA States' escrow obligations are placed in Class 10, paid in quarterly installments amortized over *seven* years (rather than five) at 4.25% interest, starting *three* years (rather than one) after the Effective Date with a balloon payment due at the end of the four years in which payments are made. (Plan, ¶5.10). Similar disparate treatment also occurs with respect to Class 11, State Penalty Claims. The Plan pays State Penalty Claims in quarterly installments amortized over four years at 4.25% interest, starting *three* years after the Effective Date. (Plan, ¶ 5.11). Again, the Plan unfairly discriminates against the States by paying them much later in time and under much riskier circumstances.

While it is not impermissible for a plan proponent to separately classify substantially similar claims, this discretion is not unlimited and the burden is on the proponent to explain and justify the basis for the separate classification. *In re Bryson* Properties, 961 F.2d 496, 502 (4th Cir. 1992). The Debtors provide no justification for why these four groups of unsecured, non-priority obligations should be separately classified, or why the Debtors are justified in (i) paying the unsecured trade and guaranty creditors for two years before the States receive their first payment, (ii) amortizing trade and guaranty debt over a shorter number of years than the States' debt (5 years versus 7 years), (iii) completing payments to trade and guarantor creditors at year six, and (iv) leaving the States at the end of year seven with three-sevenths of the escrow balance unpaid with the "promise" of a balloon payment. These differences are all one-sided and are patently unfairly toward the two State classes. Clearly, the different payment structure shifts significantly more risk of default onto the MSA States than to the trade and guaranty creditors.

Requiring the State unsecured classes to bear significantly greater risk of default than

the other two unsecured classes (or any other classes), without compensating the State classes for such increased risk, discriminates unfairly against them. *In re Sherwood Sq. Assoc.,* 107 B.R. 872, 880 (Bankr.D.MD.1989) (holding that the plan did not discriminate unfairly against one of two unsecured creditor classes even though one class received a 66.6% distribution upon confirmation while the other received a 66.6% distribution over a 15-year period because the latter class was also paid 14.5% interest, which was sufficiently high to compensate them for the increased risk of default.) Here, the Debtors propose to pay all four unsecured creditor classes the same interest rate (4.25%) and, therefore, do not compensate the States for their considerably riskier payment treatment. Such discrimination between classes is unfair and renders the Plan not confirmable.

### D. The Plan Is Unfair and Inequitable and Not Proposed in Good Faith

To confirm a non-consensual plan, the proponent must show that it is "fair and equitable" under §1129(b). However, the requirements set forth in §1129(b) are merely minimal standards, and a plan may still not be fair and equitable, and thus confirmable, even though it meets these. *In re Grandfather Mountain,* 207 B.R. 475, 486 (Bankr. M.D.N.C. 1996). To determine if the proponent has met the overall requirements, the plan "must literally be fair and equitable" when looking at the specific facts and circumstances of each case. *Id.* at 487. Some relevant factors for the court to consider with respect to the unsecured dissenting classes include (1) whether the statutory requirements of §1129(b)(2) have been met; (2) whether the primary risk of reorganization remains with the equity interests of the reorganized debtor; (3) whether the repayment period is unreasonably long; (4) whether the formula for proposed payment demonstrates good faith effort to repay those obligations; and (5) whether other particular inequalities are inherent in the plan. *Id.*

Case 09-50140    Doc 429    Filed 02/22/10    Page 17 of 26

To start, the Plan fails to pay the dissenting State classes (Class 10—assuming these are ruled claims--and 11) "in full" as required under §1129(b)(2) while the equity interest holders retain their interests and provide no new value under the plan.  To be "paid in full", a dissenting, unsecured creditor class must receive the "present value" of its allowed claim. *In re Grandfather Mountain,* 207 B.R. at 487.  The appropriate interest rate (known as the "cram-down rate) is determined using a "formula approach" that starts by looking at the prevailing market rate for a loan similar in amount and repayment terms as provided in the plan to the dissenting class at issue and adjusting this base market rate upward to account for risk factors associated with the debtor and its plan terms. *In re Deep River Warehouse, Inc.,* 2005 Bankr. LEXIS 1793, *31 (Bankr. M.D.N.C. 2005) (J. Waldrep) relying on *In re Bryson Properties,* 961 F.2d 496 (4th Cir. 1992), and *In re Grandfather Mountain,* 207 B.R. 475, 490 (Bankr. M.D.N.C. 1996).  Note, the bankruptcy court in *Deep River* explicitly considered whether the formula method used by the U.S. Supreme Court in *Till v. SCS Credit Corp.*, 541 U.S.465 (2004) applied to its Chapter 11 case and ultimately determined that it did not need to make such a determination because the formula approach already used in its jurisdiction was appropriate.  *In re Deep River Warehouse, Inc.,* 2005 at *31.  See also, *In re Price Funeral Home, Inc.,* 2008 Bankr. LEXIS 3462, *8 (Bankr. E.D.N.C. 2008) (J. Small) (holding, without explanation, that the appropriate cram-down rate for the dissenting secured class was the prime rate (4%) plus a risk factor of 4% (yielding an 8% rate) based on the standard adopted by the court in *Till*).

In determining the above formula rate, the relevant risk factors include the amount and quality of the collateral, the risk of default, and the length of the payout period.  *In re Deep River Warehouse, Inc.,* 2005 at *31.

Applying the above standard, the Debtors' interest rate of 4.25% is simply too low to

account for the considerable risks inherent in making the payments promised to the States in Classes 10 and 11. The States note at the outset that the prime rate is currently 3.25% and that the Plan proposes to pay the fully secured lender, Bank of the Carolinas, at 6.25% interest—three points above the prime rate. At a minimum, the cram-down rate applicable to the States' claims should be higher than the cram-down rate paid to the Bank of Carolinas given the following risks: (i) the States are owed significantly more than the bank ($29.1 million versus $4.1 million); (ii) the States receive their first payment *three years* after the Effective Date while the Bank receives its first payment *one month* after the Effective Date; (iii) the States' claims are not fully paid until *seven* years after Effective Date (one year later than any other class) while the Bank receives its last payment *five* years after the Effective Date (the first class to be fully paid); (iv) the States are paid quarterly while the bank is paid monthly; (v) the States' escrow claims are amortized over 7 years, but paid over four years, resulting in a substantial balloon payment, while the Bank's claim is amortized over five years and paid with principal and interest each month, requiring no balloon payment; (vi) the States have no collateral, while the bank is fully secured by the Debtors' accounts receivable and inventory.

Any one of the above circumstances might be enough to warrant a higher interest rate for the States, but taken together they provide overwhelming evidence that the States' dissenting classes should be paid at a rate higher than 6.25% because their payment treatment is far riskier than the bank's. *In re Giswold Building*, 420 B.R. 666, *73-*82 (Bankr. E.D.Mich. 2009) (holding that the dissenting secured class was entitled to a cram-down rate of prime (3.25%) plus a 3% risk adjustment upward and that had the unsecured creditor class was entitled to an even greater upward risk adjustment because the risk of nonpayment to this class was greater given the fact that their debt was unsecured and required a balloon payment.) In short, because the

Plan fails to pay the States' two classes an interest rate sufficiently high to cover their risk of non-payment, the Plan is not fair and equitable under §1129(b) and cannot be confirmed.

Secondly, the Plan is also unfair and inequitable to the State classes because it places more burden and risk on them than it does any other class, particularly the equity owners whose irresponsible actions pre-petition caused this otherwise avoidable bankruptcy. The Debtors' principal, Calvin Phelps ("Phelps"), caused significant financial problems for the Debtors when he failed to have Alternative Brands, Inc., ("ABI") pay its State escrow deposit obligations owed in 2007, instead, asserting that the underlying cigarettes brands had been "transferred" to his affiliate company, Cutting Edge Enterprises, Inc. ("Cutting Edge"), which, because it was a PM, gave rise to an MSA payment rather than escrow deposits. This purported "brand transfer" from an NPM to a PM was clearly not permitted by the MSA and caused extensive litigation with the States. Ultimately, Cutting Edge was forced to dissolve it corporate existence, and ABI was delisted in July 2007, in North Carolina (ABI's largest market) and in other MSA States. Because of the delisting, ABI's sales plummeted, and Phelps asked the State of North Carolina to put ABI back on its tobacco manufacturer directory even though it was still not current on its escrow obligations. In August 2007, North Carolina agreed to such a settlement and relisted ABI giving it 30 days from the date of relisting to become current. Then, in January 2008, ABI again asked the State of North Carolina for additional time to make their required escrow deposits. For the second time, North Carolina agreed, allowing ABI to pay $4.6 million then due in escrow deposits over the next three years. ABI defaulted on this settlement just before filing for bankruptcy protection.

But, even with those problems, ABI and its affiliated Debtor entities could have survived and complied with the payment terms that it had worked out with North Carolina except for the

fact that Mr. Phelps chose to divert some $7.75 million from the Debtor companies to finance wholly unrelated personal ventures ranging from buying a 2008 Eclipse 500LX jet plane, to a 2008 Maserati sports car, to the Chinqua Penn Plantation.  None of those toys provided any benefit to the Debtors, and there was no basis for them to have paid for any of those costs as an appropriate cost of doing business. Moreover, despite the fact that the Examiner has expressed in writing his belief that there is sufficient legal basis to bring some $8 million worth of fraudulent transfer suits against Phelps and other insiders, they have made no effort to pay back these funds to the estate to pay their creditors faster.

Absent these reckless choices of the Debtors' principal, this bankruptcy would not have been necessary.  Yet, the Plan allows Phelps to retain his equity interests in the Debtor without contributing any new value.  The Plan assigns Bankruptcy Causes of Action, which includes fraudulent transfers, to the Examiner but requires the Examiner to pay such recoveries to the Reorganized Debtor, rather than the creditors, so long as the Debtors have not defaulted on the Plan payments. This provision essentially has the examiner recovering money from Phelps only to pay it right back to him through his Debtor companies.  (Plan, ¶6.3.2).  Paying fraudulent transfer recoveries back to the Debtors, for them to use on business operations, while creditors repaid unpaid (even if the Debtors are in compliance with Plan payments) is an absurd result that is in bad faith and violates the absolute priority rule.

Similarly, although the Plan assigns Bankruptcy Causes of action to the Examiner, it fails to create a formal trust, which the States believe is needed to specify for whose benefit the Examiner is performing his duties, the scope of the Examiner's duties, the circumstances under which the Examiner needs court approval to take action versus when he may make decisions independently, and to establish a fund to pay his fees and expenses other than from the Debtors'

on-going business operations.  Without such independence from the Debtors, the Examiner will not have sufficient means to litigate against the Debtors' insiders.  The Plan's failure to establish a trust is unfair and not in good faith.

The Plan also allows the Reorganized Debtors to assume numerous and costly leases with insiders without first waiting for the Examiner to complete his appraisal to determine if these leases are, in fact, as the Debtors assert, at fair market value. (Plan ¶6.7)  The Plan should not permit the assumption of any of these leases unless and until a determination is actually made showing that that they are at fair market value. To do otherwise is unfair and not in good faith.

The Plan also fails to restrict the compensation paid to insiders post-confirmation, distributions to equity owners, or to prohibit the Reorganized Debtors to resume their practice of paying the operational expenses of Phelps' affiliate companies, a circumstance that drained millions of dollars from the Debtors pre-petition.  Failing to include such provisions in the Plan is bad faith.

The Plan, by requiring the States to wait longer than any other creditor class to receive their first payment (three years) and their last payment (seven years), the Plan places the greatest burden on the States.  Such a burden is patently unfair when North Carolina has twice worked with the Debtors to restructure their escrow deposit obligations, when Mr. Phelps has squandered over $7 million of the Debtors' earnings (during the same time that he was negotiating concessions with North Carolina), when the Debtors' insiders have made no effort to pay back their fraudulently transferred funds, when the delayed escrow payments result in the Debtors operating in violation of State law for the next seven years, and when all of the other circumstances discussed above have occurred.  Taken together, these facts show that the Plan is

22

not fair and equitable as required by §1129(b)(2) and is not proposed in good faith as required under §1129(a)(3) and therefore cannot be confirmed.

### E.    The Plan is not Feasible as Required Under §1129(a)(11)

The plan proponent has the burden of demonstrating that its plan is feasible. *In re Smith,* 357 B.R. 60, 69 (Bankr. M.D.N.C. 2006) (citations omitted). To demonstrate feasibility of the Debtors' Plan "success need not be guaranteed – the possibility that a plan may fail is not fatal – but a plan must be supported by adequate evidence that some reasonable assurance of success exists." *Id.* Some factors considered by the court include the debtor's prior performance, the adequacy of the capital structure, the earning power of the business, economic conditions, the ability of management, and other related matters. *In re Deep River Warehouse* 2005 Bankr. LEXIS at *37.

The Debtors' Plan is not feasible for at least the following reasons:

1.    It incorrectly presumes that the State Escrow obligations are claims and fails to provide for their immediate full payment or, alternatively, the Debtors' delisting in the affected MSA States;

2.    It under-estimates the amount of administrative claims and fails to show sufficient cash to pay these on the Effective Date;

3.    It proposes to fund the Plan through operating income, which it predicts will steadily increase over the life of the Plan based on increased sales volume and lower costs. Such predictions are simply contrary to the realities of the tobacco industry and the Debtors' own performance. Historically, since the implementation of the MSA, the domestic tobacco market has shrunk as a direct result of the price increases caused by the MSA and its related escrow statutes. Such price increases are guaranteed to continue in the future. The MSA and escrow statutes, alone, impose a minimum 3% price increase each year. And just recently, the federal government increased its FET tax rate on cigarettes from $3.90 per carton to $10.07 per carton.

4.    The Debtors' will not have sufficient cash flow to pay the actual amount of State Escrow owed ($13,366,379.22) and State penalties owed ($15,867,999.83) at the appropriate rate of interest.

23

Because the Debtors' Plan is not feasible, it cannot be confirmed.

**F.     Other Plan Provisions that Render the Plan Unconfirmable**

### 1.     ¶5.10.2, ¶5.11.2, and ¶9.2

This provision is repeated three times in the Plan and purports to prohibit the States' from delisting the Debtors' brands, seizing their tobacco products, assessing additional penalties or interest, or "taking any other regulatory enforcement action/remedy against the Debtors so long as the Debtors are incompliance with the Plan treatment of State claims and the States are not taking such actions on the basis of outstanding State claims. This provision attempts to give the Debtors rights beyond what the §1141 discharge injunction legislates. The States acknowledge that the discharge injunction binds "creditors" and discharges "debts," but, to the extent that the escrow deposit obligations are not "claims," those provisions do not apply to the MSA States' actions. In any event, whatever rights are provided by §114 are what they are. The Debtors' efforts to craft their own discharge language, applicable only to the States' Claims, simply invites confusion and goes beyond the rights given debtors under the Bankruptcy Code. Any Plan language that purports to limit the States' regulatory authority post-confirmation, beyond the restrictions already codified under the Bankruptcy Code, is an impermissible effort to preempt State law and renders the plan unconfirmable under §1129(a)(3).

### 2.     ¶6.3.3.  Regulatory Compliance

This provision purports to give "exclusive jurisdiction" to the Bankruptcy Court until a Final Decree is entered "to resolve any dispute over pre-petition or post-petition State Escrows that accrued before the Effective Date." While the States acknowledge that the Court has jurisdiction to estimate and determine claim amounts, the Plan's jurisdictional provision, when applied to the States' escrow claims, is impermissibly broad. For example, the States have

strong reason to believe that the Debtors owe past-due escrow on cigarettes that they contracted manufactured for third parties both pre-petition and post-confirmation.  Resolving this issue will require the adjudicator to determine which entity, ABI or the Contracting Customer, was the tobacco product manufacturer ("TPM") for these cigarettes based on the laws of each MSA State in which they were sold.  Such a determination is purely a matter of State law.  It is also police and regulatory in nature and, therefore, is not subject to the automatic stay under §326(b)(4) and cannot be removed to the bankruptcy court.  28 U.S.C. §1452(a).  Accordingly, any suit to determine the merits of this issue does not fall under the exclusive jurisdiction of the Bankruptcy Court, and any Plan provision to the contrary does not comply with the Bankruptcy Code and is, therefore, not confirmable under §1129(a)(1).

### 3.    ¶ 13.3 Injunctions or Stays.

This provision attempts to extend the automatic stay under §362 until the "Effective Date", rather than upon confirmation as provided in the Bankruptcy Code.  Under §362(c)(2), the automatic stay is lifted the earlier of the time when the case is closed, dismissed, or a discharge is granted or denied.  In a Chapter 11 case, confirmation of the plan triggers the debtor's discharge of debts.  §1141(d)(1)(A).  Accordingly, any Plan provision extending the §362 stay beyond confirmation is impermissibly broad and cannot be confirmed under 1129(a)(1).

### Conclusion

WHEREFORE, for the reasons stated above, the States ask this Court to deny confirmation of the Debtors' Plan.

Respectfully Submitted,

NATIONAL ASSOCIATION OF ATTORNEYS
GENERAL

/s/ Patricia Molteni
Patricia Molteni (DC Bar No. 980878)
Karen Cordry (DC Bar No. 278051)

2030 M Street NW., 8th Floor
Washington, D.C. 20036
Tel: 202.326.6251 (Molteni)
Tel: 202.326.6025 (Cordry)
Fax: 202-521-4052
pmolteni@naag.org
kcordry@naag.org

NICHOLLS & CRAMPTON, P.A.

/s/ Gregory B. Crampton
Gregory B. Crampton (NC bar no. 991)
P.O. Box 18237
Raleigh, NC 27619
919-781-1311

**Attorneys for the States**

26