UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| Renegade Holdings, Inc., | ) | Case No. 09-50140C-11W |
| Alternative Brands, Inc., | ) | Case No. 09-50141C-11W |
| Renegade Tobacco Co., | ) | Case No. 09-50143C-11W |
| | ) | Consolidated for Administration |
| Debtors. | ) | |
| | ) | |

MEMORANDUM OPINION

These cases came before the court on March 9 and March 15, 2010, for a confirmation hearing on Debtors' Amended Joint Plan of Reorganization dated October 1, 2009 ("the Plan"). John A. Northen appeared on behalf of the Debtors, Paul A. Fanning appeared on behalf of Bank of the Carolinas, Robyn C. Whitman appeared on behalf of the United States Bankruptcy Administrator, Patricia Molteni appeared on behalf of the States[1], and Gene B. Tarr appeared as the Examiner in this case. Having considered the Plan, the objections to the Plan, the evidence offered at the hearing, the matters of record in this case, and the arguments of counsel, the court makes the following findings of fact and conclusions of law pursuant to Rules 9014 and 7052 of the Federal Rules of Bankruptcy Procedure.

---

[1]According to their proof of claim, the States asserting escrow claims in this case are Alabama, Arizona, Arkansas, California, Georgia, Idaho, Missouri, Nebraska, North Carolina, South Carolina, Tennessee, Utah and Virginia. Missouri and South Carolina also assert penalty claims.

JURISDICTION

This court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference entered by the United States District Court for the Middle District of North Carolina on August 15, 1984. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(L) which this court may hear and determine.

FACTS

1. Background

In 1998, the four major domestic tobacco companies (Philip Morris, R.J. Reynolds Tobacco Company, Brown & Williamson Tobacco Corp. and Lorillard Tobacco Company) entered into a Master Settlement Agreement ("MSA") with forty-six states (Florida, Minnesota, Mississippi and Texas had settled separately), the District of Columbia, and the five United States territories (American Samoa, Guam, the Northern Marianna Islands, Puerto Rico, and the Virgin Islands).

Pursuant to the MSA, the States agreed to dismiss the suits that were pending against the tobacco companies and release antitrust and other claims that had been asserted against those tobacco companies in exchange for perpetual payments that are directly related to each company's market share of the cigarette industry. Under the MSA, the funds are to be paid to the States and are supposed to be used to defray health costs resulting from

- 2 -

smoking-related illnesses and to fund smoking prevention programs.

The MSA also contains provisions under which other tobacco companies may enter into or join the MSA and become Subsequent Participating Manufacturers ("SPMs").[2]  Pursuant to the terms of the MSA, all Participating Manufacturers ("PMs") make payments to the States (the "MSA payments") based primarily on the amount of cigarettes sold each year.  The MSA payments are typically due by April 15th in the year following the calendar year for which sales were reported.

Tobacco product manufacturers who chose not to participate in the MSA are known as Non-Participating Manufacturers("NPMs").  Because they are not parties to the MSA, NPMs do not make MSA payments to the States.

In order to receive the maximum benefits under the MSA, the States are required by the MSA to enact legislation known as the Qualifying Statute.  The Qualifying Statute requires, among other things, that NPMs make annual deposits into an interest bearing escrow account.[3]  The escrow funds are to be used to pay any judgment or settlement of claims brought against the NPMs by the States.  Some states have enacted additional legislation commonly known as Complimentary Statutes in order to provide for the

---

[2]Capitalized terms are terms defined under the MSA.

[3]North Carolina Gen. Stat. §§ 66-290 through 291 is an example of the Qualifying Statute.

- 3 -

enforcement of the Qualifying Statute against NPMs.[4]

The amount that NPMs are required to deposit into their escrow accounts is established under the Qualifying Statute and is based upon the NPMs' sales in the year preceding the date in which the payment is due. The amount that NPMs are required to deposit is supposed to be roughly equivalent to the amount that would be owed as MSA payments and operates to neutralize the competitive advantage NPMs otherwise would have over PMs if the PMs were the only ones making payments to the States. The funds deposited by NPMs must be held in the escrow account for 25 years so that if States successfully sue the NPMs on causes of action related to tobacco products, they may collect their judgments from the escrow accounts. At the end of 25 years, any remaining funds are returned to the NPM. The NPMs are entitled to receive the interest from the funds while the funds remain in the escrow account.

Under the Complimentary Statutes, NPMs must file a certification every year with each of the states in which they sell cigarettes, in which the NPMs list their brands of cigarettes and certify that they are maintaining the required escrow account and that they have placed the full amount of the required escrow deposits for the preceding year into the escrow account.

Most of the States publish a directory of certified tobacco

---

[4]North Carolina Gen. Stat. §§ 66-292 through 294.1 is an example of the Complimentary Statute.

Case 09-50140   Doc 459   Filed 04/16/10   Page 4 of 62

manufacturers.  These directories list both the companies and the brands that the States determine to be compliant with either the terms of the MSA Contract, or the provisions of the Qualifying Statute.  The directories are published on websites maintained by the States.  If an entity is not listed in the directory issued by a State, then under the Complimentary Statutes, wholesalers or distributors are prohibited from selling products of that entity in those states.  The removal of an entity from the directories is referred to as delisting.  Delisting occurs when a party is no longer qualified to have its cigarettes sold in a State and is removed from the State's directory.

In most States, PMs must certify their compliance with the provisions of the MSA on an annual basis.  The process is more involved for NPMs, who must report in more detail (quarterly in some States and annually in most) the amounts paid into escrow for each different brand sold in each different state.  Each of an NPM's brands is treated on an individual basis for compliance with the Qualifying Statutes.  If a PM is compliant with the terms of the MSA, or an NPM is compliant with the Qualifying Statute, then the company and all of its brands should be listed on the States' directories.  If a company is non-complaint under either the MSA (as to PMs) or the Qualifying Statutes (as to NPMs), the company's name and its brands may be delisted and removed from the directories. As a practical matter, delisting means that a company will not be

- 5 -

able to sell its cigarettes in the States in which it is delisted.

       2.  The Debtors

The Debtors, Renegade Holdings, Inc. ("RHI"), Alternative Brands, Inc. ("ABI") and Renegade Tobacco Company ("RTC"), are fabricators and distributors of tobacco products consisting primarily of cigarettes and cigars. ABI and RTC are subsidiaries of RHI. The stock of RHI is owned by Calvin A. Phelps, the chief executive officer of all three companies. The Debtors' offices and production facilities are located near Mocksville, North Carolina. The Debtors market their cigarette and cigar brands through wholesalers and retailers in 19 states and for export. ABI also is a contract fabricator for private label brands of cigarettes and cigars which are produced for other licensed tobacco manufacturers. The Debtors have 140 employees who work full-time at Debtors' offices and production facilities in Mocksville. The Debtors have far more sales in North Carolina than any other state.

The Debtors have not joined the MSA and thus operate as NPMs. The Debtors have established an escrow account at SunTrust Bank as required under N.C. Gen. Stat. § 66-291 and have made deposits into the account based upon their sales in the various states in which Debtors' brands are sold. However, when the escrow deposit required for Debtors' 2006 sales in North Carolina came due on April 1, 2007, the Debtors were unable to make the full amount of the required deposit. As a result, the State of North Carolina delisted the

- 6 -

Debtors' brands.  The Debtors were $6,945,222.57 short of paying the amount required based upon their North Carolina sales for 2006.  The Debtors were able to have their brands relisted in North Carolina in July of 2007 by means of a settlement with the State of North Carolina under which they deposited half of the $6,945,222.57 deficit into the escrow account at the time of settlement and agreed to deposit the other half within 30 days after being relisted, plus paying a penalty of $223,563.91.  The Debtors made these payments in accordance with the settlement agreement and were able to resume sales in the State of North Carolina.

The 2007 settlement agreement also required that in 2008 the Debtors begin making their North Carolina escrow deposits on a quarterly basis beginning in January of 2008.  Under the settlement, the Debtors were required to make their escrow deposit for the 4th quarter of 2007 no later than January 31, 2008; to make any remaining deposit required for 2007 sales no later than April 15, 2008; and to make their deposit for sales for the 1st quarter of 2008, no later than April 30, 2008, and to continue payments on a quarterly basis thereafter.

The Debtors were able to make the payment in January of 2008, for sales during the 4th quarter of 2007.  When it appeared that the Debtors would not be able to make the deposit required on April 15, 2008, for the first three quarters of 2007, the Debtors sought and obtained a revision of the settlement in March of 2008.  At that

- 7 -

time, the unpaid deposit required for sales during the first three quarters of 2007 was $4,642,144.19. Under the revised settlement, the $4,642,144.19 was to be repaid by 36 monthly payments, consisting of $50,000.00 per month for the first 12 months, $100,000.00 per month for the next 12 months and $236,845.35 per month for the final 12 months. For the remainder of 2008, the Debtors made the required monthly deposits for the sales in North Carolina and the other states in which they were authorized to distribute their brands. However, when it became apparent that the Debtors would not be able to make the deposits required by the end of January of 2009 for sales made during the 4th quarter of 2008 and the deposits required under the revised settlement, the Debtors filed their petitions for relief under chapter 11 of the Bankruptcy Code on January 28, 2009. At that time, the Debtors had not been delisted by any state in which the Debtors were authorized to distribute their brands and there was more than $30,000,000.00 on deposit in the statutory escrow account at SunTrust Bank.

   3. The States

  Although there are 46 states who are parties to the MSA, only the thirteen states identified on the first page of this opinion are claimants in this case. These states assert claims for the pre-petition amounts they claim should have been paid into the escrow account based upon the sales of Debtors' tobacco products that took place in the respective states. Two of the states also have

asserted penalty claims.  The Debtors have placed their unpaid pre-petition escrow obligations at $7,692,039.17 and their penalty obligations at $30,852.00.

### 4.    Other creditors of the Debtors

The other creditors in this case include both secured creditors and unsecured creditors.  The principal secured creditor is Bank of the Carolinas which is owed approximately $6,235,237.00.  This indebtedness is secured by a lien on the Debtors' assets, including accounts receivable, inventory, furniture, equipment, fixtures, general intangibles, 51% of the equity interests, and the interest income payable to the Debtors from the NPM escrow account.  The other five secured creditors financed the purchase of equipment, and each is secured by a lien on discrete items of the Debtors' equipment.  These five creditors were owed an aggregate amount of $247,163.00 on the petition date.  The other nonpriority, unsecured claims in this case total some $3,067,165.00, exclusive of guaranty claims.  Unsecured creditors consist primarily of trade creditors and the USDA Tobacco Buyout Program.  Additional creditors are owed money by the Debtors on account of guaranty arrangements, with the sum owed contingent on the amount of recovery from the primary obligor.

### 5.    Classification and treatment of claims under the Plan

The Plan classifies the claims of creditors and equity security holders in thirteen classes:

- 9 -

Class 1 consists of the secured claims of Bank of the Carolinas. (Plan 4.1) On the petition date the aggregate amount of the Bank indebtedness was $6,235,237.00. Under the Plan, Bank of the Carolinas is to retain its security interests, and the total indebtedness will be reduced by the application of approximately $1,804,000.00 held in restricted accounts before the balance is converted into a term loan in the approximate amount of $4,121,280.00. Monthly payments of principal and interest will commence on the first day of the month following the effective date of the Plan, in an amount sufficient to fully amortize the new term loan over a sixty month period. The Plan provides for interest at an annual rate of 6.25%. (Plan 5.1) Subject to further approval of the court, reasonable attorneys' fees and costs will be paid in full within thirty days of the effective date of the Plan.

Class 2 consists of employee wage and benefit claims, and is separated into two subclasses. (Plan 4.2) Class 2-A consists of all employee wage claims entitled to priority under § 507(a)(4) of the Bankruptcy Code. Class 2-B consists of employee benefit claims entitled to priority under § 507(a)(5) of the Bankruptcy Code. Under the Plan, any allowed claims in Class 2 are to be paid in full and in cash within sixty (60) days after the effective date of the plan; however, there apparently are no Class 2 claims. (Plan 5.2)

Classes 3 through 7 consist respectively of the secured claims of Business Vehicle Finance, DeLage Financial Services, Case Credit

Corp., CIT Technology Financial Services, Inc., and United Silicone. (Plan 4.3-4.7) As of the petition date, the aggregate amount of these five creditors' claims was $247,163.00. Under the Plan, each of these creditors will retain its respective security interest and the Debtors will assume the obligations under the loans and make payments in accordance with the contract terms. (Plan 5.3-5.7) Any arrearage will be paid within thirty days of the effective date of the plan, and the loan reinstated and any default deemed cured.

Class 8 consists of the claims of unsecured creditors which are for an amount of $1,000.00 or less, which are referred to as the Convenience Claims. (Plan 4.8) Under the Plan, creditors in Class 8 are to be paid the full amount of their claims, with interest from the petition date at 4.25%, within ninety days of the effective date of the Plan. (Plan 5.8) The Debtors estimate the amount of these claims at $18,950.93.

Class 9 consists of the remaining unsecured claims not otherwise classified, and includes the claims of trade creditors and the unsecured portion of any secured claim. (Plan 4.7) Under the Plan, unsecured creditors in Class 9 are to be paid in full over time, with quarterly or more frequent payments of principal and interest commencing twelve months after the effective date of the Plan, in amounts sufficient to fully amortize the outstanding indebtedness over a sixty month period. (Plan 5.9) The Plan provides that interest will accrue from the petition date at an

- 11 -

annual rate of 4.25%. Additional provisions of the plan, discussed below, provide that Class 9 creditors will receive earlier distributions, shared pro-rata with Class 10 and Class 12 creditors, in the event of excess cash flow or Examiner net recoveries. The Debtors estimate the amount of these claims at $3,027,719.64.

Class 10 consists of the claims of the various States for pre-petition amounts that the Debtors are obligated to pay into the NPM escrow account. (Plan 4.10) Under the Plan, claims in Class 10 are to be paid in full over time as follows: (i) beginning thirty-six (36) months after the effective date of the Plan, a quarterly or more frequent payment of principal and interest, of an amount sufficient to fully satisfy the obligation on a seven year amortization schedule; and then (ii) beginning in the fourth year of payments, the quarterly or more frequent payment will be accelerated so that the obligations will be paid in full within eighty-four months of the effective date of the Plan. The Plan provides that interest will accrue from the petition date at an annual rate of 4.25%. (Plan 5.10.1) Class 10 creditors also will receive earlier distributions, shared pro-rata with Class 9 and Class 12 creditors, in the event of excess cash flow or Examiner net recoveries. The Debtors estimate the amount of the Class 10 escrow account claims to be $7,692,039.17.

Class 11 consists of State penalty claims related to NPM escrow accounts. (Plan 4.11) Under the Plan, creditors in Class 11 are to

be paid in full over time, with interest at the rate of 4.25% per annum, by means of quarterly or more frequent payments of principal and interest commencing thirty-six months after the effective date of the Plan, in amount sufficient to fully satisfy the outstanding indebtedness over a forty-eight month period. (Plan 5.11.1) Class 11 creditors also will receive earlier distributions in the event of excess cash flow or Examiner net recoveries, provided that all claims in Class 9, Class 10, and Class 12 have been fully satisfied. The Debtors estimate the amount of the Class 11 penalty claims to be $30,852.00.

Class 12 consists of guaranty claims, in which a party holds a claim against the Debtors based on guaranty of payment obligations of any person or entity other than the Debtors. (Plan 4.12) Under the Plan, each guaranty claim is deemed a guaranty of collection, rather than a guaranty of payment. (Plan 5.12.1) Class 12 claims are to be paid in full over time, with quarterly or more frequent payments of principal and interest commencing twelve months after the effective date of the Plan, in amount sufficient to fully amortize the outstanding indebtedness over a sixty month period. The Plan provides that interest will accrue from the petition date at an annual rate of 4.25%. (Plan 5.12.2) Class 12 creditors also will receive earlier distributions, shared pro-rata with Class 9 and Class 10 creditors, in the event of excess cash flow or Examiner net recoveries. The Debtors estimate the amount of these claims at

$2,408,767.00, based on projections for recovery by the Class 12 creditors against primary obligors and third-party collateral.

Class 13 consists of the equity interest in the Debtors. (Plan 4.13) Under the Plan, the equity holders retain their interest in the Debtors on account of stock ownership and continue to hold all of the rights and privileges of a shareholder, except as is limited by covenants contained in the Plan. (Plan 5.13) In particular, no dividend or other distribution is permitted, except as necessary to defray income tax obligations passing through from the Debtors, until all claims have been satisfied under the Plan.

6. Means for performance of the Plan

Under the Plan, the funds necessary for the execution of the Plan are to be derived from the Debtors' cash on hand on the effective date of the Plan and from the cash flow generated by the continued operation of the Debtors' business after the effective date. These funds may be supplemented by additional payments to be made from the Debtors' Excess Cash Flow and from any recoveries by the Examiner which are to be applied as provided in the Plan.

a. Excess Cash Flow

The Plan defines Excess Cash Flow to include both 50% of certain cash flow from operations,[5] as well as 100% of recoveries by

---

[5] This cash flow is defined under clause (i) of paragraph 2.25 of the Plan to be:

> fifty percent (50%) of the Debtors' consolidated EBITDA (earnings before interest, taxes, depreciation and amortization)

Case 09-50140   Doc 459   Filed 04/16/10   Page 14 of 62

the Examiner, net of fees and costs. (Plan 2.25) Such annual Excess Cash Flow is distributed under the Plan within six (6) months after the end of the calendar year. Claims in Class 9, Class 10, and Class 12 share pro-rata in such distributions, thereby reducing their outstanding regularly scheduled distributions most remote in time. (Plan 5.9, 5.10, 5.12.2) In the event no payments remain to claims in Class 9, Class 10, and Class 12, Excess Cash Flow is distributed to Class 11 penalty claims. (Plan 5.11.1)

b.  The Examiner

The Examiner is Gene B. Tarr, an independent, unrelated attorney who was appointed by the court to serve as Examiner in this case and whose appointment is made permanent under the Plan. (Plan 6.4) The Plan provides for the Debtors to assign to the Examiner on the Effective Date any outstanding promissory note, loan, or other obligation owed to the Debtors from any Affiliate or Insider, including Mr. Phelps. (Plan 6.4.1) Under the Plan, the Examiner is empowered to enforce and bring such actions as may be necessary or appropriate to enforce and collect such obligations. The Examiner

_____

determined in accordance with GAAP (generally accepted accounting principles and practices as in effect in the United States of America from time to time, consistently applied) for each calendar year commencing with the year 2010, less payments made by the Debtors during such period for taxes, capital expenditures, State Escrows for postpetition obligations, and principal payments on Allowed Claims pursuant to the Plan.

- 15 -

is also vested by the Plan with the power to pursue any claims or causes of action, including bankruptcy causes of action, which may be asserted on behalf of the Debtors and the Debtors' estates with respect to any Affiliate or Insider, including Mr. Phelps. Any recoveries by the Examiner, less fees and expenses incurred by the Examiner, are to be distributed to creditors pursuant to the provisions of the Plan.

7.   Summary of voting

All of the impaired classes under the Plan accepted the Plan except for Class 9 and Class 10, which consist solely of claims by the States. The unsecured creditors other than the States unanimously accepted the Plan. The States were the only party that either objected to the Plan or voted against the Plan.

8.   Objections of the States

The principal objections by the States to the confirmation of the Plan are as follows:

> (a) The States assert that the escrow obligations of the Debtors are not claims within the meaning of section 101(5) of the Bankruptcy Code and therefore cannot be dealt with in a plan of reorganization;
>
> (b) The Plan does not satisfy the requirements of section 1129(a)(3) because the Plan is proposed by a means forbidden by law;
>
> (c) The Plan does not satisfy the requirements of section 1129(a)(3) in that the Plan is not proposed in good faith;
>
> (d) The Plan does not satisfy the feasibility requirement of section 1129(a)(11);

- 16 -

(e)  The Plan discriminates unfairly against the States in contravention of section 1129(b)(1);

(f)  The Plan is not fair and equitable with respect to the States because the Plan does not provide the States with the present value of their claims, as required by section 1129(b)(2)(B)(i); and

(g)  The Plan includes an impermissibly broad jurisdictional provision giving the court exclusive jurisdiction to resolve disputes over state NPM escrow.

DISCUSSION

The Plan classifies and provides treatment for pre-petition escrow deposit obligations, i.e., escrow obligations arising from sales of tobacco products that occurred prior to the January 29, 2009 petition date.  In doing so, the Debtors have treated the pre-petition deposit obligations as claims, a step which is challenged as impermissible in the States' first objection to the Plan.

A.    The escrow deposit obligations are claims

The States argue that the escrow deposit obligations are not claims under the Bankruptcy Code and that the Debtors therefore cannot classify them or pay them over time.  This argument must be examined with reference to the definition of "claim" that is provided in the Bankruptcy Code.  That definition, contained in section 101(5), is as follows:

The term "claim" means—

(A) right to payment, whether or not such right is reduced to judgment, liquidated,

- 17 -

unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

Although the Debtors are obligated by the Qualifying Statute to make escrow payments in order to comply with state law and continue to do business in the States, the States argue that the escrow obligation is not a "claim" because the States do not have a current right to payment from the escrow funds. According to the States, the escrow payments are no different from other methods the States could have used to accomplish the goals of the MSA, such as requiring surety bonds or a demonstration of minimum net worth, which are obligations that are enforceable against a debtor in bankruptcy notwithstanding the automatic stay. These same arguments were made by the States, and rejected by the bankruptcy court and the district court, in In re Carolina Tobacco Co., No. 05-34156, 2006 Bankr. LEXIS 335 (Bankr. D. Or., March 14, 2006), aff'd 360 B.R. 702 (D. Or. 2007), a case which, like the present case, involved a NPM debtor who proposed to treat pre-petition escrow deposit obligations as claims under its plan of reorganization. This court, likewise, is convinced that the States' arguments that the escrow obligations do not constitute a claim should be rejected in this case.

- 18 -

This court agrees with the conclusion of the court in <u>Carolina Tobacco</u> that the States' view of "claim" as defined under the Bankruptcy Code is too narrow. Under the expansive language of section 101(5), a "claim" is a right to payment, even one that is unliquidated, unmatured, disputed or contingent. As the Fourth Circuit observed in <u>In re Stewart Foods, Inc.</u>, 64 F.3d 141, 144 (4th Cir. 1995), the definition contained in section 101(5) is intended to be the "broadest definition possible." Quoting from the congressional record, the court stated:

> Congress intended to adopt the broadest possible definition of the term "claim," so that a bankruptcy case would deal with all of the debtor's legal obligations. The House and Senate Reports to the Bankruptcy Reform Act of 1978 state the following about the definition of "claim":
>
>> By this broadest possible definition, and by the use of the term throughout the title 11, especially in subchapter I of chapter 5, the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court.

64 F.3d at 144.

Consistent with the statutory intent that all legal obligations "no matter how remote or contingent" be treated as claims, the Supreme Court has concluded that "the plain meaning of a 'right to payment' is nothing more nor less than an enforceable obligation" and held that a criminal restitution obligation is a claim. <u>Pennsylvania Dep't of Public Welfare v. Davenport</u>, 495 U.S. 552,

- 19 -

559, 110 S. Ct. 2126, 109 L. Ed.2d 588 (1990). The Court has reached the same conclusion regarding an obligation to pay that also is a regulatory condition. <u>F.C.C. v. Nextwave Personal Comm. Inc.</u>, 537 U.S. 293, 303, 123 S. Ct. 832, 154 L. Ed.2d 863 (2003)("In short, a debt is a debt, even when the obligation to pay is also a regulatory condition."). Given the view of the Supreme Court that the intended effect of the section 101(5) definition is to define the scope of the term "claim" as broadly as possible and its rejection of efforts in the foregoing cases to narrow the scope of the definition, courts applying the definition should "rebuff virtually all attempts to characterize obligations as outside the scope of the definition due to 'special' or unique characteristics of those obligations." 2 <u>Collier on Bankruptcy</u> ¶ 101.05[3] (16th ed. 2009).

In light of the expansive definition contained in section 101(5) and the broad interpretation given that definition, this court is satisfied that the escrow deposit obligations of the Debtors are claims that may be classified and dealt with under a plan of reorganization. The argument that the obligation to make the deposits is not a claim because the money is not paid to the States and the States have no current right to payment from the escrow fund is not accepted. It is indisputable that under the escrow statutes, the Debtors are subject to an enforceable obligation to pay the escrow deposits. The argument by the States

- 20 -

that there is no enforceable obligation because they are not entitled to a money judgment at this time for the amount of the unpaid deposits also is not accepted. If escrow deposits are not made, the Qualifying and Complimentary Statutes adopted by the States allow the States to obtain an affirmative injunction requiring that the deposits be made, as well as allowing the States to delist the delinquent NPM and banish its products from the state until the deposits are made. Because the escrow obligations are legal obligations of the Debtors to pay that the States are entitled to enforce, those obligations are "claims" as defined in section 101(5) of the Bankruptcy Code and, therefore, may be dealt with in this case.

The States have cited several cases in support of their objection that were cited in the <u>Carolina Tobacco</u> case. This court agrees with the court in <u>Carolina Tobacco</u> that those cases are inapposite. As pointed out in the <u>Carolina Tobacco</u> case, none of the cases addresses the question of whether a particular obligation is a "claim" under section 101(5). 2006 Bankr. LEXIS 335, at *6. In <u>Safety-Kleen, Inc. v. Wyche</u>, the issue was whether the state's regulatory financial responsibility requirements, which required the debtor to provide a surety bond, were excepted from the automatic stay under the police and regulatory power exception to section 362. <u>Id.</u> A similar issue was involved in <u>Bickford v. Lodestar Energy, Inc.</u>, 310 B.R. 70 (E.D. Ky. 2004)(whether enforcement of state

- 21 -

bonding requirements against parties holding surface mining permits came within police power exception to automatic stay); In re Synergy Dev. Corp., 140 B.R. 958 (Bankr. S.D.N.Y. 1992)(whether action by state to compel debtor to post bond required of health clubs was excepted from the automatic stay by exception for exercise of police power); In re Edwards Mobile Home Sales, Inc., 119 B.R. 857 (Bankr. M.D. Fla. 1990)(whether revocation of debtor's license to sell mobile homes for failure to post bond came within police power exception to automatic stay). Since these cases do not address whether there were obligations that constituted "claims," they are not instructive in this case.

As further pointed out in the Carolina Tobacco opinion, the escrow deposits required under the Qualifying Statutes are solely for the benefit of the States; no other party has any right to receive the escrow funds. 2006 Bankr. LEXIS 335, at *10. This feature differentiates the escrow deposits from the surety bonds or the requirements that a debtor provide proof of responsibility which are for the benefit of unspecified third parties who might be harmed by a debtor's conduct. Id. The bonds and financial responsibility requirements also differ from bonds in that the cost of a bond is based upon the amount of potential liability to the public, while the amount of the escrow deposits is determined entirely by the number of cigarettes sold in a state, without regard to the extent of risk of harm such sales create. Id.

- 22 -

An additional reason why the escrow obligations should be regarded as claims is that the structure created by the MSA and the Qualifying Statute called for under the MSA, split what is essentially one claim into two parts: one part being the States' right to sue and obtain judgment or settlement for claims against NPMs based on the operations of the NPM, and the other part being a separate requirement that, in order to conduct business in a state, a NPM must make escrow deposits that then serve as an asset that can be used to pay any judgment or settlement that the States may obtain. Id. Payment for any claims that the States may have against the Debtor for its operations in any given year is assured by the amounts the Debtors are obligated to pay into escrow for that year. Although the States' right to sue on a claim arises out of a different statute or legal basis than the NPM's obligation to make escrow deposits, the court is convinced that when the MSA scheme is viewed as a whole, the escrow obligation is part of the claim. Id.

In summary, having concluded that the obligation to make escrow deposits is a claim, the court rejects the States' argument that the Debtors may not propose a plan in which the escrow obligations are classified and paid over time.

> B. The Plan is not proposed by a means forbidden by law in violation of section 1129(a)(3)

Section 1129(a)(3) requires that a plan be proposed "in good faith and not by any means forbidden by law." The States argue that the Plan allows the Debtors to operate in violation of the escrow

- 23 -

statutes after confirmation because it allows the Debtors to pay the unpaid pre-petition escrow payments over a period of time rather than making immediate payment of the unpaid pre-petition obligations. As a result, the States argue that the Plan is proposed by a means forbidden by law in contravention of section 1129(a)(3). This same argument was made in the Carolina Tobacco case and was rejected by both the bankruptcy court and the district court. This court also rejects the argument that the Plan in this case has been proposed by a means forbidden by law.

No one disputes the fact that the unpaid pre-petition escrow payments were not paid when required under the States' escrow statutes. Nor are there any provisions in the escrow statutes allowing the payment of an escrow arrearage by installment payments over a period of time. It does not follow, however, that the Plan cannot provide such treatment for the unpaid escrow obligations. Section 1123(a)(5) of the Bankruptcy Code provides that "notwithstanding any otherwise applicable nonbankruptcy law," a plan shall provide adequate means for the plan's implementation. Under this provision, transactions or other operative plan provisions that are necessary to implement a plan preempt and override "otherwise applicable nonbankruptcy law," including state law that conflicts with such plan provisions. In re FCX, Inc., 853 F.2d 1149, 1155 (4th Cir. 1988). In the FCX case the proposed plan provided for the surrender of patronage certificates held by the debtor, contrary to

- 24 -

applicable state law and bylaw provisions. In overruling an objection to the plan, the Fourth Circuit Court ruled that "[b]y its plain language then, § 1123(a)(5) overrules nonbankruptcy law restrictions on the distribution of collateral to satisfy a claim secured by the same." Id. at 1154. In so ruling, the court stated that section 1123(a)(5) is an "empowering statute" that "does not simply provide a means to exercise the debtor's pre-bankruptcy rights; it enlarges the scope of those rights. . . ." Id. at 1155. In accord, In re Stone & Webster, Inc., 286 B.R. 532, 543 (Bankr. D. Del. 2002)(section 1123(a)(5) means that "the provisions of a plan as articulated in § 1123(a) can be effected without regard to otherwise applicable nonbankruptcy law, including the corporation law of the State of Delaware or any other state corporation laws having bearing on the debtors"). Unlike the court in the Carolina Tobacco case, this court is not bound by the decision in Pacific Gas & Elec. Co. v. Cal. Dept. Of Toxic Substances Control, 350 F.3d 932, 949 (9th Cir. 2003), which held that section 1123(a)(5) preempts only otherwise applicable law relating to financial condition. A number of courts have disagreed with this decision as being unduly narrow and contrary to the plain language of section 1123(a)(5), a position with which this court agrees and adopts. See, e.g., In re Federal-Mogul Global, 402 B.R. 625, 641-44 (D. Del. 2009). Apart from not adopting the Pacific Gas view, this court agrees with the conclusion of the court in Carolina Tobacco that "making escrow

- 25 -

deposits relates to financial condition" and that "the requirement that escrow deposits have been made can be overcome by a plan that provides for paying that financial obligation over time" even under the ruling in Pacific Gas.  2006 Bankr. LEXIS 335, at *39.

Section 1123(a)(5) requires that a plan provide "adequate means" for its implementation.  However, other than requiring that the means be adequate, section 1123(a)(5) does not attempt to dictate what means are to be used.  Moreover, the means of implementation that are described in subparagraphs (A) through (J) that immediately follow the words "such as" are not intended to be exclusive.  In re Xofox Indust., Ltd, 241 B.R. 541, 542 (Bankr. E.D. Mich. 1999)("The optional nature of the provisions listed in § 1123(a)(5) is evident from the very fact that they are preceded by the term 'such as.'").  See also, 7 Collier on Bankruptcy ¶ 1123.01[5] (16 ed. 2009)("The types of means listed in section 1123(a)(5) are clearly illustrative and not exclusive.").

In this case, the means of implementation of the Plan as to the States' claims is quarterly payments over a maximum period of 48 months once payments begin. (Plan 5.10.1; 5.11.1)  In Carolina Tobacco the court held that "[p]ayment of a debt over time can constitute 'adequate means for the plan's implementation.'" Carolina Tobacco, 360 B.R. at 713.  This court agrees with that conclusion and rules that the Plan in this case complies with the requirements of section 1123(a)(5) in its treatment of the claims

of the States. This court also agrees with the conclusion in Carolina Tobacco, that the proposal to make periodic payments "over time is not forbidden by law, even though it means that the debtor will be out of compliance with state law until the prepetition escrow deposits are made." Id. This conclusion is fully supported by the language of section 1123(a)(5) that authorizes the utilization of means that are adequate for the implementation of a plan "notwithstanding any otherwise applicable nonbankruptcy law" and is adopted in this case.

Contrary to the contention of the States, this application of section 1123(a)(5) does not conflict with an exercise of the police power of the States. While the adoption of the Qualifying Statute certainly is related to efforts by the States to regulate the tobacco business, it does not follow that section 1123(a)(5) cannot be operative. The adoption of the Qualifying Statute is required under the MSA in order for the States to share in the stream of income from the original and subsequent parties to the MSA. The primary function of the statute is to require escrow payments by NPMs such as the Debtors. The only significant regulatory aspect of these statutes are provisions that facilitate the assessing and collection of the escrow funds by provisions that require registration with the States by the NPMs and the filing of reports regarding sales in order to facilitate the assessment and collection of the escrow funds. To the extent that the escrow payments are

- 27 -

intended to "level the playing field" between companies who are parties to the MSA and NPMs, such purpose obviously is pecuniary in nature since the Qualifying Statute served to induce the signatories of the MSA to be willing to pay the MSA fees to the States without being at a competitive disadvantage and risking the loss of their dominance of the cigarette industry. During the period that the funds are required to be held in escrow, such funds are for the sole purpose of funding any judgments or settlements obtained by the States and cannot be used for any other purpose. While the purpose of the Qualifying Statute may include some intent to promote public health and safety, the primary purpose of the statutes is to promote the pecuniary interests of the States. It is that pecuniary purpose that the States are seeking to enforce in this case by filing proofs of claim and opposing the Plan. It follows that pursuant to section 1123(a)(5), the pre-petition escrow obligations may be paid over time notwithstanding the Qualifying Statutes.

### C. The Plan was proposed in good faith as required under section 1129(a)(3)

Section 1129(a)(3) requires that a plan be proposed in good faith before it can be confirmed. According to Collier, the inclusion of good faith in the list of confirmation requirements under section 1129(a) signifies an intent on the part of Congress that there be some check on the mechanical requirements found in other subsections of section 1129. 7 Collier on Bankruptcy ¶ 1129.02[3][a] (16th ed. 2009). Although the Bankruptcy Code

- 28 -

imposes the good faith requirement, it does not define the term good faith. It is generally held that a plan is proposed in good faith if there is a reasonable likelihood that the plan will achieve a result which is consistent with the objectives and purposes of the Bankruptcy Code. See In re Madison Assocs., 749 F.2d 410, 425 (7th Cir. 1984); In re New Valley Corp., 168 B.R. 73, 80 (Bankr. D.N.J. 1994); In re Elsinore Shore Assocs., 91 B.R. 238, 260 (Bankr. D.N.J. 1988); In re Nite Lite Inns, 17 B.R. 367, 670 (Bankr. S.D. Cal. 1982). "A further refinement of the test for whether a plan is proposed in good faith is found in the notion that the plan must provide for fundamental fairness in dealing with creditors." In re New Valley Corp., 168 B.R. at 80-81. In determining whether these standards of good faith have been met, the court should consider the totality of the circumstances surrounding the proposed plan. See Matter of Texas Extrusion Corp., 844 F.2d 1142, 1160 (5th Cir. 1988); Matter of Jasnik, 727 F.2d 1379, 1383 (5th Cir. 1984). As observed in New Valley Corp., section 1129(a)(3) "permits considerable judicial discretion to be exercised and equitable considerations such as fundamental fairness to creditors to come into play." 168 B.R. at 81.

Based upon the totality of the circumstances in the present case, the court concludes that the Plan was proposed in good faith by the Debtors. The Debtors established at the confirmation hearing that in a Chapter 7 liquidation, the unsecured creditors likely

would receive less than a 50% distribution. Yet, the Plan provides for the payment in full of the allowed amount of all claims in this case, plus interest on the unsecured claims. At the same time, the Debtors showed that they likely will be able to operate successfully during the plan period and make the promised payments. In addition to the periodic payments required for claims in Class 9 (unsecured creditors other than the States), Classes 10 and 11 (the States) and Class 12 (guaranty claims), the Plan provides for 50% of their Excess Cash Flow (as defined in section 2.25), to be paid pro rata to the claimants with allowed claims in these classes throughout the Plan period or until such claimants have been paid in full. This distribution of Excess Cash Flow to the States and the other unsecured creditors is required whether or not there has been a default by the Debtors. (E.g., Plan 5.10.1) Contrary to the States' assertion, the absence of a default does not authorize the Debtors to retain the excess cash flow promised to creditors nor to retain any recoveries received from the Examiner. Moreover, the Plan leaves the independent Examiner in place and vests the Examiner with the authority to investigate and pursue any claims that exist against insiders and affiliates, including Mr. Phelps and any entity owned by him. (Plan 6.4.1) Considering the Plan as a whole and the foregoing provisions in particular, the court finds that the Plan is fundamentally fair to creditors and, considering that the Plan is one under which creditors likely will be paid and a viable

business and the jobs of 140 employees preserved, is consistent with the objectives and purposes of Chapter 11 of the Bankruptcy Code. As such, the Plan satisfies the requirements of section 1129(a)(3).

> D. The Plan satisfies the feasibility
> requirement of section 1129(a)(11)

Section 1129(a)(11) of the Bankruptcy Code requires as a precondition to confirmation that a court determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan . . . ." The purpose of this feasibility requirement "'is to prevent confirmation of visionary schemes which promises creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.'" In re Pizza of Haw., Inc., 761 F.2d 1374, 1382 (9th Cir. 1985) (citation omitted). A bankruptcy court thus has an obligation to carefully review a plan to determine if it is workable. In re Monnier Bros., 755 F.2d 1336, 1341 (8th Cir. 1985). Success need not be guaranteed – the possibility that a plan may fail is not fatal – but a plan must be supported by adequate evidence that some reasonable assurance of success exists. Kane v. Johns-Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988); In re Prussia Assocs., 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005). The debtor has the burden of demonstrating that a plan is feasible. E.g., Lisanti v. Lubetkin (In re Lisanti Foods, Inc.), 329 B.R. 491, 496 (D.N.J. 2005) ("[T]he burden is on the plan

- 31 -

proponents to prove that all the applicable provisions of 11 U.S.C. § 1129 have been satisfied."); In re Deep River Warehouse, Inc., No. 04-52749, 2005 Bankr. LEXIS 1793, at *5 (Bankr. M.D.N.C. Sept. 22, 2005) (same).

The Debtors operate in a regulated and highly taxed industry. Their primary products consist of cigarettes, little cigars, regular cigars and filtered cigars. These products are subject to substantial federal and state excise taxes, as well as an assessment associated with the federal tobacco buyout program. As NPMs, the Debtors also are subject to various state statutes that require escrow payments based upon Debtors' sales. In April of 2009, the federal excise tax was substantially increased. This occurred shortly after this case was filed. The Debtors were faced not only with the challenges ordinarily experienced by a business operating in Chapter 11, but also with new challenges presented by the tax increase. The federal excise tax on cigarettes went from $3.90 per carton to $10.07 per carton. The federal excise tax on little cigars went from $.40 per carton also to $10.07 per carton. The significant increase in the tax on little cigars had a severe impact on the Debtors' business model. Prior to the tax increase, the Debtors had taken advantage of the lower tax on little cigars and built a very substantial sales volume in little cigars which could be marketed at a much lower price than cigarettes. As a result of the nearly ten fold increase in the tax on little cigars, the

- 32 -

Debtors were faced with a dramatic decrease in the sales volume for little cigars. Debtors' management reacted swiftly and effectively. Debtors developed and began to market a filtered cigar, a product that could be marketed at a more competitive price, since it was taxed at $6.00 per carton rather than the $10.07 tax on cigarettes and little cigars. By the fourth quarter of 2009, the Debtors regained the sales volume that had been lost initially following the tax increase. In developing the projections relied upon in support of their Plan, the Debtors relied heavily upon the results achieved during the fourth quarter of 2009 since the new product mix and new taxes were reflected in their sales and operations during the fourth quarter and since the fourth quarter operations more accurately reflected the current nature and volume of their sales. Although sales over a longer period would have been preferable, it was more prudent to use the fourth quarter sales figures because of the significant changes that occurred following the tax increase in April. Under the circumstances of this case, it was reasonable for the Debtors to conclude that the fourth quarter sales should be relied upon in projecting sales during the plan period. In projecting the expenses used in preparing their projections, the Debtors relied upon actual historical operations over a period of several years, using their actual expenses. In projecting sales during the plan period, the Debtors have projected a small annual increase of less than 4% while also projecting modest increases in

materials, manufacturing and other costs.  In making the projections relied upon by the Debtors, the court finds that the assumptions that underlie the projections were reasonable and realistic and not merely speculative.  While there is a risk that the higher excise tax will result in an overall decrease in the use of tobacco products, there also is a reasonable likelihood that the Debtors nonetheless will be able to perform in accordance with the projections presented at the hearing.  The Debtors have employed and have in place experienced and very capable management who have proven that they have the ability to adjust and survive in the marketplace.  The Debtors have found a niche in the marketplace that has enabled the Debtors to overcome the loss of sales resulting from the new tax on little cigars.  If the Debtors were able to turn their business around while operating under the strictures and disadvantages of being in Chapter 11, they should be able to deal with future challenges that may lie ahead for everyone in the tobacco business.  Feasibility under section 1129(a)(11) does not require a guarantee of success.  The requirement is that a proponent show that its plan has a reasonable prospect of success and is workable.  The Debtors have met this burden.

Having considered all of the arguments made by the States relating to section 1129(a), the court concludes that the Plan complies with all of the requirements of section 1129(a) except for the requirement of section 1129(a)(8), which requires that all

- 34 -

impaired classes accept a plan, which has not occurred as a result of the States' rejection of the Plan. This leads to the question of whether the court should confirm the Plan over the objection of the States pursuant to section 1129(b).

Under section 1129(b)(1), if all of the applicable requirements of section 1129(a) are met other than section 1129(a)(8), the court "shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."

> E.    The Plan does not discriminate
>        unfairly against the States

The first requirement imposed by section 1129(b)(1) is that the plan not discriminate unfairly as to any impaired class of claims that does not accept the plan. Since the States make up the only impaired classes not accepting the Plan, the issue regarding unfair discrimination is whether the Plan discriminates unfairly as to the States, and not as to any other class of claims.

The prohibition under section 1129(b)(1) is against "unfair discrimination" and not simply discrimination of any kind. This means that "[t]here can be 'discrimination,' so long as it is not 'unfair.'" 7 Collier on Bankruptcy ¶ 1129.03[3] (16th ed. 2009). Various tests have been used for determining whether discrimination under a plan is unfair for purposes of section 1129(b)(1). The elements included in these various tests can be distilled down to

- 35 -

two basic elements: (1) there must be a reasonable basis for the discrimination; and (2) the extent of the discrimination must be necessary in light of the basis for the discrimination.  <u>See</u> 7 <u>Collier on Bankruptcy</u> ¶ 1129.04[3][a] (16th ed. 2009).  Determining whether discrimination under a plan is unfair requires consideration of the totality of the circumstances of the case.  <u>See</u> <u>In re Bryson Properties, XVIII</u>, 961 F.2d 496, 502 (4th Cir. 1992).  The court will utilize these principles in the present case in considering whether the Plan contains provisions which discriminate unfairly against the States.

The States argue that the Plan discriminates unfairly by placing their claims in different classes than the claims of other unsecured creditors and providing different treatment for their claims.  Under the Plan, the claims of unsecured creditors other than the States are placed in Class 9, while the States' escrow claims are placed in Class 10 and their penalty claims are placed in Class 11.  Under the plan, the States receive the same percentage of their claims—all of the claimants are to receive 100% of their claims—and same interest rate of 4.25% per annum as received by the unsecured claims in Class 9.  However, the terms of payment to the States are different from that of the other unsecured creditors.  The Plan provides that the claims in Class 9 are to be paid by means of "quarterly or more frequent payments of principal and interest commencing twelve (12) months after the effective date of the Plan,

- 36 -

in amounts sufficient to fully amortize the outstanding indebtedness over a sixty (60) month period." (Plan 5.9) The States' claims in Class 10 are to be paid by means of "quarterly or more frequent installments of principal and interest sufficient to fully satisfy such deposit obligations over a period of forty-eight (48) months on a seven year amortization schedule commencing thirty-six months after the Effective Date and with payments accelerated in 2016[6] to pay the balance in full." (Plan 5.10.1) The treatment for the Class 11 penalty claims differs only in that the four years of payments are not based on a seven year amortization schedule. (Plan 5.11.1) The States argue that such classification and treatment constitutes unfair and is impermissible. The court disagrees.

The section of the Bankruptcy Code dealing with classification of claims is section 1122, which provides:

> (a) except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class.

> (b) a plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

The explicit language of section 1122 requires substantial similarity between claims that are placed in the same class, but does not require that all substantially similar claims be placed

---

[6]Because confirmation will occur later than assumed under the Plan, the acceleration of payments likely will occur in 2017.

within the same class.  Section 1122 therefore leaves some flexibility in the classification of unsecured claims.  In Bryson, while acknowledging that section 1122 "grants some flexibility in classification of unsecured claims", the court pointed out that there is a limit to such flexibility.  Id. at 502.  Whether a plan has exceeded the permissible flexibility and thereby unfairly discriminates depends upon whether there is a reasonable basis for the discrimination.  The court is satisfied that there is a reasonable basis for the classification of the States' claims in different classes and for the different treatment afforded the States' claims and therefore will overrule the States' unfair discrimination objection.

The claims in Class 9 primarily consist of the claims of the Debtors' trade creditors, including suppliers of various types of raw materials and services that will be needed by the Debtors in their continuing operations.  These claims are contractual claims that are to be paid directly to the claimants for their immediate use rather than being held in escrow.  The claimants are parties with whom the Debtors need to continue to do business.  As pointed out in Collier, where there are trade creditors and a large non-trade creditor, "it makes sense to separately classify the two and pay the trade or other creditors faster."  Collier at ¶ 1129.03[3][b][i].  As reflected in the cases cited in Collier such "discrimination" has been upheld, particularly where, as in the

- 38 -

present case, the same percentage (i.e., 100%) is paid to both classes of claims.

The States' claims are very different from the claims included in Class 9. The States' claims are statutory claims arising under various state statutes and involve amounts that when paid, are to be held in escrow until the States have successfully asserted claims against the Debtors or obtained settlements which entitle them to then receive the amount of the judgment or settlement from the escrow fund. No such claims have ever been asserted against the escrow funds paid by the Debtors and, according to a witness from the North Carolina Attorney General's office, it is anticipated that if such a claim is to be established it will be far in the future. Thus, even though the payout to the States is three years longer than the payout to the Class 9 claimants, it appears that the payout nonetheless will be completed well before the States will be in a position to assert claims that would entitle them to access the funds in the escrow account. This differs significantly from the Class 9 claimants who are under no such limitation and will be entitled to utilize their payments as soon as received. The significant differences between the unsecured creditor claims in Class 9 and the claims of the States support the separate classification of the States' claims and fully justify the nature and extent of the different treatment contained in Classes 10 and 11 for the States' claims, and such classification and treatment does

not constitute unfair discrimination.

    F. The Plan is fair and equitable as
      to the States

  Section 1129(b)(2) sets forth the minimum standards that must be met in order for a plan to be "fair and equitable" for purposes of section 1129(b). <u>See, e.g.</u>, <u>In re D & F Constr., Inc.</u>, 865 F.2d 673, 675 (5th Cir. 1989); <u>In re EFH Grove Tower Assocs.</u>, 105 B.R. 310, 313 (Bankr. E.D.N.C. 1989). Under section 1129(b)(2)(B), in order for the plan to be "fair and equitable" with respect to a class of unsecured claims, the plan must (i) provide "that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim;" <u>or</u> (ii) provide that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property."

  Under the Plan in the present case, the stockholder, the holder of an interest clearly junior to the unsecured claims of the States, is retaining his equity interest in the Debtors. (Plan 5.13) Consequently, in order to satisfy the minimum requirements imposed by section 1129(b)(2)(B), the Plan must provide the States with a distribution having a value, as of the effective date of the Plan, equal to the allowed amount of their claims. Under this provision, the stream of payments payable in satisfaction of the States' claims under the Plan must have a present value equal to the allowed amount

- 40 -

of the States' claims.

The concept of present value is based upon the recognition that a dollar in hand today is worth more than a dollar due some time in the future. The difference between these two values is referred to as the time value of money. Lost opportunity to put the money to profitable use, the possibility of inflation, and the risk of non-payment explain this difference in value. Present value analysis involves an attempt to compensate for the time value of money, i.e., compensate for the delay in receiving payment. The present value calculation is a mathematical exercise which takes into account the magnitude of future income streams, as well as their timing. The discount rate used to reduce these future income streams to present value can be utilized in a bankruptcy context as an interest rate to ensure payment of the present value of a principal balance over time.

While the use of interest to ensure payment of the present value of a claim is generally accepted practice, determination of that interest rate has been a frequent issue of dispute. Over the years, courts have devised a number of methodologies for selecting an interest rate, both in the present Chapter 11 unsecured creditor "cramdown" context, and in other contexts requiring analogous payment of the present value of a claim. One such analogous context is found in section 1325(a)(5)(B)(ii), requiring that Chapter 13 plans pay holders of secured claims being crammed down the present

value of their claims. In <u>Till v. SCS Credit Corp.</u>, 541 U.S. 465 (2004), the Supreme Court took up the issue of the proper method of selecting an interest rate sufficient to pay present value under section 1325(a)(5)(B)(ii). The Court considered and rejected the coerced loan, presumptive contract rate, and cost of funds approaches, and instead settled on a formula approach. Under this formula approach, the interest rate is determined by starting with a national prime rate and adjusting upward to account for greater risk of default.

In an effort to satisfy the present value requirement of section 1129(b)(2)(B)(i), the Debtors propose in their Plan an interest rate of 4.25% for the unsecured claims of the States which is to be paid from the petition date until the claims have been satisfied pursuant to the Plan. (Plan 5.10.1; 5.11.1) The Debtors rely upon the decision in <u>Till</u> in providing the 4.25% interest rate, which apparently was arrived at by beginning with the 3.25% prime rate of interest and increasing that rate by 1% for additional risk. For the reasons hereinafter discussed, the court has concluded that the Debtors have established that the proposed treatment of the States' claims will provide the present value of the allowed amounts.

The Debtors' reliance upon <u>Till</u> was appropriate in this case. While the Court in <u>Till</u> interpreted a different section of the Code than is at issue here, the language of the two sections closely

- 42 -

track each other. The _Till_ plurality recognized this and cited a number of Code provisions, including section 1129(b)(2)(B)(i),[7] noting that they thought "it likely that Congress intended bankruptcy judges and trustees to follow essentially the same approach when choosing an appropriate interest rate under any of these provisions." _Id._ at 474. However, what would otherwise be a strong signal from the Supreme Court to apply the formula approach in Chapter 11 cramdown is attenuated by a subsequent footnote. In footnote 14, the plurality notes there is "no free market of willing cramdown lenders" in Chapter 13, unlike in Chapter 11, and concludes that "when picking a cramdown rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce." _Id._ at 477 n.14. In footnote 14, the _Till_ plurality was not suggesting it was easier to estimate market rates in Chapter 11. Instead, it appears that the suggestion is that in some Chapter 11 cases there will be an efficient bona fide market for financing, in which case that market's rate alleviates the need to undertake an estimate by the formula approach or any other approach.

---

[7]The language of section 1129(b)(2)(B)(i) closely parallels that of section 1325(a)(5)(B)(ii) which was directly at issue in _Till_. Section 1129(b)(2)(B)(i) differs only in that it requires the property distributed to the creditor be "equal" in value to the allowed amount of the claim, whereas under section 1325(a)(5)(B)(ii) the value of the distribution must be "not less than the allowed amount." While a minor distinction, the distinction nevertheless suggests that courts should be careful not to require an interest rate that either undercompensates or overcompensates a creditor who is unsecured in Chapter 11.

Several lower courts have considered the interplay between these two statements in _Till_.  _See, e.g._, _In re American HomePatient, Inc._, 420 F.3d 559 (6th Cir. 2005); _In re American Trailer and Storage, Inc._, 419 B.R. 412, 436 (Bankr. W.D. Mo. 2009) (noting several cases considering _Till_ in Chapter 11).  The prevailing view appears to be that if an efficient market exists, the market rate should be used in determining the appropriate interest, but if there is no efficient market, then the formula approach endorsed in _Till_ should be employed in determining the appropriate interest rate.  _E.g._, _American HomePatient_, 420 F.3d at 568.

When considering the question of what constitutes an efficient market rate, courts have taken different approaches.  Some courts have found market rate approximations by way of the contract rate or a coerced loan theory.  _See In re American Homepoint_, 420 F.3d at 568-69;  _In re Seaspan Development Corp._, No. 2:05-CV-315, 2006 WL 2672298, at *3 (E.D. Tenn. Sept. 18, 2006); _In re Sylvan I-30 Enterprises_, No. 05-86708-HDH-11, 2006 WL 2539718, at *7 (Bankr. N.D. Tex. Sept. 1, 2006).  Others have required a showing that an actual appropriate efficient market exists.  _See In re Griswold Bldg._, LLC, 420 B.R. 666, 693 (Bankr. E.D. Mich. 2009) (market had priced loans such that few, if any, loans were actually on the market, and therefore there was no market rate to utilize); _In re American Trailer and Storage, Inc._, 419 B.R. 412, 438 (Bankr. W.D.

- 44 -

Mo. 2009) (only available market had unreasonable terms, so no efficient market existed); In re Winn-Dixie Stores, Inc., 356 B.R. 239, 254-56 (Bankr. M.D. Fla. 2006) (junior creditor's loan was procured on the market, so its rate could be used in cramming down senior lender). Requiring the showing of an actual efficient market before substituting its rate for the formula rate is the better approach.

The evidence presented by the Debtors tended to show that no market of willing financiers of their escrow debt existed. The expert testimony presented by the States suggested that any financing for the Debtors would be at a rate of several percentage points higher than 4.25% and would probably require security as well as some equity upside, but did not suggest that there was a market in which such financing was available. Based on the totality of the evidence, the court concludes that no efficient market exists in this case. Several factors point to the absence of an efficient market. First, the court has seen no indication there are any actual lenders with loan terms the Debtors could accept as an alternative to cramming down the States. Second, high rates coupled with security and an equity interest suggest a lender is assessing an unduly high risk of default, to the point that the market is not efficient. In any case, the interest rate paired with an equity stake is irrelevant for present value purposes, as it fails to completely account for the creditor's risk and opportunity cost, as

- 45 -

required of a discount rate. Third, even if there were an efficient market providing secured exit financing, that is not the relevant market for an unsecured debt such as that owed to the States. The risk profile is different for secured and unsecured loans, and an interest rate paid to compensate a new secured lender is not necessarily the discount rate needed to ensure an unsecured claimant is paid present value. As there is no demonstrated efficient market rate of interest for the States' claims, the Debtors were correct in utilizing the formula approach in arriving at an interest rate for the States' claims and their choice in doing so is approved.

Under the formula approach, as articulated by the *Till* plurality, the process begins with the prime rate and then an upward adjustment is added to account for risk. *Till*, 541 U.S. at 478-79. As a whole, the prime rate serves to compensate the creditor receiving a promise of future payment, as "the creditor cannot use the money right away, inflation may cause the value of the dollar to decline before the debtor pays, and there is always some risk of nonpayment." *Id.* at 474. The prime rate principally compensates the creditor for the opportunity costs and the risk of inflation, with the adjustment addressing additional risk of non-payment. *Id.* at 479. As applied in *Till*, the formula approach requires two determinations: (i) what the relevant prime rate is; and (ii) how much adjustment should be applied in arriving at a final rate. As noted, the Plan proposes an interest rate of 4.25%,

- 46 -

apparently based on a prime rate of 3.25% and a 1% adjustment.  In arriving at this rate, the Debtors followed the methodology described in <u>Till</u>.

The Debtors' selection of 3.25% as the base rate for arriving at the required interest rate is consistent with the decision in <u>Till</u>.  The base rate under the <u>Till</u> formula approach is defined as "the national prime rate, reported daily in the press." <u>Id.</u> Bankruptcy courts have found sources such as the <u>Wall Street Journal</u> and the Federal Reserve's bank prime loan rate releases to accurately report the relevant rate.  <u>See, e.g.</u>, <u>In re Sparks</u>, 346 B.R. 767, 772 (Bankr. S.D. Ohio 2006)  (in Chapter 13 case, used <u>Wall Street Journal</u> or Federal Reserve); <u>In re Northwest Timberline Enterprises, Inc.</u>, 348 B.R. 412, 424 (Bankr. N.D. Tex. 2006) (<u>Wall Street Journal</u> prime rate in evidence in Chapter 11 confirmation); <u>In re Cachu</u>, 321 B.R. 716, 720 (Bankr. E.D. Cal. 2005) (taking judicial notice of Federal Reserve published prime rate in Chapter 13 case).  The court takes judicial notice of the fact the current national prime rate is 3.25%, as published in the Federal Reserve informational releases at http://www.federalreserve.gov /releases /H15/.  The Federal Reserve releases also indicate this rate has been constant since prior to the January 28, 2009 petition date. Thus, the Debtors' selection of the 3.25% national prime rate as the base rate for their interest rate proposal was consistent with the decision in <u>Till</u>.

The second step in the formula approach involves making an adjustment to account for risk of non-payment. <u>Till</u> provides some general guidance regarding the factors that should be considered in arriving at this adjustment. The plurality articulates these factors as including "the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." <u>Till</u>, 541 U.S. at 479. The plurality also quotes and appears to also agree with the dissenters' formulation of the risk factors as "(1) the probability of plan failure; (2) the rate of collateral depreciation; (3) the liquidity of the collateral market; and (4) the administrative expenses of enforcement." <u>Id.</u> at 484. The Court declined to specify any particular range of adjustment as appropriate, but noted that 1% to 3% had been common, and that "eye-popping" interest rates would not be proper adjustments, as such a rate suggests that the plan of reorganization is not feasible and should not be confirmed. <u>Id.</u> at 480-81.

While <u>Till</u> addressed cramdown of a secured claim, several of the risk factors articulated in the <u>Till</u> opinions are equally relevant in a case involving unsecured claims. In particular, risk related to the circumstances of the estate, the duration and feasibility of the reorganization and the administrative expenses of enforcement are appropriate in cases involving cramdown of unsecured claims. In contrast, the nature of security, rate of collateral depreciation and liquidity of the collateral market do not impact an

- 48 -

unsecured creditor's risks and are not relevant in this case. With collateral-risk removed from consideration, the remaining factors that are relevant in evaluating risk of non-payment significantly overlap with the factors that are relevant in determining whether the plan itself is feasible under section 1129(a)(11). The most important of these factors is the feasibility of the plan since it portends the likelihood of plan failure and is determinative of whether other factors such as administrative expense of enforcement will ever come into play. As previously discussed, the court is satisfied that the Plan as proposed is feasible and that confirmation is not likely to be followed by liquidation. Stated another way, the court has concluded that failure of the Plan is not likely to occur. As discussed earlier, the Debtors' projections for operations during the plan years reflect reasonable, modest improvements in sales, revenue, and operational efficiency. Even within these estimates, the Debtors have breathing room, as they project cash on hand of $11,564,937 at the end of 2017. Adjusting for projected income tax distributions, the Debtors could have a profit shortfall of over $19 million through the course of the plan and still make all required plan payments. While uncertainty always exists in future operations, the Debtors' current management appears capable of responding to future contingencies. The States' expert agreed that the Debtors' management was well qualified and able. This is not say that the Plan is free of feasibility-related risk to

- 49 -

the States.  The States do not receive payments on their claims until three years have elapsed under the plan and, once initiated, the payments extend over four years with a sizable portion of the escrow claims being deferred for payment during the final year of payments.  However, under the circumstances of this case, a seven year period for payment of claims the size of the States is not inordinately long nor unduly risky. Under the Debtors' projections, the later plan years have higher net income, providing more buffer to ensure sufficient funds are available to pay the States' claims. For example, in 2016 the Debtors project available proceeds payable to the Debtors of over $2 million <u>from</u> the escrow account, an amount sufficient to pay the amount due under the Plan <u>to</u> the States' escrow claims even if the Debtors had no operating profit that year. Also, while not received in the initial years, the States' claims do accrue interest which compensates the States for the timing of payment.[8]

Risk related to difficulty and expense of enforcement in the event of a default is minimized in this case.  The Plan provides for the continued appointment of the Examiner through the plan period.

---

[8]Later payment of the escrow claims offers an incidental benefit to the States.  Under the escrow statutes, the States have twenty-five years after the date of deposit to assert a claim against escrow funds. <u>See, e.g.</u>, N.C. Gen. Stat. § 66-291(b)(3) (2009).  The evidence presented by the States suggests a suit to establish a claim against an escrow account is not forthcoming, and that such a suit, if asserted, will take many years to develop. Thus, the additional years for which the funds will be on deposit might prove a valuable benefit to the States.

Case 09-50140   Doc 459   Filed 04/16/10   Page 50 of 62

The presence of the Examiner reduces the States' exposure to risk related to "administrative expense of enforcement." In addition to litigating bankruptcy causes of action for the benefit of the creditors, the Examiner serves as an additional party to bring matters to the attention of the court, functions as a clearinghouse of information and is vested with enforcement authority in the event of a default that is not cured.

Considering all of the risk factors present in this case, the court is satisfied that the 1% adjustment to the 3.25% base rate adopted by the Debtors is sufficient to account for any additional risk not covered by the 3.25% base rate and that the combined 4.25% overall interest rate proposed by the Debtors provides the States with a stream of payments with a present value equal to the allowed amount of their claims. The plurality in <u>Till</u> concludes its discussion of risk adjustment by stating that confirmation requirements concerning feasibility and cramdown, taken together, "obligates the court to select a rate high enough to compensate the creditor for its risk but not so high as to doom the plan." <u>Till</u>, 541 U.S. at 480. Here, an interest rate of 4.25% is high enough to compensate for risk, given feasibility of the plan and protection from administrative risk. No higher rate is necessary for compensation, and would instead serve to frustrate performance under the Plan.

Case 09-50140   Doc 459   Filed 04/16/10   Page 51 of 62

The selection of the formula approach by the Debtors and the application of that approach in arriving at the 4.25% interest rate is consistent with and fully supported by the decision in the <u>Till</u> case. There is, however, an alternative basis for upholding the 4.25% rate of interest in this case. As pointed out by the Court in <u>Till</u>, the prime interest rate "compensates[s] for the opportunity costs of the loan, the risk of inflation, and [a] relatively slight risk of default." 541 U.S. at 479. As this quotation reflects, when a 3.25% prime interest rate is adopted as the base rate, most of that 3.25% is included to compensate the creditor for the loss of the opportunity to use the unpaid portion of the money over the life of the payout and to compensate for the risk posed by inflation over the life of the loan. Because of the peculiar nature of the States' escrow claims, neither of these factors are present in this case. Under the escrow statutes, the most that the States will ever receive is the principal that is deposited. All of the interest earned by funds in the escrow account is paid to the NPM who made the deposit. <u>See, e.g.</u>, N.C. Gen. Stat. § 66-291(b) (2009). Only the non-appreciating principal remains available to the States if they later receive a judgment or settlement on a separate "released claim." Funds deposited in 2009 will have the exact same nominal dollar value to the States in 2029. There will be no appreciation whether the funds are paid sooner rather than later. Thus, in the event of a tardy deposit, that deposit does not need to be increased

- 52 -

from the original amount in order to restore the account to the position that it would have had but for the delay. In other words, there is no opportunity costs associated with late escrow deposits. A deposit today instead of tomorrow provides the States with no added opportunity to use or invest the money.[9] Furthermore, any exposure of the States to risk of inflation is due to the statutory design of the escrow statutes and is unrelated to whether there is delay in making the escrow deposits. Because of these circumstances, the selection of a 3.25% base rate in this case means that instead of such rate being attributable to loss of opportunity, risk of inflation and "a relatively slight risk of default," the entire 3.25% should be attributed to risk of default since that is the only one of the factors encompassed by the prime interest rate that is present in this case. The result is that the entire 4.25% is available to account for the risk that the payments under the Plan may not be made. Such a rate is more than adequate to provide the States with the present value of the allowed claims of the States. An additional factor is related to when the 4.25% interest rate is to begin. Section 1129(b)(2)(B)(i) requires the payment of present value "as of the effective date of the plan." However, the Plan instead provides for the payment of interest to the States'

---

[9]This would not necessarily be the case if a State prevailed on a released claim in an amount sufficient to entitle the state immediate access to the delinquent funds. However, the States' own evidence suggests the prospect of such released claims is beyond the seven-year time horizon of the Debtors' Plan.

- 53 -

Class 10 escrow claims from the petition date, January 28, 2009, more than fourteen months prior to the anticipated effective date. As discussed above, the escrow claimants face no opportunity costs or inflation risk, and there is no prospective risk of default in a period of time that has already elapsed. In other words, the value of the Class 10 claims has not changed since the petition date. The additional fourteen months of interest will result in the present value of future payment to the States exceeding the allowed amount of their claim once the 4.25% discount rate is applied. Whereas it is necessary to provide interest for seven years to pay the present value, the Plan provides interest for more than eight years. The result is that the Plan pays the Class 10 escrow claims an effective interest rate in excess of 4.25%.

The requirements of section 1129(b)(2) are not exclusive. Indeed, the requirements of section 1129(b)(2) are minimal standards only and a plan still may not be "fair and equitable" even though it meets the minimal standards of section 1129(b)(2). E.g., In re EFH Grove Tower Associates, 105 B.R. 310, 313 (Bankr. E.D.N.C. 1989). In order to satisfy the overall requirement of section 1129(b)(1) that a plan be "fair and equitable", the plan must literally be fair and equitable. Id. The determination of whether a plan is fair and equitable as to a dissenting unsecured creditor may include an analysis of some of the following factors: (1) whether the statutory requirements of section 1129(b)(2) have been met; (2) whether the

length of time for proposed repayment is reasonable; (3) whether the percentage or formula for proposed payment demonstrates a good faith effort to repay those obligations; (4) whether the primary risk of reorganization remains with the equity interests of the reorganized debtor; and (5) whether other particular inequities are inherent in the plan, including special prejudice to a dissenting class arising from its particular circumstances. In re Montgomery Court Apartments of Ingham County, Ltd., 141 B.R. 324, 346 (Bankr. S.D. Ohio 1992). An analysis of these factors and the other circumstances of this case has led the court to conclude that the Plan is literally fair and equitable as to the States.

For the reasons just discussed, the court is satisfied that the Plan satisfies the statutory requirements contained in section 1129(b)(2). Secondly, given the nature and size of the States' claims and the Debtors' circumstances, the court also is satisfied that the seven-year period for repayment of the States' claims is reasonable. According to the evidence, it is unlikely that the States would be entitled to draw down on the escrow funds if they were paid any earlier and there is no evidence that it would be feasible for the Debtors to make earlier payment. Thirdly, the payout proposed under the Plan obviously demonstrates a good faith effort to repay the States' claims since the proposal is to pay 100% of the principal amount of the claims plus interest from the petition date. Fourthly, the States' treatment does not shift the

- 55 -

primary risk of failure of the reorganization to the States. The States receive the quarterly payments specified in the Plan plus they share pro rata in 50% of the Debtors' excess cash flow during the repayment period. The appointment of the Examiner is made permanent and the Debtors are required to assign to the Examiner all of their rights to receive payment pursuant to any promissory note, loan or other obligation due the Debtors from any affiliate or insider, including Mr. Phelps. (Plan 6.4) The Plan authorizes the Examiner to pursue any such obligations, as well as other causes of action in favor of the Debtors and further requires that any recoveries by the Examiner be paid to unsecured creditors, including the States. There also are provisions in the Plan that lessen the risk to the States and creditors in the event of a default and failure of the Plan. Included is a provision that in the event of a default, the Examiner is authorized to proceed with actions to enforce the Plan, to seek conversion of Debtors' case to Chapter 7 or to take such other actions as may be necessary or appropriate to obtain payment of allowed claims. (Plan 6.4.3) Thus, although Mr. Phelps retains his equity interest, he remains subject to the scrutiny and enforcement authority of the Examiner. Also, he is prohibited by the Plan from receiving any dividend or other distribution until all allowed claims, including the States' claims, have been satisfied in accordance with the terms of the Plan. (Plan 5.13.1) Finally, there are no particular inequities inherent in the

Plan that involve special prejudice to the States. There are differences between the treatment of the States' claims and some of the other unsecured claims but, as previously discussed, there are legitimate reasons for such differences and such differences do not constitute unfair discrimination nor grounds for concluding that the plan is not fair and equitable.

As the States point out at great length, there were a number of bad decisions by Mr. Phelps preceding the filing of this case that heavily contributed to the financial difficulties that forced the Debtors into bankruptcy. As noted by the States, Mr. Phelps initiated costly litigation with the States that was unsuccessful and, in hindsight, was ill-advised. There also were a number of instances during the years preceding the filing of this bankruptcy case in which substantial loans were made by the Debtors to affiliates or to Mr. Phelps which later contributed to an inability on the part of the Debtors to meet their obligations in a timely manner. Even in the face of mounting financial difficulties, there were instances in which obligations were incurred on behalf of the Debtors for the purchase of an expensive automobile and an airplane, neither of which was essential in the business of the Debtors. Undoubtedly, these poor decisions heavily contributed to the inability of the Debtors to pay their obligations in a timely manner and led to the Debtors filing for bankruptcy relief. Even so, the conduct involved in these transactions, while ill-advised and

imprudent, was not shown to be dishonest or fraudulent and, in the court's estimation, is not a sufficient reason to bar confirmation of the Plan.    If poor and imprudent decisions regarding the management of a debtor's finances was a bar to bankruptcy relief, there would be few debtors successfully emerging from a chapter 11 case.

        G.   The Jurisdictional Provisions of the Plan
            Do Not Treat the States in an
            Impermissible Manner

The States object to the following provision that is contained in paragraphs 2.10.2 and 5.11.2 of the Plan:

> So long as the Debtors are in compliance with the Plan treatment of the State Escrow Claims and the State Penalty Claims, if any, the States as the holders of such claims shall not <u>on the basis of the outstanding State Escrow Claims or State Penalty Claims</u> (i) Delist the Debtors' brands, (ii) seize the Debtors' products, (iii) assess any additional penalty or interest other than as provided in the Plan, or (iv) bring any other regulatory enforcement action/remedy against the Debtors.  (Emphasis supplied in Plan)

The States' argument that this provision attempts to give the Debtors rights beyond what they are entitled to following confirmation of the Plan is unfounded.  These provisions affect the States only with respect to State Escrow Claims and State Penalty Claims which consist of pre-petition obligations.  The Plan treatment for these pre-petition claims permits the Debtors to restructure and pay the pre-petition amounts over time according to the payment schedule embodied in the Plan.  Such treatment is

- 58 -

permitted under section 1123(a)(5) of the Bankruptcy Code, notwithstanding the state escrow statutes and the remedies therein provided. Pursuant to section 1141 of the Bankruptcy Code, the confirmed Plan is binding upon all creditors, including the States. This means that so long as the Debtors comply with the Plan terms, the States, as parties bound by the Plan, are precluded from ignoring the terms of the Plan and taking any of the actions described in paragraphs 5.10.2 and 5.11.2. These paragraphs have nothing whatever to do with the States' alternatives in the event the Debtors fail to make post-petition payments required under the escrow statutes and do not attempt to limit the States' post-petition regulatory authority. Nor does the Plan attempt to modify the Debtors' obligation to make their post-petition escrow payments. To the contrary, paragraph 6.3.1 provides that "[a]ll post-petition, pre-confirmation obligations of the Debtors with respect to FET [federal excise taxes], SET [state excise taxes], TBO [tobacco buy out] or State Escrows shall be paid as and when due."

The States also argue that the provision in paragraph 6.3.3 providing that until the final decree has been entered, this court shall have exclusive jurisdiction to resolve disputes over State Escrows that accrued prior to the Effective Date, and any interest or penalties asserted with respect to such State Escrows is impermissibly broad. This provision is limited to escrow amounts that accrued prior to the effective date of the Plan and does not

purport to recognize jurisdiction where amounts accruing after the effective date are involved. Under 28 U.S.C. § 157(b)(2)(B), the allowance or disallowance of claims against the estate is a core proceeding that the bankruptcy court is authorized to hear and determine. The States' correctly observe that the allowance or disallowance of their claims may involve matters of state law. However, many claims that are filed in bankruptcy cases are based upon or involve state law and bankruptcy courts nonetheless are authorized to rule on the claims, applying state law to the extent necessary. The involvement of state law in the States' claims thus does not preclude the bankruptcy court from ruling on whether such a claim should be allowed in this case. The objection to paragraph 6.3.3 therefore is overruled.

CONCLUSION

Having considered all of the objections made by the States, the court has concluded that all of the objections should be overruled and that the Plan, including the modifications that were announced in open court at the beginning of the confirmation hearing, should be confirmed. The Plan satisfies all of the applicable requirements under section 1129(a) of the Bankruptcy Code except for section 1129(a)(8) and, notwithstanding the failure to satisfy section 1129(a)(8) as a result of the States' rejection of the Plan, the Plan should be confirmed because it satisfies all of the requirements of section 1129(b) in that it does not discriminate

- 60 -

unfairly against the States and is fair and equitable with respect to the States. The Debtors are directed to submit an order confirming the Plan, including the modifications, which should be set forth in the confirmation order.

# SERVICE LIST

John Northen

Paul Fanning

Patricia Molteni

Gene Tarr

Michael D. West