UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

IN RE:

RENEGADE HOLDINGS, INC., et al.,

    Debtors.

Case No. 09-50140
Consolidated for Administration
Chapter 11

RENEGADE HOLDINGS, INC.,
ALTERNATIVE BRANDS, INC. AND
RENEGADE TOBACCO COMPANY

    Plaintiff,

Adversary Proceeding No. 10-_____

v.

CALVIN A. PHELPS; LISA YAMAOKA
A/K/A LISA PHELPS; COMPLIANT
TOBACCO COMPANY, LLC;
DOGWOOD WINERY & VINEYARDS,
INC.; CLC PROPERTIES, LLC; CLC-
DBA/CALVIN PHELPS; CHINQUA-
PENN PLANTATION, LLC; CHINQUA-
PENN EVENTS, LLC; NORTH WEST
HOLDINGS, L.L.C.; BLUE RIDGE
AIRLINES, LLC; JET SALES
INTERNATIONAL, LLC; CLEAR JET
INTERNATIONAL, LLC; HOUSE OF
WINDSOR, LLC; WOLF BROS
MANAGEMENT, LLC; and WEST
FORSYTH DEVELOPMENT COMPANY,
INC.,

    Defendants.

## COMPLAINT[1]

Gene B. Tarr, the duly appointed examiner ("Examiner"), files this adversary proceeding for

and on behalf of the bankruptcy estates of Renegade Holdings, Inc., Alternative Brands, Inc., and

---

[1] Plaintiff reserves the right to bring additional claims against Defendants or others and nothing contained herein shall
be deemed a waiver of any rights or causes of action that the Examiner, the Chapter 11 Trustee or the Bankruptcy
Estates may have against any person or entity.

Renegade Tobacco Company ("Plaintiff"). Plaintiff alleges as follows, on information and belief:

## JURISDICTION AND VENUE

1. This adversary proceeding is brought to avoid and recover fraudulent transfers pursuant to 11 U.S.C. §§ 541, 544, 548, and 550, N.C.Gen.Stat. § 39-23.4, and for other relief pursuant to applicable North Carolina law as more specifically set forth herein.

2. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 151, 157(b), and 1334(b).

3. Pursuant to 28 U.S.C. § 157(a), the District Court has provided that all cases under Title 11 and any and all proceedings arising under Title 11 or arising in or related to a case under Title 11 shall be referred to the bankruptcy judges for the Middle District of North Carolina by the General Order of Reference entered by the United States District Court for the Middle District of North Carolina on August 15, 1984.

4. This adversary proceeding arises under Title 11, or arises in and is related to a case under Title 11.

5. This is a core proceeding for which the Court is authorized to hear and determine all matters regarding this case in accordance with 28 U.S.C. §157(b)(2)(A), (H), and (O).

6. Venue is proper in this District pursuant to 28 U.S.C. §1409.

## PROCEDURAL BACKGROUND

7. On January 28, 2009 ("Petition Date"), Renegade Holdings, Inc. ("RHI"), Renegade Tobacco Company ("RTC"), and Alternative Brands, Inc. ("ABI") (sometimes hereinafter referred to collectively as "Debtors") filed voluntary petitions seeking relief under Chapter 11 of the United States Bankruptcy Code and orders for relief were entered thereon [Docket No. 1 in each case].

8. By Order entered February 11, 2009 [Docket No. 64], Debtors' Chapter 11 cases were consolidated for the purposes of administration only.

BTM:442906v6

9.     By Order entered October 13, 2009 [Docket No. 367], the Court appointed the Examiner with special powers.  That order provides that the Examiner has the power to pursue any claims or causes of action which may be asserted by Debtors or Debtor's estates with respect to any transfers made to or for the benefit of any affiliate or insider, including any claim or cause of action that may be asserted by a trustee or debtor-in-possession under 11 U.S.C. §§ 541, 542, 544, 546, 547, 548, 549, 550, or 553.

10.     After the Petition Date, Debtors continued in possession of their respective assets and operated their businesses as debtors-in-possession.  By order entered August 18, 2010 [Docket No. 645], the Court appointed Peter L. Tourtellot as Chapter 11 Trustee.  The Chapter 11 Trustee has authorized the filing of this Complaint on behalf of Debtors' bankruptcy estates.

11.     Calvin A. Phelps ("Phelps") is an individual residing in Mocksville, Davie County, North Carolina.  Phelps is a Stipulating Party under the Order Approving Stipulation Concerning Preservation of Assets with Amended Exhibit A entered March 18, 2010 [Docket No. 447] ("Asset Preservation Order").

12.     Lisa Yamaoka, a/k/a Lisa Phelps ("Ms. Yamaoka"), is an individual residing in Mocksville, Davie County, North Carolina.  At all relevant times, Phelps and Ms. Yamaoka have been married.  Ms. Yamaoka is a Stipulating Party under the Asset Preservation Order.

13.     Phelps is the sole member of Compliant Tobacco Company, LLC, a North Carolina limited liability company formed on April 16, 2002 ("Compliant").  At all relevant times, Compliant has had an office and principal place of business in Mocksville, Davie County, North Carolina.  On information and belief:

(a)     Compliant is a manager-managed limited liability company; and

(b)     at all relevant times, Phelps has been the sole member, manager, and registered agent for Compliant.

BTM:442906v6

Compliant is a Stipulating Party under the Asset Preservation Order.

14.     Compliant is the sole shareholder of RHI. RHI is a North Carolina corporation formed on May 23, 2000. At all relevant times, RHI has had an office and principal place of business in Mocksville, Davie County, North Carolina. Phelps is the registered agent for RHI. On information and belief:

> (a)     at all relevant times, Phelps has been a director, officer, and chairman of the board of directors of RHI;

> (b)     Phelps served as president of RHI until late 2008; and

> (c)     at all relevant times, Ms. Yamaoka served as secretary of RHI.

15.     RHI is the sole shareholder of ABI. ABI is a North Carolina corporation formed on February 10, 1998. At all relevant times, ABI has had an office and principal place of business in Mocksville, Davie County, North Carolina. On information and belief, and at all relevant times, Phelps was a director, president, treasurer, chairman of the board of directors, and the registered agent of ABI.

16.     RHI is the sole shareholder of RTC. RTC is a North Carolina corporation formed on April 5, 1999. At all relevant times, RTC has had an office and principal place of business in Mocksville, Davie County, North Carolina. On information and belief, and at all relevant times, Phelps has been a director, president, chairman of the board of directors, and the registered agent of RTC.

17.     RHI is the sole shareholder of PTM Technologies, Inc. ("PTM"). PTM is a North Carolina corporation formed on August 16, 1994. At all relevant times, PTM has had an office and principal place of business in Mocksville, Davie County, North Carolina. On information and belief, at all relevant times, Phelps was a director, officer, and the registered agent of PTM. PTM filed its voluntary Chapter 11 bankruptcy petition on May 26, 2010, and is a debtor-in-possession.

4

PTM is a Stipulating Party under the Asset Preservation Order.

18.     RHI is the sole shareholder of Dogwood Winery & Vineyards, Inc., a North Carolina corporation formed on January 30, 2004 ("Dogwood"). At all relevant times, Dogwood has had an office and principal place of business in Mocksville, Davie County, North Carolina. John W. Babcock is the registered agent for Dogwood. On information and belief, Phelps:

(a)     at all relevant times, has been a director and chairman of the board of directors;

(b)     was the president of Dogwood until at least March 2007; and

(c)     was the treasurer of Dogwood on or before December 2008.

Dogwood is a Stipulating Party under the Asset Preservation Order.

19.     CLC Properties, LLC is a North Carolina limited liability company formed on February 11, 2004 ("CLC Properties, LLC"). At all relevant times, CLC Properties, LLC has had an office and principal place of business in Mocksville, Davie County, North Carolina. On information and belief:

(a)     at all relevant times, CLC Properties, LLC was a member-managed limited liability company;

(b)     Phelps is its sole member and manager; and

(c)     John W. Babcock is the registered agent for CLC Properties, LLC.

CLC Properties, LLC is a Stipulating Party under the Asset Preservation Order.

20.     On information and belief, CLC-DBA/Calvin Phelps and "CLC Properties" a/k/a "CLC" are assumed names under which Phelps, Ms. Yamaoka, and/or other Defendants do business. CLC-DBA/Calvin Phelps is a Stipulating Party under the Asset Preservation Order.

21.     Chinqua-Penn Plantation, LLC is a North Carolina limited liability company formed on September 11, 2006 ("CPP"). At all relevant times, CPP has had an office in Mocksville, Davie

5

County, North Carolina, and a place of business in Rockingham County, North Carolina. On information and belief:

  (a) until its formation in 2006, CPP and/or Phelps, Ms. Yamaoka and/or other Defendants were doing business under the name "Chinqua-Penn Plantation;"

  (b) CPP is a manager-managed limited liability company; and

  (c) Phelps is CPP's member, manager, and registered agent.

CPP is a Stipulating Party under the Asset Preservation Order.

  22. Chinqua-Penn Events, LLC is a North Carolina limited liability company formed on September 11, 2006 ("CPE"). At all relevant times, CPE has had an office in Mocksville, Davie County, North Carolina, and a place of business in Rockingham County, North Carolina. On information and belief:

  (a) CPE is a manager-managed limited liability company; and

  (b) Ms. Yamaoka is CPE's sole member, manager, and registered agent.

CPE is a Stipulating Party under the Asset Preservation Order.

  23. North West Holdings, L.L.C. is a North Carolina limited liability company formed on August 22, 2005 ("NWH"). On information and belief:

  (a) at all relevant times, NWH has had an office and principal place of business in Mocksville, Davie County, North Carolina;

  (b) NWH is a member-managed limited liability company;

  (c) Phelps is NWH's sole member and manager; and

  (d) John W. Babcock is the registered agent for NWH.

NWH is a Stipulating Party under the Asset Preservation Order.

  24. Blue Ridge Airlines, LLC is a North Carolina limited liability company formed on March 11, 2008 ("Blue Ridge Airlines"). At all relevant times, Blue Ridge Airlines has had an

6

office and place of business in Mocksville, Davie County, North Carolina. On information and belief:

     (a)    Blue Ridge Airlines is a manager-managed limited liability company;

     (b)    Phelps is its sole member and manager; and

     (c)    John W. Babcock is the registered agent for Blue Ridge Airlines.

Blue Ridge Airlines is a Stipulating Party under the Asset Preservation Order.

     25.    Jet Sales International, LLC was a North Carolina limited liability company formed on July 3, 2008 ("Jet Sales"). As of September 10, 2010, the North Carolina Secretary of State administratively dissolved Jet Sales for failure to file annual reports. At all relevant times, Jet Sales had an office and place of business in Mocksville, Davie County, North Carolina. On information and belief:

     (a)    Jet Sales was a manager-managed limited liability company;

     (b)    Phelps was its sole member and manager; and

     (c)    John W. Babcock was the registered agent for Jet Sales.

Jet Sales is a Stipulating Party under the Asset Preservation Order.

     26.    Clear Jet International, LLC is a North Carolina limited liability company formed on July 11, 2008 ("Clear Jet"). At all relevant times, Clear Jet has had an office and place of business in Mocksville, Davie County, North Carolina. On information and belief:

     (a)    Clear Jet is a member-managed limited liability company;

     (b)    Phelps is its sole member and manager; and

     (c)    Carole Folmar is the registered agent for Clear Jet.

Clear Jet is a Stipulating Party under the Asset Preservation Order.

     27.    House of Windsor, LLC is a North Carolina limited liability company formed on August 28, 2007 ("HOW"). At all relevant times, HOW has had an office and place of business in

Mocksville, Davie County, North Carolina. On information and belief:

    (a)    HOW is a manager-managed limited liability company;

    (b)    Phelps is HOW's sole member and manager; and

    (c)    John W. Babcock is the registered agent for HOW.

HOW is a Stipulating Party under the Asset Preservation Order.

28.    Wolf Bros Management, LLC is a North Carolina limited liability company formed on December 15, 2008 ("Wolf Bros"). At all relevant times, Wolf Bros has had an office and place of business in Mocksville, Davie County, North Carolina. On information and belief:

    (a)    Wolf Bros is a member-managed limited liability company; and

    (b)    Phelps is its sole member, manager, and registered agent.

Wolf Bros is a Stipulating Party under the Asset Preservation Order.

29.    4JK Partners, LLC ("4JK Partners") is a limited liability company formed in Delaware on August 12, 2004 and was authorized to do business in North Carolina on April 18, 2008. On information and belief:

    (a)    at all relevant times, 4JK Partners has had an office and place of business in Pilot Mountain, Surry County, North Carolina;

    (b)    the members of 4JK Partners are Michael W. Jessup, Horace R. Kornegay, Hail Ltd., and Lonnie J. Inman, and the manager of 4JK Partners is James H. Wilson;

    (c)    Kimberly Hughes is the registered agent for 4JK Partners; and

    (d)    ABI leased certain equipment from 4JK Partners. By order entered March 6, 2009, Debtors' motion to reject equipment lease with 4JK Partners was granted, authorizing ABI to reject its lease with 4JK Partners for equipment on Debtors' premises.

30.    On information and belief, at all relevant times, 4JK Partners held 50% of the membership interests in Key Tobacco, LLC. Key Tobacco, LLC is a Delaware limited liability

BTM:442906v6

company formed on February 25, 2005 ("Key Tobacco"). On information and belief, at all relevant times, Phelps was the manager of Key Tobacco and held 50% of the membership interests in Key Tobacco. Key Tobacco did not have a Certificate of Authority to do business in North Carolina. Key Tobacco liquidated in June 2008, and Debtors purchased Key Tobacco's assets.

31. No Smokes, LLC is a North Carolina limited liability company formed on November 10, 2009 ("No Smokes"). At all relevant times, No Smokes has had an office and place of business in Mocksville, Davie County, North Carolina. On information and belief:

      (a)     No Smokes is a manager-managed limited liability company; and

      (b)     Phelps is a member, manager, and registered agent for No Smokes.

No Smokes is a Stipulating Party under the Asset Preservation Order.

32. Windy City Tobacco, LLC ("WCT") was a Delaware limited liability company formed on February 11, 2005. WCT was wholly-owned by Compliant (the manager-managed limited liability company of which Phelps is the sole member). At all relevant times, WCT had an office and place of business in Mocksville, Davie County, North Carolina. WCT did not have a Certificate of Authority to do business in North Carolina. WCT was dissolved in January 2009.

33. Cutting Edge Enterprises, Inc. d/b/a Cutting Edge Tobacco, Inc. was a Maryland corporation formed on May 11, 1998 ("Cutting Edge"). Cutting Edge was wholly-owned by WCT. On information and belief, at all times relevant to this adversary proceeding:

      (a)     Cutting Edge had an office and principal place of business in Mocksville, Davie County, North Carolina;

      (b)     Phelps was president of Cutting Edge; and

      (c)     The North Carolina Secretary of State was the registered agent for Cutting Edge.

Cutting Edge filed its Application for Certificate of Withdrawal on November 25, 2008,

surrendering its authority to transact business in North Carolina.

34.     West Forsyth Development Company, Inc. is a North Carolina corporation formed on March 28, 1996 ("West Forsyth").  On information and belief:

(a)     at all relevant times, Phelps has been an officer and director of West Forsyth;

(b)     at all relevant times, West Forsyth has had an office and place of business in Winston-Salem, Forsyth County, North Carolina; and

(c)     Paul Freer is the registered agent for West Forsyth.

West Forsyth is a Stipulating Party under the Asset Preservation Order.

35.     On information and belief, B&L Properties, LLC is a North Carolina limited liability company formed prior to September 21, 2004 ("B&L").  On information and belief, Ms. Yamaoka and Jerry G. Burke are the members of B&L.  B&L is a Stipulating Party under the Asset Preservation Order.

36.     Raven Tobacco Company ("Raven") is a Delaware corporation formed on July 14, 2004.  Raven does not have a Certificate of Authority to do business in North Carolina.  On information and belief:

(a)     at all relevant times, Raven had an office and place of business in Mocksville, Davie County, North Carolina;

(b)     Ms. Yamaoka is the president of Raven; and

(c)     Corporation Service Company is the registered agent for Raven.

Raven is a Stipulating Party under the Asset Preservation Order.

## INSIDERS AND AFFILIATES OF DEBTORS

37.     At all relevant times, Phelps was an insider of RHI, ABI, and RTC pursuant, without limitation, to 11 U.S.C. § 101(31)(B)(i)(ii)(iii), (E), and (F).  Compliant was an insider of RHI, ABI and RTC pursuant to 11 U.S.C. § 101(31)(B)(iii).

38. At all relevant times, Phelps and Compliant were affiliates of RHI, RTC and ABI pursuant to 11 U.S.C. § 101(2)(A) and (B).

39. At all relevant times, Ms. Yamaoka was an insider of RHI, ABI, and RTC pursuant, without limitation, to 11 U.S.C. § 101(31)(B)(vi), and with respect to RHI, pursuant to 11 U.S.C. § 101(31)(B)(ii).

40. Compliant, PTM, Dogwood, CLC Properties, LLC, CLC-DBA/Calvin Phelps, CPP, CPE, Key Tobacco, No Smokes, WCT, Cutting Edge, NWH, Blue Ridge Airlines, Jet Sales, Clear Jet, HOW, Wolf Bros., West Forsyth, B&L, and Raven are sometimes collectively referred to hereinafter as the Phelps Entities.

41. The Phelps Entities are insiders of RHI, RTC, and ABI pursuant to 11 U.S.C. § 101(31), including without limitation § 101(31)(E).

42. The Phelps Entities are affiliates of RHI, RTC and ABI within the definition of 11 U.S.C. § 101(2)(B). The Phelps Entities are corporations within the definition of 11 U.S.C. § 101(9). 20% or more of the Phelps Entities' outstanding voting securities are directly or indirectly owned, controlled, or held with the power to vote by Phelps except, in the case of CPE, B&L and Raven, by Ms. Yamaoka. Until the appointment of the Chapter 11 Trustee, Phelps directly or indirectly owned, controlled, or held, with the power to vote, 20% or more of the outstanding voting securities of RHI, RTC, and ABI.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

43. Debtors are fabricators and distributors of tobacco products consisting primarily of cigarettes and cigars. ABI operates as a Non-Participating Manufacturer ("NPM") subject to the laws of states ("States") in which its products are sold, including N.C.Gen.Stat. §§ 66-290 and 66-291 ("Qualifying Statutes") and N.C.Gen.Stat. §§ 66-292 through 66-294.1 ("Complimentary Statutes"). The Qualifying Statutes, the Complimentary Statutes and other applicable state law

BTM:442906v6

require ABI to make escrow payments (the "Escrow Obligations") based upon the volume of cigarettes sold in North Carolina and in other States that are signatories to the Master Settlement Agreement ("MSA").

44.    The Escrow Obligations must be deposited (the "Escrow Deposit") into an escrow account ("Escrow Account"). Until January 1, 2008, the North Carolina Escrow Deposits were due in April of each year for cigarettes sold in the year preceding the date on which the payment was due. From and after January 1, 2008, North Carolina changed the Qualifying Statutes to require that Escrow Deposits be made quarterly for sales in the quarter preceding the date on which the payment is due. Debtors also do business in other MSA states, most of which require annual Escrow Deposits. The majority of ABI's sales take place in North Carolina.

45.    If Escrow Deposits are not timely made, the States in which the NPM's products are sold may obtain an affirmative injunction requiring that the Escrow Deposits be made, and may delist the delinquent NPM. If a brand is delisted, wholesalers or distributors in North Carolina are prohibited from selling cigarettes in North Carolina, with only a short time period in which to sell out their inventory.

46.    At all relevant times, Phelps and Debtors would have known that the failure to make the required Escrow Deposits would have resulted in delisting of ABI and its brands in North Carolina and other States in which the Escrow Deposits were not timely made.

47.    The base amount for calculation of the Escrow Obligation is determined and communicated to the manufacturer in advance, and is increased annually by at least 3%. At all relevant times, within approximately one month following the end of a given calendar quarter, Debtors received notices from the State of North Carolina specifying the estimated amount of the Escrow Obligations that would be due for the quarter just ended. Payment was due within one month after the end of the relevant quarter.

12

48.    Before 2006, Phelps and Debtors knew that the Escrow Obligations for 2006 sales would be not less than $4.29 per carton, would accrue throughout 2006, and must be deposited into the Escrow Account in full on or before April 15, 2007; would be not less than $5.02 per carton for 2007 sales, would accrue throughout 2007, and must be deposited into the Escrow Account in full on or before April 15, 2008.

49.    Before 2008, Phelps and Debtors knew that the Escrow Obligations for 2008 sales would be not less than $5.17 per carton, would accrue throughout 2008, and must be deposited into the Escrow Account one month after the end of each quarter throughout 2008, with the payment for fourth quarter sales due in full on or before January 31, 2009.

50.    The Escrow Obligation is a debt within the meaning of 11 U.S.C. §§ 101(12) and 548 and N.C.Gen.Stat. §§ 39-23.1(5) and 39-23.4.    The Escrow Obligation is an enforceable statutory obligation that must be paid for ABI to legally operate in the States in which its brands are sold.    On Debtors' federal tax returns, the Escrow Deposits are considered Qualified Settlement Liability payments, are consistently treated as expenses in "Other Deductions" and are recorded as liabilities on the consolidated financial statements prepared by Dixon Hughes, PLLC ("Dixon Hughes") in conjunction with Debtors' federal income tax returns.

51.    Plaintiff alleges and incorporates the information contained at line reference 257 on **Sealed Exhibit A**. [2]

52.    The United States Department of Agriculture ("USDA") Tobacco Buy-out Program was established in 2004. Since 2005, ABI has been assessed a fee under the Tobacco Buy-out

---

[2] The Examiner compiled a preliminary timeline that set out certain relevant transactions and events involving Phelps and the Phelps Entities ("Preliminary Timeline") which was an exhibit to the Preliminary Report of Examiner filed on December 31, 2009.  The Preliminary Timeline was filed under seal pursuant to the Court's Protective Orders entered June 22, 2009 ("Protective Orders").  For the convenience of the Court and parties in interest, pertinent portions of the Preliminary Timeline (updated) have been filed under seal contemporaneously herewith and are incorporated herein by reference as **Sealed Exhibit A**.  Within Sealed Exhibit A are line reference numbers to which reference is made herein from time to time to certain information that may be subject to the Protective Orders.

13

Program ("TBO Fee") which is billed, due, and payable quarterly thereafter. If a company does not timely pay the fee, the USDA may, but is not required to, set up a loan for repayment of delinquent TBO Fees. From time to time, the loan is arranged through Commodity Credit Corporation.

53.     Plaintiff alleges and incorporates the information contained at line reference 257 on **Sealed Exhibit A**.

54.     The TBO Fee is a debt within the meaning of 11 U.S.C. §§ 101(12) and 548, and N.C.Gen.Stat. §§ 39-23.1(5) and 39-23.4.

### ESCROW DEPOSITS NOT TIMELY MADE

55.     For sales made after January 1, 2006 until the Petition Date, ABI did not timely deposit the Escrow Obligations into the Escrow Account. From and after 2006, ABI recorded in its books penalties in the amount of $616,021 for late payment of Escrow Deposits.

56.     ABI's Escrow Obligation for 2006, due in full on April 16, 2007, was approximately $7.3 million. As of April 16, 2007, ABI had escrowed only approximately $415,000 of the $7.3 million due for 2006 sales. On information and belief, ABI also defaulted on about $1 million in Escrow Deposits owed to six other MSA States for 2006 sales made in those States.

57.     On July 19, 2007, ABI and its brands were delisted by North Carolina and other States.

58.     The delinquent balance due for 2006 sales, along with quarterly deposits for 2007 sales, became the subject of a Settlement Agreement with the State of North Carolina dated August 15, 2007 ("8/15/07 Settlement Agreement"). Under the 8/15/07 Settlement Agreement, ABI deposited half of the $6.9 million deficit into the Escrow Account at the time of settlement, agreed to deposit the other half within thirty days after being relisted, and agreed to pay a late-payment penalty of $223,563.91. The 8/15/07 Settlement Agreement further required ABI to make all Escrow Deposits relating to sales during the first three quarters of 2007 on or before April 15, 2008.

14

The 8/15/07 Settlement Agreement further required that ABI begin making its North Carolina Escrow Deposits on a quarterly basis, starting with the fourth quarter of 2007. The Escrow Deposit for the fourth quarter of 2007 was due no later than January 31, 2008. The Escrow Deposit for the first quarter of 2008 was due no later than April 30, 2008.

59. ABI did not make the 2007 Escrow Deposits in accordance with the terms of the 8/15/07 Settlement Agreement. On or about January 7, 2008, ABI determined that it would not be able to make the Escrow Deposit for the first three quarters of 2007, which was due on April 15, 2008. At that time, the unpaid Escrow Deposit required for sales during the first three quarters of 2007 was $4.6 million. ABI then sought and obtained a revision of the 8/15/07 Settlement Agreement. Under a March 2008 Settlement Agreement ("3/08 Settlement Agreement"), ABI was allowed to pay the $4.6 million owed for sales in the first three quarters of 2007 in thirty-six monthly installments consisting of $50,000 per month for the first twelve months, $100,000 per month for the next twelve months, and $236,845.35 per month for the final twelve months.

60. ABI did not make the Escrow Deposits required by the 3/08 Settlement Agreement. ABI was unable to make the Escrow Deposit due by January 31, 2009 for sales made during the fourth quarter of 2008.

61. As a result of these continued delinquencies, ABI has, at all times since at least April 2007, been delinquent on its pre-petition Escrow Obligations to one or more of the States. ABI filed its petition for relief under Chapter 11 of the Bankruptcy Code on January 28, 2009.

62. As of the Petition Date, Debtors estimated ABI's unpaid pre-petition Escrow Obligations at $7,692,039.17, and its accrued penalty obligations at $30,852.

### TBO FEES NOT TIMELY PAID

63. From and after at least January 1, 2007 until the Petition Date, ABI did not timely pay TBO Fees. As of December 31, 2007, ABI's audited financial statements show a promissory

note in favor of Commodity Credit Corporation in the amount of $889,232. On information and belief, Debtors did not pay the TBO Fee for sales made in the third and fourth quarters of 2008. As of December 31, 2008, ABI's audited financial statements show a promissory note in favor of Commodity Credit Corporation in the amount of $1,188,659. On information and belief, the Commodity Credit Corporation promissory notes represent TBO Fees that were not paid when due.

## DEBTORS' FINANCIAL CONDITION

64.     Dixon Hughes prepared the Renegade Holdings, Inc., and Subsidiaries Consolidated Statement of Assets, Liabilities and Equity—Income Tax Basis for the year ended December 31, 2005. Dixon Hughes also prepared audited consolidated financial statements for RHI for years ended December 31, 2006, December 31, 2007 and December 28 (sic), 2008 (each an "Audit").

65.     For the year ended December 31, 2005, RHI's assets totaled $45,788, and its liabilities totaled $103,462. Liabilities exceeded assets by $57,674.

66.     For the year ended December 31, 2006, RHI's assets totaled $10,763,352, and its liabilities totaled $10,807,861. Liabilities exceeded assets by $44,509.

67.     For the year ended December 31, 2007, RHI's assets totaled <$22,978,> and its liabilities totaled $20,770. Liabilities exceeded assets by $43,748.

68.     For the year ending December 28 (sic), 2008, RHI's assets totaled <$1,736,937,> and its liabilities totaled $3,602,713. Liabilities exceeded assets by $5,339,650.

69.     From no later than 2006, Debtors were facing a cash shortage. In June 2005, Debtors had obtained a $3 million line of credit from Bank of Granite, due December 31, 2006. As of December 31, 2006, the outstanding balance due under the line of credit was $2,995,652.

70.     In July 2007, Debtors hired W. Michael Mebane ("Mr. Mebane") as a consultant to raise needed capital and/or obtain refinancing of indebtedness.

71.     On August 15, 2007, Debtors entered a Forbearance Agreement with the Bank of

BTM:442906v6

Granite acknowledging that the outstanding amounts of principal and interest due under various loans under which Debtors were either borrowers or guarantors totaled approximately $6.7 million. Thereafter, the Forbearance Agreement was modified to extend the forbearance periods for short periods of time.

72.     Plaintiff alleges and incorporates the information contained at line reference 139 on **Sealed Exhibit A.**

73.     The 2008 Audit states that on May 8, 2008, two loans totaling $8,350,000 were used to retire $2,617,953 of existing debt secured by machinery and equipment, and to increase Debtors' working capital by $5,732,047.  The shortage of working capital was the result of the Transfers (defined below) to Phelps and the Phelps Entities.

74.     On November 25, 2008, Mr. Mebane provided a memorandum to Phelps concerning Debtors' current cash flow situation.  Mr. Mebane advised Phelps that a balance of more than $6 million existed from funds transferred out of RHI and its subsidiaries in the form of personal notes and advances.  Mr. Mebane stated that CPP, HOW, airplane operations and other shareholder distributions were consuming approximately $150,000 per month.  A copy of the November 25, 2008 memorandum (erroneously dated 2007) is attached hereto and incorporated herein by reference as **Exhibit B**.

75.     Attached hereto and incorporated herein by reference as **Exhibit C** are schedules that list certain insider withdrawals and distributions made by each of RHI, ABI and RTC to Phelps and the Phelps Entities during the period commencing January 1, 2005, and ending January 27, 2009 (sometimes collectively referred to hereinafter as the "Transfers").  Other insider withdrawals and distributions may be discovered during the course of the litigation, therefore Plaintiff reserves the right to supplement Exhibit C.

76.     Dixon Hughes began auditing the consolidated Debtors for the year ending

17

December 31, 2005, which included a review of the year ended December 31, 2004. The 2005 Audit necessitated Dixon Hughes' creation of financial statements for the year ended December 31, 2004. For time periods from and after December 31, 2004, it appears that Debtors, or Dixon Hughes, attempted to track and record many withdrawals and distributions made by Debtors to or for the benefit of Phelps and the Phelps Entities. Some of those withdrawals and distributions were ultimately memorialized in promissory notes made in favor of RHI and ABI and executed by Phelps and the Phelps Entities (the "Promissory Notes"). The execution of the Promissory Notes constitutes an admission by Phelps and the executing Phelps Entities that the Transfers were transfers of property of the respective Debtor, and that the amount of the Transfers are not less than the total of the Promissory Notes.

### SPECIFIC ALLEGATIONS –
### CALVIN A. PHELPS, CLC-DBA/CALVIN PHELPS, AND CLC PROPERTIES, LLC

77.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

78.     From at least 2006 through the Petition Date, the withdrawals, distributions or payments to Phelps or on his behalf from Debtors caused Debtors' inability to meet their obligations in a timely manner to, among others, the States, the USDA, and other creditors.

(a)     As detailed on attached **Exhibit C**, from January 1, 2005 through January 27, 2009, Phelps received from RHI, ABI and RTC withdrawals, distributions or payments on his behalf totaling $4,209,318.69, in addition to $1,110,000 paid to Phelps as compensation, as follows:

(i)     RHI: $65,467.52;

(ii)    ABI: $3,864,902.10; and

(iii)   RTC: $278,949.07.

(b)     As detailed on attached **Exhibit C**, from January 1, 2005 through January 27,

18

2009, CLC-DBA/Calvin Phelps received from RHI, ABI and RTC withdrawals, distributions or payments on its behalf totaling $1,605,451.58 as follows:

(i)      RHI: $17,275;

(ii)     ABI: $1,457,976.58; and

(iii)    RTC: $130,200.

(c)     As detailed on attached **Exhibit C**, from August 2007 through January 27, 2009, CLC Properties, LLC received from RHI and ABI withdrawals, distributions or payments on its behalf totaling $270,600 as follows:

(i)      RHI: $143,200; and

(ii)     ABI: $127,400.

79.     The amount of money Phelps and the Phelps Entities owed to Debtors increased from a total of $863,021 at the end of 2004, to a total of not less than $6,712,428 at the end of 2008.

80.     As of December 31, 2007, the amounts due Debtors from Phelps and the Phelps Entities no longer appear on the balance sheet as Assets; instead, the notes and related party receivables are presented in the owner's equity section of the balance sheet as "due from owner," which the balance sheet refers to as "contra-equity." On information and belief, the re-characterization from Assets to "contra-equity" occurred because Dixon Hughes observed that the numbers continued to grow and grow, Mr. Mebane believed that repayment was unlikely, and Dixon Hughes' professional standards group may have mandated the change.

81.     As of December 31, 2008, the Audit shows the total "due from owner," once again in the equity section of the balance sheet as "contra-equity," at $6,712,428.

82.     On the Petition Date, the combined Promissory Notes and amounts due from related entities on Debtors' Schedules B total $8,577,385.

83.     The combined original principal balance of the Promissory Notes is $8,114,184.49.

Attached hereto and incorporated by reference as **Exhibit D** are Related Party Notes Receivable Charts showing detail of the amounts which comprise the total of each Promissory Note summarized below.

      (a)    Unsecured Promissory Note from Phelps to ABI dated August 22, 2006, in the amount of $1,829,534.59 (for the purchase of Chinqua-Penn Plantation), requiring annual principal payments of $182,950, plus interest at prime plus 0.25%, due on September 1, 2007 through 2015, with a final principal payment of $182,950 plus interest on September 1, 2016. On information and belief, Phelps did not make these payments when due.

      (b)    Unsecured Promissory Note from Phelps to ABI dated December 31, 2006, in the amount of $1,397,234, requiring annual payments of interest only at 4.73% in the amount of $66,089.17, due on December 31, 2007 through 2010, with a balloon payment of $1,397,234, plus any accrued and outstanding interest, due on December 31, 2011. On information and belief, Phelps did not make these payments when due.

      (c)    Unsecured Promissory Note from Phelps to ABI dated June 17, 2008, in the amount of $817,383.68 (for amounts owed to ABI as of December 31, 2005), requiring annual payments of interest only at 5.25% in the amount of $42,912.64, due on June 17, 2009 through 2012, with a balloon payment of $817,383.68, plus any accrued and outstanding interest, due on June 17, 2013. On information and belief, Phelps did not make these payments when due.

      (d)    Unsecured Promissory Note from Phelps to ABI dated June 17, 2008, in the amount of $98,723.07, requiring annual payments of interest only at 5.25% in the amount of $5,182.96, due on June 17, 2009 through 2012, with a balloon payment of $98,723.07, plus any accrued and outstanding interest, due on June 17, 2013. On information and belief, Phelps did not make these payments when due.

(e)     Unsecured Promissory Note from Phelps to RHI dated June 17, 2008, in the amount of $271,676.80, requiring annual payments of interest only at 5.25% in the amount of $14,263.03, due on June 17, 2009 through 2012, with a balloon payment of $271,676.80, plus any accrued and outstanding interest, due on June 17, 2013.  On information and belief, Phelps did not make these payments when due.

(f)     Unsecured Promissory Note from CPP to RHI dated June 18, 2008, in the amount of $1,033,505.64, requiring annual payments of interest only at 5.25% in the amount of $54,259.05, due on June 18, 2009 through 2012, with a balloon payment of $1,033,505.64, plus any accrued and outstanding interest, due on June 18, 2013.   On information and belief, CPP did not make these payments when due.

(g)     Unsecured Promissory Note from CPE to RHI dated June 18, 2008, in the amount of $240,047.60, requiring annual payments of interest only at 5.25% in the amount of $12,602.50, due on June 18, 2009 through 2012, with a balloon payment of $240,047.60, plus any accrued and outstanding interest, due on June 18, 2013.  On information and belief, CPE did not make these payments when due.

(h)     Unsecured Promissory Note from HOW to RHI dated January 26, 2009, in the amount of $179,100, requiring annual payments of interest only at 5.25% in the amount of $9,402.75, due on January 26, 2010 through 2013, with a balloon payment of $179,100, plus any accrued and outstanding interest, due on January 26, 2014.

(i)     Unsecured Promissory Note from HOW to ABI dated January 26, 2009, in the amount of $107,037.87, requiring annual payments of interest only at 5.25% in the amount of $5,619.49, due on January 26, 2010 through 2013, with a balloon payment of $107,037.87, plus any accrued and outstanding interest, due on January 26, 2014.

BTM:442906v6

(j)     Unsecured Promissory Note from CLC Properties, LLC to RHI dated January 26, 2009, in the amount of $693,344.55, requiring annual payments of interest only at 5.25% in the amount of $36,400.59, due on January 26, 2010 through 2013, with a balloon payment of $693,344.55, plus any accrued and outstanding interest, due on January 26, 2014.

(k)     Unsecured Promissory Note from CPP to ABI dated January 26, 2009, in the amount of $76,266.52, requiring annual payments of interest only at 5.25% in the amount of $4,003.99, due on January 26, 2010 through 2013, with a balloon payment of $76,266.52, plus any accrued and outstanding interest, due on January 26, 2014.

(l)     Unsecured Promissory Note from NWH to RHI dated January 26, 2009, in the amount of $719,694.25, requiring annual payments of interest only at 5.25% in the amount of $37,783.95, due on January 26, 2010 through 2013, with a balloon payment of $719,694.25, plus any accrued and outstanding interest, due on January 26, 2014.

(m)     Unsecured Promissory Note from CPE to ABI dated January 26, 2009, in the amount of $20,729.40, requiring annual payments of interest only at 5.25% in the amount of $1,088.29, due on January 26, 2010 through 2013, with a balloon payment of $20,729.40, plus any accrued and outstanding interest, due on January 26, 2014.

(n)     Unsecured Promissory Note from Phelps to RHI dated January 26, 2009, in the amount of $65,368.91, requiring annual payments of interest only at 5.25% in the amount of $3,431.87, due on January 26, 2010 through 2013, with a balloon payment of $65,368.91, plus any accrued and outstanding interest, due on January 26, 2014.

(o)     Unsecured Promissory Note from Phelps to ABI dated January 26, 2009, in the amount of $449,094.83, requiring annual payments of interest only at 5.25% in the amount of $23,577.49, due on January 26, 2010 through 2013, with a balloon payment of $449,094.83, plus any accrued and outstanding interest, due on January 26, 2014.

BTM:442906v6

(p)    Unsecured Promissory Note from Blue Ridge Airlines to RHI dated January 26, 2009, in the amount of $115,442.78, requiring annual payments of interest only at 5.25% in the amount of $6,060.75, due on January 26, 2010 through 2013, with a balloon payment of $115,442.78, plus any accrued and outstanding interest, due on January 26, 2014.

84.    Phelps caused RHI and ABI to accept the Promissory Notes in exchange for the funds paid to or for the benefit of Phelps and the Phelps Entities. Phelps knew or should have known that Phelps and the Phelps Entities could not make payments on the Promissory Notes when due.

85.    Phelps knew or should have known that, without repayment of the funds represented by the Promissory Notes, Debtors would be unable to satisfy their statutory and contractual obligations.

86.    On January 1, 2004, Phelps caused ABI to enter a lease with "CLC Properties" for premises located at 321 Farmington Road, Mocksville, NC. Phelps executed the lease on behalf of landlord and tenant. The lease term was 10 years, commencing January 1, 2004, and the monthly rental was $9,000 (the "1/1/04 Lease").

87.    Although the 1/1/04 Lease had a ten (10) year term, it appears that Phelps thereafter caused ABI, RTC and PTM to enter leases for what were essentially the same premises that ABI was already leasing from "CLC Properties" under the 1/1/04 Lease.

88.    The leases Phelps caused ABI, RTC and PTM to enter are:

(a)    On May 2, 2008, a lease on behalf of "CLC Properties" with RTC as tenant, for premises located at 323 Farmington Road, Mocksville, NC. Phelps executed the lease on behalf of landlord and tenant. The lease term was two (2) years, commencing May 1, 2008, and the monthly rental was $2,000.

(b)    On January 1, 2009, a lease on behalf of CLC Properties, LLC, with ABI as

23

tenant, for premises located at 325 Farmington Road, Mocksville, NC. Phelps executed the lease on behalf of landlord and tenant. The lease term was ten (10) years, commencing January 1, 2009, and the monthly rental was $18,200.

(c)    On January 26, 2009, a lease on behalf of himself with ABI as tenant, for premises located at 321 and 323 Farmington Road, Mocksville, NC. Phelps executed the lease on behalf of landlord and tenant. The lease term was ten (10) years, commencing January 1, 2009, and the monthly rental was $17,500.

(d)    On January 26, 2009, a lease on behalf of himself with RTC as tenant, for "some space at the premises . . . described as 321 Farmington Road, Mocksville, North Carolina." Phelps executed the lease on behalf of landlord and tenant. The lease term was ten (10) years, commencing January 1, 2009, and the monthly rental was $500.

(e)    On January 26, 2009, a lease on behalf of himself with PTM as tenant, for "some space at the premises . . . described as 321 Farmington Road, Mocksville, North Carolina." Phelps executed the lease on behalf of landlord and tenant. The lease term was ten (10) years, commencing January 1, 2009, and the monthly rental was $500.

(f)    On January 26, 2009, a lease on behalf of himself with ABI as tenant, for premises located at 195 Ken Dwiggins Drive, Mocksville, NC. Phelps executed the lease on behalf of landlord and tenant. The lease term was ten (10) years, commencing January 1, 2009, and the monthly rental was $4,500.

(g)    On January 26, 2009, a lease on behalf of himself with ABI as tenant, for premises located at 163 Industrial Blvd., Mocksville, NC. Phelps executed the lease on behalf of landlord and tenant. The lease term was ten (10) years, commencing January 1, 2009, and the monthly rental was $3,000.

(h)    On January 26, 2009, a lease on behalf of himself with PTM as tenant, for

24

"some space at the premises . . . described as 163 Industrial Blvd, Mocksville, North Carolina." Phelps executed the lease on behalf of landlord and tenant. The lease term was ten (10) years, commencing January 1, 2009, and the monthly rental was $3,230.

      (i)      On January 26, 2009, a lease on behalf of himself with RTC as tenant, for premises located at 2605 US Hwy 601, Mocksville, NC. Phelps executed the lease on behalf of landlord and tenant. The lease term was ten (10) years, commencing January 1, 2009, and the monthly rental was $1,500.

89.      According to Dixon Hughes, total rents paid to Phelps and/or the Phelps Entities by "the Company" under various lease agreements for real property in 2005, 2007 and 2008 were $179,428, $385,490 and $388,560, respectively. On information and belief, some or all of the rents were above the fair rental values for the property, and some of the leased properties were not necessary to Debtors' operations.

90.      On or about August 15, 2006, Phelps purchased from the State of North Carolina the Chinqua-Penn Plantation, and its arts and artifacts ("Arts & Artifacts"). On information and belief, the purchase price was approximately $4.1 million. Phelps caused ABI to pay substantially all of the cash portion of the purchase price, in the approximate amount of $1,829,534.59, with the balance provided by a SunTrust loan to Phelps in the amount of $2 million. Phelps caused Debtors to guarantee payment of the $2 million SunTrust loan. All Chinqua-Penn Plantation real and personal property was and remains titled in Phelps' name. In addition, as shown on **Exhibit C**, RHI and ABI paid almost all of Chinqua-Penn Plantation's operating costs and, directly or through cash advances to Phelps and the Phelps Entities, the mortgage payments to SunTrust. Phelps caused ABI to make the last such mortgage payment only a few days before the Petition Date, on January 15, 2009.

91.      As reflected on **Exhibit D**, on February 1, 2008, less than one month after ABI

determined it could not make the Escrow Deposit due on April 15, 2008, Phelps caused RHI to make a $29,700 cash advance to himself.

92. On May 9, 2008, Maxus Capital Group funded the $8,350,000 operating capital loans referred to hereinabove. The day the Maxus Capital Group loan was funded, May 9, 2008, Phelps caused ABI (along with Phelps) to enter a Motor Vehicle Retail Installment Sale Contract by which Phelps and ABI purchased a 2008 Maserati Quattroporte from Foreign Cars International. The amount financed was $142,392.67, with monthly payments of $2,497.46 beginning on June 23, 2008. Phelps caused RHI to guaranty the loan. The Maserati was not necessary to Debtors' operations, and the loan payments further depleted Debtors' operating capital.

### SPECIFIC ALLEGATIONS – NORTH WEST HOLDINGS, LLC, BLUE RIDGE AIRLINES, LLC, JET SALES INTERNATIONAL, LLC AND CLEAR JET INTERNATIONAL, LLC

93. Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

94. Phelps formed North West Holdings, LLC on August 22, 2005. NWH was formed to purchase and operate an airplane.

95. On information and belief, NWH purchased its first airplane in 2005, which was sold about 1 to 1-1/2 yrs later. On information and belief, in late 2006, at a time when Phelps was aware that ABI would not be able to meet its Escrow Obligations for 2006, NWH purchased a Mitsubishi MU-2 airplane. Phelps caused Debtors to guaranty repayment of the purchase-money loan, which was in the amount of $700,000 ("Mitsubishi Loan").

96. NWH did not generate sufficient cash flow to make any payments on the Mitsubishi Loan. As shown on **Exhibit C**, Phelps caused RHI and ABI to bear most, if not all, of NWH's operating expenses, including the Mitsubishi Loan payments. During 2008, the Mitsubishi MU-2 plane became inoperable, however, Phelps caused ABI to continue to make the Mitsubishi Loan

26

payments even after the plane was inoperable.

97.     As detailed on attached **Exhibit C**, from July 11, 2005 through January 27, 2009, NWH (or the business previously operated as NWH before its formation) received from RHI and ABI withdrawals, distributions or payments on its behalf totaling $792,471.83 as follows:

    (a)    RHI: $265,873.25; and

    (b)    ABI: $526,598.58.

98.     Plaintiff alleges and incorporates the information contained at line references 137 and 259 on **Sealed Exhibit A**.

99.     On March 11, 2008, one week after entering the 3/08 Settlement Agreement for past due Escrow Obligations, Phelps formed Blue Ridge Airlines, LLC. Blue Ridge Airlines was formed to purchase and own a 2008 Eclipse 500LX jet.

100.    On July 11, 2008, Blue Ridge Airlines obtained a loan in the amount of $1,893,744 from Carolina Bank to purchase the 2008 Eclipse 500LX aircraft ("Eclipse Loan"). Phelps caused Debtors to enter guaranty agreements for the Eclipse Loan. Blue Ridge Airlines never generated income sufficient to pay its operating expenses or its loan payments. As shown on **Exhibit C**, Phelps caused RHI and ABI to bear most, if not all, of Blue Ridge Airlines' operating expenses, including the Eclipse Loan payments.

101.    As detailed on attached **Exhibit C**, from June 20, 2008 through January 27, 2009, Blue Ridge Airlines received from RHI and ABI withdrawals, distributions or payments on its behalf totaling $148,046.12 as follows:

    (a)    RHI: $130,779.77; and

    (b)    ABI: $17,266.35.

102.    On July 3, 2008, Phelps formed Jet Sales International, LLC. On July 11, 2008, Phelps formed Clear Jet International, LLC. The purpose or purposes for forming Jet Sales and

Clear Jet are unclear, however, Jet Sales and Clear Jet may hold title to property rightfully belonging to Debtors.

103.    On December 19, 2008, NWH executed a promissory note in favor of the Bank of Granite in the principal amount of $348,063.64 to refinance the Mitsubishi Loan, even though the Mitsubishi MU-2 was inoperable.  Phelps caused Debtors to guaranty the renewed Mitsubishi Loan.

104.    On January 5, 2009, twenty-two (22) days before the Petition Date, Phelps caused RHI to make the last note payment that would ever be made on the Eclipse Loan.

105.    Plaintiff alleges and incorporates the information contained at line reference 325 on **Sealed Exhibit A**.

106.    Debtors did not receive reasonably equivalent value for the amounts Debtors paid to or for the benefit of NWH and Blue Ridge Airlines.

## SPECIFIC ALLEGATIONS – CHINQUA-PENN PLANTATION, LLC AND CHINQUA-PENN EVENTS, LLC

107.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

108.    In addition to the $1.8 million ABI paid for Phelps to purchase Chinqua-Penn Plantation, and as detailed on attached **Exhibit C**, from July 2006 through January 27, 2009, at the direction of Phelps, CPP (or the business previously operated as Chinqua-Penn Plantation before its formation) received from RHI, ABI and RTC withdrawals, distributions or payments on its behalf totaling $1,474,839.11 to fund CPP's expenses and obligations as follows:

(a)    RHI: $839,662.54;

(b)    ABI: $632,216.57; and

(c)    RTC: $2,960.

109.    Plaintiff alleges and incorporates the information contained at line references 137 and 259 on **Sealed Exhibit A**.

28

110. In addition to funding CPP's operating expenses, RHI and ABI paid almost all of CPE's operating expenses. As detailed on attached **Exhibit C**, from May 2007 through January 27, 2009, at the direction of Phelps, CPE received from RHI and ABI withdrawals, distributions or payments on its behalf totaling $146,049.80 as follows:

    (a)    RHI: $64,709.66; and

    (b)    ABI: $81,340.14.

111. Plaintiff alleges and incorporates the information contained at line references 259, 325 and 350a on **Sealed Exhibit A.**

112. RHI and ABI did not receive reasonably equivalent value for the amounts they paid to or for the benefit of CPP and CPE, if they received any value at all.

### SPECIFIC ALLEGATIONS – KEY TOBACCO, LLC/4JK PARTNERS, LLC

113. Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

114. Phelps formed Key Tobacco on August 27, 2007. CLC Properties, LLC leased the building at 325 Farmington Road, Mocksville, NC to Key Tobacco. 4JK Partners leased equipment to Key Tobacco. Phelps caused RHI to bear most of the operating expenses of Key Tobacco.

115. As detailed on attached **Exhibit C**, from October 29, 2007 through January 27, 2008, at the direction of Phelps, Key Tobacco received from RHI withdrawals, distributions or payments on its behalf totaling $28,551.08.

116. On or about June 2 or 3, 2008, during a period when ABI's Escrow Obligations and TBO Fees remained delinquent, Phelps caused Debtors to acquire all of Key Tobacco's assets from 4JK Partners for $850,000, consisting of a cash payment to 4JK Partners of $472,980 and set-off of a trade receivable. Phelps also caused Debtors to enter an operating lease with 4JK Partners for machinery and equipment formerly used by Key Tobacco. The lease commenced in May 2008 for a

29

twelve (12) month term, with automatic renewals on a month-to-month basis. Debtors' monthly rental payments to 4JK Partners were $29,000. In addition, Phelps caused Debtors to pay $112,878 to 4JK Partners for an option to purchase the leased equipment for $3,000,000 at any time during the lease term.

117. Upon the dissolution of Key Tobacco, Phelps received a distribution of $124,118 on account of his 50% ownership interest in Key Tobacco.

## SPECIFIC ALLEGATIONS – HOUSE OF WINDSOR, LLC

118. Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

119. As set forth above, Phelps was the sole member of HOW.

120. Within weeks after the 3/08 Settlement Agreement pertaining to Escrow Obligations, Phelps caused RHI to pay a $175,000 down payment to American Western for the purchase of assets consisting of cigar manufacturing equipment and certain intellectual property. Notwithstanding the cash payment by RHI, Phelps caused all assets purchased to be titled in HOW's name. HOW made and delivered a promissory note to American Western in the amount of $1,425,000 for the balance of the purchase price. Phelps caused Debtors to guaranty payment of the American Western promissory note.

121. As detailed on attached **Exhibit C**, from August 2008 through January 27, 2009, at the direction of Phelps, HOW received from RHI, ABI and RTC withdrawals, distributions or payments on its behalf totaling $287,537.87 as follows:

   (a)    RHI: $179,100;

   (b)    ABI: $107,037.87; and

   (c)    RTC: $1,400.

122. The purchase of the HOW assets conferred no benefit on Debtors.

30

## SPECIFIC ALLEGATIONS –
## CUTTING EDGE ENTERPRISES, INC. AND WINDY CITY TOBACCO, LLC

123.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

124.    Phelps was the sole member of Compliant, Compliant was the sole member of WCT, and WCT was the sole shareholder of Cutting Edge.

125.    As detailed on attached **Exhibit C**, from January 1, 2006 through May 31, 2008, at the direction of Phelps, Cutting Edge received from RHI and RTC withdrawals, distributions or payments on its behalf totaling $5,059,533.31 as follows:

      (a)      RHI: $2,370,739.55; and

      (b)      RTC: $2,688,793.76.

126.    The foregoing expenditures include a payment by RHI on May 14, 2008 of Cutting Edge's obligation for Master Settlement Agreement funds.

127.    Cutting Edge filed its Application for Certificate of Withdrawal on November 25, 2008, surrendering its authority to transact business in North Carolina.

128.    As detailed on attached **Exhibit C**, from January 1, 2006 through January 9, 2009, at the direction of Phelps, WCT received from RHI withdrawals, distributions or payments on its behalf totaling $292,349.80.

129.    WCT was dissolved on or about January 9, 2009.

130.    Debtors received no benefit on account of the withdrawals, distributions and payments to or for the benefit of Cutting Edge or WCT, all of which flowed directly or indirectly to or for the benefit of Phelps.

## SPECIFIC ALLEGATIONS – WOLF BROS MANAGEMENT, LLC

131.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

31

132. On December 15, 2008, Phelps formed Wolf Bros Management, LLC.

133. According to Phelps' deposition testimony on July 20, 2009, Wolf Bros was formed to assist another tobacco manufacturing facility, Sandia Tobacco Company, in New Mexico. Sandia Tobacco Company was Wolf Bros' only client.

134. As detailed on attached **Exhibit C**, from December 22, 2008 through January 27, 2009, at the direction of Phelps, Wolf Bros received from RHI withdrawals, distributions or payments on its behalf totaling $3,289.85.

135. Debtors received no benefit on account of the withdrawals, distributions and payments to or for the benefit of Wolf Bros.

## SPECIFIC ALLEGATIONS – DOGWOOD WINERY & VINEYARDS, INC.

136. Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

137. As detailed on attached **Exhibit C**, from January 1, 2005 through January 27, 2009, ABI made transfers to or for the benefit of Dogwood totaling $5,688,584.89. Dogwood maintained a zero balance checking account. According to Debtors, RHI and/or ABI paid Dogwood's expenses from RHI's and/or ABI's checking account, and funds received by Dogwood were deposited into that checking account. In addition, ABI made cash transfers to Dogwood on an "as needed" basis.

138. As detailed on attached **Exhibit C**, from January 28, 2008 through January 27, 2009, at the direction of Phelps, Dogwood received from RHI $944,124 more than the Dogwood funds deposited into the RHI checking account.

139. In addition, ABI paid Dogwood's employees, and ABI's accounting staff kept Dogwood's books and records. On information and belief, Dogwood has not reimbursed ABI for those services.

32

140. Although RHI is the sole shareholder of Dogwood, the $944,124 Dogwood received from RHI may have benefitted Phelps indirectly, as the sole member of Compliant. Neither RHI nor ABI received reasonably equivalent value for the amounts either of them paid to or for the benefit of Phelps, as the indirect owner of Dogwood.

## PTM TECHNOLOGIES, INC.

141. Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

142. PTM owns equipment used by Debtors to manufacture tobacco products. PTM leases the tobacco manufacturing equipment to ABI.

143. According to the deposition testimony of Phelps on July 20, 2009, ABI is the only company with which PTM has an active lease. Prior to commencement of PTM's Chapter 11 case and the appointment of the Chapter 11 Trustee in Debtors' cases, Phelps managed PTM's day-to-day operations. During 2008, PTM's payroll was consolidated into RHI's payroll and was paid by RHI. RHI's accounting staff maintained PTM's books and records.

144. As detailed on attached **Exhibit C**, from January 1, 2005 through January 27, 2009, Debtors reported rent to PTM totaling $6,936,008.34.

145. Phelps caused ABI to pay varying and increasingly greater amounts of rent to PTM, often unrelated to the fair rental value of the equipment ABI was leasing. As detailed on attached **Exhibit C**:

    (a)    As of January 27, 2005, ABI's monthly lease payment to PTM was $125,310.16. On or about November 1, 2005, at the direction of Phelps, the monthly lease payment increased to $125,582.32.

    (b)    As of January 1, 2007, at the direction of Phelps, ABI's monthly lease payment was increased to $138,082.32, and was paid from January through April 2007.

33

ABI made a lump-sum payment of $700,000 on September 30, 2007. In October 2007, ABI paid a lease payment of $128,493.92. In November and December 2007, ABI paid a lease payment of $138,082.32 per month.

(c)     From January 2008 through December 2008, ABI made twelve (12) monthly lease payments of $138,082.32 each, plus a thirteenth payment in that same amount.

(d)     By a one paragraph Equipment Lease dated January 26, 2009 between PTM and ABI, executed by Phelps on behalf of both parties, PTM leased to ABI the machinery and equipment listed on the six (6) page Exhibit A attached to the lease. The lease was a month-to-month lease and could be canceled in writing by either party at any time. The lease required payments of $195,000 per month.

(e)     Post-petition, on March 5, 2009, PTM leased to ABI the machinery and equipment listed on Exhibit A attached to a one paragraph Equipment Lease. This lease also was on a month-to-month basis, and could be canceled in writing by either party at any time. Phelps executed the lease on behalf of both parties. The lease required payments of $20,000 per month.

146.     The equipment described in the January 26, 2009 and March 5, 2009 Equipment Leases, for which ABI's monthly payments totaled $215,000, was substantially the same equipment ABI leased from PTM for $125,000 to $138,000 per month under leases in effect until 26 days before the Petition Date. ABI did not receive reasonably equivalent value for the $57,000 per month increase in the equipment lease payment implemented on the eve of the Petition Date. ABI did not receive reasonably equivalent value for the $20,000 increase in equipment lease payment implemented by the equipment lease dated March 9, 2009.

147.     ABI made the following additional transfers to PTM:

(a)     In 2006, at the direction of Phelps, ABI paid PTM's payroll in the amount of

34

$119,663.86.

(b)    On December 31, 2006, at the direction of Phelps, ABI paid PTM $50,000 for an undisclosed reason.

(c)    In 2007, at the direction of Phelps, ABI paid PTM's payroll in the amount of $42,453.40.

148.    On May 6, 2008, ABI, as seller, delivered a Quitclaim Bill of Sale to PTM, as buyer, for equipment listed on Exhibit B attached to a Bill of Sale. Also on May 6, 2008, RHI, as seller, delivered a Quitclaim Bill of Sale to PTM, as buyer, for equipment listed on Exhibit B attached to a Bill of Sale. No valuable consideration is specified for either Bill of Sale.

149.    To the extent RHI and/or ABI conveyed equipment to PTM by the foregoing Bills of Sale, ABI did not receive reasonably equivalent value.

**FIRST CLAIM FOR RELIEF**
**(In the Alternative)**
**Avoidance of Transfer Under 11 U.S.C. § 548(a)(1)(A)**

150.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

151.    The Transfers specifically described in the preceding allegations were transfers of interests in property of RHI, ABI and/or RTC.

152.    The Transfers that were made between January 29, 2007 and the Petition Date were made within two (2) years of the filing of Debtors' petitions.

153.    The Transfers were made with the actual intent to hinder, delay or defraud creditors of Debtors, as shown by, without limitation, the following:

(a)    The Transfers were made to or for the benefit of insiders and affiliates of RHI, ABI and RTC.

(b)    The Transfers were not disclosed to Debtors' creditors.

35

(c)     At the time of the Transfers, ABI and its brands were threatened with delisting because of ABI's failure to timely pay its Escrow Obligations for 2006, 2007 and 2008.

(d)     The Promissory Notes were an attempt by Phelps and the Phelps Entities to hinder and delay Debtors' creditors. Phelps caused Debtors to enter the Promissory Notes without considering the terms of the Promissory Notes, other than to ensure compliance with Internal Revenue Service guidelines such that Phelps would not be required to report the amounts memorialized in the Promissory Notes as income for income tax purposes. The Promissory Notes were not made at the time Phelps and the Phelps Entities actually incurred the indebtedness represented by the Promissory Notes. Given the Promissory Notes' repayment terms, Phelps knew or should have known at the time the Promissory Notes were made that Phelps and the Phelps Entities would not have the ability to repay the Promissory Notes according to their terms.

154.    Plaintiff is entitled to avoid the Transfers made to or for the benefit of Phelps and the Phelps Entities between January 29, 2007 and the Petition Date, pursuant to 11 U.S.C. § 548(a)(1)(A).

## SECOND CLAIM FOR RELIEF
### (In the Alternative)
### Avoidance of Transfers under 11 U.S.C. § 548(a)(1)(B)

155.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

156.    RHI, ABI and RTC (at the direction of Phelps) received less than a reasonably equivalent value in exchange for the Transfers. In most, if not all, instances, real and personal property purchased with the funds of RHI, ABI and RTC was titled in the name of Phelps or a Phelps Entity. As set forth hereinabove, Debtors paid operating expenses for Phelps Entities from

36

which Debtors received no benefit; and

157.     RHI, ABI and RTC were insolvent on the date the Transfers occurred, or became insolvent as a result of the Transfers; and/or

158.     RHI, ABI and RTC were engaged in a business or a transaction for which their respective remaining property was an unreasonably small capital; and/or

159.     RHI, ABI and RTC intended to incur or believed they would incur debts beyond their ability to pay as such debts matured.

160.     Phelps agreed to perform services for RHI, ABI and RTC during the following periods for the amounts set forth below:

        2005 -- $241,000
        2006 -- $286,000
        2007 -- $286,000
        2008 -- $297,000

161.     Phelps caused Debtors to pay to him or for his benefit not less than $8,114,184.49 during the period 2005 through December 31, 2008, which Phelps consciously accepted.

162.     Plaintiff is entitled to avoid the Transfers made to or for the benefit of Phelps and the Phelps Entities between January 29, 2007 and the Petition Date, pursuant to 11 U.S.C. § 548(a)(1)(B).  To the extent distributions to or for the benefit of Phelps exceeded either his actual base salary or a reasonable base salary during the two (2) years before the Petition Date, those amounts are avoidable under Bankruptcy Code § 548 in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
#### (In the Alternative)
#### Avoidance of Transfer Under 11 U.S.C. § 544 and the
#### North Carolina Uniform Fraudulent Transfer Act, N.C.Gen.Stat. § 39-23.1, *et seq.*

163.     Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

164.     Plaintiff has standing to bring this claim pursuant to Bankruptcy Code § 544.

37

165. At the time of the Transfers, RHI, ABI and RTC were indebted to one or more creditors holding an unsecured claim that is allowable under Bankruptcy Code § 502 or that is not allowable only under Bankruptcy Code § 502(e), including, without limitation, the Escrow Obligations and the TBO Fees.

166. RHI, ABI and RTC are debtors within the meaning of N.C.Gen.Stat. § 39-23.1(6).

167. The Transfers from RHI, ABI and RTC to or for the benefit of Defendants were transfers within the meaning of N.C.Gen.Stat. § 39-23.1(12).

168. The Transfers made between January 29, 2005 and January 28, 2009 were made within the time provided by N.C.Gen.Stat. § 39-23.9.

169. The Transfers were made with the actual intent to hinder, delay and defraud creditors of Debtors within the meaning of N.C.Gen.Stat. § 39-23.4(a)(1).

170. The factors indicating fraudulent intent pursuant to N.C.Gen.Stat. § 39-23.4(b) include, without limitation, that the Transfers were made to or for the benefit of insiders; the Transfers were not disclosed; shortly before or shortly after the Transfers were made, ABI and its brands were threatened with delisting for ABI's failure to timely pay the Escrow Obligations; the Transfers were made without RHI, ABI and RTC receiving a reasonably equivalent value in exchange for the Transfers; and the Transfers were not in the course of legitimate tax planning.

171. RHI, ABI and RTC were insolvent at the time of the Transfers, or became insolvent as a result of the Transfers, or were about to engage in a transaction for which their remaining assets were unreasonably small in relation to the transaction.

172. The Transfers are avoidable pursuant to N.C.Gen.Stat. §§ 39-23.4(a)(1), 39-23.4(a)(2), 39-23.5(a) and 39-23.5(b). To the extent distributions to Phelps exceeded either his actual base salary or a reasonable base salary during the four (4) years before the Petition Date, those distributions are avoidable under Bankruptcy Code § 544 and N.C.Gen.Stat. § 39-23.1, *et seq.*

38

in an amount to be proven at trial.

173.    Plaintiff is entitled to avoid the Transfers pursuant to Bankruptcy Code § 544 and N.C.Gen.Stat. § 39-23.7(a)(1).

### FOURTH CLAIM FOR RELIEF
### (In the Alternative)
### Bankruptcy Code § 550

174.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

175.    The Transfers made between January 29, 2007 and January 28, 2009 are avoidable pursuant to Bankruptcy Code § 548.

176.    Defendants are the initial transferees of the Transfers and/or are the entities for whose benefit the Transfers were made.

177.    Recovery of the avoided Transfers will benefit Debtors' bankruptcy estates. Recovery of the avoided Transfers will inure to the benefit of Debtors' creditors and will increase the likelihood of creditors receiving future payments under a plan of reorganization.  Recovery of the avoided Transfers will increase the likelihood of creditors receiving a dividend on their claims if Debtors' cases are converted to cases under Chapter 7.

178.    Plaintiff is entitled to recover for the benefit of Debtors' bankruptcy estates the Transfers or the value of the Transfers, pursuant to Bankruptcy Code § 550.

### FIFTH CLAIM FOR RELIEF
### (In the Alternative)
### Recovery Under 11 U.S.C. § 544 and N.C.Gen.Stat. § 39-23.8(b)

179.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

180.    The Transfers made between January 29, 2005 and January 28, 2009 are avoidable pursuant to N.C.Gen.Stat. §§ 39-23.4(a)(1), 39-23.4(a)(2), 39-23.5(a), and 39-23.5(b).

BTM:442906v6

181. Defendants are the first transferees or subsequent transferees within the meaning of N.C.Gen.Stat. § 39-23.8(b).

182. Plaintiff is entitled to recover from Defendants the value of the assets transferred or the amount necessary to satisfy Plaintiff's judgment, pursuant to N.C.Gen.Stat. § 39-23.8(b).

### SIXTH CLAIM FOR RELIEF
### Breach of Fiduciary Duties of Loyalty and Due Care
### N.C.Gen.Stat. §§ 55-8-30 and 55-8-42

183. Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

184. Phelps, as an officer and director of RHI, ABI and RTC, owed Debtors fiduciary duties of care and loyalty to act in their best interests, and was required to discharge his duties in good faith, with the care an ordinarily prudent person in a like position would exercise in similar circumstances, and in a manner he reasonably believes to be in the best interests of RHI, ABI and RTC.

185. Upon information and belief, and as set forth specifically hereinabove, Phelps failed to act in good faith as an officer and director, put his own self-interests above the interests of Debtors, squandered and wasted corporate assets and otherwise breached his fiduciary duties of loyalty and care to RHI, ABI and RTC.

186. By way of example, and without limitation, Phelps failed to take reasonable steps to protect Debtors and their assets when it was apparent that Debtors could not afford to pay the expenses incurred by Phelps and the Phelps Entities.

187. By way of example, and without limitation, in causing RHI, ABI and RTC to guaranty the obligations of Phelps and the Phelps Entities, without adequate consideration, Phelps unnecessarily increased liabilities against Debtors in an amount exceeding $2.4 million.

188. By way of example, and without limitation, Phelps engaged in impermissible self-

40

dealing in violation of his duties of loyalty and care to Debtors by putting his own self-interests above the interests of Debtors, and making corporate decisions which were perceived by him to be personally advantageous, but which were detrimental to Debtors.

189. Phelps caused Debtors to pay to or for the benefit of Phelps and the Phelps Entities at least $7,028,337 at a time when Debtors were unable to make statutory-required Escrow Deposits and pay TBO Fees.

190. Phelps caused Debtors to expend cash and become obligated to pay for the purchase of Chinqua-Penn Plantation, the Maserati, two airplanes, the HOW assets and other real and personal property as described hereinabove. In exchange for these expenditures and obligations, Phelps caused Debtors to accept sixteen (16) unsecured Promissory Notes aggregating $8,114,184.49, on terms that were not commercially reasonable to Debtors and at a time when Debtors were in dire need of capital. Phelps intentionally and consciously disregarded his responsibilities to Debtors by causing Debtors to accept Promissory Notes which were unsupported by any security interest or other method of ensuring that payments would ever be made, despite the fact that Phelps had already failed to timely make payments on existing notes and obligations to Debtors.

191. The $77,000 per month increase in Debtors' equipment lease payments to PTM, and any above-market levels of real property rent Debtors paid to Phelps and the Phelps Entities, were due to Phelps' long-term depletion of Debtors' cash for personal expenditures, for the benefit of himself and the Phelps Entities.

192. Phelps' actions as described herein caused substantial harm to Debtors, and significantly increased their liabilities.

193. As a result of Phelps' various breaches of his fiduciary and statutory duties to Debtors, Debtors have suffered damages in an amount to be proven at trial, but not less than

41

$8,114,184.49.

## SEVENTH CLAIM FOR RELIEF
### Constructive Trust
### Bankruptcy Code § 541(a)(1) and N.C.Gen.Stat. § 39-23.10

194.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

195.    Phelps, CPP and/or CPE acquired Chinqua-Penn Plantation and its Arts & Artifacts through fraud, breach of duty, and other circumstances making it inequitable for Phelps to retain Chinqua-Penn Plantation and its Arts & Artifacts against the claim of ABI, as beneficiary of a constructive trust.

196.    The constructive trust in favor of ABI arose on or about August 22, 2006 upon ABI's payment of the cash portion of the purchase price for such property, guaranty of the SunTrust indebtedness, and payment thereafter of the SunTrust mortgage payments and other expenses.

197.    Phelps, CPP and/or CPE hold only bare legal title to Chinqua-Penn Plantation and its Arts & Artifacts.  The equitable interests remain with ABI.

198.    Pursuant to 11 U.S.C. § 541(a), the equitable interest in Chinqua-Penn Plantation and its Arts & Artifacts is property of the ABI bankruptcy estate.

199.    Debtors are entitled to the imposition of a constructive trust on Chinqua-Penn Plantation and its Arts & Artifacts, and on other assets, to be proven at trial, owned by Phelps and the Phelps Entities, including without limitation the guitar collection, described in **Exhibit D** as "Vintage Connection."

200.    In the alternative, Phelps should be ordered to convey to Debtors title to Chinqua-Penn Plantation, its Arts & Artifacts, and any other assets owned by Phelps and the Phelps Entities for which Debtors provided the purchase price either directly or indirectly.

42

## EIGHTH CLAIM FOR RELIEF
### Resulting Trust
### Bankruptcy Code § 541(a)(1) and N.C.Gen.Stat. § 39-23.10
### (Real and Personal Property)

201.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

202.    Phelps and the Phelps Entities have obtained title to real property and personal property under circumstances which in equity obligate them to hold the titles and to exercise their ownership for the benefit of Debtors.

203.    As set forth hereinabove, Debtors' money has been invested in real and personal property taken in the name of Phelps and the Phelps Entities.  Debtors furnished the purchase price for real and personal property and improvements thereon and thereto, that was titled in the name of Phelps and the Phelps Entities.

204.    Debtors are entitled to declaration of a resulting trust on all assets to which Phelps and the Phelps Entities obtained title under circumstances which obligate Phelps and the Phelps Entities to exercise their ownership for the benefit of Debtors.

## NINTH CLAIM FOR RELIEF
### Equitable Lien
### Bankruptcy Code § 541(a)(1) and N.C.Gen.Stat. § 39-23.10
### (Real and Personal Property)

205.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

206.    Debtors are entitled to a charge upon the real and personal property owned by Phelps and the Phelps Entities on the ground that otherwise, Phelps and the Phelps Entities will be unjustly enriched.  By way of example and without limitation, Phelps caused ABI to wrongfully expend funds that can be traced to Chinqua-Penn Plantation and its Arts & Artifacts, the assets titled in the name of HOW but paid for by ABI, and improvements to real property at 325 Farmington Road,

43

Mocksville, NC, titled in the name of Phelps (but purported to be owned by CLC Properties, LLC).

### TENTH CLAIM FOR RELIEF
### Unjust Enrichment
### N.C.Gen.Stat. § 39-23.10

207.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

208.    Phelps agreed to perform services for RHI, ABI and RTC during the following periods for the amounts set forth below:

        2005 -- $241,000
        2006 -- $286,000
        2007 -- $286,000
        2008 -- $297,000

209.    Phelps caused Debtors to pay to him or for his benefit not less than $8,114,184.49 during the period 2005 through December 31, 2008, which Phelps consciously accepted.

210.    The Promissory Notes were devised solely to prevent the amounts paid to Phelps or for his benefit from being treated as income to Phelps for income tax purposes.

211.    Allowing Phelps to retain the payment in excess of his salary would be unfair to Debtors.

212.    To prevent unjust enrichment, Phelps is equitably obligated to disgorge the excess compensation in an amount not less than $8,114,184.49.

213.    On or about June 26, 2006, Ms. Yamaoka received from ABI $27,525, described as a "shareholder advance." On information and belief, Ms. Yamaoka was not a shareholder of ABI on June 26, 2006.

214.    To prevent unjust enrichment, Ms. Yamaoka is equitably obligated to disgorge an amount not less than $27,525.

44

## ELEVENTH CLAIM FOR RELIEF
### Rescission of Agreements and Instruments
### N.C.Gen.Stat. § 39-23.10

215. Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

216. All actions taken by Phelps during the periods in which he was an officer and/or director of RHI, ABI and/or RTC were taken by Phelps while acting in a fiduciary capacity, and he owed fiduciary duties to Debtors as set forth above.

217. All actions taken by Phelps during the period from at least 2005 through the Petition Date which benefitted him and were contrary to the interests of Debtors are presumed to be fraudulent.

218. As a result of the foregoing, any and all self-aggrandizing agreements, leases, corporate resolutions or other arrangements which were detrimental to Debtors that were negotiated by Phelps while acting in his fiduciary capacity on behalf of Debtors, with himself in his individual capacity or on behalf of any Phelps Entity, should be rescinded and set aside.

## TWELFTH CLAIM FOR RELIEF
### Damages

219. Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

220. As a direct and proximate result of the foregoing, Debtors have been damaged in a sum to be proven at trial, but not less than $8,114,184.49.

221. Plaintiff is entitled to have and recover from Defendants actual damages in an amount not less than $8,114,184.49.

WHEREFORE, Plaintiff respectfully prays that the Court enter a judgment:

1. Pursuant to the First Claim for Relief, avoiding and setting aside the Transfers made to or for the benefit of Phelps and the Phelps Entities between January 29, 2007 and the Petition

45

Date;

2.      Pursuant to the Second Claim for Relief, avoiding the Transfers made to or for the benefit of Phelps and the Phelps Entities between January 29, 2007 and the Petition Date and, to the extent distributions to or for the benefit of Phelps exceeded either his actual base salary or a reasonable base salary during the two (2) years before the Petition Date, avoiding those distributions;

3.      Pursuant to the Third Claim for Relief, avoiding the Transfers made to or for the benefit of Phelps and the Phelps Entities between January 29, 2005 and the Petition Date and, to the extent distributions to Phelps exceeded either his actual base salary or a reasonable base salary during the four (4) years before the Petition Date, avoiding those distributions;

4.      Pursuant to the Fourth Claim for Relief, ordering the recovery of the Transfers or the value of the Transfers made to or for the benefit of Phelps and the Phelps Entities between January 29, 2007 and the Petition Date, plus interest thereon from the date of the Transfers;

5.      Pursuant to the Fifth Claim for Relief, ordering the recovery of the value of the assets transferred to or for the benefit of Phelps and the Phelps Entities between January 29, 2005 and the Petition Date, or the amount necessary to satisfy Plaintiff's judgment, plus interest thereon from the date of the Transfers;

6.      Pursuant to the Sixth Claim for Relief, awarding Plaintiff damages in amounts to be proven at trial for breach of Phelps' fiduciary duties of loyalty and care to Debtors;

7.      Pursuant to the Seventh Claim for Relief, declaring a constructive trust in Debtors' favor on Chinqua-Penn Plantation and its Arts & Artifacts, and on other assets owned by Phelps and the Phelps Entities to be proven at trial, or in the alternative, ordering Phelps to convey to Debtors Chinqua-Penn Plantation and its Arts & Artifacts, and any other assets owned by Phelps and the Phelps Entities for which Debtors provided the purchase price either directly or indirectly;

BTM:442906v6

8.      Pursuant to the Eighth Claim for Relief, declaring a resulting trust in favor of Debtors on real and personal property to be shown at trial;

9.      Pursuant to the Ninth Claim for Relief, awarding Debtors an equitable lien upon the real and personal property owned by Phelps and the Phelps Entities to the extent necessary to prevent unjust enrichment;

10.     Pursuant to the Tenth Claim for Relief, ordering Phelps to disgorge his excess compensation in an amount not less than $8,114,184.49 and ordering Ms. Yamaoka to disgorge an amount not less than $27,525, plus interest thereon from the date of the Transfers;

11.     Pursuant to the Eleventh Claim for Relief, ordering the rescission and setting aside of any and all self-aggrandizing agreements, leases, corporate resolutions or other arrangements negotiated by Phelps while acting in his fiduciary capacity on behalf of Debtors, which were for his own personal benefit, but which were detrimental to Debtors;

12.     Pursuant to the Twelfth Claim for Relief, awarding Debtors actual damages in an amount not less than $8,114,184.49;

13.     Awarding Plaintiff its attorney's fees to the extent allowed by law;

14.     Awarding Plaintiff the costs of this action; and

15.     Granting Plaintiff such other and further relief as the Court deems just and proper.

BTM:442906v6

This the 23rd day of September, 2010.

_____
Gene B. Tarr, NCSB #11110
Court-appointed Examiner

OF COUNSEL:

BLANCO TACKABERY
& MATAMOROS, P.A.
P. O. Drawer 25008
Winston-Salem, NC 27114-5008
Telephone: (336) 293-9000
Facsimile: (336) 293-9030
E-mail: gbt@blancolaw.com

BTM:442906v6

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

IN RE:

RENEGADE HOLDINGS, INC., et al.,    )
    )
    Debtors.    )  Case No. 09-50140
    )  Consolidated for Administration
_____    )  Chapter 11
    )
RENEGADE HOLDINGS, INC.,    )
ALTERNATIVE BRANDS, INC. AND    )
RENEGADE TOBACCO COMPANY    )
    )
    Plaintiff,    )  Adversary Proceeding No. 10-_____
    )
v.    )
    )
CALVIN A. PHELPS; LISA YAMAOKA    )
A/K/A LISA PHELPS; COMPLIANT    )
TOBACCO COMPANY, LLC;    )
DOGWOOD WINERY & VINEYARDS,    )
INC.; CLC PROPERTIES, LLC; CLC-    )
DBA/CALVIN PHELPS; CHINQUA-    )
PENN PLANTATION, LLC; CHINQUA-    )
PENN EVENTS, LLC; NORTH WEST    )
HOLDINGS, L.L.C.; BLUE RIDGE    )
AIRLINES, LLC; JET SALES    )
INTERNATIONAL, LLC; CLEAR JET    )
INTERNATIONAL, LLC; HOUSE OF    )
WINDSOR, LLC; WOLF BROS    )
MANAGEMENT, LLC; and WEST    )
FORSYTH DEVELOPMENT COMPANY,    )
INC.,    )
    )
    Defendants.    )

## VERIFICATION OF PETER L. TOURTELLOT

    I am Peter L. Tourtellot, the Court appointed Chapter 11 Trustee in the above-captioned

bankruptcy cases. I have read the foregoing Complaint and know the contents thereof. The same

are true of my own knowledge, except as to those matters therein stated to be alleged upon

information and belief, and as to those matters, I believe them to be true.

This the 23 day of September, 2010.

_____
Peter L. Tourtellot, Chapter 11 Trustee

Sworn to and subscribed before me
this 23 day of September, 2010.

Sherri Creason Kiser
_____
Notary Public

My Commission Expires: April 8, 2013

[Notary Seal]

SHERRI CREASON KISER
NOTARY PUBLIC
Iredell County, North Carolina
My Commission Expires April 8, 2013

2