## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** ("Agreement"), dated as of July 15, 2011, by and among **CB HOLDINGS, LLC**, a Virginia limited liability company ("Buyer"), **RENEGADE HOLDINGS, INC.**, a North Carolina corporation ("Renegade"), **RENEGADE TOBACCO COMPANY**, a North Carolina corporation ("Renegade Tobacco"), and **ALTERNATIVE BRANDS, INC.**, a North Carolina corporation ("ABI") (Renegade, Renegade Tobacco, and ABI are hereafter collectively referred to as "Seller"), relating to the sale by Seller and purchase by Buyer of certain assets of Seller,

## RECITALS

**WHEREAS**, Seller is owner of certain assets as defined in this Agreement to be acquired by Buyer;

**WHEREAS**, Renegade filed for protection under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of North Carolina (Case No. 09-50140) on January 28, 2009;

**WHEREAS**, Renegade Tobacco filed for protection under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of North Carolina (Case No. 09-50143) on January 28, 2009;

**WHEREAS**, ABI filed for protection under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of North Carolina (Case No. 09-50141) on June 28, 2009;

**WHEREAS**, PTM Technologies, Inc. ("PTM") filed for protection under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of North Carolina (Case No. 10-50980) on May 26, 2010;

**WHEREAS**, on August 18, 2010 Peter Tourtellot ("Trustee") was appointed as the Chapter 11 bankruptcy trustee for Renegade, Renegade Tobacco, and ABI and has the full power to operate each Seller, enter into this Agreement and sell the Assets of each Seller, subject to approval of the Bankruptcy Court.

**WHEREAS**, Seller has failed to make certain escrow deposits as required under certain states laws passed pursuant to the Master Settlement Agreement dated November 23, 1998;

**WHEREAS**, it is intended that this sale be a section 363 sale under the Bankruptcy Code and that Buyer is to purchase the Assets free and clear of all liens, encumbrances, rights of any party whatsoever, and without any liabilities whatsoever; and

**WHEREAS**, Buyer has refused to purchase the Assets unless as a part of this purchase all the escrow deposits which had not been made as of the commencement of Seller's bankruptcy

EXHIBIT
A

cases and all current escrow deposits are made at Closing, and Buyer has no liability whatsoever for Seller's action prior to Closing.

## WITNESSETH

**NOW THEREFORE**, for and in consideration of the mutual promises and covenants contained herein and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE I - DEFINITIONS

As used in this Agreement, the following words and phrases have the following meanings, respectively:

"Assets" shall mean all of the assets of Seller other than Excluded Assets and Leased Assets. The Assets, include, but shall not be limited to, all contracts, orders, books and records, equipment, intangible assets, inventory, licenses, brands, trademarks, intellectual property, ingredient lists, escrow deposits, and all other personal property as such items are identified on **Schedule A**, attached hereto and made a part hereof by this reference. Except for Excluded Assets and Leased Assets, it is the intent of this Agreement that the property being sold includes all of the property which comprises the Business and which has heretofore been used by Seller in connection with the operation of the Business.

"Bankruptcy Court" means the United States Bankruptcy Court for the Middle District of North Carolina.

"Bidding Procedures Order" means an order of the Bankruptcy Court in substantially the form attached to this Agreement as **Schedule B** approving certain bid procedures (the "Bid Procedures") and bid protections (the "Bid Protections") as defined in that order.

"Brands" shall mean all of the cigarette, cigar, little cigar, or other tobacco products brands owned by Seller as set forth on **Schedule C**, attached hereto and made a part hereof by this reference.

"Business" means the business of manufacturing cigarettes, little cigars, cigars, and other tobacco products and other activities as presently being conducted by Seller.

"Closing" or "Closing Date" as defined in Section 7.1.

"Excluded Assets" shall mean cash, accounts receivable (except to the extent assigned to Buyer for purposes of collection, as provided below), any cause of action (including but not limited to causes of action which may arise under the Bankruptcy Code), and those other items set forth on **Schedule D** attached hereto and made a part hereof by this reference.

"Financial Statements" shall mean the annual balance sheet and income statement as of December 31, 2007, 2008, 2009, and 2010 and the interim balance sheet and income statement as of June 30, 2011.

"Final Order" means an order of the Bankruptcy Court or other court of competent jurisdiction: (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect.

"Governmental Authority" means any federal, state, local, foreign or other government or quasi-governmental authority or any department, agency, subdivision, court or other tribunal of any of the foregoing.

"Knowledge of Buyer" means the actual knowledge, without inquiry, of Willie G. Barker, Jr. and Charles F. Fuller.

"Knowledge of Seller" means the actual knowledge, without inquiry, of the Trustee and each executive officer, compliance officer, plant manager, or human resources manager of Seller.

"Leased Assets" shall mean the real property upon which the Business is presently being conducted consisting of two parcels of land and certain equipment owned by PTM Technologies and leased to the Seller as specifically set forth on **Schedule E** attached hereto and made a part hereof by this reference.

"Ordinary Course of Business" means an action taken by Seller in connection with the operation of the Business that is (a) consistent in nature, scope, and magnitude with the past recent practices of Seller and is taken in the ordinary course of the normal, day-to-day operations of Seller and that does not require authorization by the board of directors or shareholders of Seller or (b) otherwise permitted by the Bankruptcy Court.

"Representative" means, with respect to a party hereto, any director, officer, manager, employee, agent, consultant, advisor, accountant, financial advisor, legal counsel or other representative of that party.

"Sale Approval Order" means an order of the Bankruptcy Court in substantially the form attached to this Agreement as **Exhibit F**, which order will include a specific finding and conclusion of law that Buyer is a good faith purchaser of the Assets within the meaning of Section 363(m) of the Bankruptcy Code, will state that the sale of the Assets to Buyer shall be free and clear of any and all liens, security interests, mortgages, charges, claims, conditions, equitable interests, options, pledges, rights of first refusal, and any and all other encumbrances and restrictions whatsoever ("Liens") and performance by Seller of its obligations under this Agreement and the other agreements referenced herein is pursuant to Section 363 of the Bankruptcy Code, and will include specific findings that the Business and the Assets were properly advertised and marketed for sale and that the order is entered with sufficient prior notice in accordance with the applicable requirements of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with other applicable provisions of the Bankruptcy Code.

Case 09-50140    Doc 972-1    Filed 07/20/11    Page 3 of 64

"Tax" means any federal, state, local, foreign or other tax, levy, impost, fee, assessment or other government charge, including, without limitation, (i) income, estimated income, business, occupation, franchise, property, payroll, personal property, sales, transfer, use, employment, commercial rent, occupancy, franchise or withholding taxes; (ii) any taxes, assessments, or escrows related to or arising as the result of the manufacture or sale of cigarettes, cigars, little cigars, or other tobacco products; and (iii) any premium, interest, penalties and additions in connection therewith.

## ARTICLE II - SALE AND TRANSFER OF PROPERTY

Section 2.1 <u>Purchase of Assets</u>. At Closing, Buyer shall purchase from Seller, and Seller shall sell, transfer, assign, and deliver to Buyer, free and clear of any and all Liens, except those identified in this Agreement or in the Schedules attached hereto, all of the Assets, except the Excluded Assets and the Leased Assets.

Section 2.2 <u>Assumed Liabilities</u>. Buyer will assume as of the Closing Date and indemnify, defend and hold Seller harmless with respect to, the obligations of Seller under (a) the Assumed Agreements, to the extent that such obligations arise after the Closing Date, provided, however, that such obligations will only be Assumed Liabilities to the extent that (i) all benefits under any Assumed Agreement are transferred to Buyer pursuant to this Agreement and, with respect to any Assumed Agreements that are Executory Contracts, all defaults arising prior to the Closing have been cured by Seller and such Executory Contracts have been assumed by Seller and assigned to Buyer in accordance with Section 365 of the Bankruptcy Code, and (ii) the existence of such obligations does not constitute a breach of the representations and warranties of Seller set forth in this Agreement or a breach of such Assumed Agreement (to the extent not rendered unenforceable by the Bankruptcy Code), and (b) any loss, cost or expense imposed or assessed against Seller under the Workers Adjustment Retraining and Notification Act (the "WARN Act") as provided in Section 3.2 below (collectively, the "Assumed Liabilities").

Section 2.3 <u>Excluded Liabilities</u>. Other than the Assumed Liabilities, Seller expressly acknowledges that Buyer will not be liable for any obligations or liabilities of Seller of any kind or nature whether actual or contingent, matured or unmatured, liquidated or unliquidated, known or unknown, all of which shall remain the sole responsibility of and shall be retained, paid, performed and discharged solely by Seller, including any liabilities:

(a) relating to Seller, the Business or the Assets, and in each case to circumstances or events occurring before the Closing Date, including, without limitation:

(i) any liability or obligation to or in respect of any shareholder, officer, director, employee or agent (former or existing) of Seller whether under any plan, policy, agreement, law, board action, charter provision, bylaw provision, or otherwise, including any liability to distribute to any of Seller's shareholders or otherwise apply all or any part of the consideration received hereunder, or any liability to indemnify, reimburse, or advance amounts to any officer, director, employee or agent of Seller;

(ii) any employee or employee benefit plan liabilities, including any liability under any employment, severance, retention, or termination agreement with any employee of Seller or any insider or other affiliate, any liability relating to payroll, vacation, sick leave, workers' compensation, unemployment benefits, pension benefits, employee stock option or profit-sharing plans, health care plans or benefits or any other employee plans or benefits of any kind for Seller's employees or former employees or both, or any liability arising out of or relating to any employee grievance whether or not the affected employees are hired by Buyer;

(iii) any liability under any Assumed Agreement assumed by Buyer that arises after the Closing Date, but that arises out of or relates to any breach or events that occurred prior to the Closing Date, and any liability under any agreement or contract not assumed by Buyer, including any liability arising out of or relating to Seller's credit facilities or any related security interest;

(iv) any liability or obligation of Seller in respect of any Tax;

(v) any claim, litigation, arbitration, or other proceeding, whether based on negligence, breach of warranty, breach of contract, fraud, misrepresentation, open account, strict liability, enterprise liability or otherwise, including any liability arising out of any legal proceeding pending as of the Closing Date or arising out of any legal proceeding commenced after the Closing Date and arising out of or relating to any occurrence or event happening prior to the Closing Date;

(vi) any liability or obligation for violation by Seller of any Applicable Law, including any environmental law; or

(vii) any liability or obligation arising out of or relating to products or services of Seller to the extent sold or rendered by Seller on or prior to the Closing;

(b) arising in Seller's operation of any continuing business or any other act or omission of Seller following the Closing Date; and

(c) of Seller under this Agreement or under any other document executed in connection with this Agreement.

Section 2.4 <u>Determination and Allocation of Purchase Price</u>. The Purchase Price for the Assets shall be equal to the sum of the following (each as defined below): (i) the Total Escrow Value, (ii) the Accounts Receivable Amount, (iii) the Inventory Amount and (iv) the Remaining Purchase Price.

(a) The term "Total Escrow Value" means an amount equal to 23% of the Total Escrow Deposits. The term "Total Escrow Deposits" means the Existing Deposits as of the Closing Date plus the Delinquent Amount and shall include amounts to be deposited by Seller at or after Closing pursuant to this Agreement. The term "Existing Deposits" means the amount Seller has deposited into escrow pursuant to applicable state statutes, adjusted at Closing to reflect the actual deposits made up to and including the Closing

Date. The term "Delinquent Amount" means the amount accrued as of the commencement of Seller's bankruptcy cases and which Seller is required to deposit into escrow pursuant to applicable state statutes promulgated in accordance with the terms of the Master Settlement Agreement, but which Seller has not deposited and is, therefore, in arrears with respect thereto, which amount is currently estimated to be Seven Million Five Hundred Thousand and 00/100 Dollars ($7,500,000.00) plus such amount as may be allowed for the disputed Escrow Amount claim asserted by the State of Missouri either by Final Order or by agreement between the Seller and the State of Missouri.

The parties recognize, understand, and agree, that the amount deposited in escrow is subject to review by each state in which Seller has sold or is selling tobacco products and that Seller will be required to put money into escrow after the Closing as a result of such sales made by Seller. In addition, the parties agree that it is their intention that all money placed in escrow accounts as the result of Seller's selling of tobacco products ultimately be transferred to Buyer pursuant to this Agreement. Therefore, on April 30, 2012, the parties intend to "true up" the amount paid by Buyer for the Total Escrow Deposits. On April 15, 2012, Seller shall provide to Buyer in writing the amount of escrow deposits made after the Closing. Seller and Buyer shall cooperate fully and jointly use their best efforts to confirm with each state attorney general that such amount is accurate, providing access for each party to all relevant or necessary records for such purpose, and Seller shall make any and all payments necessary to satisfy any shortage. On April 30, 2012, Buyer shall pay to Seller 23% of any Escrow Deposit not previously paid for by Buyer and, in the event that Buyer has paid more than 23% of the Total Escrow Deposits, Buyer shall be entitled to recover such overage from the money held in escrow pursuant to Section 2.5(e) of this Agreement.

(b) The term "Accounts Receivable Amount" means the amount Buyer actually collects as proceeds from Seller's accounts receivable that are assigned to Buyer at Closing, which amount is estimated by Seller to be $1,100,000.00. Buyer shall use best and commercially reasonable efforts to collect Seller's accounts receivable, but shall not be required to commence litigation in an effort to collect such accounts. Buyer shall not accept any partial or discounted amount in full satisfaction of any such accounts without Seller's advance consent, and shall not accept any return of goods for credit against such account except as provided in Section 3.7. Buyer shall assign to Seller the right to receive the proceeds of any Seller's accounts receivable that remain uncollected, in whole or in part, on the date that is 90 days from the Closing Date, and thereafter Buyer shall have no obligation to pay any amount therefore or perform any obligation related thereto.

(c) The term "Inventory Amount" means the value of raw material, work in process and finished goods useable by Buyer and determined at cost at the Closing Date, which is estimated to be Two Million and 00/100 Dollars ($2,000,000.00). At or before closing, the Buyer and the Seller shall review and mutually determine the cost value of the existing inventory useable by Buyer, applying the same methodology as was used during the Study Period.

(d) The term "Remaining Purchase Price" means One Million Four Hundred Thousand and 00/100 Dollars ($1,400,000.00).

Section 2.5  <u>Payment of Purchase Price</u>  The aggregate purchase price will be paid as follows:

(a)  Buyer shall pay, in escrow, as a deposit toward the Purchase Price, Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) within three (3) business days following the issuance of the Bidding Procedures Order by the Bankruptcy Court ("Earnest Money Deposit"). The Earnest Money Deposit shall be deposited by Buyer into an interest bearing escrow account pursuant to the terms of an escrow agreement in form and substance reasonably acceptable to Buyer and Seller (the "Escrow Agreement"). The Earnest Money Deposit shall be refundable to Buyer or paid to Seller in accordance with the terms of this Agreement.

(b)  The portion of the Purchase Price equal to the Total Escrow Value shall be paid as follows:  At Closing, an amount equaling the Delinquent Amount shall be deposited in the appropriate escrow account or sub-account which has previously been designated for each state who claims a Delinquent Amount.  The balance of the Total Escrow Value (that is, the Total Escrow Value less the Delinquent Amount) shall be paid by Buyer to Seller at Closing.

(c)  Subject to Section 2.4 (b) hereof, the portion of the Purchase Price equal to the Accounts Receivable Amount shall be paid by Buyer to Seller in payments on a weekly basis commencing seven (7) days after the Closing with each payment being in an amount equal to the amount Buyer actually collects during the prior seven days as proceeds from Seller's accounts receivable assigned to Buyer at Closing.

(d)  Subject to Section 2.4 (c) hereof, the portion of the Purchase Price equal to the Inventory Amount shall be paid by Buyer to Seller in payments on a monthly basis commencing thirty (30) days after the Closing with each payment being in an amount equal to the cost value of the inventory used by Buyer or sold by Buyer on behalf of Seller during the preceding thirty (30) days.  Any remaining raw materials or work in process inventory not previously paid for by Buyer shall be paid for by Buyer not later than six months from the Closing Date. Any remaining finished goods inventory not sold within six (6) months of the Closing shall be returned to or destroyed by Seller.  Buyer shall pay directly to the taxing authority, when due, all FET, SET and tobacco quota buyout (TBO) payments and shall deposit with the appropriate bank all appropriate escrow amounts required with respect thereto as and when due.

(e)  One Million and 00/100 Dollars ($1,000,000.00) of the Remaining Purchase Price shall be paid by Buyer to Seller at Closing.  Four Hundred Thousand and 00/100 Dollars ($400,000.00), consisting of the Earnest Money Deposit and One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00) due at closing, shall be paid directly to a mutually acceptable escrow agent to be held in escrow for six (6) months from Closing or April 30, 2012, whichever is later, for the purpose of satisfying any amounts owed by Seller to Buyer under this Agreement.

Section 2.6  <u>Transfer Taxes and Proration</u>.  Buyer and Seller shall cooperate to obtain an

order of the Bankruptcy Court exempting the sale of the Assets under this Agreement from sales, use, transfer, stamp, recording, duty and value added Taxes, and other similar Taxes and fees (including recording costs) which may be payable by reason of the sale of the Assets under this Agreement or the transactions contemplated herein (collectively, "Transfer Taxes"). In the event that Buyer and Seller do not obtain such an exemption order of the Bankruptcy Court and any Transfer Taxes are assessed at any time thereafter, such Transfer Taxes incurred as a result of the transactions contemplated hereby shall be allocated between Seller and Buyer in accordance with the standards, customs, and practices of the jurisdictions imposing such Transfer Taxes. Buyer and Seller agree to provide each other reasonable assistance in the preparation and filing of any and all required Tax returns for or with respect to such Transfer Taxes with any and all appropriate taxing authorities. Buyer and Seller shall cooperate to minimize the amount of any such Transfer Taxes to the extent reasonably feasible and shall cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation.

Section 2.7 <u>Proration of Personal Property Taxes</u>. The personal property Taxes (including property Taxes payable by the tenant or lessee under any lease assumed by Buyer) and assessments on the Assets for any taxable period commencing prior to the Closing Date and ending after the Closing Date shall be prorated between Buyer and Seller as of the Closing Date. All such prorations shall be allocated so that items relating to time periods ending on the Closing Date shall be allocated to Seller based upon the number of days in the period prior to and including the Closing Date and items related to time periods beginning after the Closing Date shall be allocated to Buyer based on the number of days in the period after the Closing Date. The amount of all such prorations shall be settled and paid on the Closing Date, provided that final payments with respect to prorations that are not able to be calculated on the Closing Date shall be calculated and paid as soon as practicable thereafter. Notwithstanding any other provisions of this Agreement, if Seller or Buyer has paid a property Tax allocable to the other, then that other party shall reimburse the payer party upon demand for the amount of such property Tax so paid.

## ARTICLE III - OTHER AGREEMENTS

Section 3.1 <u>Bankruptcy Court Approval and Notice</u>. Buyer and Seller agree to use their best efforts to obtain Bankruptcy Court approval of this Agreement, and if such approval is obtained, to close on such transactions as expeditiously thereafter as possible, but in no event later than October 31, 2011, unless such time is extended by Buyer in its sole discretion; provided however, the closing date may not be extended past December 31, 2011 without the mutual consent of both Seller and Buyer. The obligations of Seller and Buyer under this Agreement shall be conditioned upon receipt of such Bankruptcy Court approval. Commencing on the date on which this Agreement is executed, Seller shall send immediate written notice to Buyer of any negotiation, solicitation, or discussion, either directly or through intermediaries, with any person regarding the purchase of all or any portion of the Assets of Seller outside of its ordinary course of business. Any motion to approve the Agreement shall contain a provision for payment of a breakup fee of not less than Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) to Buyer, if some party other than Buyer purchases all or any material portion of the Assets.

Section 3.2 <u>Personnel</u>.

(a) Seller will provide to Buyer information concerning the name, age, position,

rate of compensation and incentive compensation arrangements, bonuses, or commissions of each employee employed in the Business ("Business Employees"). Buyer intends to retain substantially all Business Employees after Closing, but shall have no obligation to offer employment to any particular Business Employee. Buyer shall advise Seller as soon as possible and at least ten (10) days prior to Closing as to which Business Employees will not be employed by Buyer after Closing.

(b)  Seller is responsible, and will retain responsibility as an Excluded Liability, all employment related liabilities and for any pension, severance and other benefits, payments, obligations or liabilities, including accrued vacation and sick time, sick pay and other compensation, benefits and perquisites, incurred as a result of or in connection with Seller's employment of the Business Employees and Seller's termination of the Business Employees, for (i) compensation and benefits arising prior to the Closing Date, (ii) any severance pay entitlements, (iii) any accrued and unused vacation or sick time entitlements, (iv) all liabilities and costs under the Consolidated Omnibus Budget Reconciliation Act, as amended ("COBRA") (including liabilities for violations thereof) for all "qualifying events" (as defined in COBRA) occurring with respect to such employees and their dependents on or before the Closing Date or as a result of the transactions contemplated by this Agreement, including qualifying events that occur as a result of the sale of the Assets contemplated hereby, and (v) all liabilities related to the employment of such employees including, but in no way limited to, sexual harassment discrimination under Title VII of the Civil rights act, ADEA, the ADA and any and all other employment laws.

(c)  Seller is responsible, and will retain responsibility as an Excluded Liability, for all obligations under any profit sharing program required under applicable law with respect to any employees of Seller or their affiliates.

(d)  Upon notification by Buyer as to which employees will not be employed by Buyer after Closing, Seller shall give any and all notifications required by the Workers Adjustment Retraining and Notification Act (the "WARN Act"), as amended, and the rules and regulations thereunder as a result of the termination of any of its employees. Buyer shall be responsible for, and shall indemnify and hold Seller harmless from any loss, cost or expense imposed or assessed against Seller under the WARN Act by reason of Buyer's failure to employ an appropriate number of Seller's Business Employees.

Section 3.3  <u>Cooperation by Seller</u>.  Seller and Buyer agree to cooperate with each other in every reasonable way so as to cause the transfer of the Assets to Buyer to be accomplished in a smooth and orderly way and so as to preserve for Buyer the value of the Assets.  Further, each of the parties agrees to deliver or cause to be delivered, at such times and places as shall be reasonably agreed on, such additional instruments as any other party may reasonably request for the purpose of carrying out this Agreement.

Section 3.4  <u>Bulk Sales Laws</u>.  Seller shall comply with any and all Bulk Sales Law.

Section 3.5  <u>Third Party Consents</u>.  Buyer shall be responsible for obtaining, where necessary, consents of third parties to the assignment of any necessary permits, licenses or other

authorizations by Seller to Buyer, to the extent such items can be assigned, and for applying for certification to sell the Brands in every state in which Seller presently sells cigarettes, and Seller shall cooperate fully with Buyer in this regard including, but in no way limited to, cooperating in getting each and every escrow agreement approved.

Section 3.6 <u>Environmental Indemnity</u>. Seller shall indemnify and hold Buyer harmless from and against any costs, penalties, fines, damages, suits, or liability associated with any environmental condition which arises from the operation of the Business by Seller. Such claims must be delivered to Seller in writing on or before April 30, 2012.

Section 3.7 <u>Accounts Receivable</u>. Seller shall deliver to Buyer the records of Seller concerning Seller's Accounts Receivable. Buyer shall use its best and commercially reasonable efforts to collect Seller's Accounts Receivable on behalf of Seller. Buyer shall assign to Seller the right to receive the proceeds of any Seller's accounts receivable that remain uncollected, in whole or in part, on the date that is 90 days from the Closing Date. If Buyer receives a payment from any party which is indebted or liable to Buyer in any manner whatsoever and such party is also indebted to Seller pursuant to any of Seller's accounts receivable and such payment does not indicate the account to which such payment should be applied, Buyer shall treat and apply such payment first to Seller's accounts receivable for such party. In the event that any product is returned, Buyer shall notify Seller and (i) if approved by Seller in its reasonable discretion such return shall be credited against any outstanding Account Receivable or in the event that the Accounts Receivable are not sufficient to satisfy such return, then any other money owed by Buyer to Seller, or (ii) if not approved by Seller, Buyer may in its sole discretion accept such returned goods on its own account and make payment to Seller in the amount of the returned goods invoice for credit against Seller's Accounts Receivable, in which event Buyer shall be entitled to receive any refund of or credit against the FET, SET, or Escrow Deposits associated with the returned goods accepted by Buyer.

Section 3.8 <u>Inventory</u>. During the Study Period, the parties agree to audit the raw materials, work in process and finished goods inventory of Seller to determine in good faith what is useable inventory for the Buyer; provided however, if the value of useable inventory as determined by Buyer is less than seventy-five percent (75%) of the value as determined by Seller, then Seller shall give notice to Buyer of its valuation and this Agreement will terminate five (5) days after such notice, unless Buyer agrees in writing to accept Seller's valuation. Useable Inventory shall be adjusted at Closing based upon Buyer's initial assessment and Seller's ordinary course of business from the end of the Study Period until Closing, provided that Seller agrees not to ship orders to customers between the date of this Agreement and the Closing at a rate which is more than one hundred five percent (105%) of the average monthly rate for such customers during 2011. Buyer agrees to sell all useable finished goods inventory of Seller to the extent allowed by law and to pay Seller its costs of finished goods as provided hereunder. Buyer shall make all tax payments and escrow payments for the sales of finished goods inventory, and shall indemnify and hold Seller harmless from any loss, cost or expense arising from Buyer's failure to timely make such tax payments and escrow payments. All finished goods inventory which cannot be sold by Buyer in the manner provided above shall either be (i) returned to Seller to be destroyed by Seller or (ii) be destroyed by Buyer in Buyer's facility. In either event, Seller shall take any and all action necessary to assign to Buyer all tax refunds, buyout refunds, or escrow refunds related to such destroyed product. Each party shall have the right to observe such

Sale motion Exh A-asset purchase agreement 2011.07.14                                                      10

destruction by the other party, and each party shall give the other party at least ten (10) days notice prior to any such destruction.

Section 3.9 <u>Leased Assets</u>. The Leased Assets shall be made available for lease by Buyer from the owners thereof at Closing, subject to approval of the Bankruptcy Court and, in the case of equipment leased from PTM, subject to approval by the Bankruptcy Court in the PTM bankruptcy case, and at Closing the Leased Assets shall be owned by persons or entities other than Calvin Phelps or persons or entities who would be considered "insiders" of Calvin Phelps. The specific terms and conditions available for the respective leases of the Leased Assets shall be provided by Seller to Buyer at least twenty (20) days prior to the expiration of the Study Period, and such owners shall agree to execute leases with Buyer (or with Seller, provided such lease is assumed by Seller and assigned to Buyer at Closing) with respect to the Leased Assets on such terms, or on terms otherwise satisfactory to Buyer in its sole discretion; provided however, Buyer shall have the option to (i) renegotiate any or all of such proposed leases, or (ii) reject the proposed leases and decline to lease any or all of the Leased Assets and proceed with Closing, in which event the Leased Assets under the rejected leases shall be excluded from this transaction.

Section 3.10 <u>Due Diligence</u>.

A. From the date of this Agreement and for a period of sixty (60) days thereafter ("Study Period"), Seller grants to Buyer and Buyer's employees, agents, and contractors the right to enter upon the Seller's property at any reasonable time and from time to time for the purpose of making such inspections, examinations, surveys, and tests as Buyer shall deem necessary or appropriate in order (1) to perform a survey of the real property, if desired by Buyer, (2) to determine the existence, amount, value, and condition of the Assets, (3) to perform environmental assessment(s), (4) to verify the accuracy of the representations and warranties made by Seller in this Agreement, (5) to review the Business operations and books and records; (6) to perform any and all due diligence determined by Buyer to be necessary on the Escrow Accounts, and (7) to conduct all other due diligence that Buyer in its sole discretion deems necessary or appropriate.

This right is granted subject, however, to the following conditions: (a) that all such entries shall be made in the manner reasonably calculated to cause the least practicable interference with the normal business operations of Seller; (b) that Buyer shall cause no damage, other than minor damage necessary in connection with the tests being performed by Buyer, which minor damage shall be repaired immediately by Buyer at its expense; and (c) that Buyer shall indemnify and hold Seller harmless from and against any loss, cost, damage or liability arising out of or resulting from any action or omission by Buyer or Buyer's employees, agents or contractors in the course of any entry on the Property made pursuant to this right. In all cases, Buyer's opinion and judgment shall determine whether the Assets are acceptable for their intended use, so long as such decision is made within the Study Period.

Seller agrees to cooperate with Buyer with respect to Buyer's efforts to obtain all relevant information pertaining to the Assets and the Business and to satisfy all conditions set forth herein.

B. Buyer may terminate this Agreement at any time during the Study Period for any reason whatsoever, without further liability to Seller. In spite of Buyer's due diligence investigation revealing any fact or condition that makes any representations and warranties of Seller untrue, each such representation and warranty shall survive the Closing regardless of Buyer's investigation subject to the limitations set forth herein related to Buyer's ability to recover ending April 30, 2012, in certain cases.

C. On or before the last day of the Study Period, Buyer may notify Seller that Buyer is terminating this Agreement, in which event the full amount of the Earnest Money Deposit will be returned to Buyer immediately, and Buyer and Seller shall be relieved as to one another of all obligations and liability under this Agreement, except as otherwise provided herein. Buyer's failure to so notify Seller shall constitute notice that Buyer is satisfied as to its due diligence and ready to proceed with Closing subject to the other terms and conditions of this Agreement.

Section 3.11 <u>Noncompetition</u>. In order to ensure to Buyer the full benefits of the Assets and the Business, Seller hereby covenants and agrees that prior to the fifth anniversary of the Closing Date, Seller will not, directly or indirectly, engage in the development, design, manufacture, marketing or sale of cigarettes, cigars, little cigars or other tobacco products in the United States, Mexico, or the Dominican Republic. Seller acknowledges that any breach of the covenants of this Section will result in irreparable damage and continuing injury to Buyer. Therefore, in the event of any breach of the covenants contained in this Section, Seller acknowledges that Buyer shall be entitled, without limiting any other remedies available to Buyer, to an injunction restraining Seller from committing any such violation.

Section 3.12 <u>Assumption of Agreements</u>. Seller will use its best and commercially reasonable efforts to assist Buyer to effect the assignment to Buyer of any Assumed Agreement, Intellectual Property and permits. However, any Assumed Agreement, Intellectual Property or permit will not be deemed transferred or assigned to Buyer if the attempted transfer or assignment thereof would be ineffective or would constitute a breach of such Assumed Agreement, intellectual property or permit, except to the extent otherwise provided by the Bankruptcy Code. All monetary liabilities, including pre-petition monetary liabilities, of Seller that must be paid or otherwise satisfied to cure all of Seller's monetary defaults under the Assumed Agreements at the time of the assumption thereof and assignment to Buyer as provided hereunder as such amounts are determined by the Bankruptcy Court shall be paid out of the Closing proceeds.

Section 3.13 <u>Further Action: Regulatory and Other Authorizations: Consents</u>. Each of the parties hereto shall use its commercially reasonable efforts to (i) take, or cause to be taken, all appropriate action, and do, or cause to be done, all things necessary, proper or advisable under any applicable law or otherwise to consummate and make effective the transactions contemplated by this Agreement, (ii) obtain any consents, licenses, permits, waivers, approvals, authorizations or orders required to be obtained or made in connection with the authorization, execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, including all consents, and (iii) make all filings and give any notice, and thereafter make any other submissions either required or reasonably deemed appropriate by each of the parties, with respect to this Agreement and the transactions contemplated hereby required under any applicable law.

Section 3.14 <u>Escrows</u>. Seller shall sign any and all documents necessary to effectuate the assignment of the release rights of the Escrow Deposits and the intent thereof to Buyer. Seller shall take any and all action necessary or reasonably required by Buyer related to the transfer of the Escrow Deposit release rights, and to extinguish any residual rights by or on behalf of the Seller, the Seller's estates, or the owners of equity interests in the Seller.

Section 3.15 <u>Transfer of Corporate Shell</u>. To the extent necessary or reasonably required by Buyer to effectuate the assignment of the release rights pursuant to Section 3.14, upon the completion of the proceedings in the Bankruptcy Court, Seller shall transfer all outstanding equity interest in ABI to a single purpose entity identified by Buyer for consideration of One and 00/100 Dollars ($1.00).

## ARTICLE IV - REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents, warrants, and agrees as follows, which representations and warranties are true as of the date hereof and shall be true at Closing and shall survive Closing:

Section 4.1 <u>Status</u>. Renegade, Renegade Tobacco, and ABI are all corporations duly organized, validly existing, and in good standing under the laws of the State of North Carolina.

Section 4.2 <u>Authorization of Agreement</u>. Trustee has all of the power and authority to make, execute, deliver, and perform this Agreement and the transactions contemplated hereby, subject to approval by the Bankruptcy Court. This Agreement constitutes a valid and binding agreement enforceable against Seller in accordance with its terms.

Section 4.3 <u>Title to Assets</u>. At Closing, Seller shall have good and valid fee simple title to the Assets, and the ability to sell, transfer and convey the Assets to Buyer free and clear of all Liens. Seller does not know of any fact, event, or action that is not generally known which could result in a material adverse change in the business, prospects, financial condition, or results of operations of the Business or the operation or ownership of the Assets by Buyer following Closing.

Section 4.4 <u>Condition of Assets</u>. At Closing, all Assets will be in good operating condition ordinary wear and tear excepted.

Section 4.5 <u>Adequacy of the Assets</u>. The Assets and the Leased Assets constitute, in the aggregate, all of the property necessary for the conduct of the Business in the manner in which and to the extent to which it is currently being conducted.

Section 4.6 <u>Maintenance of Business</u>. Seller will operate the Business in the normal and ordinary course without implementing any unusual methods of purchase, sale, management, accounting or operations which vary from the methods used at the present time. Seller will refrain from any extraordinary transactions between the date hereof and Closing.

Section 4.7 <u>Exhibits</u>. The Exhibits and Schedules referred and attached to in this Agreement have been appropriately identified and delivered prior to the execution of this Agreement and are incorporated herein and made a part hereof by reference. To the best of

Seller's knowledge, each Exhibit and Schedule is true and correct and contains all information necessary to prevent it from being misleading.

Section 4.8  Litigation and Compliance Matters.  Other than as set forth on **Schedule 4.8** attached hereto, Seller (a) is not engaged in or a party to, or to Seller's Knowledge threatened with, any legal action or other proceeding before any court, arbitration or other tribunal or administrative agency, (b) has not been charged with or, to Seller's Knowledge is under investigation with respect to any charge concerning, any violation of any law or administrative regulation, and (c) is not in default under or in violation of any judgment, order, decree, regulation or rule of any court of governmental authority applicable to Seller; and Seller does not know of any valid basis for any such action, proceeding or investigation.  Seller is not subject to any existing judgment, order or decree entered in any lawsuit or proceeding which may have a materially adverse effect on any of its operations, business practices or on its ability to acquire any property or conduct business in any area.

Section 4.9  Licenses.  [intentionally omitted].

Section 4.10  Materiality and Disclosure.  Seller agrees that each of their representations and warranties is material.  To Seller's Knowledge, no representation or warranty contained in this Agreement, and no statement contained in any certificate, Exhibit, Schedule, list or other writing furnished to Buyer pursuant to the provisions hereof, contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained therein not misleading.

Section 4.11  Financial Statements.  The Financial Statements provided to Buyer as identified in **Schedule 4.11** are true and correct in all material respects, and fairly and accurately present the financial condition and results of operations of the Business for the periods indicated.

Section 4.12  Agreements.  All of the Contracts used in the Business are accurately listed in **Schedule 4.12** and are in full force and effect, and all such agreements will continue to be binding in accordance with their terms upon assumption and assignment to Buyer pursuant hereto.

Section 4.13  Tax Matters.  Except for any matter listed on **Schedule 4.13,** Seller has filed all tax returns that it was required to file to date in connection with its operations of the Business and has paid or will pay all Taxes, additions to Tax, interest, and penalties payable and due for the periods covered by such returns or reports or pursuant to any assessment or adjustment made with respect thereto in accordance with applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

Section 4.14  Compliance with Laws.  To Seller's Knowledge, except for matters listed on **Schedule 4.14,** Seller is in compliance and has not received any notice of noncompliance with all applicable laws, rules, regulations, ordinances, agreements, and orders of all applicable federal, state, and local governmental authorities, including without limitation, law made pursuant to the Master Settlement Agreement applicable and relating to the operations of the Business. To Seller's Knowledge, there are no material and adverse environmental conditions or liabilities affecting the Assets, including any related to the use, treatment, storage, release, or disposal of petroleum products or hazardous or toxic substances, materials, pollutants, wastes or

contaminants. To Seller's Knowledge, no petroleum products or hazardous or toxic materials, pollutants, contaminants or wastes have been released by the Seller in violation of applicable law or otherwise affect any real property owned or used by the Seller, nor to Seller's Knowledge has any such real property been used at any time by any person as a landfill or waste disposal site or waste treatment facility.

Section 4.15  Leases.  None of the vehicles, equipment, furniture, or machinery presently used in the Business or necessary for the operations of the Business is leased from any third party except for the Leased Assets.

Section 4.16  Tobacco Escrow Payments.  To Seller's Knowledge all tobacco escrow payments have been timely made or made in accordance with the orders of the Bankruptcy Court and will be timely made from the date of the commencement of Seller's bankruptcy cases to the Closing.

Section 4.17  Brands.  To Seller's Knowledge all Brands are compliant with all state laws in the states where such Brands were sold in 2009, 2010, and 2011.

Section 4.18  No Conflicts. Upon entry of the Sale Approval Order, the execution and delivery of this Agreement, the consummation of the transactions contemplated herein and therein and the performance of, fulfillment of, and compliance with the terms and conditions hereof by Seller do not and will not conflict with or result in a breach of the organizational documents of Seller or to Seller's Knowledge, violate any applicable laws; *provided, however,* that provisions of applicable laws prohibiting the transfer or assignment of permits without the consent of a Governmental Authority or the assumption of obligations by the transferee shall not be deemed to breach this representation and warranty.

Section 4.19  No Required Consents. Except as set forth on **Schedule 4.19** and subject to the approval of the Bankruptcy Court, (i) no notice to, filing with, authorization of, exemption by, or consent of any Governmental Authority, and (ii) no consent, approval, authorization of or notice to any other third party, is required in order for Seller to consummate the transactions contemplated hereby (the items described herein, collectively, the "Required Consents").

Section 4.20  Inventories. All items included in the Inventory are useable and saleable in accordance with the ordinary course of business, except for slow-moving and obsolete items and items of below-standard quality, all of which have been written off or written down in accordance with generally accepted accounting principles in the United States as consistently applied.

Section 4.21  Assumed Agreements. Seller shall provide to Buyer copies of all the Contracts used by the Seller to operate the Business, and within the Study Period Buyer shall designate the Contracts which Seller shall assume and assign to Buyer at Closing, subject to approval of the Bankruptcy Court (the "Assumed Agreements"), the list of which shall be attached hereto as **Schedule 4.21**. Any and all defaults under the Assumed Agreements will be cured within the meaning of Section 365 and other applicable provisions of the Bankruptcy Code or any applicable order of the Bankruptcy Court as of or prior to the Closing.

Section 4.22  Intellectual Property.  Other than as provided on **Schedule 4.22**, the

Intellectual Property includes all intellectual property necessary for the continued conduct of the Business after Closing in substantially the same manner as conducted prior to Closing. Each item of Intellectual Property owned, licensed or used by Seller in the Business immediately prior to the Closing will be owned, licensed or available for use by Buyer on substantially similar terms and conditions immediately following the Closing. Seller has and shall assign to Buyer at Closing the full legal, right, title, and interest in and to, or valid and enforceable licenses to use, all of the Intellectual Property. Intellectual Property licensed to Seller is appropriately marked as licensed Intellectual Property on **Schedule 4.22**. Except as set forth on **Schedule 4.22**, to the Knowledge of Seller, no third party has infringed upon or otherwise come into conflict with any of the Intellectual Property and no third party has any right to use any of the Intellectual Property. There are no actions instituted, pending or, to the Knowledge of Seller, threatened by any third party pertaining to or challenging Seller's use of or right to use any of the Intellectual Property, which actions could reasonably be expected to have a material adverse effect. Seller has taken all reasonably necessary action to maintain and protect each material item of Intellectual Property. Other than as provided on **Schedule 4.22**, Seller has not licensed or assigned any of the Intellectual Property to any third party nor is Seller under any obligation to do so in the future. With respect to the Business, Seller has not received any notice alleging any violation, infringement or other conflict with any Intellectual Property of any third party.

In the event any of the representations, warranties, additional undertakings of Seller in this Section and/or other responsibilities of the Seller, as set forth in this Agreement, are not accurate and cannot be or are not ratified or fulfilled prior to Closing, then the Buyer shall have the right at its sole option, to take any or none of the following actions: (i) waive the inaccurate, unratified or unfulfilled representation, warranty, additional undertakings and/or responsibility of Seller, and proceed with Closing hereunder, provided, however, that such waiver shall be in writing; or (ii) terminate this Agreement, whereupon all rights and responsibilities hereunder shall be null and void, and neither party shall have any further obligation hereunder. Remedies of Buyer under this Section are in addition to the remedies of Buyer under terms of this Agreement.

Section 4.23 <u>Survival.</u> All representations and warranties of Seller shall survive Closing.

## **ARTICLE V - REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer represents, warrants, and agrees as follows:

Section 5.1 <u>Status.</u> Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the Commonwealth of Virginia.

Section 5.2 <u>Authorization of Agreement.</u> Buyer has the power and authority to make, execute, deliver and perform this Agreement and the transactions contemplated hereby and this Agreement has been duly authorized and approved by all required action. This Agreement constitutes a valid and binding agreement enforceable against Buyer in accordance with its terms, except to the extent limited by bankruptcy, insolvency or moratorium laws or equitable remedies.

Section 5.3 <u>Financial Ability.</u> Buyer has the financial ability to pay the Purchase Price in accordance with the terms and conditions of this Agreement, and Buyer's obligations hereunder are not dependent or conditional upon obtaining financing from any third party.

# ARTICLE VI - CONDITIONS PRECEDENT TO BUYER'S OBLIGATIONS

Section 6.1 <u>Buyer's Closing Conditions</u>. All obligations of Buyer that are to be discharged under this Agreement at the Closing are subject to the fulfillment, prior to or at the Closing, of each of the following conditions:

(a) All of the representations and warranties made by Seller contained in Article IV of this Agreement are true as of the date of this Agreement, shall be deemed to have been made again at and as of the Closing Date, and are true and correct at and as of the Closing Date in all material respects;

(b) Seller has performed or complied with all covenants and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing;

(c) All permits, licenses, and certifications required to conduct the Business are readily available or can be reasonably obtained;

(d) The Bankruptcy Court shall have entered the Bidding Procedures Order expressly approving and authorizing the Bid Procedures and the Bid Protections, and is otherwise in procedure, form, and substance reasonably satisfactory to Buyer, and the Bidding Procedure Order shall not have been stayed, modified, terminated, vacated or rescinded as of the Closing;

(e) The Bankruptcy Court shall have entered the Sale Approval Order consistent with this Agreement, expressly making Section 363(m) of the Bankruptcy Code applicable to this Agreement, and which is otherwise in procedure, form, and substance reasonably satisfactory to Buyer and the Sale Approval Order shall not have been stayed, modified, terminated, vacated or rescinded as of the Closing;

(f) The Bankruptcy Court shall have entered the Executory Contracts Order (as defined below) consistent with this Agreement, and which is otherwise in procedure, form, and substance reasonably satisfactory to Buyer, and the Executory Contracts Order shall not have been stayed, modified, terminated, vacated or rescinded as of the Closing;

(g) Seller shall have obtained the cancellation, release or transfer to proceeds of any and all security interests in the Assets and shall have delivered transfer documents satisfactory in form to counsel for Buyer assigning and conveying all the Assets free and clear of any and all Liens;

(h) . No action or proceeding against Seller shall have been instituted or threatened that, if successful, could prohibit consummation or require substantial rescission of the transactions contemplated under this Agreement.

(i) Seller shall have executed and delivered any other certificate, document, or statement as may be reasonably necessary in order to consummate the transactions contemplated by this Agreement.

(j)  Buyer intends to offer employment to some or all existing personnel of the Business, in Buyer's sole discretion and conditioned upon approval of the sale by the Bankruptcy Court and Closing.  It shall be a condition precedent to Buyer's obligation to close that certain employees of the Business, as identified by Buyer to Seller within thirty (30) days after the date of this Agreement, enter into an employment relationship with noncompetition agreements with Buyer satisfactory to Buyer in its sole discretion.  Seller shall cooperate in communications with Seller's employees and facilitate Buyer's conditional employment offers during the Study Period.

(k)  No material damage, destruction, or confiscation or condemnation shall have occurred to the Assets (unless repaired, replaced or restored to the reasonable satisfaction of Buyer before the Closing);

(l)  All of the Assumed Agreements shall have been assigned to Buyer and be in full force and effect in accordance with their terms in effect on the date of this Agreement and shall be enforceable in all respects without default or breach, or threatened default or breach by any party except for those Contracts which (a) may expire by their terms and with the consent of the other party where necessary or (b) for which Buyer has waived assignment in writing;

(m)  To the extent necessary, Buyer has obtained all consents of third parties to the assignment of any licenses and/or Assumed Agreement by Seller to Buyer;

(n)  All (i) required consents and (ii) orders or notifications of, or registrations, declarations or filings with, or expiration of waiting periods imposed by, any applicable Governmental Authority shall have been made or obtained or shall have occurred, and the Sale Approval Order shall be a Final Order on the Closing Date;

(o)  Any and all defaults arising prior to the Closing with respect to any Executory Contract shall have been cured to the full extent required by Section 365 and other applicable provisions of the Bankruptcy Code and any order of the Bankruptcy Court;

(p)  All documents necessary to transfer the release rights in the escrow accounts have been executed and delivered to Buyer;

(q)  Buyer has entered into, or Seller has assumed and assigned to Buyer leases of the Leased Assets as and to the extent set forth in Section 3.9;

(r)  No objection has been filed or delivered to Seller or Buyer by or on behalf of any state attorney general related to this transaction, or if an objection has been filed or delivered to Seller or Buyer then such objection has been withdrawn or otherwise resolved to the satisfaction of Buyer in its sole discretion.

(s)  All regulatory matters related to the Business have been completed and all approvals necessary for Buyer to conduct the Business and sell the Brands have been received or can be readily obtained; and

(t) There shall have been no material adverse change in the Business, including the operation or condition thereof or liabilities relating thereto, or with respect to the Assets including but not limited to the Escrow Deposits, since the date hereof, and all of the Assets shall be immediately available to Buyer at the current location of the Business.

Section 6.2 Seller's Closing Conditions. All obligations of Seller that are to be discharged under this Agreement at the Closing are subject to the fulfillment, prior to or at the Closing, of each of the following conditions:

(a) All of the representations and warranties made by Buyer contained in Article V of this Agreement are true as of the date of this Agreement, shall be deemed to have been made again at and as of the Closing Date, and are true and correct at and as of the Closing Date in all material respects;

(b) All of the covenants and obligations that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects;

(c) No action or proceeding shall be pending by or before any Governmental Authority which has been instigated by a party other than Seller or an affiliate of Seller and which seeks to restrain, prohibit or invalidate any of the transactions contemplated by this Agreement;

(d) The Bankruptcy Court shall have entered the Sale Approval Order and it shall not have been modified, terminated, vacated or rescinded or be stayed as of the Closing; and

(e) Buyer has paid or is prepared to pay the Purchase Price due at Closing in immediately available funds.

## ARTICLE VII - CLOSING

Section 7.1     Place and Date of Closing.  Consummation of the sale and purchase provided for herein ("Closing") shall take place on or before October 31, 2011, unless extended as set forth in Section 3.1 (the "Closing Date") at the offices of Woods Rogers PLC, 341 Main Street, Danville, Virginia.

Section 7.2     Closing Costs-Settlement Obligations of the Parties.  Each party shall pay their own legal fees . Utilities and lease payments, if any, will be prorated as of the Closing.

Section 7.3     Delivery by Seller.  At the Closing, Seller shall deliver to Buyer all in form and content reasonably acceptable to Buyer:

(a) bills of sale, assignments, and other good and sufficient instruments of conveyance and transfer as shall be effective to vest good title to the Assets, all as provided in this Agreement;

(b) titles to vehicles;

(c) all escrows and escrow account information and all documents deemed necessary to transfer the release rights to the Escrow Deposits and interest thereof;

(d) an Assignment and Assumption of Contracts relating to the Assumed Agreements;

(e) one or more Assignments and Assumptions of Leases;

(f) an Assignment of Intellectual Property Rights;

(g) the Sale Approval Order from the Bankruptcy Court;

(h) the order of the Bankruptcy Court authorizing the assumption and assignment to Buyer of the Assumed Agreements and ordering that any and all defaults arising prior to the Closing with respect to any Assumed Agreement shall be cured to the full extent required by Section 365 and other applicable provisions of the Bankruptcy Code, which order shall be in a form acceptable to Buyer in its discretion (the "Executory Contracts Order");

(i) a certificate of Seller certifying that Seller is not a "foreign person" within the meaning of Section 1445 of the Code and that Buyer has no obligation to withhold taxes from the Purchase Price due to Seller; and

(j) any further documents and instruments of transfer reasonably requested by Buyer for the purpose of transferring and conveying to Buyer all property and rights to be transferred and conveyed by this Agreement.

Section 7.4    <u>Delivery by Buyer</u>.  At the Closing, Buyer shall deliver:

(a) the Purchase Price;

(b) any other documents reasonably requested by Seller or necessary for the consummation of the transactions contemplated by this Agreement.

## ARTICLE VIII – INDEMNIFICATION

Seller agrees to indemnify and hold Buyer and its officers, directors and agents (each an "Indemnified Party") harmless from any and all claims, damages, losses or expenses suffered or paid, directly or indirectly, as a result of (a) the failure or breach of any representation, warranty or undertaking made by Seller in this Agreement or in any Exhibit or Schedule delivered pursuant hereto to be true and correct in all respects as of the date of this Agreement and the Closing Date, notwithstanding that Buyer or any of its agents or employees may have knowledge that any representation herein is untrue, and (b) any breach by Seller of any covenant or agreement herein, and (c) relating to or arising from any debt, Lien or obligation of Seller not expressly assumed by Buyer pursuant to Section 2.4, and (d) any action by Seller after Closing which has the effect of

exposing Buyer to liability for breach of any federal, state or local law or such by any third parties and (e) any failure of Seller to make any federal, state or local tax or escrow payments as the result of the manufacture or sale of any product by Seller; and (f) workers compensation liability and any liability related the violation of any law including, but not limited to, employment laws. Notwithstanding the foregoing, on May 1, 2012, Buyer acknowledges that Seller may disburse any and all funds of Seller.

Subject to the foregoing, Buyer shall have the right to offset (i) any such claims, (ii) any amounts paid by Buyer as the result of Seller's actions, and (iii) any other amounts owed by Seller to Buyer under this Agreement against any portion of the Purchase Price held in escrow or to be paid after Closing including Inventory and Accounts Receivable. Such offset shall not be Buyer's sole and exclusive remedy.

Buyer agrees to indemnify and hold Seller and its officers, directors and agents (each an "Indemnified Party") harmless from any and all claims, damages, losses or expenses suffered or paid, directly or indirectly, as a result of the failure or breach of any representation, warranty or undertaking made by Buyer in this Agreement.

Each party shall notify the other party in writing of any claim for recovery, specifying in reasonable detail the nature of the claim, and shall provide as promptly as practicable thereafter all information and documentation reasonably requested by the other party to verify the claim asserted.

Buyer shall be entitled to a disbursement from the funds in escrow for the amount of the indemnified loss in the event that Seller has not disputed the claim, in writing, within fifteen (15) days of receipt of a notice of claim.

## ARTICLE IX -TERMINATION

Section 9.1     <u>Termination</u>.  This Agreement may be terminated at any time prior to the Closing:

(a) by mutual written consent of Buyer and Seller;

(b) by Buyer at any time on or before the date immediately preceding the expiration of the Study Period, or by Seller if the parties are unable to agree on the value of the Inventory as provided in Section 3.8;

(c) by either Buyer or Seller if the other party materially breaches any of its representations, warranties, or covenants contained in this Agreement and, if the breach is curable, the breach is not cured within ten (10) business days after written notice specifying such breach;

(d) by either Seller or Buyer, if the Bankruptcy Court approves a sale, transfer or other disposition by Seller of all or substantially all of the Assets to another party (a "Competing Transaction");

(e) by Buyer if any of the following shall occur:

      (i) Seller's bankruptcy cases are dismissed or converted to Chapter 7 of the Bankruptcy Code;

      (ii) the Bidding Procedures Order shall not have been entered by the Bankruptcy Court within thirty (30) days after the date hereof; or

      (iii) the Sale Approval Order shall not been entered by the Bankruptcy Court within seventy-five (75) days after the date hereof;

      (f) by Buyer or Seller if the Closing shall not have occurred on or prior to October 31, 2011, except as provided in Section 3.1, provided that the right to terminate this Agreement under this Section shall not be available to a party who is then in material breach of this Agreement;

Section 9.2   <u>Effect of Termination</u>. Each party's right of termination is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of such right of termination will not be an election of remedies. If this Agreement is terminated, all obligations of the parties under this Agreement will terminate, except that the obligations of the parties in this Section will survive. Upon termination for any reason other than an alleged breach of this Agreement by Buyer, the Earnest Money Deposit shall be immediately released to Buyer and in the event that there is a higher bidder, and as a result the Agreement is terminated, the break up fee shall be immediately paid to Buyer as and to the extent provided in the applicable Orders of the Bankruptcy Court.

## ARTICLE IX - MISCELLANEOUS

Section 10.1   <u>Parties in Interest</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective trustees, successors, and assigns.

Section 10.2   <u>Counterparts</u>. This Agreement may be executed by facsimile and in two or more counterparts, all of which taken together shall constitute one instrument. The exchange of copies of this Agreement and of signature pages by facsimile or electronic transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes. Signatures of the parties transmitted by facsimile or electronic means shall be deemed to be their original signatures for all purposes.

Section 10.3   <u>Governing Law</u>. The validity and construction of this Agreement shall be governed by the laws of the state of North Carolina. Buyer and Seller agree that the Bankruptcy Court shall have exclusive jurisdiction over all disputes and other matters relating to: the interpretation and enforcement of this Agreement and any other ancillary document executed pursuant hereto.

Section 10.4   <u>Entire Agreement; Waiver</u>. This Agreement, including the other documents referred to herein and supplementing documents delivered herewith which form a part hereof, contain the entire understanding of the parties hereto with respect to the subject matter

contained herein and supersedes all prior agreements and understandings between the parties with respect thereto. This Agreement may not be changed orally but only by agreement in writing signed by the party against whom enforcement of any waiver, change, modification or discharge is sought. No failure or delay in enforcing any covenant or condition of this Agreement against a breach thereof shall be construed as a waiver of the covenant or condition, either in the particular instance or in the future.

Section 10.5 <u>Brokers' Commission</u>. Each party hereto will indemnify and hold harmless each other party from any commission, fee or claim of any person, firm or corporation employed or retained or claiming to be employed or retained by the indemnifying party to bring about, or to represent it in, the transactions contemplated hereby.

Section 10.6 <u>Notices</u>. Any notice, request, information or other document to be given hereunder to any of the parties by any other party shall be in writing and shall be given by hand delivery, certified or registered U.S. mail or a private courier service which provides evidence of receipt as part of its service, as follows:

| | |
|---|---|
| If to Buyer: | CB Holdings, LLC<br>4700 Homewood Court, Ste 100<br>Raleigh, NC 27609<br>Attn: Charles F. Fuller, CEO |
| With a copy to: | Woods Rogers PLC<br>341 Main Street, Ste 302<br>Danville, VA 24541<br>Attn: RJ Lackey, Esq. |
| If to Seller: | Renegade Holdings, Inc.<br>230 North Elm Street, Ste 1650<br>Greensboro, NC 27402<br>Attn: Peter Tourtellot, Trustee |
| With a copy to: | Northen Blue, LLP<br>1414 Raleigh Rd., Ste 435<br>Chapel Hill, NC 27517<br>Attn: John A. Northen, Esq. |

Any party may change the address number to which notices hereunder are to be sent to it by giving written notice of such change as herein provided. Any notice given hereunder shall be deemed given on the date of hand delivery, deposit with the U.S. Postal Service or delivery to a courier service, as appropriate.

Section 10.7 <u>Severability</u>. If any provision of this Agreement is determined to be illegal or unenforceable, such provision will be deemed amended to the extent necessary to conform to applicable law or, if it cannot be so amended without materially altering the intention of the parties, it will be deemed stricken and the remainder of the Agreement will remain in full force and effect.

Section 10.8  Expenses.  Each party shall pay its own costs and expenses, including accounting, banking and the fees and disbursements of their respective counsel, in connection with the negotiation, preparation and execution of this Agreement and completion of the transactions contemplated hereby whether or not the transaction is completed.

Section 10.9  Further Assurances and Cooperation.  From time to time after the Closing Date, at Buyer's request and without further consideration, Seller shall execute and deliver or cause to be executed and delivered such further instruments of conveyance, assignment and transfer and shall take such other action as Buyer may reasonably request in order more effectively to convey, transfer, reduce to possession or record title to any of the Assets purchased pursuant to this Agreement. On Buyer's request, Seller shall cooperate and use its commercially reasonable efforts on or after the Closing by furnishing information, evidence, testimony and other assistance in connection with any actions, proceedings, arrangements or disputes involving Buyer and which are based on contracts, leases, arrangements or acts of Seller which were in effect or occurred on or prior to the Closing.

Section 10.10  Default.  In the event that a party to this Agreement defaults in the performance of any of the terms or obligations imposed upon such party by this Agreement or the transactions contemplated hereby, the non-defaulting party may institute legal proceeding to enforce the provisions of this Agreement.  In such instance, in addition to any other remedy, the defaulting party shall be responsible for the reasonable attorneys' fees incurred by the non-defaulting party in pursuing such action.  The parties retain all rights at law and in equity to enforce the provisions of this Agreement in accordance with applicable law.

Section 10.11  Survival.  All representations, warranties, indemnities, and other obligations of the parties pursuant to this Agreement shall survive any Closing contemplated herein, and shall remain in full force and effect after the Closing, and shall not be merged into documents or instruments of conveyance to be executed and delivered at the Closing.

Section 10.12  Books and Records.  Following the Closing, the parties will make reasonably available to one another any records or documents that they maintain with respect to the Assets or the Business for purposes of compliance with applicable Tax laws or in defending any third-party litigation arising in respect of this Agreement.

Section 10.13  Transaction Expenses.  Each party shall be responsible for all of their legal fees and expenses relating to the proposed transactions.

Section 10.14  Assignment, No Third Party Beneficiaries  This Agreement will not be assigned by operation of law or otherwise, except that Buyer may assign all or any portion of its rights under this Agreement to any wholly owned subsidiary or affiliated entity, but no such assignment will relieve Buyer of its obligations hereunder. The terms and provisions of this Agreement (including provisions regarding employee matters) are intended solely for the benefit of the parties hereto and their respective successors and permitted assigns and are not intended to, and shall not, confer third-party beneficiary rights upon any other person.

Section 10.15  Disclosure.  Until such time as this Agreement is presented to the Bankruptcy Court for Approval, neither Seller nor Buyer will make any public disclosure pertaining to the terms and conditions reflected in this Agreement, unless otherwise mutually agreed or unless otherwise required by applicable laws, rules, regulations or court order.  It is further agreed that all such matters will be kept strictly confidential and not disclosed to any third party except as mutually agreed, as necessary in dealing with attorneys or consultants, or as required by applicable law, rule, regulation, or court order. This Agreement may be disclosed to and discussed with the Examiner and counsel for the debtor in the separate Chapter 11 proceeding of PTM Technologies, Inc. who shall also agree not to make public disclosure of the terms and conditions of this Agreement.

**[signatures on following pages]**

**IN WITNESS WHEREOF**, the parties have executed these presents as of the day and year first above written.

**RENEGADE HOLDINGS, INC**

By _~Peter J. Tuthill~_

Its _Trustee_

**RENEGADE TOBACCO COMPANY**

By _~John J. Tuthill~_

Its _Trustee_

**ALTERNATIVE BRANDS, INC.**

By _~John J. Tuthill~_

Its _President_

**CB HOLDINGS, LLC**

By: _____

Its: _____

Case 09-50140    Doc 972-1    Filed 07/20/11    Page 26 of 64

**IN WITNESS WHEREOF**, the parties have executed these presents as of the day and year first above written.

RENEGADE HOLDINGS, INC

By_____

Its_____

RENEGADE TOBACCO COMPANY

By_____

Its_____

ALTERNATIVE BRANDS, INC.

By_____

Its_____

**CB HOLDINGS, LLC**

By: _____

Its: *President & CEO*_____

## SCHEDULE A

### ASSETS

(i)     Total Escrow Deposits.

(ii)    All rights and interests of Seller under all contracts and agreements, (collectively "**Contracts**") relating to the Business which are identified by Buyer as executory contracts to be assumed by Seller and assigned to Buyer at Closing. The Contracts existing as of July 1, 2011 are set forth on **Schedule A.1** attached hereto.

(iii)   Seller's rights under open purchase orders for purchases of inventory and supplies and open customer work orders (collectively "**Orders**"), in each case arising out of the normal operation of the Business. The Orders existing as of July 1, 2011 are set forth on **Schedule A.2** attached hereto.

(iv)    all data, files, and records, whether in print, electronic, or other media, required to enable Buyer to operate the Business in the same manner operated by Seller prior to the date hereof, including, without limitation, (A) all of Seller's books and records, (B) all of Seller's lists and other information relating to customers, including mailing lists, card indices and other lists of customers and suppliers with respect to operations of the Business, (C) all of Seller's existing business correspondence with customers and suppliers with respect to operations of the Business, and (D) all of Seller's other administrative materials and data relating exclusively to the Business (collectively, the **"Books and Records"**); provided, that Seller shall be entitled to make and retain such copies of the Books and Records as it shall in its sole discretion deem necessary or advisable. The Seller shall have the right to obtain copies of any Books and Records supplied by Buyer after purchase.

(v)     all owned vehicles, machinery and other equipment, together with all parts, tools, and accessories relating thereto, and all owned furniture, fixtures, trade fixtures, computers and office equipment and all spare parts and repair parts relating thereto (collectively, the "**Equipment**") as set forth on **Schedule A.3** attached hereto;

(vi)    all goodwill incident to or associated with the Business as a going concern, all telephone numbers and telephone and advertising listings relating to the Business (to the extent transferrable), all trade names associated with the Business, customer lists, financial and accounting records, and all promotional displays and materials, all other intellectual property, and any licenses, license agreements, and applications related to any of the foregoing except to the extent excluded (collectively, the **"Intangible Assets"**) all of which are set forth on **Schedule A.4** attached hereto;

(vii)    all regulatory, business, and operating permits and governmental licenses relating exclusively to the Business (to the extent transferable without payment by Seller of additional consideration) (**"Licenses"**);

(viii)    all signage and open contracts and purchase orders for the acquisition of new signage, together with all down payments made by Seller for such signage;

(ix)    all products, materials, supplies, and inventories of the Business as of the Closing Date, tangible or intangible, wherever located and in whatever medium, and whether raw materials, components, spare parts, supplies to be used or consumed in the production of finished goods, work-in-progress, samples, prototypes or finished goods all of which is determined, as agreed by Seller and Buyer during the Study Period, to be undamaged, non-obsolete, and useable by Buyer in the Business (**"Inventory"**);

(x)    all trademarks, service marks, trade names, logos, ingredients, recipes, know how confidential or proprietary processes, inventions (patentable or not), formulas, trade secrets, know-how, technical data and other similar information and technologies that are of commercial value to the Business and other trade records which qualify under North Carolina law as such based upon their protection and trademark by Seller, and other intellectual property not specifically described above, including internet domain names, websites, telephone numbers, software and licenses (including licenses for the use of computer software programs) used in the Business;

(xi)    all brands, brand names and associated property and intellectual property rights therein; and

(xii)    except for the Excluded Assets, any other tangible or intangible property used in the Business of every kind and description, real, personal or mixed, including, for example, customer orders, customer and supplier lists, distribution lists, price lists, referral sources, operating manuals, production reports, service and warranty records, equipment logs, employee files (subject to legal requirements), mailing lists, advertising, creative and promotional materials, purchasing materials and records, financial and accounting records, books and records, litigation files, telephone, fax and data line numbers, websites, email addresses, domain names, studies, reports, correspondence and other similar documents and records, and goodwill.

A. 2

**P.O: 2,973**

| P.O. Line | Part Number | 1.00 | Supplier ID | Unit Cost | Rel | Due Date | Promise Date | Job / Asm / Seq | On Order | Ext. Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Shipping Release Requirements | | | | |
| 2,973  1 | ZX-A-610 | | 469 | 29.22 EA | 1 | 5/27/2011 | | | 143.00 EA | 4,178.46 |

**P.O: 3,243**

| P.O. Line | Part Number | 1.00 | Supplier ID | Unit Cost | Rel | Due Date | Promise Date | Job / Asm / Seq | On Order | Ext. Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Shipping Release Requirements | | | | |
| 3,243  1 | CHAIN ASSY | | 187 | 1,950.00 EA | 1 | | | | 1.00 EA | 1,950.00 |

**P.O: 3,249**

| P.O. Line | Part Number | 1.00 | Supplier ID | Unit Cost | Rel | Due Date | Promise Date | Job / Asm / Seq | On Order | Ext. Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Shipping Release Requirements | | | | |
| 3,249  1 | Repair | | AES | 412.00 EA | 1 | | | | 1.00 EA | 412.00 |

**P.O: 3,274**

| P.O. Line | Part Number | 1.00 | Supplier ID | Unit Cost | Rel | Due Date | Promise Date | Job / Asm / Seq | On Order | Ext. Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Shipping Release Requirements | | | | |
| 3,274  1 | 2138530-000-01 | | 219 | 700.00 EA | 1 | | | | 2.00 EA | 1,400.00 |

**P.O: 3,300**

| P.O. Line | Part Number | 1.00 | Supplier ID | Unit Cost | Rel | Due Date | Promise Date | Job / Asm / Seq | On Order | Ext. Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Shipping Release Requirements | | | | |
| 3,300  3 | 15506 | | 394 | 270.00 EA | 1 | | | | 1.00 EA | 270.00 |

**P.O: 3,304**

| P.O. Line | Part Number | 1.00 | Supplier ID | Unit Cost | Rel | Due Date | Promise Date | Job / Asm / Seq | On Order | Ext. Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Shipping Release Requirements | | | | |
| 3,304  1 | 22-07S1 | | 52 | 121.10 EA | 1 | | | | 2.00 EA | 242.20 |

**P.O: 3,305**

| P.O. Line | Part Number | 1.00 | Supplier ID | Unit Cost | Rel | Due Date | Promise Date | Job / Asm / Seq | On Order | Ext. Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Shipping Release Requirements | | | | |
| 3,305  1 | 3726 | | 394 | 52.50 EA | 1 | | | | 2.00 EA | 105.00 |
| 3,305  2 | 33547.1 23 | | 394 | 27.00 EA | 1 | | | | 2.00 EA | 54.00 |
| | | | | | 2 | | | 3,305 - PO Totals: | 4.00 | 159.00 |

**P.O: 3,306**

| P.O. Line | Part Number | 1.00 | Supplier ID | Unit Cost | Rel | Due Date | Promise Date | Job / Asm / Seq | On Order | Ext. Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Shipping Release Requirements | | | | |
| 3,306  1 | 2500787-000-00 | | 219 | 2.61 EA | 1 | | | | 5.00 EA | 13.05 |

**P.O: 3,307**

| P.O. Line | Part Number | 1.00 | Supplier ID | Unit Cost | Rel | Due Date | Promise Date | Job / Asm / Seq | On Order | Ext. Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Shipping Release Requirements | | | | |
| 3,307  1 | Service | | 219 | 8,032.00 EA | 1 | 6/14/2011 | | | 1.00 EA | 8,032.00 |

**P.O: 3,311**

| P.O. Line | Part Number | 1.00 | Supplier ID | Unit Cost | Rel | Due Date | Promise Date | Job / Asm / Seq | On Order | Ext. Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Shipping Release Requirements | | | | |
| 3,311  2 | 2534185-000-00 | | 219 | 4.43 EA | 1 | | | | 6.00 EA | 26.58 |
| 3,311  4 | 9659971-000-00 | | 219 | 36.45 EA | 1 | | | | 2.00 EA | 72.90 |
| | | | | | 2 | | | 3,311 - PO Totals: | 8.00 | 99.48 |

**P.O: 3,319**

| P.O. Line | Part Number | 1.00 | Supplier ID | Unit Cost | Rel | Due Date | Promise Date | Job / Asm / Seq | On Order | Ext. Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Shipping Release Requirements | | | | |
| 3,319  1 | 138max 6 20-1 | | 219 | 314.18 EA | 1 | | | | 1.00 EA | 314.18 |

**P.O: 3,324**

| P.O. Line | Part Number | 1.00 | Supplier ID | Unit Cost | Rel | Due Date | Promise Date | Job / Asm / Seq | On Order | Ext. Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Shipping Release Requirements | | | | |
| 3,324  1 | TU4010 | | 467 | 11.44 /M | 1 | 7/15/2011 | | | 175,500.00 EA | 2,007.72 |
| 3,324  2 | TU4011 | | 467 | 11.44 /M | 1 | 7/15/2011 | | | 175,500.00 EA | 2,007.72 |
| 3,324  3 | TU4012 | | 467 | 11.44 /M | 1 | 7/15/2011 | | | 117,000.00 EA | 1,338.48 |
| 3,324  4 | TU4013 | | 467 | 11.44 /M | 1 | 7/15/2011 | | | 58,500.00 EA | 669.24 |
| 3,324  5 | TU4014 | | 467 | 11.44 /M | 1 | 7/15/2011 | | | 175,500.00 EA | 2,007.72 |
| 3,324  6 | TU4005 | | 467 | 13.51 /M | 1 | 7/15/2011 | | | 156,000.00 EA | 2,107.56 |
| 3,324  7 | TU4006 | | 467 | 13.51 /M | 1 | 7/15/2011 | | | 78,000.00 EA | 1,053.78 |
| 3,324  8 | TU4007 | | 467 | 13.51 /M | 1 | 7/15/2011 | | | 78,000.00 EA | 1,053.78 |
| 3,324  9 | TU4008 | | 467 | 13.51 /M | 1 | 7/15/2011 | | | 78,000.00 EA | 1,053.78 |
| 3,324  10 | TU4009 | | 467 | 13.51 /M | 1 | 7/15/2011 | | | 78,000.00 EA | 1,053.78 |
| 3,324  11 | TU4015 | | 467 | 13.51 /M | 1 | 7/15/2011 | | | 78,000.00 EA | 1,053.78 |
| 3,324  12 | TU2003 | | 467 | 42.42 /M | 1 | 7/15/2011 | | | 50,000.00 EA | 2,121.00 |
| 3,324  13 | TU2001 | | 467 | 40.56 /M | 1 | 7/15/2011 | | | 50,000.00 EA | 2,028.00 |
| 3,324  14 | TU2001 | | 467 | 40.56 /M | 1 | 7/15/2011 | | | 50,000.00 EA | 2,028.00 |

1

User: trieke
Time: 1:45PM

**Alternative Brands, Inc.**
**Open Purchase Order Report**
(By PO/Line For Materials & SubContracting)

Page: 2 of 3
Date: 7/7/2011

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | 14 | | | 3,324 - PO Totals: | 1,398,000.00 | 21,584.34 |

**P.O.: 3,325** — Shipping Release Requirements

| P.O. | Line | Part Number | 1.00 | Supplier ID | Unit Cost | Rel | Due Date | Promise Date | Job / Asm / Seq | On Order | Ext. Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3,325 | 1 | TU6010 | | 467 | 125.49 /M | 1 | 7/15/2011 | | | 16,000.00 EA | 2,007.84 |
| 3,325 | 2 | TU6011 | | 467 | 125.49 /M | 1 | 7/15/2011 | | | 16,000.00 EA | 2,007.84 |
| 3,325 | 3 | TU6012 | | 467 | 125.49 /M | 1 | 7/15/2011 | | | 9,000.00 EA | 1,129.41 |
| 3,325 | 4 | TU6013 | | 467 | 125.49 /M | 1 | 7/15/2011 | | | 5,000.00 EA | 627.45 |
| 3,325 | 5 | TU6014 | | 467 | 125.49 /M | 1 | 7/15/2011 | | | 17,000.00 EA | 2,133.33 |
| 3,325 | 6 | TU6005 | | 467 | 125.28 /M | 1 | 7/15/2011 | | | 18,000.00 EA | 2,255.04 |
| 3,325 | 7 | TU6006 | | 467 | 125.28 /M | 1 | 7/15/2011 | | | 8,000.00 EA | 1,002.24 |
| 3,325 | 8 | TU6007 | | 467 | 125.28 /M | 1 | 7/15/2011 | | | 7,500.00 EA | 939.60 |
| 3,325 | 9 | TU6008 | | 467 | 125.28 /M | 1 | 7/15/2011 | | | 6,300.00 EA | 789.26 |
| 3,325 | 10 | TU6009 | | 467 | 125.28 /M | 1 | 7/15/2011 | | | 6,700.00 EA | 839.38 |
| 3,325 | 11 | TU6015 | | 467 | 125.28 /M | 1 | 7/15/2011 | | | 6,000.00 EA | 751.68 |
| 3,325 | 12 | TU6003 | | 467 | 325.34 /M | 1 | 7/15/2011 | | | 5,000.00 EA | 1,626.70 |
| 3,325 | 13 | TU6001 | | 467 | 242.93 /M | 1 | 7/15/2011 | | | 5,000.00 EA | 1,214.65 |
| 3,325 | 14 | TU6017 | | 467 | 242.93 /M | 1 | 7/15/2011 | | | 5,500.00 EA | 1,336.12 |
| | | | | | | 14 | | | 3,325 - PO Totals: | 131,000.00 | 18,660.54 |

**P.O.: 3,326** — Shipping Release Requirements

| P.O. | Line | Part Number | 1.00 | Supplier ID | Unit Cost | Rel | Due Date | Promise Date | Job / Asm / Seq | On Order | Ext. Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3,326 | 1 | HOMFFRW | | 467 | 11.02 /M | 1 | 7/15/2011 | | | 58,500.00 EA | 644.67 |
| 3,326 | 2 | HOMLTRW | | 467 | 11.02 /M | 1 | 7/15/2011 | | | 58,500.00 EA | 644.67 |
| 3,326 | 3 | HOMMNRW | | 467 | 11.02 /M | 1 | 7/15/2011 | | | 58,500.00 EA | 644.67 |
| 3,326 | 4 | HOMBLKCHYRW | | 467 | 11.02 /M | 1 | 7/15/2011 | | | 58,500.00 EA | 644.67 |
| 3,326 | 5 | HOMVANRW | | 467 | 11.02 /M | 1 | 7/15/2011 | | | 117,000.00 EA | 1,289.34 |
| 3,326 | 6 | HOMCHOCRW | | 467 | 11.02 /M | 1 | 7/15/2011 | | | 58,500.00 EA | 644.67 |
| 3,326 | 7 | HOMFFCTN | | 467 | 117.24 /M | 1 | 7/15/2011 | | | 15,000.00 EA | 1,758.60 |
| 3,326 | 8 | HOMLTCTN | | 467 | 117.24 /M | 1 | 7/15/2011 | | | 9,000.00 EA | 1,055.16 |
| 3,326 | 9 | HOMBLKCHYCTN | | 467 | 117.24 /M | 1 | 7/15/2011 | | | 5,000.00 EA | 586.20 |
| 3,326 | 10 | HOMPCHCTN | | 467 | 117.24 /M | 1 | 7/15/2011 | | | 3,000.00 EA | 351.72 |
| 3,326 | 11 | HOMVANCTN | | 467 | 117.24 /M | 1 | 7/15/2011 | | | 9,000.00 EA | 1,055.16 |
| 3,326 | 12 | HOMCHOCCTN | | 467 | 117.24 /M | 1 | 6/15/2011 | | | 5,500.00 EA | 644.82 |
| 3,326 | 13 | HOMPCHRW | | 467 | 11.02 /M | 1 | 7/15/2011 | | | 58,500.00 EA | 644.67 |
| 3,326 | 14 | HB RCLSR | | 467 | 1.52 /M | 1 | | | | 500,000.00 EA | 760.00 |
| | | | | | | 14 | | | 3,326 - PO Totals: | 1,014,500.00 | 11,369.02 |

**P.O.: 3,330** — Shipping Release Requirements

| P.O. | Line | Part Number | 1.00 | Supplier ID | Unit Cost | Rel | Due Date | Promise Date | Job / Asm / Seq | On Order | Ext. Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3,330 | 1 | VD4011 | | 467 | 13.54 /M | 1 | | | | 175,500.00 EA | 2,376.27 |
| 3,330 | 2 | VD6011 | | 467 | 161.56 /M | 1 | | | | 14,869.00 EA | 2,402.24 |
| | | | | | | 2 | | | 3,330 - PO Totals: | 190,369.00 | 4,778.51 |

**P.O.: 3,331** — Shipping Release Requirements

| P.O. | Line | Part Number | 1.00 | Supplier ID | Unit Cost | Rel | Due Date | Promise Date | Job / Asm / Seq | On Order | Ext. Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3,331 | 1 | CB-NAT | | 21 | 1.92 EA | 1 | 7/11/2011 | | | 24,640.00 LB | 47,308.80 |
| 3,331 | 2 | CB-CHY | | 21 | 2.15 EA | 1 | 7/11/2011 | | | 2,200.00 LB | 4,730.00 |
| 3,331 | 3 | CB-VAN | | 21 | 2.12 EA | 1 | 7/11/2011 | | | 2,200.00 LB | 4,664.00 |
| | | | | | | 3 | | | 3,331 - PO Totals: | 29,040.00 | 56,702.80 |

**P.O.: 3,332** — Shipping Release Requirements

| P.O. | Line | Part Number | 1.00 | Supplier ID | Unit Cost | Rel | Due Date | Promise Date | Job / Asm / Seq | On Order | Ext. Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3,332 | 1 | CB-NAT | | 21 | 1.92 EA | 1 | 7/18/2011 | | | 29,040.00 LB | 55,756.80 |

**P.O.: 3,340** — Shipping Release Requirements

| P.O. | Line | Part Number | 1.00 | Supplier ID | Unit Cost | Rel | Due Date | Promise Date | Job / Asm / Seq | On Order | Ext. Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3,340 | 1 | ZN-A-205 | | 436 | 50.62 EA | 1 | 7/11/2011 | | | 80.00 BB | 4,049.60 |

(By PO/Line For Materials & SubContracting)

### P.O.: 3,341

| | | | | | | | Shipping Release Requirements | | |
|---|---|---|---|---|---|---|---|---|---|
| P.O. | Line | Part Number | 1.00 | Supplier ID | Unit Cost | Rel | Due Date | Promise Date | Job / Asm / Seq | On Order | Ext. Cost |
| 3,341 | 1 | ZX-B-502 | | 292 | 40.50 EA | 1 | 7/08/2011 | | | 81.00 BB | 3,280.50 |
| 3,341 | 2 | ZX-A-510 | | 292 | 24.31 EA | 1 | 7/08/2011 | | | 126.00 BB | 3,063.06 |
| | | | | | | 2 | | | 3,341 - PO Totals: | 207.00 | 6,343.56 |

### P.O.: 3,343

| P.O. | Line | Part Number | 1.00 | Supplier ID | Unit Cost | Rel | Due Date | Promise Date | Job / Asm / Seq | On Order | Ext. Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3,343 | 1 | MUFFRW | | 467 | 9.12 /M | 1 | 7/19/2011 | | | 702,000.00 EA | 6,402.24 |
| 3,343 | 2 | MULTRW | | 467 | 9.12 /M | 1 | 7/19/2011 | | | 585,000.00 EA | 5,335.20 |
| 3,343 | 3 | MUMNRW | | 467 | 9.12 /M | 1 | 7/19/2011 | | | 175,500.00 EA | 1,600.56 |
| 3,343 | 4 | MUFFCTN | | 467 | 92.36 /M | 1 | 7/19/2011 | | | 58,500.00 EA | 5,403.06 |
| 3,343 | 5 | MULTCTN | | 467 | 92.36 /M | 1 | 7/19/2011 | | | 56,000.00 EA | 5,172.16 |
| 3,343 | 6 | MUMNCTN | | 467 | 92.36 /M | 1 | 7/19/2011 | | | 22,000.00 EA | 2,031.92 |
| | | | | | | 6 | | | 3,343 - PO Totals: | 1,599,000.00 | 25,945.14 |

### P.O.: 3,344

| P.O. | Line | Part Number | 1.00 | Supplier ID | Unit Cost | Rel | Due Date | Promise Date | Job / Asm / Seq | On Order | Ext. Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3,344 | 1 | P191204 | | 479 | 92.00 EA | 1 | | | | 6.00 EA | 552.00 |
| 3,344 | 2 | K2529 | | 479 | 36.00 EA | 1 | | | | 10.00 EA | 360.00 |
| | | | | | | 2 | | | 3,344 - PO Totals: | 16.00 | 912.00 |

### P.O.: 3,345

| P.O. | Line | Part Number | 1.00 | Supplier ID | Unit Cost | Rel | Due Date | Promise Date | Job / Asm / Seq | On Order | Ext. Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3,345 | 1 | HOMGRPRW | | 467 | 11.02 /M | 1 | 7/20/2011 | | | 117,000.00 EA | 1,289.34 |
| 3,345 | 2 | HOMGRPCTN | | 467 | 117.24 /M | 1 | 7/20/2011 | | | 11,700.00 EA | 1,371.71 |
| | | | | | | 2 | | | 3,345 - PO Totals: | 128,700.00 | 2,661.05 |

### P.O.: 3,347

| P.O. | Line | Part Number | 1.00 | Supplier ID | Unit Cost | Rel | Due Date | Promise Date | Job / Asm / Seq | On Order | Ext. Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3,347 | 1 | 15DR23-1 | | 219 | 41.26 EA | 1 | 7/06/2011 | | | 2.00 EA | 82.52 |

### P.O.: 3,348

| P.O. | Line | Part Number | 1.00 | Supplier ID | Unit Cost | Rel | Due Date | Promise Date | Job / Asm / Seq | On Order | Ext. Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3,348 | 1 | ZX-CG-75 | | 375 | 60.00 EA | 1 | 7/13/2011 | | | 140.00 BB | 8,400.00 |
| 3,348 | 2 | ZX-PAW | | 375 | 72.00 EA | 1 | 7/13/2011 | | | 912.00 EA | 65,664.00 |
| | | | | | | 2 | | | 3,348 - PO Totals: | 1,052.00 | 74,064.00 |

### P.O.: 3,349

| P.O. | Line | Part Number | 1.00 | Supplier ID | Unit Cost | Rel | Due Date | Promise Date | Job / Asm / Seq | On Order | Ext. Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3,349 | 1 | 121DR3001F.167 | | 219 | 326.41 EA | 1 | 10/05/2011 | | | 1.00 EA | 326.41 |

### P.O.: 3,350

| P.O. | Line | Part Number | 1.00 | Supplier ID | Unit Cost | Rel | Due Date | Promise Date | Job / Asm / Seq | On Order | Ext. Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3,350 | 1 | 9650 | | SPEC | 0.92 EA | 1 | 7/15/2011 | | | 2,500.00 LB | 2,300.00 |
| 3,350 | 2 | 4048 | | SPEC | 1,045.00 /M | 1 | 7/15/2011 | | | 2,000.00 LB | 2,090.00 |
| 3,350 | 3 | 9740 | | SPEC | 1.01 EA | 1 | 7/15/2011 | | | 1,000.00 LB | 1,010.00 |
| | | | | | | 3 | | | 3,350 - PO Totals: | 5,500.00 | 5,400.00 |

| 81 | | | **Report Totals:** | 4,526,676.00 | 305,706.65 |
|---|---|---|---|---|---|

3

Case 09-50140    Doc 972-1    Filed 07/20/11    Page 32 of 64

# ALTERNATIVE BRANDS, INC.

### Group: Furniture & Fixtures - 1520

| Description | Date in Service | Cost |
|---|---|---|
| Fax Machine | 12/21/02 | 1,915.94 |
| Board room paintings | 8/25/03 | 1,826.49 |
| Baumgartner | 4/28/03 | 2,000.00 |
| Framing - Tapestry | 2/12/04 | 518.95 |
| Desk & Guest Chairs - CAP | 2/19/04 | 3,352.30 |
| Conference room furniture - FR (used) | 2/13/04 | 1,680.00 |
| Canon Fax Machine | 1/8/04 | 1,817.93 |
| Sofa Table & Curio - Conf room | 2/19/05 | 1,284.00 |
| Area rugs - CAP Office | 2/14/05 | 5,436.94 |
| Printer/Copier | 2/28/07 | 9,605.37 |
| Myriad Show Case Kit | 1/18/11 | 4,159.15 |
| **Total with Additions** | | **33,597.07** |

### Group: Computer Equipment - 1525

| Description | Date in Service | Cost |
|---|---|---|
| Computer equipment | 3/1/02 | 13,849.51 |
| Computer - Circuit City | 10/15/02 | 1,064.99 |
| Dell - Desktops & Server - 321 FR | 7/11/03 | 3,767.48 |
| Dell - PC for CAP | 1/15/04 | 3,333.12 |
| Dell - PC Sellers | 2/15/04 | 793.95 |
| Dell - PC for CFO | 2/16/04 | 1,789.10 |
| Timeclock & SW | 2/13/04 | 2,005.00 |
| Dell - Laptop for GD troubleshooting | 7/19/04 | 1,077.34 |
| Dell - PC for Reception | 8/31/04 | 688.04 |
| Dell - PC for Exec Asst | 11/16/04 | 747.97 |
| Dell - PC for Susan S. | 12/5/04 | 719.08 |
| HP 5Si Printers (2) - used | 1/8/04 | 1,658.50 |
| Dell Computers (3) - Dimension 3000 | 5/1/05 | 2,141.09 |
| Qqest Software timeclock - KDD | 1/23/06 | 1,825.00 |
| Dell - PC for Grant Blair | 9/1/06 | 2,135.75 |
| Dell - PC | 12/1/06 | 2,624.79 |
| Dell - PC | 12/18/06 | 1,736.65 |
| Computer Equipment - Key Tobacco | 6/3/08 | 3,000.00 |
| New Servers (Hardware) | 11/3/10 | 18,196.74 |
| Additional Server Cost | 12/22/10 | 5,223.11 |
| **TOTAL** | | **68,377.21** |

### Group:  Software - 1530

| Description | Date in Service | Cost |
|---|---|---|
| Dell Computer | 7/30/03 | 954.97 |
| Maint Work Order Program | 6/14/04 | 3,250.00 |
| Intuit - QB Enterprise Edition | 8/19/04 | 3,699.22 |
| CCA - GD Software | 5/29/04 | 2,100.62 |
| Vantage Software | 1/1/07 | 176,553.21 |
| Software-Key Tobacco | 6/3/08 | 1,000.00 |
| Additional Vantage Costs (See GJ 3247) | 12/28/08 | 19,719.96 |
| New Server (Software) | 12/22/10 | 3,068.38 |
| SQL Server 2008R2 with licenses | 3/10/11 | 5,441.32 |
| Upgrade to Epicor 9.03 (1st installment) | 5/16/11 | 2,000.00 |

| | | 217,787.68 |
|---|---|---|

**_Group: Vehicles - 1540_**

| Description | Date in Service | Cost |
|---|---|---|
| 2001 Ford F-350 Dump | 4/11/02 | 36,800.00 |
| John Deere Tractor | 5/31/02 | 23,424.00 |
| Ford F-350 Dump - Slater (Farm Vehicle) | 6/20/02 | 8,500.00 |
| Fork Truck - 35RRTT-198 | 10/15/02 | 11,169.52 |
| 2003 Dodge Ram P/U | 3/13/03 | 23,242.61 |
| 2003 Dodge Cargo Van - Bill H | 8/12/03 | 22,766.03 |
| 1997 GMC Truck (Clement) | 4/28/03 | 8,000.00 |
| 2004 Case JX75 Tractor & access. | 11/1/04 | 46,094.50 |
| 2004 Chevy Express Work Van | 7/19/04 | 21,975.54 |
| 2004 Caravan | 2/9/04 | 19,581.97 |
| 2003 Chevy Express Work Van (GS) | 8/24/05 | 14,300.00 |
| 2006 Chrysler Town & Country Van | 4/1/06 | 21,674.00 |
| 2006 Chrysler Town & Country Van | 4/1/06 | 21,266.00 |
| 2006 Chrysler Town & Country Van | 4/1/06 | 21,470.00 |
| 1987 Ford Truck | 3/27/06 | 2,500.00 |
| Used 1988 Mack Truck | 3/14/06 | 2,000.00 |
| Used Beam Trailer | 4/25/06 | 1,600.00 |
| 2006 Chrysler Town & Country Van | 9/1/06 | 21,632.06 |
| 2006 Chrysler Town & Country Van | 11/7/06 | 23,184.24 |
| York Equipment - used trailer | 12/6/06 | 1,825.00 |
| York Equipment - used trailer | 12/6/06 | 1,825.00 |
| Backhoe Tractor | 2/20/07 | 3,000.00 |
| 1984 Volvo White Tractor | 12/20/07 | 4,000.00 |
| Fork Truck - 35RRTT-198 | 10/15/02 | (11,169.52) |
| Used 1988 Mack Truck | 3/14/06 | (2,000.00) |
| 1998 GMC C6500 | 5/6/10 | 8,500.00 |
| 2007 Jeep Laredo (Mike R's) | 9/3/10 | 3,531.76 |
| | | - |
| **TOTAL** | | **360,692.71** |
| | | |
| **Total Fixed Assets ABI** | | **680,454.67** |

# RENEGADE TOBACCO COMPANY

**_Group: Computers - Computer Equipment - 1525_**

| Description | Date in Service | Cost |
|---|---|---|
| Web Site Development | 3/31/2004 | 4,100.00 |
| Web Site Development | 6/1/2004 | 3,050.00 |
| | 2/14/2005 | 5,000.00 |
| Microsoft POS System | 12/31/07 | 123,759.15 |
| W/O Portion of POS System | 9/28/08 | (99,520.13) |
| | | - |
| | | 36,389.02 |

**_Group: Shop Equipment - 1536_**

| Description | Date in Service | Cost |
|---|---|---|
| _Signage -_ | 4/25/05 | 3,865.00 |
| _Security Systems -_ | 4/15/05 | 8,073.00 |
| _United Silicone Tax Stamping Equip_ | 9/28/08 | 89,936.51 |
| | | - |
| | | 101,874.51 |

**_Group: Vehicles - 1540_**      Date in

| Description | Service | Cost |
|---|---|---|
| Trailer | 6/11/02 | 5,168.50 |
| Cargo Trailer | 3/13/03 | 7,700.00 |
| Pace Trailer VIN 61159 | 4/3/03 | 5,193.50 |
| | | - |
| | | **18,062.00** |
| | | |
| **Total Fixed Assets RTC** | | 156,325.53 |

SCHEDULE A.4 - INTANGIBLES

| TRADEMARKS | OWNER | STATUS | SERIAL | REGISTRATION |
|---|---|---|---|---|
| BARTON | RTC | REGISTERED | 76547561 | 3348977 |
| BUENO | ABI | REGISTERED | 76561386 | 3213763 |
| CUT YOUR OWN | RTC | REGISTERED | 76443648 | 3237745 |
| DALLAS | RTC | REGISTERED | 78593855 | 3379331 |
| DAYTONA | RTC | PENDING | 77399453 | |
| DIAMOND JACK | RTC | REGISTERED | 76563073 | 3373406 |
| GEM | RTC | PENDING | 77964517 | |
| IMPALA | RTC | REGISTERED | 76547559 | 3348976 |
| INTERSTATE | RTC | PENDING | 77415722 | |
| MAKRO | RTC | REGISTERED | 78790090 | 3446722 |
| MURANO | RTC | REGISTERED | 77787965 | 3734256 |
| RAMPAGE | RTC | PENDING | 85181042 | |
| SPEEDWAY | RTC | REGISTERED | 76156512 | 3540583 |
| TRACKER | RTC | REGISTERED | 76525463 | 2929424 |
| TRAX | RTC | REGISTERED | 76563072 | 3369801 |
| TUCSON | RTC | REGISTERED | 76156510 | 2882095 |
| VALUE BUY | RTC | REGISTERED | 76547557 | 3340467 |
| VENDETTA | RTC | REGISTERED | 78679487 | 3116995 |

TRADE NAMES

NONE

COPYRIGHTED MATERIALS

NONE

| PHONE NUMBERS | COMPANY |
|---|---|
| 336-940-2804 | YADTEL/MCI |
| 336-940-3507 | YADTEL/MCI |
| 336-940-3669 | YADTEL/MCI |
| 336-940-3761 | YADTEL/MCI |
| 336-940-3764 | YADTEL/MCI |
| 336-940-3765 | YADTEL/MCI |
| 336-940-4818 | YADTEL/MCI |
| 336-940-5377 | YADTEL/MCI |
| 336-940-3769 | YADTEL/MCI |
| 336-940-6405 | YADTEL/MCI |
| 336-998-6010 | YADTEL/MCI |
| 336-215-5976 | SPRINT |
| 336-477-4043 | SPRINT |
| 336-477-4067 | SPRINT |
| 336-477-4076 | SPRINT |
| 336-477-4130 | SPRINT |
| 336-477-4221 | SPRINT |
| 336-477-4222 | SPRINT |

Case 09-50140   Doc 972-1   Filed 07/20/11   Page 36 of 64

| | |
|---|---|
| 336-477-4224 | SPRINT |
| 336-477-4225 | SPRINT |
| 336-477-4226 | SPRINT |
| 336-477-4227 | SPRINT |
| 336-477-4228 | SPRINT |
| 336-477-4229 | SPRINT |
| 336-477-4230 | SPRINT |
| 336-477-4231 | SPRINT |
| 336-477-4232 | SPRINT |
| 336-477-4233 | SPRINT |
| 336-477-4330 | SPRINT |
| 336-477-4331 | SPRINT |
| 336-477-4415 | SPRINT |
| 336-477-4454 | SPRINT |
| 336-477-4463 | SPRINT |
| 336-477-4726 | SPRINT |
| 336558-5828 | SPRINT |
| 336-587-4053 | SPRINT |
| 336-587-5745 | SPRINT |

**WEBSITES**
**WWW.RENEGADETOBACCOUSA.COM**

## Schedule 4.8

**Litigation and Compliance Matters:**

Litigation with State of Missouri regarding escrow deposits for prior years.
Criminal investigation by U.S. Attorney for the Northern District of Mississippi.

## Schedule 4.11

**Financial Statements Provided:**

2008 Audited Financial Statements
2009 Audited Financial Statements
2010 Draft Financial Statements

## Schedule 4.12

**Contracts Used in the Business:**

1. Howerton Equipment Purchase Agreement and Extension
2. ABDG Distribution Agreement
3. Six Nations Contract Manufacturing Agreement
4. Sandia Manufacturers Contract Manufacturing Agreement
5. Republic Tobacco Contract Manufacturing Agreement
6. Sovereign Tobacco Contract Manufacturing Agreement
7. Ohserase Contract Manufacturing Agreement
8. RSB Tobacco Contract Manufacturing Agreement
9. Good Times USA Supply Agreement

## Schedule 4.13

**Required Tax Returns Not Filed:**

None.

## Schedule 4.14

**Notices of Non-Compliance:**

Litigation with State of Missouri regarding escrow deposits for prior years.
Criminal investigation by U.S. Attorney for the Northern District of Mississippi.

## Schedule 4.19

**Consents Required for Sale of Assets:**

None, except to the extent any transfer of licenses requires such consent.

## Schedule 4.21

**Designated Assumed Agreements**:

To be supplied by Buyer within Study Period.

## Schedule 4.22

**Intellectual Property**:

None licensed to Seller.
No known infringement, license or right to use by any third party.

# SCHEDULE B

## FORM OF BIDDING PROCEDURES ORDER

### [Attached]

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
### WINSTON-SALEM DIVISION

| IN THE MATTER OF: | Case No. 09–50140 |
|---|---|
| Renegade Holdings, Inc., et al | **Chapter 11** |
| Debtors | **Consolidated for Administration** |

**Order To Establish Bidding Procedures And Approve Break-up Fee, Approve Form And Manner Of Notice Of Sale, And Schedule Hearing To Confirm Sale**

This matter came before the Court to consider the motion for an order authorizing the Sale and granting related relief (the "Sale Motion") filed by Peter Tourtellot (the "Trustee") on behalf of Renegade Holdings, Inc. ("RHI"), Alternative Brands, Inc. ("ABI") and Renegade Tobacco Co. ("RTC" and collectively, the "Debtors"), pursuant to §§ 105, 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006 and 9006 of the Federal Rules of Bankruptcy Procedure. After considering the matters set forth in the Sale Motion, the evidence presented or proffered without objection, and the comments of parties in interest, it is hereby ORDERED as follows:

The final hearing to grant the Sale Motion and approve the Sale (the "Sale Approval Hearing") shall be held before this Court in Court in Courtroom #1, 101 S. Edgeworth Street, Greensboro, North Carolina at 9:30 a.m. on October 12, 2011.

The "Break-up Fee" as provided in the Bidding Procedures is expressly approved and authorized, the notice contemplated by the Sale Motion is adequate and sufficient notice of the proposed sale and no additional notice need be given, and the bidding procedures set forth below (the "Bidding Procedures") are hereby approved.

# BIDDING PROCEDURES

## Renegade Holdings, Inc., Alternative Brands, Inc. and Renegade Tobacco Co.

1.   <u>Diligence by Prospective Bidders</u>. The Trustee shall give notice of the proposed Sale and these Bidding Procedures to prospective bidders as required by the Bidding Procedures Order, receive and consider unsolicited offers for the Sale Assets, provide information to any such prospective bidder, and allow any such prospective bidder to conduct due diligence in connection with consideration of a potential bid for the Sale Assets; provided, however, that any such prospective bidder desiring to conduct due diligence shall (a) demonstrate the financial ability to consummate a transaction for the purchase of the Sale Assets, and (b) execute a confidentiality agreement in a form acceptable to the Trustee.

2.   <u>Contracts and Leases; Alleged Defaults</u>. Any allegation that defaults exist or must be cured as a condition to the assumption and assignment of any of the executory contracts or leases which may be assumed and/or assigned to the Buyer, which allegation shall include a precise statement of the nature and amounts of such alleged defaults (a "Statement of Defaults"), must be served upon John Northen, Northen Blue, LLC, 1414 Raleigh Rd., Suite 435, Chapel Hill, NC 27517 ("Trustee's Counsel") in a manner such that the Statement of Defaults is actually received by said counsel by <u>September 30, 2011</u> (the "Statement of Defaults Deadline").

3.   <u>Bid Deadline</u>. Any competing "Bid" (as described below) must be served upon Trustee's Counsel in a manner such that the bid is actually received by <u>September 30, 2011</u> (the "Bid Deadline").

4.   <u>Bid Requirements</u>.  Any entity (other than CB Holdings, LLC) that is interested in purchasing the Sale Assets (a "Bidder") must submit to Trustee's Counsel a "Bid" in conformance with this paragraph, in a manner such that the Bid is received no later than the Bid Deadline. Every such Bid must:

     a.    include (i) an executed copy of a definitive sale agreement, including schedules, and (ii) a version of the Bidder's definitive sale document and schedules redlined or otherwise marked to show any and all deviations from the Agreement;

     b.    contain terms and conditions no less favorable to the Debtors than the terms and conditions of the Agreement;

     c.    provide for cash consideration to Debtor of at least $350,000 more than the cash consideration to be provided by the Buyer ($100,000 more after taking into account the Break-up Fee);

     d.    not contain any contingencies to the validity, effectiveness, and/or binding nature of the offer, including, without limitation, contingencies for financing, due diligence or inspection except for the conditions to closing provided for in the Agreement

e. be accompanied by admissible evidence, in the form of affidavits or declarations establishing the Bidder's good faith, within the meaning of section 363(m) of the Bankruptcy Code, and its "adequate assurance of future performance" with respect to the Assumed Agreements, within the meaning of section 365(f)(2)(B) of the Bankruptcy Code;

f. be accompanied by (i) financial statements or admissible evidence in the form of affidavits or declarations establishing that the Bidder is ready, willing, authorized, capable, and qualified, financially, legally, and otherwise, of unconditionally performing all obligations under the Agreement (or its equivalent) in the event that it submits the prevailing bid at the Sale Approval Hearing, and (ii) evidence that it is duly authorized and entitled to engage in the transaction contemplated by the Bid without the consent of any entity that has not been obtained;

g. be accompanied by a deposit in the sum of $350,000 (the "Deposit Amount") in the form of a wire transfer or bank check payable to Trustee's Counsel and to be held in a non-interest bearing trust account pending completion of the Auction; and

h. include a commitment to close and consummate the Sale promptly following entry of the Sale Approval Order, assuming no stay thereof, no later than October 31, 2011 unless extended in accordance with the terms of the Asset Purchase Agreement.

5. <u>Non-Conforming Bids Disqualified from Auction</u>. Any entity that fails to submit a timely, conforming Bid, as set forth above, as determined by the Trustee in his reasonable discretion, shall be disqualified from bidding for any of the Sale Assets at the Auction, and in such event the Trustee shall file with the Court on or before the Auction Date a statement explaining the grounds for disqualification ("Statement of Disqualification").

6. <u>No Conforming Bids</u>. If no timely, conforming Bids are submitted, the Trustee shall request at the Sale Approval Hearing that the Court approve the proposed sale of the Sale Assets to CB Holdings, LLC ("CB"). Any party in interest may contest the Trustee's determination as to whether a Bid is conforming, but any such contest must be in writing and served upon Trustee's Counsel and filed with the Bankruptcy Court, in a manner such that contest is actually received by said counsel and the Bankruptcy Court at least one (1) business day in advance of the Sale Approval Hearing.

7. <u>Auction</u>. In the event that one or more timely, conforming Bids are submitted (CB and each person who has submitted such a timely, conforming Bid shall be referred to herein as a "Qualified Bidder"), the Trustee shall conduct the Auction, in which all Qualified Bidders may participate. The Auction shall be held on October 4, 2011, commencing at 9:00 o'clock a.m. Eastern, in the offices of John Northen, Northen Blue, LLC, 1414 Raleigh Rd., Suite 435, Chapel Hill, NC 27517 (or such other location as may be determined by Trustee's Counsel and communicated to all Qualified Bidders at least three (3) business days before the Auction), and shall be governed by the following procedures:

a. all Qualified Bidders shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and to have waived any right to jury trial in connection with any disputes relating to the Auction and/or the sale of the Sale Assets;

b. bidding will commence at an amount of the highest or otherwise best conforming Bid submitted by a Qualified Bidder, as determined by the Trustee in his sole discretion;

c. each subsequent bid by a Qualified Bidder shall be in increments of at least $50,000 in aggregate consideration above the previous bid after taking into account the Break-up Fee;

d. each Qualified Bidder should be prepared to make its best and final offer at the Auction, and the Trustee reserves all rights to object to and oppose any request for a continuance or recess of the Auction or the Sale Approval Hearing;

e. if, upon the conclusion of the Auction, and consistent with the terms of these bidding procedures, CB has failed to make a bid that the Trustee determines, in his reasonable discretion, to be the highest or otherwise best bid, after taking into consideration the Break-up Fee, the Trustee will recommend that the Bankruptcy Court authorize and approve a sale of the Sale Assets (including an assumption and assignment of the Assumed Agreements) to the prevailing Qualified Bidder;

f. if, however, CB makes a bid that the Trustee determines, in his reasonable discretion, and consistent with the terms of these Bidding Procedures, to be the highest or otherwise best bid compared to any bid by any other Qualified Bidder, after taking into consideration the Break-up Fee, the Trustee will recommend that the Bankruptcy Court approve the Agreement and authorize Debtor to sell the Sale Assets (including assumption and assignment of the Assumed Agreements) to CB; and

g. upon conclusion of the Auction, the Trustee shall designate the Qualified Bidder submitting the highest or otherwise best bid as the prevailing bidder (the "Prevailing Bidder"). Any objection to the Trustee's designation of the Prevailing Bidder shall be raised at the Sale Approval Hearing and decided by the Bankruptcy Court.

8. <u>Objection</u>. Any objection (an "Objection") to the Sale Motion, including any objection to the assumption and/or assignment of any of the Assumed Agreements, must be filed with the Bankruptcy Court and served on the following parties (the "Limited Notice Parties"), in a manner such that the Objection is actually received by <u>October 7, 2011</u> (the "Objection Deadline").

a. Michael D. West, Bankruptcy Administrator, 101 S. Edgeworth St., PO Box 1828, Greensboro, NC 27402

b. John A. Northen, special counsel for the Trustee, Northen Blue, LLP, 1414 Raleigh Rd., Ste 435, PO Box 2208, Chapel Hill, NC 27515-2208.

c.       RJ Lackey, counsel for CB Holdings, LLC, Woods Rogers PLC, 341 Main St., Ste 302, Danville, VA 24541.

d.       Richard Maxwell, counsel for CB Holdings, LLC, Woods Rogers PLC, PO Box 14125, Roanoke, VA 24038-4125.

e.       Gregory B. Crampton, counsel for the Settling States, Nicholls & Crampton PA, 3700 Glenwood Ave, Ste 500, PO Box 18237, Raleigh, NC 27619-8237.

f.       Patricia Molteni, counsel for the Settling States, National Association of Attorneys General, 2030 M Street NW, 8th Floor, Washington, DC 20036.

g.       Paul A. Fanning, counsel for Bank of the Carolinas, Ward and Smith, PA, P O Box 8088, Greenville, NC 27835-8088.

h.       Charles M. Ivey, III, counsel for PTM Technologies, Inc., Ivey McClellan Gatton & Talcott, LLP, P O Box 3324, Greensboro, NC 27402

9.      <u>Presumed Consent to Assumption and/or Assignment of Assumed Agreements</u>. Any entity that fails to file a timely Objection or Statement of Defaults by the applicable Deadline shall be deemed to have consented to the relief sought in the Sale Motion.

10.     <u>Sale Approval Hearing</u>. The final hearing to approve the Prevailing Bidder (the "Sale Approval Hearing") shall be held before the Bankruptcy Court in Courtroom #1, 101 S. Edgeworth Street, Greensboro, North Carolina at 9:30 a.m. on <u>October 12, 2011</u>.

11.     <u>Business Judgment</u>.

a.       The Trustee (i) may exercise his business judgment to recommend a sale of the Sale Assets (including assumption and assignment of the Assumed Agreements) to any Qualified Bidder whose bid the Trustee determines, in his reasonable discretion, to be in the best interests of the bankruptcy estate; (ii) shall consult with the secured creditors and any other significant constituent in connection with the bidding process and the selection of the highest or otherwise best bid; and (iii) may reject, at any time before the entry of an order of the Bankruptcy Court approving a bid from a Qualified Bidder, any bid that, in the Trustee's sole discretion, is (i) inadequate or insufficient, (ii) not in substantial conformity with the Bankruptcy Code, these Bidding Procedures, or the terms and conditions of the Sale Motion, or (iii) contrary to the best interests of the Debtors' estate and its creditors.

b.       In exercising business judgment as to which Bid constitutes the highest or otherwise best Bid, the Trustee may consider all factors which he deems relevant, including but not limited to, the terms and conditions of the proposed purchase agreement, the Bidder's ability to close the proposed transaction without delay, the scope of the proposed transaction, the form and market value of any non-cash consideration offered, the aggregate value of any assets not included in such Bid and the Debtors' ability to recognize such value, and the costs to the estate of any Bid.

12.     Break-up Fee.  Solely in the event that the Bankruptcy Court enters an order approving the sale of the Sale Assets to an entity other than CB, CB has not committed a material default under the Agreement, and the Trustee does not sell the Sale Assets to CB, the Debtors shall pay CB a break-up fee of $250,000 (the "Break-up Fee") which will compensate CB for the lost opportunity cost and the value it brought to the Debtors and the estate in the form of the Asset Purchase Agreement to serve as a "stalking horse offer" for other bids and to reimburse CB for the time and effort expended and the expenses incurred in connection therewith (including, without limitation, legal and consulting fees and costs).  If earned pursuant to these Bidding Procedures, the Break-up Fee shall be payable to CB within ten days after closing of the sale of the Sale Assets to an entity other than CB.

13.     Back-up Bidder.  Upon the conclusion of the Auction, the Trustee may designate the Bidder submitting the next highest or otherwise best bid after the Prevailing Bidder to serve as the "Back-up Bidder," provided, however, that CB shall be bound by its bid only until the Bankruptcy Court has entered an order approving the sale to the Prevailing Bidder unless CB agrees in writing to act as the Back-up Bidder.  Any objection to the Trustee's designation of the Back-up Bidder shall be raised at the Sale Approval Hearing and decided by the Bankruptcy Court.  If, for any reason, the Prevailing Bidder is unable or unwilling timely to perform its obligations under the Prevailing Bidder's definitive sale agreement, the Trustee may in the exercise of his business judgment sell the Sale Assets to the Back-up Bidder without further notice or a hearing.  The Back-up Bidder's bid shall remain open and binding until closing of the sale to the Prevailing Bidder or, if the Prevailing Bidder is unable or unwilling to close and Debtor elects to sell to the Back-up Bidder, until the sale to the Back-up Bidder closes.

14.     Disposition of Deposits.  Promptly following the Bankruptcy Court's determination of the Prevailing Bidder, the deposits submitted by CB and any Bidders shall be refunded to each unsuccessful bidder other than the Back-up Bidder, if any.  The deposit of the Prevailing Bidder and the Back-up Bidder shall be retained as earnest money to be used in the following ways:

a.      the deposit of the Prevailing Bidder shall either be (i) applied at closing as a credit toward the purchase price of the Prevailing Bidder or, if the purchase price is paid in full at closing, returned to the Prevailing Bidder, (ii) if the sale to the Prevailing Bidder shall fail to timely close by reason of a breach or default of the Prevailing Bidder, the deposit shall be retained by the Trustee as liquidated damages, or (iii) in the event that the sale to the Prevailing Bidder shall fail to timely close by reason of a breach or default of the Debtors, the deposit shall be returned to the Prevailing Bidder; and

b.      the deposit of the Back-up Bidder shall either be (i) returned to the Back-up Bidder upon the closing of the transaction with the Prevailing Bidder, or (ii) if the sale to the Prevailing Bidder shall fail to close for any reason, applied at closing as a credit toward the purchase price of the Back-up Bidder, or (iii) if the sale to the Back-up Bidder shall fail to timely close by reason of a breach or default of the Back-up Bidder, retained by the Trustee as liquidated damages.

## SCHEDULE C

## <u>BRANDS</u>

Barton
Bueno
Cut Your Own
Dallas
Daytona
Diamond Jack
Gem
Impala
Interstate
Makro
Murano
Rampage
Speedway
Tracker
Trax
Tucson
Value Buy
Vendetta
Hombre (common law rights)

## SCHEDULE D

## EXCLUDED ASSETS

(i)     Cash, cash equivalents, bank deposits, funds in transit and Tax refunds.

(ii)    Any cause of action pending or which may be asserted by the Seller or the Trustee against Calvin Phelps or any other person or entity.

(iii)    The minute books, stock transfer records, corporate seals and other corporate records and documents relating to the organizational existence of each Seller and the shares of capital stock of each Seller held in treasury subject to the provisions of Section 3.15.

## SCHEDULE E

## LEASED ASSETS

(i)      Land, buildings and other improvements located in Davie County, North Carolina, located at 321-323 Farmington Road and containing approximately 18 acres presently owned by SunTrust Bank.

(ii)      Land, buildings and other improvements located in Davie County, North Carolina, located at 325 Farmington Road and containing approximately 2 acres presently owned directly or indirectly by Calvin Phelps, on which Bank of the Carolinas has a deed of trust now in foreclosure.

(iii)      All equipment leased by the Seller from PTM Technologies, Inc. in connection with the Business.

(iv)      Any other equipment leased by Seller necessary or desirable for the operation of the Business.

# SCHEDULE F

## FORM OF SALE APPROVAL ORDER

### [Attached]

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
## WINSTON-SALEM DIVISION

| IN THE MATTER OF:<br><br>**Renegade Holdings, Inc., et al**<br><br>**Debtors** | **Case No. 09-50140**<br>**Chapter 11**<br>**Consolidated for Administration** |
|---|---|

**Order Confirming Sale, Transferring Liens To Proceeds, Approving Assumption And Assignment Of Certain Assumed Agreements, And Other Relief**

This matter came before the Court to consider the motion for an order authorizing the sale and granting related relief (the "Sale Motion") filed by Peter Tourtellot (the "Trustee") on behalf of Renegade Holdings, Inc. ("RHI"), Alternative Brands, Inc. ("ABI") and Renegade Tobacco Co. ("RTC" and collectively, the "Debtors"), pursuant to §§ 105, 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006 and 9006 of the Federal Rules of Bankruptcy Procedure.

Following a hearing (the "Interim Hearing"), the Court entered the Order To Establish Bidding Procedures And Approve Break-up Fee, Approve Form And Manner Of Notice Of Sale, And Schedule Hearing To Confirm Sale (the "Bidding Procedures Order"), pursuant to which the Debtors transmitted certain materials as specified therein to each party who had previously or subsequently expressed an interest in bidding on the property, and solicited bids conforming to the requirements set forth in the Bidding Procedures Order. In addition, notice of the Sale Motion, the Interim Hearing and the Final Hearing was timely served on all parties in interest entitled thereto.

**[insert summary as to Bids, Auction and any Objections]**

Upon further consideration of the Sale Motion, the evidence submitted in support thereof and the arguments of parties wishing to be heard, and sufficient cause appearing, the Court makes the following findings:

1.      This Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. §§157 and 1334, and this matter is a core proceeding under 28 U.S.C. §157(b)(2). Venue is proper pursuant to 28 U.S.C. §§1408 and 1409.

2. Appropriate, due, and adequate notice of the Sale Motion and the hearing thereon has been provided to all creditors, customers, and employees of the Debtors, all persons believed or known to have an interest in purchasing the assets of the Debtors, all parties to executory contracts and leases which may be assumed and/or assigned in conjunction with the proposed sale, all interested governmental, pension, and environmental authorities, the Office of the United States Bankruptcy Administrator, and all other parties who filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rule 2002, and such notice is in compliance with Bankruptcy Rules 2002, 6004, 6006, and 9014. No other or further notice of the Sale Motion, the hearing thereon, or entry of this Order is necessary.

3. Pursuant to the Bidding Procedures Order, competing bids for the Sale Assets were solicited. _____ submitted the highest and best bid for the Sale Assets and was designated by the Trustee as the "Prevailing Bidder". _____ submitted the next highest and best bid for the Sale Assets and was designated by the Trustee as the "Back-up Bidder". The Prevailing Bidder, or to the extent applicable the Back-up Bidder, is hereinafter referred to as the "Buyer".

4. [Alternate paragraphs:]
   a. As CB Holdings, LLC was the determined to be the Prevailing Bidder, the provision in the Bidding Procedures Order regarding the "Break-up Fee" is moot and no such fee is due or payable in connection with the sale. **[or]**
   b. As CB Holdings, LLC was not the Prevailing Bidder, the "Break-up Fee" is due or payable to CB Holdings, LLC as provided in the Bidding Procedures Order.

5. The sale is within the reasonable business judgment of the Trustee on behalf of the Debtors and is in the best interest of the estates, after having exposed the "Sale Assets" (as defined in the Asset Purchase Agreement) to higher and better bids. The Purchase Price (as defined the Asset Purchase Agreement) that the Buyer has agreed to pay for the Sale Assets is fair and constitutes full and adequate consideration and reasonably equivalent value for the Sale Assets. The terms and conditions of the Asset

Purchase Agreement in their totality are fair and reasonable and the transactions contemplated therein are in the best interest of the Debtors' estates.

6. The Trustee filed separate motions in conjunction with the Sale Motion, seeking (i) authority to enter into certain real estate and equipment leases related to the business operations, and (ii) authority for the assumption and assignment of these and other leases or executory contracts as may be specifically identified by the Buyer in advance of the Closing (collectively, the "Assumed Agreements"); provided however, the Buyer has the option to (i) renegotiate any or all of such proposed leases, or (ii) reject the proposed leases and decline to lease any or all of such real estate or equipment (the "Leased Assets") and proceed with Closing, in which event the Leased Assets under the leases rejected by the Buyer shall be excluded from the transaction.

7. Approval of the related assumption and assignment to the Buyer of the Assumed Agreements (as defined the Asset Purchase Agreement) is a necessary condition and part of the sale of the Sale Assets and is also in the best interest of the Debtors, their estates, and their creditors. The Asset Purchase Agreement provides for defaults under the Assumed Agreements to be cured, and the Buyer has demonstrated adequate assurances of future performance of the Assumed Agreements.

8. The proposed sale and the assumption and/or assignment of the Assumed Agreements have been presented in conjunction with the Trustee's proposed plan of reorganization (the "Trustee's Plan"), which in turn contemplates a sale of all, substantially all, or a substantial portion of the Debtors' assets.

9. The Trustee on behalf of the Debtors has full power and authority to execute, deliver, and perform the Asset Purchase Agreement, subject to approval by this Court, and no consent or approval by third parties is required to consummate such transactions.

10. One or more of the grounds for a sale free and clear pursuant to Section 363(f) of the Bankruptcy Code has been met as to each claim, lien, encumbrance, or interest in any or all of the Sale Assets

11.    The Buyer is a "good faith purchaser" as defined in Section 363(m) of the Bankruptcy Code, and none of the grounds set forth in Section 363(n) exist with respect to a sale to the Buyer.

Based upon the foregoing findings, the Court concludes that the Sale Motion should be granted and for good and sufficient reasons appearing it is hereby ORDERED as follows:

1.    The Sale Motion is granted in all respects, as provided herein, and any and all objections filed or raised at the Final Hearing have been withdrawn, resolved by the terms of this Order, or are expressly overruled and denied.

2.    The Debtors are authorized and directed pursuant to Sections 105, 363(b) and 363(f) of the Bankruptcy Code to sell, transfer, and convey the Sale Assets to Buyer pursuant to and in material accord with the terms and conditions of the Asset Purchase Agreement free and clear of any and all liens, claims, mortgages, deeds of trust, security interests, restrictions, prior assignments, liabilities (other than the Assumed Liabilities described in the Asset Purchase Agreement), obligations, encumbrances, charges, and other interests of any and every type, kind, nature or description whatsoever, whether asserted or unasserted, known or unknown, perfected or unperfected, recorded or unrecorded, scheduled or unscheduled, inchoate or choate, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, whether arising before or after Debtors' chapter 11 filing, or imposed by agreement, statute, common law, equity or otherwise, including, but not limited to, liens asserted by the Debtors' customers, shareholders, employees, secured creditors, landlords and equipment lessors, tax authorities, priority creditors, administrative expense claimants, and other creditors. To the extent necessary or reasonably required by Buyer to effectuate the assignment of the release rights pursuant to Section 3.14 of the Asset Purchase Agreement, upon the completion of the Debtors' proceedings in the Bankruptcy Court, the Trustee is also authorized to transfer all outstanding equity interest in ABI to a single purpose entity identified by Buyer for consideration of One and 00/100 Dollars ($1.00).

3.    The Debtors are also authorized to assign to the Buyer all the Debtors' rights under any Assumed Agreement, subject to the provisions of any separate Orders

entered in regard to any particular Assumed Agreement, together with any purchase order with any customer and any confidentiality agreement executed by any party in connection with the proposed sale and the opportunity to conduct due diligence prior to submitting any bid.

4.     All persons and entities which now or hereafter possess some or all of the Sale Assets are directed to surrender possession thereof to the Buyer on the Closing Date (as defined the Asset Purchase Agreement) or at such time thereafter as Buyer may request in writing.

5.     Each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release or terminate at Closing any lien upon or against the Sale Assets. If any person or entity that has filed or recorded financing statements or other documents or agreements evidencing or perfecting liens upon or against the Sale Assets shall not have delivered to the Debtors prior to Closing, in proper form for filing and executed by the appropriate persons, termination statements, instruments of satisfaction, and releases of Liens (as defined the Asset Purchase Agreement), the Debtors are hereby authorized and directed to execute and file such documents on behalf of such person or entity with respect to such Sale Assets immediately prior to or during Closing.

6.     The Debtors shall retain the Excluded Assets (as defined in the Asset Purchase Agreement), including but not limited to (i) any cash, cash equivalents, bank deposits, funds in transit and tax refunds, (ii) any cause of action which are pending or may be brought by or on behalf of one or more of the Debtors, including those which may be brought by the Trustee pursuant to Chapter 5 of the Bankruptcy Code in connection with this bankruptcy case, and (iii) corporate records and shares of capital stock of each Debtor held in treasury subject to certain provisions set forth in the Asset Purchase Agreement.

7.     The Sale Assets do not include any asset in the Debtors' custody, possession or control that is owned by any customers of the Debtors. Nothing in this Order or in the Asset Purchase Agreement shall be construed to convey to Buyer any right, title or interest in or to any asset owned by any customer of the Debtors or to

impose upon Buyer any responsibility, liability or obligation with respect to any such asset.

        8.     The Debtors are authorized to assume and/or assign to the Buyer the following leases and contracts (as the "Assumed Agreements"), having been so designated by the Buyer:

        a.

        9.     The Debtors are authorized to reject the following leases and contracts, having not been designated as Assumed Agreements by the Buyer:

        a.

        10.    The Debtors are authorized to credit, pay or provide for the payment at Closing the following cure payments on the Assumed Agreements. The cure payments relating to the Assumed Agreements set forth in this paragraph shall be binding and in full satisfaction of any such cure payment due any party. The acceptance by any party of such cure payment shall be deemed in full satisfaction and shall constitute a waiver of any claims against the Debtor or the Buyer relating to the cure payments.

        a.

        11.    All remaining sale proceeds shall be retained by the Debtors pending further orders of this Court after notice and hearing. Any allocation of the sale proceeds as between the Debtors and the Buyer shall be for tax purposes only and without prejudice to any allocation of the sale proceeds as between the respective Debtors' estates or as between their creditors.

        12.    Each non-debtor party to the Assumed Agreements shall, as of the Closing, be forever barred and enjoined from asserting against Buyer, any of the Sale Assets, the Debtors or the Debtors' bankruptcy estates any objection to assumption and assignment of the Assumed Agreements. Assignment of the Assumed Agreements to the Buyer will not cause a default or otherwise allow the non-debtor parties thereto to terminate or adversely affect the Debtors' or the Buyer's rights thereunder. Each of the Assumed Agreements shall remain in full force and effect notwithstanding any anti-assignment clause therein. Pursuant to Section 365(k) of the Bankruptcy Code, upon assumption and assignment to the Buyer of the Assumed Agreements in accordance with

this Order or separate Orders with respect thereto, neither the Debtors nor their estates shall have any liability under the Assumed Agreements for breach thereof or otherwise.

13.     The Buyer shall not assume nor have any liabilities or responsibility for liabilities or obligations of the Debtors, whether *in rem* claims or *in personam* claims, except with respect to the Assumed Liabilities. The Buyer is hereby granted and is entitled to the protections of a good faith purchaser under Section 363(m) of the Bankruptcy Code, including with respect to assumption and assignment of the Assumed Agreements under Section 365 of the Bankruptcy Code.

14.     All creditors and claimants of the Debtors, and all persons having an interest of any nature derived through the Debtors, are permanently enjoined from pursuing any action challenging of affecting the validity or effectiveness of the sale against the Buyer or the Sale Assets once acquired by the Buyer.

15.     Except as otherwise limited or provided herein, this Order is without prejudice to the right of the Debtors, or the right of any of their creditors, if any, to bring any other action or actions in the Bankruptcy Court ("Actions"), including but not limited to Actions associated with the sale of the Sale Assets, so long as such Actions do not challenge or affect the validity or effectiveness of the sale.

16.     This Order and the Asset Purchase Agreement shall be binding upon, and inure to the benefit of the Debtors and the Buyer, and their respective successors and assigns, including without limitation, any trustee hereafter appointed, in the event of a conversion under Section 1112 of the Bankruptcy Code, in the Debtors' chapter 7 cases. This Order shall also be binding upon and govern the acts of all persons and entities, including without limitation, all filing agents, recording agents, secretary of states, and county clerks, who may be required by operation of law to accept, file, register, or otherwise record or release any documents or instruments relating to liens.

17.     The Debtors and the Buyer are authorized by written agreement to amend, modify, supplement, or waive any provision of the Asset Purchase Agreement after the date of this Order and without further approval by this Court; provided, however, that no such amendment, modification, supplement or waiver shall change the Asset Purchase Agreement in a manner that is materially disadvantageous to the Debtors or their estates.

18.     The Buyer is not a successor to any of the Debtors, their businesses, or their bankruptcy estates by reason of any theory of law or equity. Other than the Assumed Liabilities described in the Asset Purchase Agreement, the Buyer shall not assume or be responsible in any way for any liability or obligation of the Debtors, whether known or unknown, liquidated or unliquidated, contingent, disputed, fixed, accrued, or disclosed including but not limited to the Excluded Liabilities described in the Asset Purchase Agreement.

19.     Pursuant to Sections 105 and 363 of the Bankruptcy Code, any and all creditors of the Debtors shall be barred, estopped and enjoined from taking any action of any kind against the Buyer or the Sale Assets on account of any claim against the Debtors or any of the Sale Assets.

20.     Effective upon the Closing, all persons and entities shall be permanently and forever barred, restrained and enjoined from commencing or continuing in any manner any action or other proceeding of any kind against the Buyer as alleged successor with respect to any liens upon or against the Sale Assets.

21.     No bulk sale law or any similar law of any state or other jurisdiction shall apply in any way to the transactions contemplated by the Asset Purchase Agreement.

22.     To the extent that any of the Debtors' employees are offered employment with the Buyer, such employees' employment with the Debtors shall not be deemed to have terminated solely for purposes of the Worker Adjustment and Retraining Notification ("WARN") Act.

23.     The Debtors are hereby directed (i) on or before the Closing, directly or through the appropriate third party servicer, to provide any and all notices required by the Consolidated Omnibus Budget Reconciliation Act ("COBRA") to all of the Debtors' employees of their rights to continue health care insurance coverage under the Debtors' current health coverage following their resignation or termination of employment with Debtors, if available; and (ii) through the Closing and afterward, to perform all obligations under the Debtors' health insurance contracts or under COBRA to the extent applicable.

24.     The 14-day stay authorized by Bankruptcy Rule 6004(h) and 6006(d) shall not apply to this Order which shall be effective immediately upon entry, and the Debtors and the Buyer may consummate the sale of the Sale Assets and assumption and assignment of the Assumed Agreements as early as the date hereof. The sale approved by this Order is not subject to avoidance pursuant to Section 363(n) of the Bankruptcy Code.

25.     This Court shall retain exclusive jurisdiction for the purpose of (i) enforcing the provisions of this Order, any separate but related Orders, and the Asset Purchase Agreement, (ii) resolving any dispute regarding this Order, any separate but related Orders, the Asset Purchase Agreement, or the rights and duties of the parties hereunder or thereunder, or (iv) any issues relating to this Order, any separate but related Orders or the Asset Purchase Agreement, including, but not limited to, the interpretation of the provisions of this Order, any separate but related Orders, the terms and conditions of the Asset Purchase Agreement, the status, nature and extent of the Sale Assets and all issues and disputes arising in connection with the relief authorized herein. If and to the extent any provisions of this Order conflict with those of the Asset Purchase Agreement, this Order shall govern and control.

## SCHEDULE G

## FORM OF EXECUTORY CONTRACTS ORDER

**[Attached]**

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
## WINSTON-SALEM DIVISION

| IN THE MATTER OF:<br><br>**Renegade Holdings, Inc., et al**<br><br>**Debtors** | **Case No. 09-50140**<br>**Chapter 11**<br>**Consolidated for Administration** |
| --- | --- |

| **Order Granting Authority To Assume And Assign, Or In The Alternative To Reject Certain Leases And Executory Contracts In Conjunction With Sale Of Assets** |
| --- |

This matter came before the Court to consider the Motion For Authority To Assume And Assign, Or In The Alternative To Reject Certain Leases And Executory Contracts In Conjunction With Sale Of Assets (the "Motion") filed by filed by Peter Tourtellot (the "Trustee") on behalf of Renegade Holdings, Inc. ("RHI"), Alternative Brands, Inc. ("ABI") and Renegade Tobacco Co. ("RTC" and collectively, the "Debtors") pursuant to § 365 of the Bankruptcy Code and Rule 6006 of the Federal Rules of Bankruptcy Procedure.

After hearing and consideration of the evidence submitted in support thereof and the arguments of parties wishing to be heard, and sufficient cause appearing, the Court makes the following findings:

1    On January 28, 2009 (the "Petition Date"), the Debtors filed voluntary petitions seeking relief under Chapter 11 of the Bankruptcy Code and an Order for relief was entered. The cases have been consolidated for purposes of administration only by order entered on February 11, 2009. On August 18, 2010, the Court appointed Peter L. Tourtellot as Chapter 11 Trustee for the Debtors ("Trustee").

2    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334, and this matter is a core proceeding under 28 U.S.C. §157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§1408 and 1409.

3    Appropriate, due, and adequate notice of the Motion and the hearing thereon has been provided to all creditors, all parties to executory contracts and leases which may be assumed and/or assigned in conjunction with the proposed sale, all interested governmental, pension and environmental authorities, the Office of the United States Bankruptcy Administrator, and all other parties who filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to

notice under Bankruptcy Rule 2002, and such notice is in compliance with Bankruptcy Rules 2002, 6004, 6006, and 9014. No other or further notice of the Motion, the hearing thereon, or entry of this Order is necessary.

4    The Trustee has filed a Motion To (A) Approve Sale Of Substantially All Assets, (B) Establish Bidding Procedures And Approve Break-up Fee, (C) Transfer Any And All Claims, Liens, Encumbrances And Interests In Sale Assets To Proceeds Of Sale, (D) Approve Form And Manner Of Notice Of Sale, (E) Assume And Assign Certain Leases And Executory Contracts, And (F) Schedule Hearings To Establish Sales Procedures And Confirm Sale (the "Sale Motion").

5    After due notice and hearing the Court entered the Order To Establish Bidding Procedures And Approve Break-up Fee, Approve Form And Manner Of Notice Of Sale, And Schedule Hearing To Confirm Sale (the "Bidding Procedures Order"). Pursuant to the Bidding Procedures Order, competing bids for the Sale Assets were solicited. _____ submitted the highest and best bid for the Sale Assets and was designated by the Trustee as the "Prevailing Bidder". _____ submitted the next highest and best bid for the Sale Assets and was designated by the Trustee as the "Back-up Bidder". The Prevailing Bidder, or to the extent applicable the Back-up Bidder, is hereinafter referred to as the Buyer.

6    In conjunction with the Sale Motion, the Trustee has filed the Motion seeking authority for the Debtors (i) to assume and/or assign to the Buyer at Closing those executory contracts or leases which are designated by the Buyer as Assumed Agreements, or in the alternative (ii) to reject any of executory contracts or leases which are not so designated by the Buyer as Assumed Agreements; provided however, the Buyer will have the option to (i) renegotiate any or all of such proposed leases, or (ii) decline any or all of such proposed leases and proceed with Closing, in which event the leases not designated by the Buyer as Assumed Agreements will be excluded from the sale and may be rejected by the Debtors.

7    The Assumed Agreements include any or all of the following:

   a.    A new lease with respect to the land and building located at 321 Farmington Rd., Mocksville, NC.

   b.    A new lease with respect to the land and building located at 325 Farmington Rd., Mocksville, NC.

     c.     A new lease with PTM Technologies, Inc., with respect to the equipment used in the business operation.

     d.     Any existing executory contract or equipment lease necessary or desirable for the operation of the business.

8     The amount of the respective cure payments which are required in order to assume and assign the Assumed Agreements is as follows:

     a.

9     All requirements for assumption and assignment of the Assumed Agreement pursuant to § 365 have been satisfied, including but not limited to the following:

     a.     The Buyer has provided adequate assurance of future performance on each Assumed Agreement.

     b.     The Debtors are authorized to credit, pay or provide for the payment at Closing of any necessary cure payments on the Assumed Agreements.

10     The assumption and assignment of the Assumed Agreements to the Buyer at Closing is in the best interests of the Debtors' estates.

Based upon the foregoing findings, the Court concludes that the Motion should be granted and for good and sufficient reasons appearing it is hereby ORDERED as follows:

     1.     The Motion is granted in all respects, as provided herein, and any and all objections filed or raised at the hearing have been withdrawn, resolved by the terms of this Order, or are expressly overruled and denied.

     2.     The amount of the respective cure payments which are required in order to assume and assign any of the Assumed Agreements as set forth above shall be binding upon and the payment of such amounts shall be deemed in full satisfaction of any such cure payment due any such party, and the acceptance by any party of such cure payment shall be deemed in full satisfaction and shall constitute a waiver of any claims against the Debtor or the Buyer relating to such cure payments.

     3.     The Trustee on behalf of the Debtors, upon entry of the Sale Approval Order designating the Buyer, is authorized to (i) assume and/or assign to the Buyer at Closing those executory contracts or leases which are designated by the Buyer as Assumed Agreements, or in the alternative (ii) reject any of executory contracts or leases which are not so designated by the Buyer as Assumed Agreements.

4.     The Buyer is authorized, at its option to renegotiate any or all of the proposed leases or decline any or all of the proposed leases, at or before Closing.

5.     The 14-day stay authorized by Bankruptcy Rule 6004(h) and 6006(d) shall not apply to this Order, which shall be effective immediately upon entry.