UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| Renegade Holdings, Inc., | ) | Case No. 09-50140C-11W |
| Alternative Brands, Inc., | ) | Case No. 09-50141C-11W |
| Renegade Tobacco Co., | ) | Case No. 09-50143C-11W |
| | ) | (Consolidated for Administration) |
| Debtors. | ) | |
| | ) | |

MEMORANDUM OPINION

These cases came before the court on April 17, 2013, for a confirmation hearing on the Trustee's Second Amended and Restated Joint Plan of Reorganization dated January 31, 2013, Modified February 18, 2013 (Docket #1540)("the Plan"). John A. Northen appeared as special counsel for the Trustee, Peter L. Tourtellot, Gerald A. Jeutter also appeared on behalf of the Trustee, Paul A. Fanning appeared on behalf of Bank of the Carolinas, Robyn C. Whitman appeared on behalf of the United States Bankruptcy Administrator, Patricia Molteni and C. Scott Meyers appeared on behalf of the States[1], and Rebecca A. Leigh and Alexander Terras appeared on behalf of General Electric Capital Corporation. Having considered the Plan, the objections to the Plan, the evidence

---

[1]"States" refers to 51 of the 52 government jurisdictions that are signatories to the 1998 tobacco Master Settlement Agreement ("MSA"). The 52 jurisdictions include forty-six states of the United States (excluding Texas, Mississippi, Minnesota, and Florida), the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, American Samoa, and the Northern Marianas. The one MSA jurisdiction that is not included is Tennessee. Tennessee is separately represented and not included among the State parties who have voted against the Plan and asserted objections to confirmation.

offered at the hearing, the matters of record in this case, and the arguments of counsel, the court makes the following findings of fact and conclusions of law pursuant to Rules 9014 and 7052 of the Federal Rules of Bankruptcy Procedure.

## JURISDICTION

This court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and Local Rule 83.11 of the United States District Court for the Middle District of North Carolina.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(L) which this court may hear and determine.

## FACTS

### 1.  Regulatory Background

In 1998, the four major domestic tobacco companies (Philip Morris, R.J. Reynolds Tobacco Company, Brown & Williamson Tobacco Corp., and Lorillard Tobacco Company) entered into a Master Settlement Agreement ("MSA") with forty-six states (Florida, Minnesota, Mississippi and Texas had settled separately), the District of Columbia, and the five United States territories (American Samoa, Guam, the Northern Marianna Islands, Puerto Rico, and the Virgin Islands).

Pursuant to the MSA, the States agreed to dismiss the suits that were pending against the tobacco companies and release antitrust and other claims that had been asserted against those

tobacco companies in exchange for perpetual payments that are directly related to each company's market share of the cigarette industry.  Under the MSA, the funds are to be paid to the States and are supposed to be used to defray health costs resulting from smoking-related illnesses and to fund smoking prevention programs.

The MSA also contains provisions under which other tobacco companies may enter into or join the MSA and become Subsequent Participating Manufacturers ("SPMs").[2]  Pursuant to the terms of the MSA, all Participating Manufacturers ("PMs") make payments to the States (the "MSA payments") based primarily on the amount of cigarettes sold each year.  The MSA payments are typically due by April 15 in the year following the calendar year for which sales were reported.

Tobacco product manufacturers who chose not to participate in the MSA are known as Non-Participating Manufacturers("NPMs").  Because they are not parties to the MSA, NPMs do not make MSA payments to the States.

In order to receive the maximum benefits under the MSA, the States are required by the MSA to enact legislation known as the Qualifying Statute.  The Qualifying Statute requires, among other things, that NPMs make annual deposits into an interest bearing

---

[2]Capitalized terms are terms defined under the MSA.

- 3 -

escrow account.[3]   The escrow funds are to be used to pay any
judgment or settlement of claims brought against the NPMs by the
States.   Some states have enacted additional legislation commonly
known as Complimentary Statutes in order to provide for the
enforcement of the Qualifying Statute against NPMs.[4]

The amount that NPMs are required to deposit into their escrow
accounts is established under the Qualifying Statute and is based
upon the NPM's sales in the year preceding the date in which the
payment is due.   The amount that NPMs are required to deposit is
supposed to be roughly equivalent to the amount that would be owed
as MSA payments and operates to neutralize the competitive advantage
NPMs otherwise would have over PMs if the PMs were the only firms
making payments to the States.   The funds deposited by NPMs must be
held in the escrow account for twenty-five years so that if States
successfully sue the NPMs on causes of action related to tobacco
products, they may collect their judgments from the escrow accounts.
At the end of twenty-five years, any remaining funds are returned
to the NPM.   The NPMs are entitled to receive the interest from the
funds while the funds remain in the escrow account.

Under the Complimentary Statutes, NPMs must file a
certification every year with each of the states in which they sell

_____

[3]North Carolina Gen. Stat. §§ 66-290 through 291 is an example
of a Qualifying Statute.

[4]North Carolina Gen. Stat. §§ 66-292 through 294.1 is an
example of a Complimentary Statute.

- 4 -

cigarettes, in which the NPMs list their brands of cigarettes and certify that they are maintaining the required escrow account and that they have placed the full amount of the required escrow deposits for the preceding year into the escrow account.

Most of the States publish a directory of certified tobacco manufacturers. These directories list both the companies and the brands that the States determine to be compliant with either the terms of the MSA Contract, or the provisions of the Qualifying Statute. The directories are published on websites maintained by the States. If an entity is not listed in the directory issued by a State, then under the Complimentary Statutes, wholesalers or distributors are prohibited from selling products of that entity in those states. The removal of an entity from the directories is referred to as delisting. Delisting occurs when a party is no longer qualified to have its cigarettes sold in a State and is removed from the State's directory.

In most States, PMs must certify their compliance with the provisions of the MSA on an annual basis. The process is more involved for NPMs, who must report in more detail (quarterly in some States and annually in most) the amounts paid into escrow for each brand sold in each state. Each of an NPM's brands is treated separately for compliance with the Qualifying Statutes. If a PM is compliant with the terms of the MSA, or an NPM is compliant with the Qualifying Statute, then the company and all of its brands should

- 5 -

be listed on the States' directories.  If a company is non-complaint under either the MSA (as to PMs) or the Qualifying Statutes (as to NPMs), the company's name and its brands may be delisted and removed from the directories.  As a practical matter, delisting means that a company will not be able to sell its cigarettes in the States in which it is delisted.

     2.   The Debtors

The Debtors, Renegade Holdings, Inc. ("RHI"), Alternative Brands, Inc. ("ABI"), and Renegade Tobacco Company ("RTC"), are fabricators and distributors of tobacco products consisting primarily of cigarettes and cigars.  ABI and RTC are subsidiaries of RHI.  The stock of RHI is owned by Compliant Tobacco Company, LLC ("Compliant").  The stock of Complaint is owned by Calvin A. Phelps. The Debtors' offices and production facilities are located near Mocksville, North Carolina.  The Debtors market their cigarette and cigar brands through wholesalers and retailers in twenty states and for export.  ABI also is a contract fabricator for private label brands of cigarettes and cigars which are produced for other licensed tobacco manufacturers.  The Debtors have approximately eighty employees who work full-time at the Debtors' offices and production facilities in Mocksville.  The Debtors have more sales in North Carolina than any other state.

The Debtors have not joined the MSA and thus operate as NPMs. The Debtors have established an escrow account at SunTrust Bank as

required under N.C. Gen. Stat. § 66-291 and have made deposits into the account based upon their sales in the various states in which the Debtors' brands are sold. However, when the escrow deposit required for the Debtors' 2006 sales in North Carolina came due on April 1, 2007, the Debtors were unable to make the full amount of the required deposit. As a result, the State of North Carolina delisted the Debtors' brands. The Debtors were $6,945,222.57 short of paying the amount required based upon their North Carolina sales for 2006. The Debtors were able to have their brands relisted in North Carolina in July of 2007 by means of a settlement with the State of North Carolina under which they deposited half of the $6,945,222.57 deficit into the escrow account at the time of settlement and agreed to deposit the other half within thirty days after being relisted. The Debtors also agreed to pay a penalty of $223,563.91. The Debtors made these payments in accordance with the settlement agreement and were able to resume sales in North Carolina.

The 2007 settlement agreement also required that the Debtors begin making their North Carolina escrow deposits on a quarterly basis beginning in January of 2008. Under the settlement, the Debtors were required to make their escrow deposit for the fourth quarter of 2007 no later than January 31, 2008; to make any remaining deposit required for 2007 sales no later than April 15, 2008; and to make their deposit for sales for the first quarter of

2008 no later than April 30, 2008, and to continue payments on a quarterly basis thereafter.

The Debtors were able to make the payment in January of 2008, for sales during the fourth quarter of 2007. When it appeared that the Debtors would not be able to make the deposit required on April 15, 2008, for the first three quarters of 2007, the Debtors sought and obtained a revision of the settlement in March of 2008. At that time, the unpaid deposit required for sales during the first three quarters of 2007 was $4,642,144.19. Under the revised settlement, the $4,642,144.19 was to be repaid by thirty-six monthly payments, consisting of $50,000 per month for the first twelve months, $100,000 per month for the next twelve months and $236,845.35 per month for the final twelve months. For the remainder of 2008, the Debtors made the required monthly deposits for the sales in North Carolina and the other states in which they were authorized to distribute their brands. However, when it became apparent that the Debtors would not be able to make the deposits required by the end of January of 2009 for sales made during the fourth quarter of 2008 and the deposits required under the revised settlement, the Debtors filed their petitions for relief under chapter 11 of the Bankruptcy Code on January 28, 2009. At that time, the Debtors had not been delisted by any state in which the Debtors were authorized to distribute their brands and there was more than $30,000,000 on deposit in the statutory escrow account at

SunTrust Bank.

### 3.  The Escrow Claims

Although forty-six states are parties to the MSA, only thirteen states are making claims related to the Debtors' failure to make required escrow payments.  These states assert claims for the pre-petition amounts that should have been paid into the escrow account based upon the pre-petition sales of the Debtors' tobacco products that took place in the respective states.  Two of the states also assert penalty claims.  The Trustee has consented to an order establishing that the unpaid pre-petition escrow obligations total $12,490,870, and acknowledges that these pre-petition escrow obligations must be paid in full if the Debtors are to continue in business.  The penalty claims consist of a penalty claim by the State of Missouri, which the parties have agreed should be allowed in the amount of $1,000,000, and a penalty claim by the State of Tennessee, which the parties have agreed should be allowed in the amount of $3,377,033.

### 4.  The Disputed FET Expense

The Alcohol and Tobacco Tax and Trade Bureau of the United States ("TTB") claims that the Debtors owe additional tax in excess of $4,506,481 with respect to the Debtor's post-petition sale of large cigars.  This claim is disputed and depends upon whether the tobacco buyout assessments paid by the Debtors should be included in the gross sales price of the cigars for purposes of computing the

federal excise tax due on the sales of large cigars. Since the claim involves post-petition sales, the claim, to the extent allowed, would constitute a priority administrative expense under section 507(a)(2) of the Bankruptcy Code. The Plan includes a proposed settlement which establishes the amount of the claim at $4,506,481 and provides for a consensual payment schedule.

5.   Other Creditors of the Debtors

The other creditors in this case include priority tax creditors, secured creditors, and unsecured creditors. The priority tax claims total approximately $2,859,605 and consist of (I) federal excise tax of $627,789, (ii) state excise tax of $209,375, (iii) California Board of Equalization tax of $54,800, and (iv) tobacco buyout obligations totaling $1,967,641. The principal secured creditor is Bank of the Carolinas which is owed approximately $1,116,401. This indebtedness is secured by a lien on the Debtors' assets, including accounts receivable, inventory, furniture, equipment, fixtures, general intangibles, fifty-one percent of the equity interests, and the interest income payable to the Debtors from the NPM escrow account. The other secured creditor is United Silicone Company which is owed approximately $8,000 which is secured by equipment utilized by the Debtors. The other non-priority, unsecured claims in this case, exclusive of guaranty claims, include $1,014,164 of claims held primarily by trade creditors and a MSA claim filed by the Settling States in the amount

of $5,222,071.  This claim arises out of an earlier chapter 11 case that was filed by a related company known as Cutting Edge Enterprises, Inc.[5], and is disputed by the Trustee.  The only remaining guaranty claim is held by Carolina Bank and has been allowed in the amount of $950,000.

      6.  History of the Proceedings

The Debtors previously filed an Amended Joint Plan of Reorganization dated October 1, 2009 (the "Prior Plan").  The States objected to and voted against the Prior Plan.  All other creditors voted to accept the Prior Plan.  Following an evidentiary hearing, the States' objections were overruled and the Prior Plan was confirmed by this court on April 23, 2009.  In addition to filing an appeal, the States also filed a motion to reconsider the order confirming the Prior Plan.  The States sought reconsideration based on new information that Calvin Phelps and the Debtors were the subject of a criminal investigation by the U.S. Attorney for the Northern District of Mississippi for tobacco-related crimes, which had not been disclosed before confirmation of the Prior Plan.  The court determined that the existence of the ongoing criminal investigation was material information that should have been disclosed to creditors before they considered and voted to accept or reject the Prior Plan, and vacated the order confirming the Prior Plan.  In response to a subsequent request filed by the Debtors for

_____

    [5]Case No. 07-50585, filed on April 16, 2007.

the appointment of a chief restructuring officer or trustee, the court appointed Peter L. Tourtellot as Chapter 11 Trustee for the Debtors.  The Trustee first attempted to sell the Debtors' business as a going concern, but the proposed sale was not approved as a result of objections filed with the court and concerns expressed at the hearing to consider the proposed sale.  The Trustee thereafter filed a proposed plan of reorganization which was circulated to creditors but was not scheduled for a final confirmation hearing due to certain issues that arose regarding the feasibility of the proposed plan.  The Plan now before the court amends and restates the Trustee's First Amended Joint Plan of Reorganization dated July 20, 2012 (Docket #1291), as previously modified August 10, 2012 (Docket #1310), and October 4, 2012 (Docket #1398), so as to consolidate such prior filings into one document, and makes additional modifications thereto.

       7.  Summary of the Plan

The Plan contemplates that the Debtors will continue in business following confirmation. Under the Plan, all of the assets in the estate vest in the Reorganized Debtors on the Effective Date of the Plan except for the Debtors' causes of action.  Also, on the Effective Date, the Reorganized Debtors assume the leases for the premises where their office and plant are located, enter into a new lease for the machinery and equipment they were utilizing pre-confirmation, and continue to fabricate and market tobacco products

as they have in the past.

Immediately following confirmation of the Plan, RHI is to enter into the Liquidating Trust Agreement which is intended to create a liquidating trust that will qualify as a grantor trust as that term is defined in the Internal Revenue Code.  The existing equity interests in the Debtors are to be terminated as of the Effective Date[6] of the Plan, and New Equity Interests in ABI and RTC are to be issued to RHI.  The New Equity Interests in RHI are to be issued and vested in the Liquidating Trust.  All causes of action formerly held by the Debtors also are to vest in the Liquidating Trust as of the Effective Date.  Under the Plan, the Liquidating Trust is to receive monthly payments from the Debtors, liquidate the Debtors' causes of action, and sell or otherwise liquidate the New Equity Interests in RHI, and distribute the resulting proceeds to the creditors who are the beneficiaries of the Liquidating Trust.  The payments from the Debtors are to commence twelve months after the Effective Date and continue on a monthly basis for the next thirty-six months.   The Liquidating Trust has forty-eight months after the Effective Date within which to sell the New Equity Interests in RHI.

        8.   Classification and Treatment
            of Claims under the Plan

---

[6]The Plan defines the Effective Date as the "first day of the month next following the Confirmation Date, unless the Confirmation Order is then subject to a stay." The Confirmation Date is defined as the "date on which the Clerk enters on the Court's docket the Confirmation Order confirming the Plan."

The Plan classifies the claims of creditors and equity security into the following nine classes:

Class 1 consists of the secured claim of Bank of the Carolinas ("BofC"). BofC is owed the sum of approximately $1,116,401 on a term loan. Under the Plan, the outstanding balance of the term loan will bear interest at an annual rate of 6.25 percent, and shall be paid in equal monthly installments of principal and interest in the amount of $45,805 until paid in full. At the Trustee's election, BofC's reasonable attorneys' fees and expenses may be added to the principal balance of the term loan, in which event monthly payments will continue and the maturity date will be automatically extended.

Class 2 consists of the secured claim of United Silicone. Under the Plan, United Silicone retains it lien on the stamping machine that secures its claim and will be repaid in full with interest at 6.5 percent by monthly installments of $1,774 that commence thirty days after the Effective Date.

Class 3 consists of Convenience Claims which are defined as unsecured claims that are allowed in an amount equal to or less than $1,000. Under the Plan, Convenience Claims are to be paid in an amount equal to seventy-five percent of such claims within ninety days after the Effective Date, in full satisfaction of such claims.

Class 4 consists of the State Escrow Claims which are defined as claims for outstanding State Escrow Obligations due from ABI and incurred prior to the petition date. State Escrow Obligations

consists of obligations which were required to be made by the Debtors to a Qualified Escrow Fund under the applicable Qualifying Statute.  These claims total $12,490,870 and are to be paid in full within forty-eight months after the Effective Date by distributions from the Liquidating Trust.

Classes 5 through 7 are comprised of other types of unsecured claims.  Class 7 consists of the unsecured claim of Michael Mebane, Class 6 consists of Guaranty Claims, and Class 5 consists of unsecured claims other than the Convenience Claims, the claim of Michael Mebane, Guaranty Claims, and State Penalty Claims.  These claims are to receive distributions from the Liquidating Trust from any funds that are left in the Liquidating Trust after the $4,506,481 Disputed FET Expense and the State Escrow Funds have been paid in full from the Liquidating Trust.  The Plan provides for a minimum distribution of $2,000,000 to this class, to be paid on a pro rata basis, with distributions to be made pari passu among such classes.

Class 8 consists of State Penalty Claims which are defined as claims by an MSA State for penalties under a Qualifying Statute. These claims are to receive distributions from the Liquidating Trust from any funds that are left in the Liquidating Trust after the claims in Classes 5 though 7 have been paid in full from the Liquidating Trust.

Class 9 consists of the old equity interests in RHI.  This

class receives no distribution unless and until all allowed claims have been paid in full.

9.   Means for Performance of the Plan

The payments to be made under the Plan are divided between the Debtors and the Liquidating Trust.  The Plan payments to be made by the Debtors include administrative expense claims (excluding the Disputed FET Expense, except for an initial payment of $250,000), Allowed Priority Tax Claims, Allowed Secured Claims, and Allowed Convenience Claims.  Additionally, until such time as the New Equity Interests have been sold by the Liquidating Trust, the Debtors are to make monthly payments to the Liquidating Trust.  These payments commence twelve months after the Effective Date at the rate of (i) $50,000 per month for months thirteen through twenty-four, then (ii) $75,000 per month for months twenty-five through thirty-six, and then (iii) $100,000 per month for months thirty-seven through forty-eight.  The funds necessary to make these payments are to be derived from the Debtors' cash on hand on the Effective Date and from the cash flow generated by the continued operation of the Debtors' business after the Effective Date and income derived from the State Escrow Fund.

All other payments called for under the Plan are to be made from the Liquidating Trust.  The funds necessary to make such payments are to be derived by any recoveries by the Liquidating Trust on causes of action, the monthly payments received from the

Debtors, and from proceeds realized from a sale of the New Equity Interests.

10.  Summary of Voting

The only claimants voting against the Plan were the States who filed negative votes in Classes 4, 5, and 8.  As a result of the States' ballots, the Plan was rejected by those classes.  The Plan was accepted by all other classes except for Class 9 which was deemed to have rejected the Plan as a result of no ballot having been filed.

11.  Objections of the States

The principal objections by the States to confirmation of the Plan are as follows:

(a)  The Plan fails to provide adequate means for its implementation in violation of section 1123(a)(5);

(b)  The Plan fails to comply with related provisions of sections 1123(a)(6) and 1123(a)(7);

(c)  The Plan is not proposed in good faith or by lawful means as required by section 1129(a)(3);

(d)  The Plan fails to adequately disclose costs and expenses, and therefore fails to comply with section 1129(a)(4);

(e)  The Plan fails to comply with section 1129(a)(5)(A)(ii) because it creates an incurable conflict of interest;

(f)  The Plan fails to comply with the Best Interests of Creditors Test set

- 17 -

forth in section 1129(a)(7);

(g)   The Plan is not feasible and, thus, cannot satisfy section 1129(a)(11);

(h)   The Plan fails to comply with section 1129(b)(1) and section 1123(a)(4) because it unfairly discriminates in the classification and treatment of dissenting classes;

(I)   The Plan is not fair and equitable to dissenting classes in violation of section 1129(b)(2)(B);

## DISCUSSION

Feasibility under section 1129(a)(11) has been described as a dispositive hurdle which, if not surmounted, obviates the need for consideration of the other requirements under section 1129(a). In re Olde Prairie Block Owner, LLC, 467 B.R. 165, 169 (Bankr. N.D. Ill. 2012). The court, therefore, will begin with consideration of whether the Plan complies with section 1129(a)(11).

Section 1129(a)(11) of the Bankruptcy Code requires as a precondition to confirmation that a court determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." This section imposes what is commonly referred to as a feasibility requirement. See 7 Collier on Bankruptcy ¶ 1129.02[11] (16th rev. ed. 2013). The purpose of this feasibility requirement is to prevent confirmation of unrealistic plans which promise creditors

and equity security holders more than the debtor can likely attain after confirmation.  In re Pizza of Haw., Inc., 761 F.2d 1374, 1382 (9th Cir. 1985).  A bankruptcy court has an obligation to carefully review a plan to determine whether it offers a reasonable prospect of success and is workable.  See Travelers Ins. Co. v. Pikes Peak Water Co. (In re Pikes Peak Water Co.), 779 F.2d 1456, 1460 (10th Cir. 1985); In re Monnier Bros., 755 F.2d 1336, 1341 (8th Cir. 1985).  The factors that may be considered in making this determination include the earning power of the business, economic conditions, the ability of the debtor's management, and "any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan."  7 Collier on Bankruptcy ¶ 1129.02[11] (16th rev. ed. 2013). Success need not be guaranteed—the possibility that a plan may fail is not fatal—but a plan must be supported by adequate evidence that the plan offers a reasonable assurance of success.  Kane v. Johns-Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988); In re Prussia Assocs., 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005).  The debtor has the burden of demonstrating that a plan is feasible. E.g., Lisanti v. Lubetkin (In re Lisanti Foods, Inc.), 329 B.R. 491, 496 (D.N.J. 2005) ("[T]he burden is on the plan proponents to prove that all the applicable provisions of 11 U.S.C. § 1129 have been satisfied."); In re Deep River Warehouse, Inc., No. 04-52749, 2005 Bankr. LEXIS 1793, at *5 (Bankr. M.D.N.C. Sept. 22, 2005) (same).

This requires that the plan proponent provide concrete evidence of a sufficient cash flow to fund and maintain both the business operations of the debtor and the obligations under the plan. S & P, Inc. v. Pfeifer, 189 B.R. 173, 183 (N.D. Ind. 1995).

A. Earning Power of the Debtors

In order to continue in business and also comply with the Plan, the Debtors will have to make various periodic payments throughout the four-year plan period. The Debtors also are obligated under the Plan to make certain lump sum payments shortly after confirmation of the Plan. The periodic payments related to the continuation of the Debtors' business operations include a monthly payment of some $42,000 to BofC and a monthly equipment lease payment of $90,000 to PTM Technologies, Inc ("PTM"). The Debtors also are required to make a monthly payment of $308,236 toward priority tax obligations during the first year of the Plan, and to fund monthly payments on the Disputed FET Expense of $50,000 during months thirteen through twenty-four, $75,000 during months twenty-five through thirty-six, and $100,000 during months thirty-seven through forty-eight. These payments are in addition to the Debtors' regular operating expenses, costs of goods sold, etc. The lump sum payments required upon confirmation include $324,311 to PTM, $205,055 to the State of Missouri, $50,000 to Carolina Bank, a $250,000 payment on the Disputed FET Expense, and $14,191 to Convenience Claimants, for a total of $843,557. Under the Plan, these payments and the cost of

- 20 -

maintaining the Debtors' business operations are to be made from the Debtors' cash on hand at confirmation, from funds to be generated by Debtors' business operations and from income to be derived from investment activities involving the State Escrow Fund. The Debtors' have the burden of showing that there is a reasonable likelihood that these sources will provide the funds necessary to maintain their business operations and to make the payments required under the Plan.

The evidence submitted by the Debtors includes projections of the income and cash flow which the Debtors project will be derived by the Debtors during the four years following confirmation of the Plan.[7] An important consideration in evaluating and weighing projections of future performance for purposes of determining feasibility is a debtor's actual past performance. In re Euerle Farms, Inc., 861 F.2d 1089, 1090 (8th Cir. 1988). "Because past behavior and productivity are excellent indicators of future production, courts have frequently rejected plans which are premised on highly optimistic projections of increased production." In re Crowley, 85 B.R. 76, 79 (W.D. Wis. 1988). While past performance is not the only factor to be considered in determining feasibility, a glaring discrepancy between past performance and predictions for the future is strong evidence that a debtor's projections are flawed and that the plan is not feasible. In re Inv. Co. Of the Sw., Inc.,

---

[7]Trustee's Exhibit No. 7.

341 B.R. 298, 311 (B.A.P. 10th Cir. 2006); In accord In re Trenton Ridge Investors, LLC, 461 B.R. 440 (Bankr. S.D. Ohio 2011); In re Hughes, 2007 WL 2620438 (Bankr. M.D.N.C. Sept. 11, 2006).

According to the Trustee's projections, the Debtors will be able to fund business operations, make the payments required under the Plan, and produce a positive cash balance at the end of each year of the Plan in amounts increasing from $39,431 the first year to $3,491,419 at the end of the fourth year. These projections rely and are dependent upon the Debtors achieving a sales volume of 7,871,000 cartons of tobacco products during the first year of the Plan, followed by a sales volume during years two, three, and four, respectively, of 8,028,420 cartons, 8,188,988 cartons and 8,352,768 cartons. These projected sales volumes represent a very large increase over the Debtors' actual sales volumes in 2011 and 2012, when the Debtors' actual sales were 5,914,200 cartons in 2011 and 5,324,540 cartons in 2012. As these figures reflect, the projected sales volume of 7,871,000 cartons in year one of the Plan represents a forty-eight percent increase over the volume of sales achieved by the Debtors in the preceding year. Moreover, the Trustee projects that the forty-eight percent increase will be achieved in a single year. Contrariwise, the trend of the Debtors' actual sales volumes during the four years preceding the confirmation hearing has been distinctly downward rather than upward as projected for the first year of the Plan. The volume of sales in 2012 was ten percent lower

than the sales volume in 2011.  The sales volume in 2011 was twenty-two percent lower than the sales volume in 2010.  While the figure for the sales volume in 2010 was some three percent higher than the figure for 2009, the figure for 2010 involved twelve months of operation, while the 2009 figure involved only eleven months of operation.  It is, therefore, apparent that the past performance of the Debtors' business and the actual results that were achieved by such operations provide little, if any, support for the projected forty-eight percent increase in sales during the first year of the Plan.

Nor does the profitability of the Debtors' business operations during the years immediately preceding the confirmation hearing support the Debtors' projections regarding the profitability of the business or the ability of the Debtors to produce or maintain a cash reserve from their operations following confirmation.  The Debtors project income from business operations of $704,251 for the first year of the Plan, $838,148 for the second year, $1,464,640 for the third year, and $2,124,715 for the fourth year.  The Debtors' actual income from business operations from 2009 through 2012 was much less than these figures, involving losses of $774,921 in 2009, $1,432,513 in 2010, $1,398,760 in 2011, and $2,964,676 in 2012.  These losses would have been even greater had the Debtors paid the $4,506,481 of delinquent taxes that comprise the Disputed FET Expense.  The Debtors were able to continue operations despite these large

operational losses only through the use of substantial income that was generated through investment activity involving the State Escrow Fund and the consumption of their available cash. As a result, the Debtors' available cash diminished significantly from 2009 through 2012, rather than increasing as Debtors have forecasted in their projections.

The foregoing comparisons between the projected sales volumes and projected business income, and the Debtors' actual sales volumes and business income demonstrates that there is a glaring discrepancy between the Debtors' past performance and what the Trustee has projected for the future. In order for the Debtors to make the payments required under the Plan during the first year following confirmation, the Debtors must achieve a forty-eight percent increase in sales in the space of a single year. Apart from this daunting challenge, it appears that the Debtors also are faced with an increasing deficit in the cash required to meet their projections for the first year of the Plan. According to the Debtors' income and cash flow projections, the Debtors will require available cash of $2,627,338 in order to meet the obligations that must be paid during the first year of the Plan. The Debtors project that they will have beginning cash of $3,000,000 to meet this cash requirement. The Debtors' monthly reports for February and March of 2013, however, paint a very different picture. According to the Debtors' monthly reports, the Debtors' available cash at the end of

February was $2,279,107 and at the end of March was only $1,703,161. Thus, if the Plan were confirmed, these figures suggest that the Debtors would begin with a $924,177 deficit with respect to their projections for the first year of the Plan.

Considered in its entirety, the evidence offered in support of the Plan falls short of showing that there is a reasonable likelihood that the Debtors would be able to generate the funds required in order to continue to operate their tobacco business and make the payments required under the Plan.   In addition to the factors discussed above, the court also has considered the ability of the Debtors' management and the economic conditions faced by the Debtors.   Since the commencement of these cases, the Debtors have employed and had in place experienced and very capable management who have done an excellent job of managing the Debtors under very difficult circumstances. The economic conditions facing the Debtors, however, do not weigh in their favor.   The Debtors operate in a challenging and difficult business environment.   Their products are subject to substantial federal and state excise taxes, as well as an assessment related to the federal tobacco buyout program which they must pay.   As NPMs, the Debtors also are subject to state statutes that require escrow payments based upon the Debtors' sales. Cigarette manufacturers are now subject to regulation by the United States Food and Drug Administration which has imposed new regulations, including regulations that limit the introduction of

new products by cigarette manufacturers. The specter of additional taxes and new regulations is a constant for the cigarette industry. New taxes already have forced the Debtors to alter their product mix and business plan once and could do so again if there is another tax increase like the last one. Increases in the taxes on tobacco products necessitate increases in the price of tobacco products which, in turn, tends to reduce sales. Cigarette manufacturers are faced with a national anti-smoking campaign which is well funded and which also has contributed to a reduction in the consumption of tobacco products. This is not to say that economic success is not possible in the tobacco industry, but it must be acknowledged that companies like the Debtors who are engaged in the industry are faced with challenges not present in most other industries. The Debtors face the additional burden under the Plan of having to increase sales by nearly fifty percent in a business environment in which the number of smokers is not increasing and compensating strategies such as advertising are very limited. According to the Debtors' witnesses, the poor performance of the Debtors is the result of uncertainty created by the Debtors being in bankruptcy. These witnesses believe that the unresolved chapter 11 process has increased customer concern about the Debtors being delisted, which, in turn, has made customers reluctant to purchase product in quantities they otherwise would purchase. These witnesses testified that they believe that business should improve dramatically once

- 26 -

they were out of bankruptcy.  There was, however, little detail about how such a recovery would occur or how a forty-eight percent increase could be produced in the span of a single year.  There was no evidence of firm commitments from customers for new or additional business should the Plan be confirmed, and no plausible explanation of how the Debtors could achieve the dramatic increases quickly enough to get through the first year of the Plan.

B. Liquidation of Assets upon Default

The Plan proposes that at some point following the Effective Date, whether immediately thereafter or later during the four-year term provided in the Plan, the Liquidating Trust will:

> (I)  sell the New Equity Interests to a third party and apply the sale proceeds to payment of the remaining claims to the extent provided in the Plan, or
>
> (ii) in the event of a Plan Default, liquidate the Reorganized Debtors and their respective assets in order to make distributions to creditors.

The Trustee asserts that because "the Plan already provides for liquidation in one form or another, whether through the successful sale of the New Equity Interests or a complete liquidation in the event the Plan subsequently becomes unfeasible, [it] complies with the requirements of Section 1129(a)(11)."[8]  The Trustee cites two cases, In Re Nite Lite Inns, 17 B.R. 367 (Bankr. S.D. Cal. 1982) and

-----

[8]Resp. to States Ob. To Confirmation of Plan 5.

In Re T-H New Orleans Limited Partnership, 116 F.3d 790 (5th Cir. 1997), in support of the argument that the provisions providing for the liquidation of the Debtors' assets upon a default under the Plan satisfies section 1129(a)(11). These decisions involve distinguishing facts and do not support the Trustee's argument. In both Nite Lite and T-H New Orleans the debtors proposed reorganization plans which provided that in the event of default, a particular asset would be sold to cover the creditor's secured claim. Rather than finding that such contemplated liquidation provisions made the plans feasible as a matter of law, the court in each case examined the facts supporting the plans and found them to be feasible because the liquidation alternative effectively guaranteed payment of the claims provided for in the plan. In Nite Lite, for example, it was undisputed that the value which would be realized upon the sale of the debtor's hotel in the event of a plan default would be greater than all the debts in the case. Similarly, in T-H New Orleans the secured creditor stood to be fully compensated in the event of the liquidation scenario contemplated in the plan. A similar result was reached in the case of In the Matter of 203 North LaSalle Street Partnership, 126 F.3d 955, 962 (7th Cir. 1997), rev'd on other grounds, Bank of Am. Ntn'l Trust and Savings Ass'n v. 203 North LaSalle Street P'ship, 526 U.S. 434, 437, 458, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999), and In re Price Funeral Home, Inc., 2008 WL 5225845 (Bankr. E.D.N.C. Dec. 12, 2008). In

both of these cases, unlike the present case, the assets that were
to be liquidated upon a default were sufficient to pay the claims
at issue.

The decisions in which the property to be liquidated upon a
plan default will not pay creditors the full amount of their claims
reach a different conclusion regarding feasibility.  For example,
in the case of In re Merrimack Valley Oil Co., Inc., 32 B.R. 485
(Bankr. D. Mass. 1983), the plan proposed to make payments from the
income of three debtor companies and if they fell short on any
payment, to liquidate the amount of assets necessary to make any
payment.  The debtor had sustained significant losses during the
pendency of the case and the court was not convinced that the
projections included in the plan demonstrated feasibility.  The
court also was not convinced of the adequacy of the debtor's
proposal to sell assets to satisfy any revenue shortage.  The court
distinguished the case from Nite Lite Inns because the value of the
assets was far less than the deferred payments promised over the
duration of the plan.  The debtor's "true" liquidation value was
somewhere between $136,000 and $336,000, while the plan payment's
requirements were over $1,100,000.  The success of the liquidation
alternative was unpredictable because the amount of the shortfall
on each deferred payment was unknown, and neither party's
projections reliably estimated the shortfall.  The evidence further
showed that the assets the debtors intended to liquidate were not

- 29 -

readily saleable–the debtor had been attempting to sell the assets
for more than a year without success.  Similarly, in the case of In
re Las Vegas Monorail Co., 462 B.R. 795 (Bankr. D. Nev. 2011), the
court concluded that the debtor's plan to restructure a monorail
project was visionary in light of projected shortfalls, uncertain
refinancing, and unconvincing predictions of future grant money.
The debtor argued that the plan was nevertheless feasible because
it contained a liquidation provision.  In rejecting this argument,
the court concluded that the debtor's argument effectively would
read feasibility out of the feasibility requirement: "[The Debtor]
essentially asks the court to allow it to float along until it
sinks, suggesting that when it ultimately sinks, the court need not
concern itself with how creditors will make it onto the life raft—or
even whether there will be a life raft available."  Monorail, 462
B.R. at 803.  The court echoed this sentiment in the case of In re
Investment Co. of The Southwest, Inc., 341 B.R. 298 (B.A.P. 10th
2006), in which the debtor argued that even if the plan was not
otherwise feasible, a "drop-dead" provision allowing secured
creditors to foreclose in the event of a default rendered the plan
feasible.  Disagreeing, the court explained,

> [T]he mere existence of a drop-dead clause does
> not prove feasibility.  It only provides a
> method for a creditor to extricate itself more
> quickly, and force a quicker liquidation, if it
> turns out that the court guessed wrong in
> finding the plan feasible.  In other words,
> inclusion of the drop-dead clause may result in
> a creditor not losing as much—because it can

> more quickly liquidate the remaining collateral
> upon default—but it does not, on the front end,
> support a finding that a plan, itself, is not
> likely to be followed by the liquidation of, or
> the need for further financial reorganization
> by, the debtor.

Inv. Co., 341 B.R. at 317.

Relying on similar reasoning, Judge Doub denied confirmation in the case of In re Radco Properties, Inc., 402 B.R. 666 (Bankr. E.D.N.C. 2009). In Radco, the plan also included a drop dead provision: in the event that the debtor was unable to find an investor or to refinance the commercial properties, the debtor would auction the properties no later than July 1, 2009. In denying confirmation, Judge Doub ruled that a debtor is not automatically able to establish feasibility by merely including a drop dead clause in its plan; rather, the court must determine whether the provision would make the creditors whole in the event of default. The court concluded that the drop dead provision before the court did not demonstrate feasibility because the debtor proposed to liquidate only the non-performing commercial properties, did not allow the creditor to retake its collateral, and requested that ten percent of auction sale proceeds be earmarked for the debtor's administrative expenses. In accord In re Danny Thomas Props. II Ltd. P'ship, 241 F.3d 959, 37 (8th Cir. 2001).

The Plan in the present case suffers from the same infirmity as existed in the cases in which confirmation was denied despite the

presence of a "liquidation upon default" provision. The Plan in this case does not purport to be a plan of liquidation under which the function of the plan is the orderly liquidation of the Debtors' assets. The Plan instead contemplates a restructuring of the Debtor finances, the issuance of new equity and the continuing operations of the Debtors until the new equity can be sold. The presence of a plan provision under which liquidation is to occur upon a plan default does not _ipso_ _facto_ make such a plan feasible if it otherwise is unfeasible. Under the Trustee's Plan, a liquidation occurs only upon a default with respect to reorganization provisions of the Plan. It is apparent from the evidence that such a liquidation would fall far short of producing the funds required to pay the claims provided for in the Plan. Under such circumstances, providing for the liquidation of the Debtors assets upon a plan default does not satisfy section 1129(a)(11). To conclude otherwise, would effectively read feasibility and the requirement for likelihood of success out of section 1129(a)(11) in reorganization cases. All that any debtor would be required to do in order to satisfy section 1129(a)(11) would be to insert a provision providing that the debtor's assets would be liquidated upon a default in the reorganization provisions of a plan. Congress could not have intended such a result and the court is unwilling to read the statute in such a manner in this case.

C. Prospective Sale of New Equity Interests

- 32 -

The prospective sale of the New Equity Interests contemplated under the Plan likewise does not provide a basis for finding feasibility.  The Plan contemplates that at some point during the four years following confirmation, the Trustee will sell the New Equity Interests and use the proceeds to pay the amounts then required to be distributed to creditors under the Plan.  The Plan does not require any payments to unsecured creditors until the sale of the New Equity Interests which could occur as late as four years after confirmation.

Merely providing in a plan that an asset will be sold in the future and that creditors will be paid at that time from the proceeds realized from the sale will not support a finding of feasibility.  Absent evidence regarding matters such as the value and marketability of the asset that is sufficient to provide adequate assurance that the projected sale of the asset will occur and will produce the required proceeds, the plan is speculative and does not satisfy section 1129(a)(11).  See In re South Canaan Cellular Invs., Inc., 427 B.R. 44, 63 (Bankr. E.D. Pa. 2010); In re Kings Gate Apartments, Ltd., 206 B.R. 233, 235 (Bankr. W.D. Okla. 1996); In re Calvanese, 169 B.R. 104, 107-08 (Bankr. E.D. Pa. 1994).  As explained in Calvanese, a plan is particularly problematic where, as in the present case, creditors do not receive any distribution until the future sale of the asset occurs:

> [B]ankruptcy courts have refused to confirm
> plans which keep creditors "on hold" without

> receipt of payments while the debtor seeks to
> sell real estate which it has been unable to
> sell in years past. Generally, these courts
> point out that such plans are nothing more than
> speculative ventures which place all the risk
> on the respective creditors, and, therefore are
> not . . . feasible.

169 B.R. 104, 107-108. <u>See also</u> <u>In re Inv. Co. of The Sw., Inc.</u>,
341 B.R. at 315 ("there must be some evidence that Debtor's overall
plan to sell part or all of its inventory is reasonable, based on
either past performance or identifiable factors indicating the
likelihood of probable future performance"); <u>In re Leominster</u>
<u>Materials Corp.</u>, 2005 WL 3310296 (Bankr. D. Mass. Nov. 17, 2005);
<u>In re Hoffman</u>, 52 B.R. 212, 215 (Bankr. D.N.D. 1985).

In the present case, the prospective sale of the New Equity
Interests is shrouded by uncertainty. In the Debtor's application
for a private letter ruling from the Internal Revenue Service, the
New Equity Interests is characterized as having no value when
issued. This is consistent with the poor performance of the
Debtors' business and the resulting operational losses incurred by
the Debtors leading up to the confirmation hearing. In order to
provide the funds required to pay the obligations under the Plan,
the new equity must be sold for at least $24,036,134 if sold
immediately following confirmation. If sold at twenty-four months,
the selling price for the new equity would have to be at least
$18,883,165 in order to satisfy the Plan obligations remaining at
that time. If sold at forty-eight months, the selling price for the

new equity would have to be at least $16,783,165 in order to satisfy the obligations remaining at that time.[9]   The reduced amounts required at twenty-four and forty-eight months assume that the Debtors will be able to continue to operate as projected for twenty-four and forty-eight months, respectively, and make all of the payments required under the Plan, which as previously discussed, is uncertain and speculative.   The evidence also leaves uncertain and problematic whether the required values for the New Equity Interests will be present or whether there will be a purchaser willing to pay those prices in order to engage in the cigarette business.   In short, the Trustee's evidence, taken as a whole, is insufficient for the court to conclude that there is a reasonable likelihood that the new equity will increase in value to the extent required under the Plan or that the Trustee would be able to find a ready, willing, and able purchaser for the New Equity Interests at the required prices. Historical considerations further weigh against the likelihood of a successful sale, given the Trustee's diligent efforts over the last two years to find a purchaser and his inability to do so.

Based upon the foregoing findings and conclusions, the court has concluded that the Plan does not comply with section 1129(a)(11) of the Bankruptcy Code and therefore cannot be confirmed.   An order so providing is being entered contemporaneously with the filing of this memorandum opinion.

_____

[9]Trustee's Exhibit No. 8, Exhibit 4.

This 29th day of May, 2013.

WILLIAM L. STOCKS
United States Bankruptcy Judge

## PARTIES IN INTEREST

John A. Northen, Esq.
P.O. Box 2208
Chapel Hill, NC 27514-2208

Patricia A. Molteni, Esq.
Natl. Assoc. Of Attorney Generals
2030 M Street, NW, 8th Floor
Washington, D.C.  20036

C. Scott Meyers, Esq.
333 N. Greene Street, Suite 200
Greensboro, NC 27401

Lawrence P. Blaskopf, Esq.
U.S. Department of Justice
Ben Franklin Station
P.O. Box 227
Washington, D.C.  20044

Gill R. Geldreich, Esq.
Tennessee Attorney General's Office
P.O. Box 20207
Nashville, TN 37202

Gerald A. Jeutter, Jr., Esq.
615 Oberlin Road, Suite 102
Raleigh, NC 27605

Paul A. Fanning, Esq.
P.O. Box 8088
Greenville, NC 27835-8088

Charles M. Ivey, III. Esq.
100 S. Elm Street, Suite 500
Greensboro, NC 27401

Rebecca A. Leigh, Esq.
301 S. Greene Street, Suite 201
Greensboro, NC 27401

Alexander Terras, Esq.
Reed Smith, LLP
10 South Wacker Drive
Chicago, IL 60606-7507

Walter W. Pitt, Esq.
P.O. Box 21029
Winston Salem, NC 27120-1029

William P. Miller, Bankruptcy Administrator