UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

| | |
|---|---|
| IN RE:<br><br>Renegade Holdings, Inc.,<br>et al.,<br><br>    Debtors.<br>_____<br><br>Renegade Holdings, Inc.,<br>Alternative Brands, Inc. and<br>Renegade Tobacco Company,<br><br>    Plaintiffs,<br><br>v.<br><br>Calvin A. Phelps; Lisa<br>Yamaoka a/k/a Lisa Phelps;<br>Compliant Tobacco Company,<br>LLC; CLC Properties, LLC;<br>CLC-DBA/Calvin Phelps;<br>Chinqua-Penn Plantation, LLC;<br>Chinqua-Penn Events, LLC;<br>North West Holdings, L.L.C.;<br>Blue Ridge Airlines, LLC; Jet<br>Sales International, LLC;<br>Clear Jet International, LLC;<br>House of Windsor, LLC; and<br>Wolf Bros Management, LLC,<br><br>    Defendants. | Case No. 09-50140C-11W<br>(Consolidated for Administration)<br><br><br><br><br><br><br><br><br><br>Adversary No. 10-6053 |

## MEMORANDUM OPINION

The above-captioned case and adversary proceeding came before the court on August 13, 2013, for hearing on the Trustee's Motion to Modify and Amend Order Approving Settlement of Adversary Proceeding (the "Motion"). At the hearing, Ashley S. Rusher appeared on behalf of the Trustee and G. Gray Wilson appeared on behalf of Lisa Yamaoka. No appearance was made by or on behalf of

Calvin A. Phelps and no objection or other response to the Motion was filed by Mr. Phelps. Having considered the Motion, the briefs and the other filings submitted in support of and in opposition to the Motion and the evidence offered at the hearing, the court has concluded that the relief requested by the Trustee should be granted.

FACTS

Renegade Holdings, Inc., Renegade Tobacco Company, and Alternative Brands, Inc. (the "Debtors"), filed voluntary petitions seeking relief under Chapter 11 of the United States Bankruptcy Code on January 28, 2009. On February 12, 2009 the cases were consolidated for purposes of administration. On September 23, 2010, an adversary proceeding against Calvin Phelps and his wife, Lisa Yamaoka, among others (the "Defendants"), was commenced by the Trustee[1] challenging numerous transfers and payments that were made by the Debtors to or for the benefit of the Defendants prior to the Debtors filing for bankruptcy relief. On September 24, 2010, the Trustee moved for and obtained an order for the levy on the tangible and intangible personal property owned by the Defendants (the "Attachment Order"). Pursuant to the Attachment Order, on September 28, 2010 the Clerk of Court issued a Writ of Attachment

---

[1]Although the Examiner in these cases initially acted on behalf of the Debtors in commencing this adversary proceeding, the Trustee succeeded to position of the Examiner in the adversary proceeding following his appointment.

to the United States Marshal, which provided for the transfer of custody of any property attached by the Marshal to the Trustee. Writs of Garnishments also were issued and Writs of Garnishment were served by the Marshal on several banks, including Branch Banking and Trust Company ("BB&T") and Bank of the Carolinas ("BOC").

The writ served on BOC levied upon "any and all property" that BOC had in its possession "for the account, use, or benefit of any one or more of the [Defendants] and upon all debts owed by [BOC] to any one or more of the Defendants." BOC filed a verified answer to the Writ of Garnishment on October 15, 2010. In its answer, BOC identified five deposit accounts, one savings account, one certificate of deposit, and certain loans held by BOC secured by liens upon assets owned by the Defendants. Together, BOC held approximately $27,992.69 in these accounts. The Verified Answer did not disclose the existence of any safe deposit boxes maintained at BOC by any of the Defendants.

On March 9, 2012, the Trustee and the Phelps settled the claims alleged in the Adversary Proceeding and executed the Settlement Agreement referred to in the Motion. Prior to the settlement, Calvin Phelps and Lisa Yamaoka ("the Phelps") purportedly had disclosed their assets to the Trustee and the manner in which the settlement was structured was that the assets that would be retained by the Phelps were identified. At the time

of the settlement neither the Phelps nor BOC had disclosed the existence of any safe deposit boxes at BOC and there is no specific reference in the Settlement Agreement to safe deposit boxes. On March 12, 2012, the Trustee filed a motion entitled Motion for Order Approving Settlement of Adversary Proceeding seeking approval of the settlement between the Trustee and the Phelps.

On March 26, 2012, the Trustee received for the first time information regarding the existence of safe deposit boxes at BOC. On that date, BOC, through its counsel, sent an email to the Trustee disclosing that Calvin Phelps and Lisa Yamaoka each had a safe deposit box at BOC but also stating that there was no money in the safe deposit boxes. A hearing on the Trustee's Motion for Order Approving Settlement of Adversary Proceeding was held on April 17, 2012. Believing that there was no money in the safe deposit boxes at BOC, the Trustee sought approval of the Settlement Agreement at the hearing which was granted. An order approving the Settlement Agreement was entered on May 4, 2012, approving the Settlement Agreement and authorizing the Trustee to consummate the settlement provided for in the Settlement Agreement. One of the findings upon which this relief was granted was a finding in paragraph fourteen of the order that the Trustee had "identified all property available to satisfy any potential judgment and effectively evaluated the assets."

On April 30, 2013, approximately one year after the approval

of the settlement, BOC advised the Trustee that it had drilled the safe deposit boxes held by the Phelps and discovered $15,364 in Calvin's box and $88,400 in Yamaoka's box. This disclosure prompted the filing of the Motion now before the court on June 13, 2013.

The Trustee asserts in the Motion that, under the Settlement Agreement, he is entitled to receive the contents of the safe deposit boxes. Alternatively, the Trustee contends that if the $103,764 in the safe deposit boxes is not encompassed by the Settlement Agreement, the Settlement Agreement should be reformed, and the order approving the settlement amended, to provide that the $103,764 is included in the property allocated to the Trustee and are funds that the Trustee should receive. Yamaoka objects to the Trustee's Motion and argues that the contents of the safe deposit boxes were not included under the terms of the Settlement Agreement and that she is therefore entitled to retain the funds that were contained in her safe deposit box.

## DISCUSSION

The adversary proceeding giving rise to the Settlement Agreement asserted numerous claims involving the recovery of substantial assets and large sums of money from the Phelps and the other defendants in the proceeding. At the outset of the adversary proceeding, the Trustee obtained writs of garnishment which were utilized to levy upon the assets held by the Phelps at various

banks and other locations, including BB&T and BOC. Under the writs of garnishment that were served on BB&T and BOC, the Trustee levied upon "any and all property" in the possession of BB&T and BOC for the "account, use or benefit" of Calvin A. Phelps and Lisa Yamaoka and obtained a lien "on all tangible property" of Calvin Phelps and Lisa Yamaoka in the possession of BB&T and BOC. The claims asserted by the Trustee included claims for fraudulent conveyances, breach of fiduciary duties, constructive trust, equitable liens and unjust enrichment. In these claims, the Trustee sought to recover $8,000,000 which significantly exceeded the value of the assets held by the Defendants. The settlement that ultimately was reached was based upon the parties being able to agree upon which items of property held by the Phelps could be retained by them, with the remainder of the assets to be received by the Trustee. Following negotiations regarding the "Phelps Wish List" in which the Phelps listed the items which they wished to retain, the parties were able to agree upon which property would be retained by the Phelps and entered into the settlement giving rise to the Settlement Agreement.

The dispositive provisions of the Settlement Agreement are contained in paragraph 2 of the Agreement which provides as follows:

> 2. <u>Disposition of Attached Personal Property.</u> The Attached Personal Property shall be treated as follows:

The Settlement Agreement then provides for the division of the following categories of assets in subparagraphs (a) through (g): (a) CCP Property, (b) Vehicles, (c) Musical Instruments, (d) Gun Collection, (e) Cash in Garnished Bank Accounts, (f) Real Property and (g) Other Personal Property. In each subparagraph, the Agreement identifies which assets are to be retained by the Trustee and which are to be retained by the Phelps. The Trustee asserts that subparagraph (e) is the subparagraph applicable to the cash that was contained in the safe deposit boxes at BOC. Subparagraph (e) provides:

> Garnished Bank Accounts. The Trustee shall retain all funds in the bank account maintained at BB&T and attached pursuant to the Writ of Garnishment served on BB&T, which account has a current balance in the amount of $174,949.71 ("Tax Escrow Account"). The funds in the Tax Escrow Account shall immediately be paid over to the Trustee. The Phelps shall retain the first $25,000 in the bank accounts maintained at Bank of the Carolinas ("BOC Accounts"), which funds shall be immediately paid over to G. Gray Wilson, counsel for the Defendants. The Trustee shall retain the balance of the funds in the BOC Accounts, which funds shall immediately be paid over to the Trustee.

The Trustee points out that "BOC Accounts" is a capitalized term that is defined in the Settlement Agreement as meaning "the <u>bank accounts</u> maintained at Bank of the Carolinas and attached pursuant to the Writ of Garnishment served on Bank of the Carolinas." The Trustee argues that "bank accounts" as used in the foregoing provisions is an undefined "generic term used to describe

any number of types of accounts which may be maintained at a bank, such as accounts evidenced by an instrument, safe deposit box accounts, money market accounts, etc." According to the Trustee, the safe deposit boxes at BOC "are 'bank accounts' as that term is generally defined in commerce, and therefore are BOC Accounts as specifically defined by the Settlement Agreement." However, the Trustee offered no evidence or authority to support his assertion that "bank accounts" are generally defined in commerce as including safe deposit boxes. Nor is the court convinced by the Trustee's argument that "bank account" is an ambiguous term that should be construed as including safe deposit boxes. Under North Carolina law, when the language of a contract is clear and unambiguous on its face, the agreement is not open to judicial construction and the court cannot look beyond the terms of the contract to determine the intentions of the parties. Walton v. City of Raleigh, 467 S.E.2d 410, 411 (N.C. 1996); Schenkel & Shultz, Inc. v. Fox & Assoc., 658 S.E.2d 918, 921 (N.C. 2008). Such a contract will be interpreted as written, without resort to extrinsic evidence, by the court as a matter of law. Schenkel, 658 S.E.2d at 921; Philip Morris, 685 S.E.2d at 90. The first question in contract interpretation therefore is to determine whether the agreement is ambiguous. Whether or not the language of a contract is ambiguous is a question for the court to determine. Stovall v. Stovall, 698 S.E.2d 680, 648(N.C. Ct. App. 2010). A contract is ambiguous if

either the meaning of words or the effect of provisions is "uncertain or capable of several reasonable interpretations". <u>Id.</u> In making this determination, "words are to be given their usual and ordinary meaning." <u>Myers v. Myers</u>, 714 S.E.2d 194, 198 (N.C. Ct. App. 2011) (citations omitted). An ambiguity exists where the "language of the contract is fairly and reasonably susceptible to either of the constructions asserted by the parties." <u>Id.</u> A term is not ambiguous, however, simply because the parties do not agree on its proper construction; any ambiguity must come from the language used in the agreement rather than from one party's subjective perception of its terms. <u>See</u> <u>Vestal v. Vestal</u>, 271 S.E.2d 306, 309-10 (N.C. Ct. App. 1980). Where an agreement defines a term, that definition is to be used; however, if no definition is given, "non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended." <u>Gatson County Dyeing Machine Co. v. Northfield Ins. Co.</u>, 524 S.E.2d 558, 563 (N.C. 2000).

While there appears to be no case in North Carolina bearing on the precise issue of whether "bank account" should be construed as including safe deposit boxes, the court is satisfied that the ordinary meaning of a "bank account" does not include a safe deposit box. <u>Black's Law Dictionary</u> defines a bank account as: "a deposit or credit account with a bank, such as a demand, time, savings, or passbook account." <u>Black's Law Dictionary</u>, p. 144 (8th

ed. 2004). N.C. Gen. Stat. § 25-4-104(a)(1) provides that "'Account' means any deposit or credit account with a bank, including a demand, time, savings, passbook, share draft, or like account, other than an account evidenced by a certificate of deposit." It would be inconsistent with these definitions and an unreasonable stretch of the term "bank account" to construe the term as including a safe deposit box. Bank accounts are comprised of monetary deposits and serve to create a debtor-creditor relationship between the depositor and the bank. The amount of the deposits are known by both parties and are recorded by the bank at the time of each deposit. Safe deposit boxes, on the other hand, are based on rental contracts under which the customer rents or leases a receptacle made available by the bank for use without any record required as to the contents that may be placed in the box by the customer. The use of the safe deposit box does not create a debtor-creditor relationship and removal of property from the box does not involve the bank honoring any type of check or draft issued by the customer. The distinction between a bank account and a safe deposit box was succinctly stated by the court in In re Estate of Schmidt, 119 A.2d 786 (N.J. Super. Ct. Prob. Div. 1956). In that case, a testator bequeathed to his wife "the remainder of any cash in any bank account. . . ." In addition to the debtor's bank accounts, the Schmidt executor discovered that the testator had a safe deposit box containing $24,000 in cash. Id. at 786.

The issue before the court was whether the funds in the safe deposit box were to be distributed under the "bank account" provision or should pass by intestacy. In ruling that the funds in the safe deposit box were not cash in a "bank account," the court stated:

> There is such a vast distinction between cash which is maintained in a bank account and cash which is kept in a safe deposit box that it would require a forced and unnatural interpretation to ascribe the same meaning to each. A bank account creates a creditor-debtor relationship, and the amount on deposit is specifically recorded and receipted for by the banking institution. A safe deposit box on the other hand creates at most a bailment relationship between the parties and the funds contained therein at all times are within the sole knowledge and control of the person renting the box. The fact that the decedent kept a substantial amount on the record, as it were, in bank accounts, and a substantial amount off the record, as it were, indicates that the testator recognized the distinction between them as well as the peculiar advantages of each type of fund keeping.

Id. at 786. See also Lavin v. Banks, 406 N.E.2d 876, 877 (Ill. 1950)(discussing the difference between a bank account and a safe deposit box and concluding that funds in a safe deposit box are not on deposit in a bank account).

In summary, as used in the Settlement Agreement, the term "bank accounts" is a non-technical, undefined term. When the words comprising the term are given their ordinary meaning, the term does not include a safe deposit box. As such, the term does not give

rise to either a patent or latent ambiguity. The result is that subparagraph 2(e), as drafted, does not encompass the funds discovered in the Phelps' safe deposit boxes.

The question that remains is whether the Settlement Agreement should be reformed to provide for the disposition of the funds in the safe deposit boxes. According to the Trustee, the parties intended for their settlement to apply to such funds and that the failure of the Settlement Agreement to refer to the funds was the result of both parties being mistaken as to whether there were any funds in the safe deposit boxes. Because that was the intent and agreement of the parties, and because the failure of the Settlement Agreement to specifically address the money in the safe deposit boxes was the result of both parties mistakenly believing that there was no money in the safe deposit boxes, the court concludes that the reformation relief sought by the Trustee should be granted.

The parties do not dispute that the applicable law in determining whether reformation is available in this proceeding is the law of North Carolina. Under North Carolina law, "[r]eformation is a well-established equitable remedy used to reframe written instruments where, through mutual mistake or the unilateral mistake of one party induced by the fraud of the other, the written instrument fails to embody the parties' actual, original agreement." Metropolitan Prop. and Cas. Ins. Co. v.

Dillard, 487 S.E.2d 157, 159 (N.C. Ct. App. 1997); see also Lawyers Title Ins. Co. v. Golf Links Dev. Corp., 87 F.Supp.2d 505, 512 (W.D.N.C. 1999)(applying North Carolina law); Branch Banking and Trust Co. v. Chicago Title Ins. Co., 714 S.E.2d 514, 517-8 (N.C. Ct. App. 2011); Drake v. Nance, 673 S.E.2d 411 (N.C. Ct. App. 2009). "A mutual mistake is one common to both parties to a contract . . . wherein each labors under the same misconception respecting a material fact, the terms of the agreement or the provisions of the written instrument designed to embody such agreement." Branch Banking and Trust Co. v. Chicago Title Ins. Co., 714 S.E.2d at 518 (quoting from Metropolitan Prop. and Cas. Ins. Co. v. Dillard, 487 S.E.2d at 159). When a party seeks to reform a contract, the burden of proof lies with the moving party. Smith v. First Choice Servs., 580 S.E.2d 743, 748 (N.C. Ct. App. 2003). Because there is a presumption in favor of the correctness of an instrument as written and executed, the rule in North Carolina is that the party seeking reformation must establish his entitlement to the relief by clear, strong and convincing evidence. E.g., Lawyers Title Ins. Co. v. Golf Links Dev. Corp., 87 F.Supp.2d at 512; Textile Ins. Co. v. Lambeth, 108 S.E.2d 36 (N.C. 1958); Drake v. Hance, 673 S.E.2d at 592. The parol evidence rule does not preclude the admission of evidence offered to prove the existence of a mutual mistake of fact in a reformation action. Top Line Constr. Co. v. J.W. Cook & Sons, Inc., 455 S.E.2d 463, 466

(N.C. Ct. App. 1995)("Parol evidence is generally admissible to show grounds for granting a [reformation] even if the written agreement includes a merger clause."); Nelson v. Harris, 232 S.E.2d 298, 300 (N.C. Ct. App. 1977)("In an action to reform a deed for mutual mistake, parol evidence is admissible to prove that due to the mutual mistake of the parties, the deed does not express the actual intent of the parties."). See also Brandis & Brown on North Carolina Evidence § 264 (5th ed. 1998)(The "parol evidence rule presupposes the existence of a legally effective written instrument. It does not in any way preclude a showing of facts which would render the writing inoperative or unenforceable. Thus, it may be proved that . . . there was such mistake as to prevent the formation of a contract or make it subject to reformation.").

In their settlement, the parties agreed to deal with all of the assets that had been attached by the Trustee which included the money in the safe deposit boxes at BOC. This is shown by the terms of the written Settlement Agreement as well as a preponderance of the evidence at the hearing. The Settlement Agreement provides in paragraph two for "the Attached Personal Property" to be divided between the Trustee and the Phelps. On page two of the Settlement Agreement, the "Attached Personal Property" is described as the "personal property at several locations" that was levied upon pursuant to the writs obtained by the Trustee. It is undisputed that the locations at which the levies occurred included BOC.

Under the writs that were served on BOC, the Trustee levied upon "any and all property" in the possession of BOC for the "account, use or benefit" of Calvin A. Phelps and Lisa Yamaoka and obtained a lien "on all tangible Property" of Calvin Phelps and Lisa Yamaoka located at BOC. Under this broad language, the levy and attachment extended to and included the contents of the safe deposit boxes at BOC in the names of Calvin Phelps and Lisa Yamaoka. The structure of the settlement that was reached by the parties was one in which the Trustee was to retain all of the assets except for those on the "Phelps Wish List" that were agreed to by the Trustee. The assets described in the settlement included the cash available from the bank accounts at BB&T and BOC. Paragraph 2(e) of the Settlement Agreement recites that there were bank accounts at BB&T and BOC and provides for $25,000 of the funds at BOC to be paid to the attorney for the Phelps. Under the settlement and the Settlement Agreement, the Phelps received no funds directly. After providing for the $25,000 payment to the attorney, Paragraph 2(e) then provides that the "Trustee shall retain the balance of the funds in the BOC Accounts" as well as all of the funds ($179,949.71) on deposit at BB&T. Thus, consistent with the settlement, the Trustee was to receive the rest of the cash.[2]

---

[2]Prior to the hearing on the Trustee's motion for approval of the settlement, the parties learned that the Phelps did not have sufficient funds on deposit at BOC to pay $25,000 to their attorney. Consistent with the agreement that $25,000 was to be paid to the Phelps' attorney, the Settlement Agreement was amended to allow the remainder of the $25,000 to be paid from the money on

Why then did the Settlement Agreement not explicitly refer to the cash located in the safe deposit boxes? The answer is because both parties mistakenly believed that there was nothing in the safe deposit boxes and hence no need to refer to the safe deposit boxes. While the Trustee learned of the existence of the safe deposit boxes on March 26, 2012, prior to court approval of the settlement, he was told at the same time that there was nothing in the boxes. This information came from the attorney for BOC and according to the Trustee was accepted as being accurate and correct. Nor had the Phelps at any time prior to the settlement indicated that they had money in safe deposit boxes at BOC. The Trustee's unequivocal testimony was that until the safe deposit boxes were drilled in April of 2013, he believed that there was nothing in the safe deposit boxes located at BOC. This testimony was entirely credible and is accepted by the court as truthful and correct.

The evidence likewise established that the Phelps mistakenly believed that there was nothing in the safe deposit boxes. Both of the safe deposit boxes were obtained in May of 2005. The last time that Calvin Phelps accessed his box was in July of 2006. Lisa Yamaoka accessed her safe deposit box only twice, once in May of 2005 and once in October of 2005. According to Lisa Yamaoka, she was aware that she had a safe deposit box at BOC prior to the settlement, but believed that she had removed the money in the box

---

deposit at BB&T.

much earlier.  This testimony is consistent with a conversation the Phelps had with a bank employee in March of 2013.  The Phelps were at BOC to discuss the unpaid rent on the boxes and commented to the bank employee that there was nothing in the boxes and authorized the drilling of the boxes.  This statement and conduct on the part of the Phelps is consistent with Lisa Yamaoka's testimony that she believed that the money in the box had been removed and that the box was empty.  The court is satisfied from the evidence, taken as a whole, that the Phelps mistakenly believed that the safe deposit boxes at BOC were empty.

The arguments by Yamaoka that the Settlement Agreement may not be reformed because of waiver on the part of the Trustee and because the evidence failed to show that it was the intent of both parties that the settlement agreement include the funds in the safe deposit boxes are not accepted.  Citing McNally v. Allstate Ins. Co., 544 S.E.2d 807 (N.C. Ct. App. 2001), Yamaoka argues that the Trustee waived any claim to seek reformation of the Settlement Agreement.  As pointed out in McNally, waiver is the intentional relinquishment of a known right and may occur where one with "full knowledge of the material facts, does or forebears the doing of something inconsistent with the existence of the right." Id. at 810.  There was no intentional relinquishment by the Trustee at a time when he had full knowledge of the material facts.  Nor was there any unreasonable delay by the Trustee in seeking to reform

the Settlement Agreement. It is true that the information received by the Trustee on March 26, 2012, included a summary that indicated that the contents of Yamaoka's box were unknown. However, in the body of the email that forwarded the summary, the attorney for BOC stated unequivocally that there was no money in the safe deposit box. This latter statement was consistent with all of the negotiations with the Phelps that had occurred prior to that time, during which neither of the Phelps had ever disclosed that they had any money in a safe deposit box. When the Trustee did learn that there was money in the safe deposit boxes on April 30, 2013, he filed the Motion that is now before the court a little more than a month later on June 13, 2013. These circumstances do not reflect an intentional relinquishment by the Trustee of any of his rights nor an unreasonable delay in seeking relief after he had full knowledge of the facts. Moreover, the fact that Yamaoka now says that it was not her intent that the settlement include the contents of the safe deposit box does not preclude a finding by the court that there was mutual intent to do so and that the settlement did so. The Trustee's evidence was to the contrary which created a conflict in the evidence to be resolved by the court. Having evaluated the credibility and weight of the evidence offered by both parties, the court has resolved the conflict in the evidence in favor of the Trustee and finds that the Trustee has proven by clear, cogent and convincing evidence that the terms of the

settlement that were agreed upon by both parties require that the money in the BOC safe deposit boxes be paid to the Trustee and that the reason the written Settlement Agreement did not do so is because both parties mistakenly believed that there was no money in the safe deposit boxes and hence no need to mention the boxes. It follows that the written Settlement Agreement should be reformed, and the approval order amended, to explicitly provide that the funds in the safe deposit boxes should be paid to the Trustee. An order so providing, is being entered contemporaneously with the filing of this memorandum opinion.

This 29th day of October, 2013.

*William L. Stocks*
WILLIAM L. STOCKS
United States Bankruptcy Judge